UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x
In re BARCLAYS BANK PLC            :
SECURITIES LITIGATION             :    Master File No. 1:09-cv-01989 (PAC)
                                  :
This Document Relates To:         :
                                  :
        ALL ACTIONS               :
                                  :
-------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF THE BARCLAYS DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

David H. Braff (DB-0761)
Michael T. Tomaino, Jr. (MT-6200)
Christopher A. Perrin (CP-1999)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
(212) 558-4000 (Telephone)
(212) 558-3588 (Fax)

*Attorneys for the Barclays Defendants*

April 19, 2010

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

ALLEGATIONS OF THE COMPLAINT......................................................................4

    A.    The Parties and Claims ...............................................................4

    B.    The ADS Offerings and Offering Documents .......................................5

    C.    The Alleged Misrepresentations .................................................8

STANDARD ON THIS MOTION .............................................................................10

ARGUMENT .....................................................................................................10

I.    THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT
    DOES NOT PLEAD ANY ACTIONABLE MISSTATEMENTS
    OR OMISSIONS ...........................................................................10

    A.    The Complaint Does Not Adequately Allege that Barclays'
        Disclosures Were False or Misleading at the Time They
        Were Made.....................................................................11

    B.    Barclays Did Not Have a Duty To Disclose Separately the
        Various Categories of Its Mortgage-Related Assets.........................13

    C.    Barclays' Statements About the Value of Mortgage-Related
        Assets Are Not Actionable....................................................15

        1.    The Challenged Statements Are Non-Actionable
            Opinions, Not Facts ................................................15

        2.    The Challenged Forward-Looking Statements Are
            Protected Under the PSLRA's Safe Harbor
            Provision ...........................................................17

    D.    The Complaint Fails to Allege an Actionable
        Misrepresentation Regarding Barclays' Risk Management
        Program.......................................................................19

    E.    Lead Plaintiff Martin Ettin's Claims Relating to Series 5
        Fail .........................................................................21

**Page**

II.    LEAD PLAINTIFFS LACK STANDING UNDER SECTION
       12(a)(2) ...................................................................................................................21

III.   LEAD PLAINTIFFS' CLAIMS WITH RESPECT TO THE
       SERIES 2, 3 AND 4 ADS OFFERINGS ARE TIME-BARRED ....................................22

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft* v. *Iqbal*,
  129 S. Ct. 1937 (2009) ....................................................................................................10

*ATSI Communications* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .................................................................................................3

*Basic, Inc.* v. *Levinson*,
  485 U.S. 224 (1988) .........................................................................................................11

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007) .........................................................................................................10

*Coronel* v. *Quanta Capital Holdings, Ltd.*,
  No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .............................................19

*Castlerock Management Ltd.* v. *Ultralife Batteries, Inc.*,
  114 F. Supp. 2d 316, 323 (D.N.J. 2000) ............................................................................11

*DiLeo* v. *Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ............................................................................................12

*Dodds* v. *Cigna Sec., Inc.*,
  12 F.3d 346 (2d Cir. 1993)................................................................................................23

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................................25

*Harris* v. *Ivax Corp.*,
  998 F. Supp. 1449 (S.D. Fla. 1998) ....................................................................................18

*Hunt* v. *Alliance North Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998)..............................................................................................14

*In re Alstom SA Securities Litigation*,
  406 F. Supp. 2d 402 (S.D.N.Y. 2005)............................................................................22, 23

*In re Ambac Fin. Group, Inc. Securities Litigation*,
  No. 08 Civ. 411(NRB), 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) ....................................19

*In re Ashanti Goldfields Securities Litigation*,
  184 F. Supp. 2d 247 (E.D.N.Y.2002) .................................................................................18

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Britannia Bulk Holdings Inc. Securities Litigation*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009)........................................................................15

*In re CIT Group Inc. Securities Litigation*,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)........................................................................12

*In re Citigroup, Inc. Securities Litigation*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)..................................................................20, 21

*In re Duke Energy Corp. Securities Litigation*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................................15, 20

*In re JP Morgan Chase Securities Litigation*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)........................................................................20

*In re Lehman Bros. Securities and ERISA Litigation*,
    No. 09 MD 2017 (LAK), 2010 WL 545992 (S.D.N.Y. Feb. 17, 2010)........................3, 16, 17

*In re Morgan Stanley Technology Fund Securities Litigation*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009)........................................................................13

*In re N.Y. Cmty. Bancorp, Inc. Securities Litigation*,
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ........................................................................14

*In re Take-Two Interactive Securities Litigation*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)........................................................................3

*LC Capital Parnters, Inc.* v. *Frontier Ins. Group., Inc.*,
    318 F.3d 148 (2d Cir. 2003).........................................................................................22

*Lin* v. *Interactive Brokers Group, Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008)........................................................................11

*Menowitz* v. *Brown*,
    991 F.2d 36 (2d Cir. 1993)..........................................................................................23

*New Jersey Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*,
    No. 08 Civ. 5653 (PAC) (S.D.N.Y. Mar. 29, 2010) ....................................... passim

*New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*,
    No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ...............................3, 16

*New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group*,
    No. 08 CV 5093 (HB), 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) .....................................3

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Newman* v. *Warnaco Group Inc.*,
   335 F.3d 187 (2d Cir. 2003)................................................................................23

*Panther Partners* v. *Ikanos Communications, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008)........................................................10, 12, 15

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of
   Commerce*,
   No. 08 Civ. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010)...................1

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
   658 F. Supp. 2d 299, 305 (D. Mass. 2009) ..............................................................22

*Rombach* v. *Chang*,
   355 F.3d 164 (2d Cir. 2004)....................................................................................19

*Rubin* v. *MF Global, Ltd.*
   634 F. Supp. 2d 459 (S.D.N.Y. 2009).....................................................................20

*Salomon Analyst Level 3 Litigation*,
   373 F. Supp. 2d 248 (S.D.N.Y. 2005).....................................................................16

*Shah* v. *Meeker*,
   435 F.3d 244 (2d Cir. 2006)....................................................................................23

*Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*,
   No. 08 Civ. 10637 (LAK), 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010)............3, 16

*Tsc Indus.* v. *Northway*,
   426 U.S. 438, 449 (1976)........................................................................................11

*Yu* v. *State Street Corp.*,
   No. 08 Civ. 8235 (RJH), 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010) ..........passim

*Zirkin* v. *Quanta Capital Holdings Ltd.*,
   No. 07 Civ. 851 (RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009).......................11

**STATUTES AND RULES**

15 U.S.C. § 77m..........................................................................................................22

15 U.S.C. § 77z...........................................................................................................19

15 U.S.C. § 78u...........................................................................................................18

**TABLE OF AUTHORITIES**
(continued)

<u>**Page(s)**</u>

FED. R. CIV. P. 12(b)(6)...........................................................................................1, 10

The Barclays Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Complaint (the "Complaint" or "CAC") in this action with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, for lack of standing and as barred by the statute of limitations.

## PRELIMINARY STATEMENT

This case is one of dozens of putative federal securities law class actions brought in the wake of the unanticipated and unprecedented global financial crisis that began to unfold in the second half of 2007, and ultimately devastated the housing, mortgage and credit markets. *See Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143 (WHP), 2010 WL 961596, at *11 (S.D.N.Y. Mar. 17, 2010) (referring to the "mortgage crisis" that defendant bank, "like so many other institutions, could not have been expected to anticipate"). As the crisis deepened, many banks and other financial institutions announced write downs of their mortgage-related assets and other financial instruments affected by the crisis. Barclays did so as well.

With the benefit of 20/20 hindsight, Lead Plaintiffs assert claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"), challenging four separate offerings of Barclays' American Depository Shares, which are similar to preferred stock, during the period from April 2006 through April 2008 (the "ADS Offerings"). In essence, Lead Plaintiffs complain that Barclays did not foresee the historic collapse of the global financial markets or its impact on mortgage-related securities and other assets owned by Barclays.

---

[1]    The Barclays Defendants are Barclays Bank PLC ("Barclays"), Barclays PLC and the following current or former members of Barclays' Board of Directors: Marcus Agius, Matthew William Barrett, David Booth, Sir Richard Broadbent, Richard Leigh Clifford, Fulvio Conti, Daniel Cronje, Dame Sandra J.N. Dawson, Robert Edward Diamond, Jr., Gary Hoffman, Naguib Kheraj, Sir Andrew Likierman, Christopher Lucas, Sir Nigel Rudd, Stephen George Russell, Frederik Seegers, John Michael Sunderland and John Silvester Varley.

The Complaint alleges that the ADS Offering Documents, which incorporated various Barclays financial statements, were materially misleading because they did not adequately disclose or accurately value Barclays' holdings of mortgage-related assets. In summary, the Complaint cites three categories of alleged misrepresentations: (i) Barclays' failure to disclose its holdings of various sub-categories of mortgage-related assets in line-item fashion; (ii) Barclays' alleged overvaluation of those assets and failure to take timely write downs; and (iii) Barclays' allegedly inaccurate description of its risk-management systems. The Complaint is based entirely on hindsight: it alleges in wholly conclusory fashion that, because Barclays wrote down the values of various mortgage-related assets in late 2007 and 2008, Barclays' earlier valuations in the Offering Documents must have been false at the time they were made. But a mere "backward-looking assessment" such as this is not sufficient to state a claim for a violation of Section 11 or 12(a)(2) of the 1933 Act. *Yu* v. *State St. Corp.*, No. 08 Civ. 8235 (RJH), 2010 WL 668645, at *6 (S.D.N.Y. Feb. 25, 2010). The Court should dismiss the Complaint for several reasons.

*First*, Lead Plaintiffs' claims under Sections 11 and 12(a)(2) fail because they do not adequately plead that the ADS Offering Documents contained any actionable misstatement or omission of material fact. The Offering Documents adequately disclosed Barclays' mortgage-related assets, and Barclays did not have a duty to disclose separate categories of those assets with the level of detail that the Complaint asserts was necessary.

The Complaint's related allegations—that Barclays carried those assets at inflated values on its financial statements and waited too long before writing them down—are insufficient as a matter of law because Barclays' valuations and its decision to write down certain assets are subjective opinions, not statements of fact. As this Court recognized just last

month, a subjective opinion is actionable under Sections 11 and 12(a)(2) only if a complaint alleges that the speaker did not hold that opinion at the time it was disclosed. *See N.J. Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*, No. 08 Civ. 5653 (PAC), Mem. Op. at 12 (S.D.N.Y. Mar. 29, 2010) (Ex. W).[2] Here, the Complaint contains no such allegation. Instead, it hinges entirely on the conclusory assertion that Barclays' decisions to write down the values of certain assets—made in the throes of an escalating global financial meltdown— somehow suggest that Barclays earlier issued valuations were inflated. But the Complaint does not allege that Barclays knew in the earlier periods that its mortgage-related assets were valued inappropriately. In fact, the Complaint *expressly disclaims* any allegation that the Barclays Defendants acted with fraudulent intent, thus negating any inference that they knew that their valuations or write down decisions were incorrect at the time. (CAC ¶¶ 212, 223, 229.) Indeed, this Court in the *DLJ Mortgage* decision, and Judge Kaplan and Judge Baer in four other recent decisions, have dismissed Section 11 and 12(a)(2) claims based on analogous opinion statements (*e.g.*, asset appraisals, credit ratings) absent allegations that the defendants did not believe the statements at the time they were made.[3] In addition, the challenged forward-looking statements are protected by the safe harbor provision of the Private Securities Litigation Reform Act

---

[2]    References in this memorandum to "Ex. __" refer to exhibits attached to the Declaration of Christopher A. Perrin ("Perrin Decl.") submitted herewith. The Complaint is attached to the Perrin Decl. as Ex. A. On a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008) (citing *ATSI Commc'ns* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[3]    *See N.J. Carpenters Health Fund* v. *Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528, at *11 (S.D.N.Y. Mar. 31, 2010) (Baer, J.); *N.J. Carpenters Vacation Fund* v. *Royal Bank of Scot. Group*, No. 08 CV 5093 (HB), 2010 WL 1172694, at *14 (S.D.N.Y. Mar. 26, 2010) (Baer, J.); *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, No. 08 Civ. 10637 (LAK), 2010 WL 816623, at *4 (S.D.N.Y. Mar. 11, 2010) (Kaplan, J.); *In re Lehman Bros. Sec. and ERISA Litig.*, No. 09 MD 2017 (LAK), 2010 WL 545992, at *9 (S.D.N.Y. Feb. 17, 2010) (Kaplan, J.).

("PSLRA").

*Second*, Lead Plaintiffs' Section 12(a)(2) claim fails for lack of statutory standing because Lead Plaintiffs do not allege that they purchased their shares *from* any of the Defendants or *in* the public offerings, both of which are required to bring a Section 12(a)(2) claim.

*Third*, the applicable statute of limitations bars Lead Plaintiffs' claims with respect to all but one of the four ADS Offerings in question because, as is apparent even on the face of their pleadings, Lead Plaintiffs had at least inquiry notice of their purported claims more than one year before they filed them.

*Finally*, Lead Plaintiffs' Section 15 "control person" claim fails because the Complaint does not state a claim for an underlying primary violation of Section 11 or 12(a)(2).

## ALLEGATIONS OF THE COMPLAINT

### A.    The Parties and Claims

Lead Plaintiffs Mr. Friedus, Ms. Mahboubi, Mr. and Mrs. Thompson and Mr. Ettin purport to represent a putative class of investors who purchased Barclays' American Depository Shares issued in four Offerings during the period April 2006 through April 2008. (CAC ¶¶ 1,18-21.)  The Complaint challenges all four ADS Offerings, asserting claims under (i) Section 11 against all Defendants; (ii) Section 12(a)(2) against Barclays, Barclays PLC and the Underwriter Defendants; and (iii) Section 15 against the Individual Defendants.  (CAC ¶¶ 211-31.)  No Lead Plaintiff alleges that he or she purchased shares *from* any of the Defendants or *in* the ADS Offerings.  (*See id.* ¶¶ 18-21; *see also* Exs. B-E (Lead Plaintiffs' Certifications).)

Barclays was the issuer in all the ADS Offerings and is a global financial services provider with operations in the United States and other countries.  (CAC ¶¶ 1, 22.)  Barclays PLC is a holding company located in London, England, and is Barclays' parent company.  (CAC ¶ 23.)  Barclays PLC was not the issuer or an underwriter in any of the Offerings, and the

Complaint does not contain any allegations of substance against it.  Each of the Individual

Defendants is or was a member of the Board of Directors of Barclays.  (CAC ¶¶ 24-41.)

    **B.**      **The ADS Offerings and Offering Documents**

        The Complaint challenges the four ADS Offerings, specifically:  (i) Series 2

preference shares, offered in April 2006; (ii) Series 3 preference shares, offered in September

2007; (iii) Series 4 preference shares, offered in December 2007; and (iv) Series 5 preference

shares, offered in April 2008.  Barclays made these ADS Offerings pursuant to shelf registration

statements and four separate prospectus supplements that incorporated by reference various

financial statements and other SEC filings.  (*See* CAC ¶¶ 77, 105, 118, 128.)[4]

        The ADS Offering Documents clearly disclosed that Barclays held billions of

pounds worth of mortgage-related securities and had a significant mortgage securitization

business.  For example, the Series 2 and Series 3 Offering Documents disclosed that Barclays

held mortgage- and other asset-backed securities in excess of 13 billion pounds and 18.7 billion

pounds, respectively.  (Ex. G (2005 Form 20-F) at 113; Ex. H (2006 Form 20-F) at 58.)  They

also disclosed that Barclays had securitized nearly 6.3 billion pounds and 15 billion pounds of

residential mortgages in 2005 and 2006, respectively.  (Ex. G (2005 Form 20-F) at 144; Ex. H

(2006 Form 20-F) at 198.)  In addition, the Offering Documents warned investors that Barclays'

financial condition and the offered shares were subject to numerous risks.

        For example, the Series 2 Offering Documents disclosed that if certain risks were

to materialize, Barclays' "business, financial condition, and results of operations could suffer,

---

[4]      The Series 2 ADS Offering was made pursuant to a 2005 shelf registration statement.  (CAC
¶ 104.)  The Series 3, 4 and 5 ADS Offerings were made pursuant to a 2007 shelf registration statement.
(*Id.*)  This memorandum refers to the applicable shelf registration statement, prospectus supplement and
financial statements or other SEC filings incorporated by reference as the "Offering Documents" for each
Offering.

and the trading price and liquidity of the . . . ADSs could decline, in which case you could lose some or all of your investment." (Ex. F (Series 2 Pro. Supp.) at S-10.) The Offering Documents also highlighted market risks:

> The performance of financial markets may cause changes in the value of our investment and trading portfolios and in the amount of revenues generated from assets under management. We have implemented risk management methods to mitigate and control these and other market risks to which we are exposed. However, it is difficult to predict with accuracy changes in economic or market conditions and to anticipate the effects that such changes could have on our financial performance . . . .

(*Id*.) The Series 2 Offering Documents further cautioned that Barclays' risk-management "system is designed to manage rather than eliminate the risk of failure to achieve business objectives, and can only provide reasonable and not absolute assurance against material misstatement or loss." (Ex. G (2005 Form 20-F) at 29 (Series 2).) The Offering Documents for Series 3, 4 and 5 contained similar disclosures. (*See*, *e.g.*, Ex. H (2006 Form 20-F) at 60, 86 (Series 3 and 4); Ex. I (2007 Form 20-F) at 143 (Series 5).)

As the Complaint itself makes clear, in 2007 and 2008 the market was flooded with an increasing volume of media reports, corporate disclosures and market data documenting the worsening mortgage and credit market conditions. (*See*, *e.g.*, CAC ¶¶ 85-99.) The Complaint concedes, as it must, that "this collapse of the housing and mortgage market was affecting all financial institutions that had invested or participated in these markets," and that these developments were widely publicized. (CAC ¶ 88.) For example, the Complaint points specifically to numerous public disclosures about (i) increasing loan default rates; (ii) the bankruptcy of New Century, one of the nation's largest subprime mortgage originators; (iii) Barclays' purchase of EquiFirst (another mortgage originator) for 67% less than the initially announced purchase price due to EquiFirst's massive operating losses; and (iv) accelerating declines in public indices that track the values of mortgage-related securities. (*See* CAC ¶¶ 66,

88-99.)  Indeed, the Complaint goes so far as to say that, by early 2007, "market participants anticipated that the values of [certain mortgage-related securities] *were going to zero*."  (CAC ¶ 94 (emphasis in original).)

The Complaint also points to public disclosures in October and November 2007, in which various major financial institutions—including Morgan Stanley, Merrill Lynch, Citigroup, Bank of America and UBS—announced "massive losses as a consequence of the mortgage crisis" by taking significant write downs on their mortgage-related securities and other holdings affected by the crisis.  (CAC ¶¶ 112-13.)  The Complaint admits that Barclays also publicly announced write downs in a November 15, 2007 "trading update."  (CAC ¶¶ 114-15.) In this update, issued two weeks before the Series 4 Offering, Barclays announced "credit, mortgage and leveraged finance charges and write downs" of 1.3 billion pounds (roughly $2.6 billion at the exchange rate suggested in the Complaint).  (CAC ¶ 6 n.2; Ex. J (11/15/07 Trading Update) at 1.)[5]

As the crisis continued to unfold and worsen in 2008, major financial institutions, including Barclays, announced additional write downs of mortgage-related securities and other holdings, and rating agencies continued to downgrade such instruments.  (CAC ¶¶ 120-25.)  In March 2008, Bear Stearns, on the brink of collapse, announced that it would be acquired by J.P. Morgan in a "deal that had to be brokered by the Federal Reserve."  (CAC ¶ 126.)

As a consequence of the increasing turmoil in the financial markets, the April

---

[5]      This trading update was also filed on Form 6-K and stated on its cover page that "THIS REPORT ON FORM 6-K SHALL BE DEEMED TO BE INCORPORATED BY REFERENCE IN THE REGISTRATION STATEMENTS ON FORM F-3 (NOS. 333-145845) . . . ," referring to the 2007 registration statement by file number.  (*See* Ex. J (11/15/07 Trading Update); Ex. K (11/16/07 Form 6-K); Ex. L (2007 Registration Statement).)  The 2007 registration statement was one of the Series 4 Offering Documents.  (*See* CAC ¶ 118.)  Thus, the Complaint's assertion that the Series 4 Offering Documents "did not incorporate, and therefore specifically excluded, the November 15, 2007 trading update" is demonstrably false.  (*Id.*)

2008 Series 5 Offering Documents included additional disclosures about Barclays' exposure to mortgage-related securities, residential and commercial mortgage loans and other related instruments. (CAC ¶ 129.)  Like the disclosures for the prior ADS Offerings, they cautioned investors that "[t]o the extent that valuation is based on models or inputs that are not observable in the market, the determination of fair value can be more subjective."  (Ex. I (2007 Form 20-F) at 48; *see also* Ex. G (2005 Form 20-F) at 89 (Series 2); Ex. H (2006 Form 20-F) at 104 (Series 3 and 4).)  The Complaint notes that the Series 5 Offering Documents disclosed that "[i]mpairment charges and other credit provisions rose 30%" to 2.795 billion pounds, including charges relating to subprime mortgages and other credit market exposures.  (CAC ¶ 129.)

### C.    The Alleged Misrepresentations

Notwithstanding the sea of public information about the mortgage and credit market meltdown, and the voluminous information disclosed in the Offering Documents regarding Barclays' holdings of mortgage- and credit-related instruments and its significant mortgage securitization business, the Complaint alleges that the Offering Documents were materially misleading.  Although the Complaint resorts to generalized allegations that wholesale block quotations from the Offering Documents were false in their entirety (CAC ¶¶ 81-82, 107-110, 129-130), the alleged misrepresentations appear to fall into three categories.

*First*, the Complaint alleges that the Offering Documents were misleading because they did not separately disclose Barclays' holdings of specific subcategories of assets such as "Alt-A loans," "subprime loans," "RMBS," "CMBS," and "SIVs."  (*See* CAC ¶¶ 83, 111, 119.)  *Second*, the Complaint alleges that Barclays "failed to adequately write down its . . . mortgage related assets" (CAC ¶ 111(h), *see also id.* ¶¶ 119(a), 131(a)) and "improperly valued these subprime and other mortgage-based assets using internally generated valuation models" (*id.* ¶ 146), and makes largely the same allegations regarding Barclays' assessment of its

exposure to monoline insurers (*see id.* ¶¶ 68-74, 111(f), 119(c), 131(b)).  The Complaint also alleges that Barclays' failure to disaggregate subcategories of mortgage-related assets and alleged overvaluation of those assets violated various international accounting standards, Item 503 of SEC Regulation S-K and SEC Regulation S-X.  (*See* CAC ¶¶ 69, 83, 111, 119, 131, 132-51, 157, 163, 182).)  The Complaint, however, does little more than quote and paraphrase these standards and regulations, without alleging which of Barclays' disclosures allegedly violated them or in what way.  (*See*, *e.g.*, CAC ¶¶ 133-142, 144, 148-151.)  *Third*, the Complaint alleges that Barclays' descriptions of its risk management systems were misleading because Barclays' mortgage-related holdings themselves violated Barclays' risk management policies.  (*See id.* ¶¶ 83(f), 111(k), 119(h), 131(d), 181, 182.)

In an effort to shore up its challenges to Barclays' disclosures, the Complaint relies on various "post-offering events" described in news articles and Barclays' announcements. (CAC ¶¶ 186-201.)  But the Complaint nowhere alleges how these later events demonstrate that Barclays' valuations and other disclosures from *prior* periods were false *at the time* of the ADS Offerings.  There is also no allegation that Barclays believed when it issued the Offering Documents that they were false or knew what effect the financial crisis ultimately would have on Barclays' mortgage-related holdings or overall financial condition.

Although the financial crisis temporarily depressed the price of the shares issued in the ADS Offerings, the Complaint conveniently ignores the fact that the shares' prices have returned to levels near their original offering prices.  The Complaint alleges that Barclays made the ADS Offerings at $25 per share (CAC ¶ 1), but that the shares were trading in the range of only $5-7 per share on March 4, 2009 (the date of the first-filed initial complaint) (*id.* ¶ 14). Lead Plaintiffs omit, however, that on February 12, 2010—the date of the instant Complaint—

the closing prices of the shares were $21.20 per share (Series 2), $22.86 per share (Series 3),

$24.30 per share (Series 4) and $24.97 per share (Series 5).  (*See* Ex. M.)

## STANDARD ON THIS MOTION

Under Rule 12(b)(6), Fed. R. Civ. P., a complaint should be dismissed if it fails to

plead sufficient grounds to entitle the plaintiff to relief.  *Bell Atl. Corp.* v. *Twombly*, 550 U.S.

544, 555 (2007).  A complaint must contain "allegations plausibly suggesting (not merely

consistent with)" an "entitle[ment] to relief."  *Id*. at 557.  The mere possibility that a plaintiff

might prove some facts in support of its claims is insufficient to survive a motion to dismiss.

*Twombly*, 550 U.S. at 570.  Dismissal is appropriate where a plaintiff fails "to raise a right to

relief above the speculative level."  *Id.* at 555.  "A pleading that offers 'labels or conclusions' or

'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft* v.

*Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation

omitted).  "[R]everse-engineered" allegations that are "craftily drafted to imply that what only

became clear due to subsequent events was somehow known to [defendants] far earlier in time,"

do not satisfy this standard.  *Panther Partners* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662,

669-70 (S.D.N.Y. 2008) (Crotty, J.), *aff'd* 347 Fed. Appx. 617 (2d Cir. 2009).

## ARGUMENT

## I.    THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT DOES NOT PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

To state a claim under Section 11 or 12(a)(2) of the 1933 Act, a complaint must

sufficiently allege (among other things) that the registration statement or the prospectus

"contained an untrue statement of material fact or omitted to state a material fact necessary to

make the statements not misleading."[6] *Zirkin* v. *Quanta Capital Holdings, Ltd.*, No. 07 Civ. 851, 2009 WL 185940, at *9 (S.D.N.Y. Jan. 23, 2009). A misstatement or omission is material if "'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988) (quoting *Tsc Indus.* v. *Northway*, 426 U.S. 438, 449 (1976)). Section 11 and 12(a)(2) claims must be "evaluated in tandem, because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)(2)." *Yu*, 2010 WL 668645 at *3 (citation omitted).

**A.     The Complaint Does Not Adequately Allege that Barclays' Disclosures Were False or Misleading at the Time They Were Made.**

"To be actionable under Section 11, the registration statement must contain an untruth or material omission '*when such part became effective*,'" and "plaintiffs [must] 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and *were known or knowable, at the time of the offering*.'" *Lin* v. *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (quoting 15 U.S.C. § 77k(a) and *Castlerock Mgmt. Ltd.* v. *Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323 (D.N.J. 2000)) (emphasis added). Thus, "the accuracy of offering documents must be assessed in light of information available at the time they were published." *Yu*, 2010 WL 668645 at *6. Here, Lead Plaintiffs' Section 11 and 12(a)(2) claims

---

[6]     In addition, to state a claim under Section 11, a complaint must allege that "a defendant is a signer of a registration statement or a director of the issuer or an underwriter for the offering." *Zirkin*, 2009 WL 185940 at *9. The Complaint fails to allege any of these required facts as against Barclays PLC, the holding company parent of Barclays. (*See, e.g.*, CAC ¶ 23.) The Section 11 claim against Barclays PLC should be dismissed for this reason alone. Similarly, the Complaint does not allege that Individual Defendants Messrs. Agius, Booth, Conti, Cronje, Hoffman, Lucas or Seegers signed the 2005 registration statement or that they were directors at the time of the Series 2 Offering, and admits that Mr. Barrett and Mr. Kheraj did not sign the 2007 registration statement and were not directors at the time of the Series 3, 4 or 5 Offerings. (*See* CAC ¶¶ 33-41.) Thus, the claims against these Individual Defendants with respect to those Offerings should be dismissed.

are based entirely on hindsight and are insufficient to state a claim as a matter of law.

The Complaint lacks any factual allegations to support a permissible inference that Barclays inaccurately valued its mortgage-related assets at the time of the ADS Offerings or that it should have written down the asset values sooner. Subsequent events beyond Barclays' control—such as the severe market dislocation in late 2007 and 2008—do not, without more, render Barclays' earlier disclosures actionable. Barclays' decisions in November 2007 and thereafter to make additional disclosures about its specific mortgage-related assets, and to write down some of those assets, do not retroactively taint its prior disclosures and render them actionable. *See In re CIT Group Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) ("That defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective."); *Panther Partners*, 538 F. Supp. 2d at 669-70.

As Judge Easterbrook explained in *DiLeo* v. *Ernst & Young*, 901 F.2d 624 (7th Cir. 1990), hindsight allegations attacking a company's decision concerning when to take a write down are particularly ill-suited to securities-law claims:

> For any bad loan the time comes when the debtor's failure is so plain the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will not pay, we do not have fraud; we may not even have negligence.

*Id.* at 627. Judge Holwell in this District made a similar observation earlier this year in dismissing Section 11 and 12(a)(2) claims alleging inadequate disclosure of mortgage-related securities holdings and inflated valuations:

> [F]rom our vantage point on the other side of the financial crisis . . . it could be alleged that investments that were viewed by the defendants—and the marketplace—to be 'high-quality . . . investment grade instruments' in fact stood

-12-

> on shaky foundations.  But the accuracy of offering documents must be assessed
> in light of information available at the time they were published. . . .  A backward-
> looking assessment of the infirmities of mortgage-related securities, therefore,
> cannot help plaintiffs' case.

*Yu*, 2010 WL 668645 at *6 (citations omitted).  These same principles apply here.  Because the

Complaint does no more than plead a *post hoc* disagreement with the timing of Barclays'

adjustments to the valuations of its mortgage-related assets in the wake of the unprecedented

market collapse, it fails to state a claim under the 1933 Act.

> **B.    Barclays Did Not Have a Duty To Disclose Separately the Various Categories
> of Its Mortgage-Related Assets.**

The Complaint alleges that various statements in the Offering Documents were

actionable because Barclays did not break down and itemize its mortgage-related assets into

separate categories, such as "ABS CDO," "Alt-A," "subprime," "CMBS" and "SIVs." (*See* CAC

¶¶ 83, 111, 119.)  These allegations are insufficient as a matter of law because Barclays did not

have a duty to disclose its holdings with that level of granularity or detail.  *See In re Morgan*

*Stanley Tech. Fund Sec. Litig*., 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009) (no liability absent a

duty to disclose).

With respect to the Series 2 and 3 ADS Offerings, Barclays made substantial

disclosures regarding its aggregate holdings of mortgage-backed securities and its significant

mortgage securitization business, and also included abundant risk disclosures concerning its

holdings.  For example, the offering materials included the following disclosures:

- Barclays held over 13 billion pounds of mortgage- and asset-backed securities at year-end 2005.  (Ex. G (2005 Form 20-F) at 113 (Series 2).)

- Barclays' holdings of such securities increased to almost 19 billion pounds at year-end 2006.  (Ex. H. (2006 Form 20-F) at 58 (Series 3).)

- Barclays securitized nearly 6.3 billion pounds of residential mortgages in 2005.  (Ex. G (2005 Form 20-F) at 144 (Series 2).)

- Barclays securitized 15 billion pounds of residential mortgages in 2006.  (Ex. H (2006

Form 20-F) at 198 (Series 3).)

-   "The profitability of Barclays businesses could be adversely affected by a worsening of general economic conditions in the United Kingdom, globally or in certain individual markets such as the US or South Africa. . . .  An economic downturn or significantly higher interest rates could adversely affect the credit quality of Barclays on-balance sheet and off-balance sheet assets by increasing the risk that a greater number of Barclays customers would be unable to meet their obligations."  (Ex. H (2006 Form 20-F) at 60 (Series 3); *see also* Ex. G (2005 Form 20-F) at 31, 87 (Series 2).)

As recognized by the Second Circuit, where an issuer discloses its significant holdings of mortgage-related securities—as Barclays indisputably did here—there is no duty to itemize separate subcategories of these assets.  *See Hunt* v. *Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730-31 (2d Cir. 1998) (no duty to specifically disclose investment in "collateralized mortgage obligations" where prospectus disclosed "mortgage-related securities"); *Yu*, 2010 WL 668645 at *6 (no duty to disclose "particular mortgage-related holdings" where "[t]he prospectuses communicated that mortgage-related securities were significant to the [defendant's] portfolio"); *see also In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 482-83 (E.D.N.Y. 2006) (detailed disclosure regarding the use of offering proceeds to buy mortgage-backed securities is unnecessary where "it is apparent from [publicly disclosed reports] that [defendant] was heavily involved in investing in mortgage-backed securities.")

Moreover, as a consequence of the unfolding economic crisis, the Series 4 and Series 5 Offering Documents disclosed the very information that the Complaint alleges was omitted, including detailed information regarding Barclays' exposure, such as:  (i) "ABS CDO Super Senior Exposure" (high-grade 3.8 billion pounds, mezzanine 1.2 billion pounds), (ii) "Other US Subprime Exposure" (4.3 billion pounds), (iii) "SIVs and SIV-lites" (0.9 billion pounds) and (iv) "Leveraged Finance" (7.3 billion pounds).  (*See*, *e.g.*, Ex. J (11/15/07 Trading Update) at 2-3.)  The Series 5 Offering Documents also clearly disclosed that "[i]mpairment charges and other credit provisions rose 30%" to 2.795 billion pounds, including charges relating

to subprime mortgages and other credit market exposures.  (CAC ¶ 129.)  Because Barclays

plainly disclosed the information that the Complaint claims was omitted, Lead Plaintiffs' claims

fail.  *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 417 (S.D.N.Y.

2009) (Section 11 and 12(a)(2) claims based on alleged omissions failed because defendant

disclosed the relevant information).

   The Complaint also alleges in wholly conclusory fashion that Barclays'

disclosures did not comply with various accounting standards and SEC regulations regarding the

disclosure of market, credit and other risks associated with its holdings of financial instruments.

(*See* CAC ¶¶ 132-51.)  These allegations, however, do not specify "in any cognizable respect

whatever how [Barclays'] . . . accounting practices were improper," and thus do not state a claim

under the 1933 Act.  *See In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160

(S.D.N.Y. 2003).  And, as this Court observed in *Panther Partners*, a plaintiff cannot state a

claim where an issuer makes—as Barclays did here—"a fair and adequate disclosure of the risks

inherent in [its] industry, and any significant risks already materialized."  538 F. Supp. 2d at 673.

  **C.**  **Barclays' Statements About the Value of Mortgage-Related Assets Are Not
Actionable.**

   The Complaint alleges that the ADS Offering Documents were false and

misleading because Barclays inaccurately valued its mortgage-related holdings and failed to take

timely write downs.  (*See*, *e.g.*, CAC ¶¶ 6, 71, 72, 84-100, 111(h), 119(a), 131(a), 156, 183.)

Lead Plaintiffs' second-guessing of these subjective judgments does not state a claim for a

Section 11 or 12(a)(2) violation.

   **1.**  **The Challenged Statements Are Non-Actionable Opinions, Not Facts.**

   Lead Plaintiffs' claims relating to Barclays' valuations of its mortgage-related

assets fail because the Complaint does not allege that Barclays disbelieved the valuations at the

time they were disclosed.  As this Court recently observed:  "subjective opinions—as opposed to facts—are only actionable under the Securities Act if a complaint alleges that the speaker did not truly have the opinion at the time it was made public."  *DLJ Mortgage*, Mem. Op. at 12 (Ex. W) (citing *Tsereteli*).  Thus, in *DLJ Mortgage*, this Court dismissed Section 11 claims predicated on allegedly incorrect asset appraisals, loan-to-value ratios and credit ratings because plaintiffs "fail[ed] to allege that the Originators, the Rating Agencies, or the Defendants made knowingly false statements at the time they published their appraisals, loan-to-value ratios, and ratings."  *Id.*

Judge Kaplan and Judge Baer in this District also recently dismissed Section 11 and 12(a)(2) claims based on similar opinion statements for the same reason.[7]  As this Court observed, "Judge Kaplan [in *Tsereteli*] held that allegations regarding:  (a) appraisal practices, (b) loan-to-value ratios, and (c) ratings and rating methodology, are not actionable [under Section 11] where plaintiffs failed to allege knowing falsity at the time of publication."  *DLJ Mortgage*,  Mem. Op. at 12 (Ex. W).  The subjective opinions at issue in these recent cases are analogous to the Barclays valuation estimates and write down decisions being challenged here.

Barclays' valuations of its mortgage-related assets squarely qualify as opinions. "[V]aluation models depend so heavily on the discretionary choices of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions." *Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005); *see also Tsereteli*, 2010 WL 816623 at *4 n.42 (same).[8]  Moreover, the Complaint also concedes that Barclays'

---

[7]     *See Royal Bank of Scotland*, 2010 WL 1172694 at *14*; Tsereteli*, 2010 WL 816623 at *4; *In re Lehman Bros.*, 2010 WL 545992 at *9; *Residential Capital, LLC*,  2010 WL 1257528 at *11.

[8]     Indeed, Barclays disclosed that "[t]o the extent that valuation is based on models or inputs that are not observable in the market, the determination of fair value can be more subjective . . . ."  (Ex. I (2007 Form 20-F) at 48; *see also* Ex. G (2005 Form 20-F) at 89 ("[C]alculating fair value on illiquid instruments or from a valuation model may require estimation of certain pricing parameters, assumptions or model characteristics."); Ex. H (2006 Form 20-F) at 104 (same).)

valuations relied on "subjective forward-looking estimates supplied by Barclays' own management."  (CAC ¶ 146.)

Thus, to state a Section 11 or 12(a)(2) claim here, the Complaint must allege that Barclays "did not truly have the opinion at the time it was made public."  *DLJ Mortgage*, Mem. Op. at 12 (Ex. W).  This requires non-conclusory factual allegations that support a permissible inference that Barclays did not in fact hold the challenged opinions.  Indeed, Judge Kaplan dismissed 1933 Act claims in *Lehman Bros.* even though the complaint cited testimony by rating agency employees that their valuation models were known to be out-of-date and unrealistic:

> These allegations are insufficient to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued.  At best, they support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions.  Consequently, the claims based on these statements fail.

*Lehman Bros.*, 2010 WL 545992 at *6.  Here, Lead Plaintiffs' allegations are plainly insufficient. The Complaint does not contain any allegations about Barclays' knowledge or valuation methods that come close to the level of those dismissed as insufficient in *Lehman Bros*.  In fact, the Complaint *expressly disclaims* any allegations "that could be construed as alleging . . . intentional or reckless misconduct."  (CAC ¶¶ 212, 223, 229.)  Accordingly, the Complaint's Section 11 and 12(a)(2) claims fail as a matter of law.

### 2. The Challenged Forward-Looking Statements Are Protected Under the PSLRA's Safe Harbor Provision.

The PSLRA's safe harbor shields Barclays from liability for forward-looking statements, even if those statements later prove to be incorrect.  Under the safe harbor, a forward-looking statement cannot form the basis for liability where it "is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-

looking statement . . . ."  15 U.S.C. § 78u-5(c)(1)(A)(i).[9]  Asset valuations and write down

decisions are necessarily predictive and, therefore, properly considered forward-looking

statements.  *See In re Ashanti Goldfields Secs. Litig.*, 184 F. Supp. 2d 247, 266 (E.D.N.Y. 2002)

("[A]s a general rule, statements whose truth cannot be ascertained until some time after the time

they are made are 'forward-looking statements.'"); *Harris* v. *IVAX Corp.*, 998 F. Supp. 1449,

1453 (S.D. Fla. 1998) (a decision not to write down goodwill is "necessarily forward-looking").

Indeed, the Complaint concedes that Barclays' valuations relied on "subjective forward-looking

estimates supplied by Barclays' own management."  (CAC ¶ 146.)

          Barclays' valuation judgments and other forward-looking disclosures are

protected under the PSLRA safe harbor because they were accompanied by warnings about the

uncertainties involved in estimating the value of complex and illiquid securities.  Barclays

warned investors that "the process of calculating fair value on illiquid instruments or from a

valuation model may require estimation" (Ex. H (2006 Form 20-F) at 104), and that "[t]o the

extent that valuation is based on models or inputs that are not observable in the market, the

determination of fair value can be more subjective" (Ex. I (2007 Form 20-F) at 48).  Moreover,

the prospectus supplements for the ADS Offerings each contained a PSLRA safe harbor

disclosure.  For example, the Series 3, Series 4 and Series 5 prospectus supplements state:

> This prospectus supplement and certain documents incorporated by reference
> herein contain forward-looking statements . . . .  We caution readers that no
> forward-looking statement is a guarantee of future performance and that actual
> results could differ materially from those contained in the forward-looking
> statements. . . .  *Examples of forward-looking statements include, among others,
> statements regarding . . . impairment charges . . . and other statements that are*

---

[9]       A separate prong of the safe harbor provides that there is no liability for a forward-looking statement if the plaintiff fails to establish that the statement was made with "actual knowledge" that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B).  Given that the Complaint affirmatively disclaims allegations of fraudulent intent, this prong of the safe harbor applies here as well.

> *not historical fact.*
>
> By their nature, forward-looking statements involve risk and uncertainty because they relate to future events and circumstances which are subject to, among other things, domestic and global economic and business conditions, . . . *volatility in the global financial markets (such as those experienced recently). . . .* Any forward-looking statements made by or on our behalf speak only as of the date they are made.

(Ex. N (Series 3 Pro. Supp.) at S-3 (emphasis added); Ex. O (Series 4 Pro. Supp.) at S-3; Ex. P (Series 5 Pro. Supp.) at S-3; *see also* Ex. F (Series 2 Pro. Supp.) at S-3.)  When read alongside the disclaimers and risk disclosures outlined above, the challenged disclosures concerning valuations and the timing of write downs are immunized from liability under the PSLRA safe harbor.[10]

### D.    The Complaint Fails to Allege an Actionable Misrepresentation Regarding Barclays' Risk Management Program.

The Complaint alleges that various statements in the Offering Documents were false or misleading due to "the Company's . . . contravention of [its] stated risk management policies."  (CAC ¶¶ 83(f); 111(k); 119(h); 131(d).)  In essence, Lead Plaintiffs allege that—

---

[10]    The PSLRA's safe harbor does not apply to statements "included in a financial statement prepared in accordance with generally accepted accounting principles," 15 U.S.C. § 77z-2(b)(2)(A), but this exclusion does not salvage Lead Plaintiffs' claims.  The Complaint quotes long narrative passages from ADS Offering Documents—which discuss, among other things, impairment charges and valuations of mortgage-related assets—and alleges in wholly conclusory fashion that they are false and misleading in their entirety, without identifying which specific valuations or impairment charges they challenge.  (*See* CAC ¶¶ 81-83, 107-111, 118-119, 129-131.)  But the quoted disclosures are separate and distinct from "financial statements."  (*See, e.g.*, Ex. I (2007 Form 20-F) at 4-5, 25, 51, 53, quoted in CAC ¶ 129; Ex. Q (Aug. 2, 2007 Form 6-K) at 32, 43, 44, 56, quoted in CAC ¶ 110).  Consequently, the safe harbor applies to these statements.

In any event, Barclays' valuations and write down disclosures are also protected by the bespeaks caution doctrine, under which alleged misrepresentations are immaterial as a matter of law if no "reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  *Rombach* v. *Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted).  When read alongside the disclaimers and risk disclosures outlined above, Barclays' valuations satisfy the bespeaks caution doctrine.  *See, e.g.*, *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411(NRB), 2010 WL 727227, at *31 (S.D.N.Y. Feb. 22, 2010) (dismissing Section 11 claim alleging that "financial statements [were] misleading in that they understate[d] the value of [defendant's] mark-to-market losses and credit impairments"); *Coronel* v. *Quanta Capital Holdings, Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *17-18 (S.D.N.Y. Jan. 26, 2009) (applying doctrine to loss estimates in offering documents).

merely because Barclays owned mortgage-related assets—Barclays' risk management program was non-existent or not followed. This attempt to bootstrap allegations of corporate mismanagement into a securities claim is fatally flawed, not least because mismanagement is not actionable under the 1933 Act. *See In re Duke Energy*, 282 F. Supp. 2d at 160.

      *First*, Barclays' descriptions of its risk management programs and policies are not actionable because they "are too general to cause a reasonable investor to rely upon them." *ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co*., 553 F.3d 187, 205-6 (2d Cir. 2009). They are precisely the sort of "soft" statements that courts routinely find immaterial as a matter of law. *See id.* For example, in *In re JP Morgan Chase Securities Litigation*, the court found that a defendant's statement that it had "sound risk-management procedures" constituted non-actionable puffery. 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005). Moreover, Barclays repeatedly warned investors that its risk management policies were not guarantees against loss; these caveats and cautionary disclosures further demonstrate that the alleged statements about risk management are immaterial as a matter of law.[11] *See*, *e.g.*, *Rubin* v. *MF Global, Ltd.,* 634 F. Supp. 2d 459, 472-73 (S.D.N.Y. 2009).

      *Second*, a complaint challenging an issuer's disclosures about its risk management systems fails unless it alleges facts "showing that the descriptions of the [risk management] processes were false or misleading at the time they were included in the public statements, [or] facts showing that the processes were not followed." *In re Citigroup, Inc. Sec. Litig.*, 330 F.

---

[11]     For example, Barclays cautioned that risk management is "not absolute assurance against material misstatement or loss" and that "[i]t is not cost effective to eliminate all . . . business risks and in any event it would not be possible to do so" (Ex. G (2005 Form 20-F) at 29, 58; *see also* Ex. H (2006 Form 20-F) at 60 (explaining that despite risk-management efforts, "it is difficult to predict with accuracy changes in economic or market conditions and to anticipate the effects that such changes could have on the Group's financial performance"); *id.* at 86 ("[A] system [of risk control] is designed to manage rather than eliminate the risk of failure to achieve business objectives, and can only provide reasonable and not absolute assurance against material misstatement or loss.").)

Supp. 2d 367, 379 (S.D.N.Y. 2004).  Here the Complaint alleges no facts to support a

permissible inference that Barclays' holdings of mortgage-related assets were inconsistent with

Barclays' risk management policies.  Moreover, even if Barclays did not follow these policies in

one sector of its wide-ranging business, that would be insufficient to support an inference that the

statements about risk management were materially misleading.  *See id.* (allegations that

"Citigroup extended increasingly more credit to an 'unstable borrower' [Enron]" did not show

falsity of statements regarding Citigroup's risk management procedures.).[12]

> **E.    Lead Plaintiff Martin Ettin's Claims Relating to Series 5 Fail.**

Mr. Ettin is the only Lead Plaintiff who allegedly purchased Series 5 shares; thus,

he is the only one with potential standing to assert claims as to the Series 5 ADS Offering.  *See*

*DLJ Mortgage*, Mem. Op. at 5 (Ex. W).  Mr. Ettin's claims fail, however, because he purchased

his shares in September 2008, which the Complaint concedes was *after* Barclays made "adequate

disclosures of its capital credit market exposures" on August 7, 2008.  (*See* CAC ¶ 184; Ex. R

(8/7/08 Form 6-K); Ex. D (Ettin Certification).)  As explained in the Underwriter Defendants'

brief, a plaintiff may not recover under the 1933 Act if the truth about the allegedly

misrepresented information was known at the time of purchase.  (*See* Underwriter Defendants'

Br. pp. 12-13.)  Accordingly, all claims with respect to the Series 5 Offering should be dismissed.

## II.    LEAD PLAINTIFFS LACK STANDING UNDER SECTION 12(a)(2).

Lead Plaintiffs' Section 12(a)(2) claims also fail because Lead Plaintiffs do not

allege that they purchased their shares (i) *from* any of the Defendants or (ii) *in* the public

---

[12]    *In re Citigroup* was a 1934 Act securities fraud action, and the decision rested in part on the plaintiffs' failure to satisfy the strictures of Rule 9(b).  *See id.*  Nevertheless, the decision also concluded that the allegations about risk management systems failed because they did not adequately plead that any statement was materially false when issued, which is also the case here.  *See id.* at 378-79.

offerings, both of which are required for standing to bring a Section 12(a)(2) claim. Here, Lead

Plaintiffs allege only that they purchased "pursuant to or traceable to the false and misleading"

Offering Documents. (CAC ¶¶ 18-21.) As this Court recently ruled, allegations that a

"[p]laintiff purchased [securities] 'pursuant and traceable to'" certain Offering Documents "[are]

insufficient to assert standing for Section 12 claims." *DLJ Mortgage*, Mem. Op. at 6-7 (Ex. W)

(citing *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 658 F.

Supp. 2d 299, 305 (D. Mass. 2009)). Accordingly, Lead Plaintiffs' Section 12(a)(2) claims

should be dismissed.

### III.    LEAD PLAINTIFFS' CLAIMS WITH RESPECT TO THE SERIES 2, 3 AND 4 ADS OFFERINGS ARE TIME-BARRED.

Lead Plaintiffs' claims with respect to the Series 2, 3 and 4 ADS Offerings should

also be dismissed for the independently sufficient reason that they are barred by the one-year

statute of limitations applicable to Section 11, 12(a)(2) and 15 claims. *See* 15 U.S.C. § 77m.

The one-year period begins to run when a plaintiff has actual notice or inquiry notice of the

alleged misstatement or omission. *Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 349-50 (2d Cir.

1993). A plaintiff does not need "notice of the entire wrongdoing" to trigger inquiry notice. *In*

*re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005). Rather, inquiry notice is

triggered by "financial, legal or other data, such as public disclosures in the media . . . that

provide a plaintiff with sufficient storm warnings to alert a reasonable person to the probability

that there may have been misleading statements or material omissions involved in the sale of the

securities at issue." *Id.*; *see also Dodds*, 12 F.3d at 350. [13]

---

[13]    "When the facts from which knowledge may be imputed are clear from the pleadings and the papers and filings integral to the complaint, the question of inquiry notice may properly be resolved on a motion to dismiss." *In re Alstom*, 406 F. Supp. 2d at 421-422; *see also LC Capital Partners, Inc.* v. *Frontier Ins. Group., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003); *Dodds*, 12 F.3d at 352 n.3.

Here, Barclays' detailed disclosures on November 15, 2007 and February 19, 2008 regarding its mortgage-related exposure and write downs "relate[] directly to the misstatements or omissions" alleged in the Complaint. *See Newman* v. *Warnaco Group Inc*., 335 F.3d 187, 193 (2d Cir. 2003). [14]  In fact, the Complaint bases its allegations that the Offering Documents were misleading on information that was clearly set forth in these two Barclays disclosures.  (*See*, *e.g.*, CAC ¶¶ 83, 111, 119.)  Thus, the November 15, 2007 disclosure triggered inquiry notice with respect to the April 2006 Series 2 Offering and the September 2007 Series 3 Offering, and the February 19, 2008 disclosure triggered inquiry notice with respect to the November 2007 Series 4 Offering, as explained further below.

*Series 2 and 3.*  Lead Plaintiffs were on inquiry notice with respect to their Series 2 and 3 claims no later than November 15, 2007, when Barclays issued the "trading update" described in the Complaint.  The table below shows that the information allegedly omitted from the Series 2 and 3 Offering Documents was disclosed in the trading update and Barclays' Form 6-K filed the next day.  (*Compare* Ex. J (11/15/07 Trading Update); Ex. K (11/16/07 Form 6-K) *with* CAC ¶¶ 83, 111.)

| The Complaint's Allegations | November 15, 2007 Trading Update (which triggered inquiry notice) |
|---|---|
| Barclays failed to disclose in April 2006 "approximately **£7 billion** in ABS CDOs backed by risky U.S. subprime and Alt-A mortgages and RMBS."  (CAC ¶ 83(a).) | Barclays disclosed **£7.4 billion** exposure to ABS CDO Super Seniors as of June 30, 2007.  (Ex. J at 2.) |

---

[14]    Barclays publicly filed these disclosures on SEC Forms 6-K (*see* Ex. J (11/15/07 Trading Update); Ex. K (11/16/07 Form 6-K), and they were discussed in mainstream publications.  (*See*, *e.g.*, CAC ¶ 125; Exs. R-S.)  Inquiry notice may be triggered by "public disclosures in the media about the financial condition of the corporation."  *Shah* v. *Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) ("Information contained in articles in the financial press may trigger the duty to investigate"); *see also Menowitz* v. *Brown*, 991 F.2d 36, 42 (2d Cir. 1993) (government filings can provide inquiry notice).

| The Complaint's Allegations | November 15, 2007 Trading Update (which triggered inquiry notice) |
|---|---|
| Barclays failed to disclose in April 2006 "approximately **£6 billion** in U.S. subprime loans." (*Id.* ¶ 83(b).) | Barclays disclosed **£6 billion** exposure to "other U.S. subprime" in whole loan and trading book as of June 30, 2007. (*Id.* at 3.) |
| Barclays failed to disclose in September 2007 "**£5 billion** in risky ABS CDOs exposure." (*Id.* ¶ 111(a).) | Barclays disclosed **£5 billion** exposure to ABS CDO Super Seniors as of October 31, 2007. (*Id.* at 2.) |
| Barclays failed to disclose in September 2007 "**£5.4 billion** in U.S. subprime mortgage exposure, including £2.4 billion of subprime mortgages." (*Id.* ¶ 111(b).) | Barclays disclosed **£5.4 billion** of exposure to "[o]ther U.S. Sub Prime Exposure" in whole loan and trading book as of October 31, 2007. (*Id.* at 2-3.) |
| Barclays failed to disclose in September 2007 "**£7.3 billion** in leveraged finance exposure." (*Id.* ¶ 111(c).) | Barclays disclosed **£7.3 billion** in leveraged finance exposure as of June 30, 2007. (*Id.* at 3) |
| Barclays failed to disclose in September 2007 "**£900 million** in exposure to SIVs created by Barclays." (*Id.* ¶ 111(d).) | Barclays disclosed **£900 million** in SIV exposure as of June 30, 2007. (*Id.*) |

Thus, Lead Plaintiffs were on inquiry notice of their claims with respect to the Series 2 and 3 Offerings no later than November 15, 2007, and the one-year statute of limitations ran no later November 15, 2008. Yet, Lead Plaintiffs did not file their initial complaints relating to those Offerings until March 4, 2009 and April 20, 2009, respectively, so their claims are time-barred.

    *Series 4.* Lead Plaintiffs were on inquiry notice of their Series 4 claims no later than February 19, 2008, when Barclays released its 2007 annual results. (*See* Ex. U (2/19/08 2007 Results Announcement); Ex. V (2/19/08 Form 6-K).) Indeed, it is the very information that Barclays disclosed in this February 2008 announcement that the Complaint alleges was missing from the Series 4 Offering Documents:

| The Complaint's Allegations | February 19, 2008 Announcement (which triggered inquiry notice) |
|---|---|
| Barclays failed to disclose in November 2007 "**£5 billion** in exposure to risky U.S. Alt-A loans." (CAC ¶ 119(b).) | Barclays disclosed Alt-A exposure of **£4.9 billion** as of December 31, 2007. (Ex. U at 60.) |

| The Complaint's Allegations | February 19, 2008 Announcement (which triggered inquiry notice) |
|---|---|
| Barclays failed to disclose in November 2007 "**£12.4 billion** in commercial mortgage exposure, **£1.3 billion** of which was comprised of CMBS." (*Id.* ¶ 119(d).) | Barclays disclosed commercial mortgage exposure of **£12.4 billion** (comprised of £11.1 billion in loans and **£1.3 billion** in CMBS) as of December 31, 2007. (*Id.* at 60, 61.) |
| Barclays failed to disclose in November 2007 "**£1.3 billion** in net monoline insurance exposure . . . ." (*Id.* ¶ 119(c).) | Barclays disclosed monoline exposure of **£1.3 billion** as of December 31, 2007. (*Id.* at 60.) |

Thus, Lead Plaintiffs were on inquiry notice of their claims with respect to the Series 4 Offering no later than February 19, 2008, and the statute of limitations ran on February 19, 2009. Yet, Lead Plaintiffs did not file their initial complaint relating to this Offering until March 12, 2009, so their claims are time-barred.

## CONCLUSION

For the foregoing reasons, the Court should grant the Barclays Defendants' motion and dismiss the Consolidated Amended Complaint in its entirety, with prejudice.[15]

Dated:  New York, New York
      April 19, 2010

Respectfully submitted,

/s/  David H. Braff
David H. Braff (DB-0761)
Michael T. Tomaino, Jr. (MT-6200)
Christopher A. Perrin (CP-1999)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
(212) 558-4000 (Telephone)
(212) 558-3588 (Fax)

*Attorneys for the Barclays Defendants*

---

[15]  Because Lead Plaintiffs have failed to plead a primary violation of Section 11 or 12(a)(2) of the 1933 Act, their claim under Section 15 of the 1933 Act fails as well. *See ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009).

-25-

## CERTIFICATE OF SERVICE

I hereby certify that, on April 19, 2010, I caused a true and correct copy of the

foregoing Memorandum of Law in Support of the Barclays Defendants' Motion to Dismiss the

Consolidated Amended Complaint to be served on all counsel of record by filing the same with

the Court's Electronic Filing System.


_____/s/ Christopher A. Perrin_____
Christopher A. Perrin (CP-1999)