```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re BARCLAYS BANK PLC                          :
SECURITIES LITIGATION                            :      09 Civ. 1989 (PAC)
                                                 :
                                                 :      ORDER
----------------------------------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 5, 2011

HONORABLE PAUL A. CROTTY, United States District Judge:

The early 2000s experienced a sharp rise in real estate prices, which then went upside down starting in 2006-7. The sudden collapse cascaded through the financial markets, causing distress in the securities issued by banks and other financial institutions to finance real estate investment. Plaintiffs in this proceeding complain of four separate offerings ("Offerings") of American Depositary Shares ("ADS" or the "Securities") issued by Barclays Bank PLC ("Barclays") between April 2006 and April 2008 (the "Offering Period"), pursuant to two shelf registration statements and several prospectuses (collectively, the "Offering Materials"). The core complaint is that Barclays failed to disclose and to properly account for the risky real estate business in which it was engaged. Lead Plaintiffs,[1] who allegedly each purchased at least one of these Securities, bring this action against Barclays, Barclays PLC, several senior officers[2] (the "Individual Defendants"), and the investment banks that underwrote the four pertinent securities offerings[3] (the "Underwriter Defendants") (collectively, the "Defendants"). Lead Plaintiffs

---

[1] The Lead Plaintiffs are Marshall Friedus, Dora L. Mahboubi, Stewart Thompson, Sharon Thompson, and Martin S. Ettin. (Consolidated Amended Complaint ("Am. Compl.") ¶¶ 18-21.)

[2] The Individual Defendants are current or former members of Barclays' Board of Directors: Marcus Agius, Matthew William Barrett, David G. Booth, Sir Richard Broadbent, Richard Leigh Clifford, Fulvio Conti, Daniel Cronje, Dame Sandra J.N. Dawson, Robert Edward Diamond, Jr., Gary A. Hoffman, Naguib Kheraj, Sir Andrew Likierman, Christopher Lucas, Sir Nigel Rudd, Stephen George Russell, Frederik Seegers, John Michael Sunderland, and John Silvester Varley. (Id. ¶¶ 24-41.)

[3] The Underwriter Defendants are A.G. Edwards & Sons, Inc., Banc of America Securities LLC, Barclays Capital Securities Limited, BNP Paribas Securities Corp., Citigroup Global Markets Inc., Goldman Sachs & Co., KeyBanc

assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"). 15 U.S.C. §§ 77k, 77l, 77o.

On April 19, 2010, Defendants moved to dismiss the Consolidated Amended Complaint ("Complaint") under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, Defendants' motion is GRANTED in its entirety.

## **BACKGROUND**[4]

Between April 2006 and April 2008, Barclays made four offerings of its American Depositary Shares[5]: (i) Series 2 securities, offered in April 2006; (ii) Series 3 securities, offered in September 2007; (iii) Series 4 securities, offered in November 2007; and (iv) Series 5 securities, offered in April 2008.  (Consolidated Amended Complaint ("Am. Compl.") ¶¶ 77, 105, 118, 128.)  In total, Barclays issued a total of 218 million ADSs at $25 per share, for proceeds of $5.45 billion.  (Id. ¶ 1.)  Lead Plaintiffs bought shares during the Offering Period "issued pursuant or traceable to" the allegedly false and misleading Offering Materials.  (Am. Compl. ¶¶ 18-21.)  They claim that the Offering Materials accompanying these Securities Offerings contained materially false and misleading statements because Barclays (a) failed to timely and adequately disclose and write down its exposure to risky credit market assets, (id. ¶¶ 6, 12), (b) failed to comply with applicable accounting standards and SEC requirements, (id. ¶¶ 132-51), and (c) misleadingly assured investors that Barclays' extensive risk management practices helped it avoid such credit market risks (id. ¶ 11).

---

Capital Markets, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co., Inc., RBC Dain Rauscher Inc., SunTrust Capital Markets, UBS Securities LLC, Wachovia Capital Markets, LLC, and Wells Fargo Securities, LLC. (Id. ¶¶ 43-56.)
[4] The facts in this section are drawn from the Consolidated Amended Complaint and are assumed to be true for the purposes of this motion.
[5] American Depositary Shares are U.S. dollar-based shares of a foreign company which may be purchased on a U.S. stock exchange. The Securities here are non-cumulative callable dollar preference shares of Barclays. (Id. ¶ 1 n.1.)

**I. Barclays' Alleged Inadequate Disclosures and Writedowns**

Lead Plaintiffs claim that Barclays reasonably should have known, but did not disclose, that it had total credit market exposure greater than £36 billion by the middle of 2007, exceeding its total equity of £32.5 billion.  (See Am. Compl. ¶¶ 6, 111, 119.)  Specifically, according to Lead Plaintiffs, Barclays held large amounts of risky mortgage-backed assets during the Offering Period, including: (1) Alt-A mortgages[6] and residential mortgage-backed securities ("RMBS")[7] with par value of over £5 billion[8] (id. ¶ 62); (2) subprime mortgages and subprime RMBS[9] with par value of over £6 billion (id. ¶ 63); (3) gross exposure to risky mortgage-backed collateralized debt obligations ("CDOs")[10] of approximately £5 billion (id. ¶ 67); (4) commercial real estate related assets of approximately £8 billion (id. ¶ 83(d)); and (5) exposure to structural investment vehicles ("SIVs"[11] and "SIV-lites"[12]) of £0.9-1.6 billion (id. ¶ 75).

In 2006, mortgage loan defaults rose dramatically when housing prices began to stall and interest rates began to rise.  (Id. ¶ 3.)  Default rates for subprime and Alt-A mortgages increased, driving down the value of the securities backed by those mortgages, leading in turn to a cascading effect on the credit markets.  (Id.)   Specialized indices such as the ABX.HE

---

[6] "'Alt-A' is shorthand for 'Alternative to Agency,' . . . . An Alt-A loan falls just above subprime status, but below that of a 'prime' loan because of deficiencies in the borrower's credit profile." (Id. ¶ 62.)
[7] RMBS "were created by originating and purchasing thousands of residential mortgages, pooling them together, and then issuing securities that entitled the purchaser to a specified payout of the cash generated when borrowers made payments on the underlying mortgages." (Id. ¶ 60.)
[8] Lead Plaintiffs suggest an exchange rate of 1.99 dollars to the pound — the average from January 1, 2007 to April 8, 2008 — for purposes of comparing pounds ("£") to dollars ("$").  (Id. ¶ 6 n.2.)
[9] "'Subprime RMBS,' are residential mortgage-backed securities in which the underlying collateral consists of subprime mortgages." (Id. ¶ 63.)
[10] "[A] CDO is a structured finance vehicle holding pools of underlying cash generating assets and issuing certificates paying a fixed amount of principal and interest." (Id. ¶ 4.)
[11] "SIVs were generally constructed to make money by selling short-term debt and buying longer-dated and higher-yielding assets including bank bonds, mortgage-backed securities and collateralized debt obligations." (Id. ¶ 75.)
[12] "SIV-lites . . . are essentially CDOs which pool together bonds backed by mortgages and other asset-backed debt. The main difference is that other CDOs sell long-term senior debt to fund their assets while SIV-lites raise senior debt in the short-term asset-backed commercial paper or asset-backed commercial paper markets." (Id. ¶ 169; see also id. at ¶ 75.)

3

("ABX")[13] and the TABX.HE ("TABX")[14] — relied upon by market experts, analysts, and Barclays itself — indicated substantial declines in the value of RMBSs and CDOs beginning in late 2006. (Id. ¶¶ 92-100.) Lead Plaintiffs claim that "[t]he collapse of the ABX and TABX indices made it clear that the value of Barclays' subprime/non-prime-backed RMBS/CDOs and other subprime/non-prime-related assets had declined significantly prior to the September 2007 [Series 3] Offering." (Id. ¶ 100.) Lead Plaintiffs claim, however, that, unlike other banks, Barclays did not timely disclose or write down its massive losses owing to the mortgage crisis. (See id. ¶¶ 6-12, 112-13).) Instead, Barclays sold ADSs through the four Securities Offerings in order to bolster its capital base. (See id. ¶ 7.)

On November 15, 2007 (after the Series 2 and 3 Offerings), however, Barclays issued an unscheduled "Trading Update" in which it allegedly "partially and misleadingly" disclosed Barclays' exposure to the U.S. subprime mortgage and credit markets of approximately £18.4 billion. (Id. ¶¶ 114-15.) Lead Plaintiffs claim that, in actuality, as of November 30, 2007, Barclays' total credit market exposure was approximately £35 billion. (Id. ¶119.) Moreover, the trading update disclosed for the first time that Barclays had written down £1.5 billion on its CDO and subprime exposure as of October 2007 and reassured the market that Barclays' "liquidity position remain[ed] very strong," especially in comparison to its competitors' substantial writedowns. (Id. ¶¶ 115-17.) Three months later, on February 19, 2008, in announcing its 2007 Annual Results, Barclays increased its writedowns on these assets to £1.6 billion, which, combined with the fact that its annual profit purportedly met forecasts, "sent its shares soaring."

---

[13] "The ABX index, developed in 2006, was designed to track the value of RMBS tranches at each rating level (AAA, AA, A, BBB and BBB-)." (Id. ¶ 92.)
[14] "[T]he TABX index, launched in 2007 by a consortium of banks attempts to replicate the market value of a basket of RMBS and CDOs. The TABX index accounts for high levels of subordination and therefore provides a benchmark for the value of senior MBS." (Id. ¶ 92.)

(Id. ¶¶ 124-25.)  Reuters also reported that "Barclays said it remains confident it knows where its risks are and is comfortable with the current levels of writedowns."  (Id. ¶ 125.)

Lead Plaintiffs claim that Barclays continued to make inadequate disclosures until it released its 2008 interim results (as of June 30, 2008), in which it disclosed that its first-half net income declined 34 percent, largely owing to a massive writedown of £2.8 billion in credit-related assets.  (Id. ¶¶ 184, 190.)  Further, Barclays allegedly did not make certain imperative disclosures until it released its 2008 annual report.  (Id. ¶ 184.)

Defendants point out, however, that the Series 2 and Series 3 Offering Materials, for example, disclosed that Barclays held over £13 billion and £18.7 billion, respectively, of mortgage- and other asset-backed securities.  (Perrin Decl., Ex. G (2005 Form 20-F) at 113; Ex. H (2006 Form 20-F) at 58.)  In addition, Barclays disclosed that it had securitized approximately £6.3 billion and £15 billion of residential mortgage loans in 2005 and 2006, respectively.  (Perrin Decl., Ex. G (2005 Form 20-F) at 144; Ex. H (2006 Form 20-F) at 198.)  Moreover, Barclays' 2007 annual report stated that "[i]mpairment charges and other credit provisions rose 30% to £2,795 [million].  Impairment charges relating to US sub-prime mortgages and other credit market exposures were £782 [million]."  (Am. Compl. ¶ 129 (citing 2007 Form 20-F).)

The Offering Materials also cautioned investors that there were numerous risks associated with Barclays' financial condition and the offered shares.  For instance, the Series 2 prospectus supplement warned that if certain risks — including market risks — were to materialize, Barclays' "business, financial condition, and results of operations could suffer, and the trading price and liquidity of the . . . ADSs could decline, in which case you could lose some or all of your investment." (Perrin Decl., Ex. F (Series 2 Prospectus Supplement ("Pro. Supp.")) at S-10.)  The Offering Materials also warned investors that "[t]o the extent that valuation is

based on models or inputs that are not observable in the market, the determination of fair value can be more subjective." (Perrin Decl., Ex. I (2007 Form 20-F) at 48; see also Ex. G (2005 Form 20-F) at 89; Ex. H (2006 Form 20-F) at 104.)

**II. Barclays' Alleged Failure to Comply with Accounting and SEC Requirements**

Since Barclays is a publicly traded company, the EU Commission requires Barclays to issue financial statements in compliance with the International Financial Reporting Standards ("IFRS"). (Id. ¶ 132.)  IFRS No. 7 Financial Instruments: Disclosures ("IFRS 7") requires that financial statements provide disclosures that allow investors to evaluate (a) the significance of financial instruments, such as subprime-backed CDOs and other subprime-related assets, to the company's financial position and performance, as well as (b) the nature and extent of risks stemming from these financial instruments and how the company manages these risks. (Id. ¶¶ 135, 137; see also Id. ¶¶ 138-41.)  According to Lead Plaintiffs, "[a]s the subprime/non-prime crisis worsened, Barclays was required at the end of each period to value its subprime/non-prime-backed CDOs and other assets at their true fair value based on the then-current market conditions — not a hypothetical value based on Barclays' own internal assumptions." (Id. ¶ 145.) For example, Lead Plaintiffs claim that Defendants "reasonably should have known that the ABX should have been used in valuing RMBS and CDOs and that disregarding this market index in [Barclays'] mark-to-market valuations was a violation of IFRS." (Id. ¶ 96, 100.) Instead, Lead Plaintiffs claim that Defendants neither disclosed nor wrote down its RMBS and CDO holdings until November 2007, and did not adequately write down the value of these assets until the end of 2008. (Id. ¶ 145.)

Lead Plaintiffs also claim that Barclays' Offering Materials failed to comply with SEC Regulations S-K and S-X. (Id. ¶ 151.)  Pursuant to Item 503 of Regulation S-K, 17 C.F.R. §

229.503(c), Registration Statements and Prospectuses are required to disclose a "discussion of the most significant factors that make the offering speculative or risky" and an explanation of "how the risk affects the issuer or the securities being offered." (Id. ¶ 142, 148.) SEC Article 10-01 of Regulation S-X, 17 C.F.R. § 210.10-01, indicates that while disclosures in interim period financial statements need not duplicate those contained in the most recent audited financial statements, "where material contingencies exist, disclosures of such matters shall be provided even though a significant change since year end may not have occurred." (Id. ¶ 149.) According to Lead Plaintiffs, the disclosures in the Offering Materials failed to sufficiently warn investors of the actual risks related to Barclays' credit market exposure.

### III. Barclays' Allegedly Misleading Emphasis on its Risk Management Practices

Lead Plaintiffs also allege that Barclays misleadingly boasted at length about its stringent risk management practices. (See id. ¶¶ 81, 108, 130, 155, 161-63.) For example:

> Barclays reassured investors that "Barclays actively manages its credit exposures." Barclays also stated that "[w]hen weaknesses in exposures are detected — either in individual exposures or in groups of exposures — action is taken to mitigate the risks." Barclays also claimed that it "manages the diversification of its portfolio to avoid unwanted credit risk concentrations." Indeed, Barclays claimed that "the identification and management of risk remains a high priority and underpins all our business activity."

(Id. ¶ 155.) According to Lead Plaintiffs, the four Offering Materials extolled Barclays' "healthy" capital position and "well controlled" market risk, while failing to disclose current information about Barclays' risk exposure, and only providing information about Barclays' past financial condition. (See id. ¶¶ 80-81, 106, 111, 128-30, 153-55, 157-166, 179-184.) Barclays points out, however, that the Offering Materials for each Series warned that Barclays' risk-management "system is designed to manage rather than eliminate the risk of failure to achieve business objectives, and can only provide reasonable and not absolute assurance against material

misstatement or loss." (See, e.g., Perrin Decl., Ex. G (2005 Form 20-F) at 29; Ex. I (2007 Form 20-F) at 143.)

**PLEADING STANDARD**

Lead Plaintiffs' complaint "expressly exclude[s] and disclaim[s] any allegation that could be construed as alleging fraud or intentional or reckless misconduct," and specifically sounds in strict liability and negligence. (Am. Compl. ¶¶ 212, 223, 229)  Accordingly, although the question is not free from doubt, the Court will utilize the conventional pleading standards of Fed. R. Civ. P. 8 and will not impose the stricter pleading standards of Fed. R. Civ. P. 9 and the Private Securities Litigation Reform Act ("PSLRA").

Under Rule 8, a pleading must "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  When considering a Fed. R. Civ. P. 12(b)(6)  motion, the court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the nonmoving party.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007); see Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

Allegations which are only legal conclusions, however, are not assumed to be true. See Iqbal, 129 S.Ct. at 1949.  Dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) is appropriate if the plaintiff has failed to offer factual allegations sufficient to render the asserted claim plausible on its face.  See id.  To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.   "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-

8

me accusation." Id. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (citation omitted). Stated differently: although legal conclusions can form the framework of a complaint, they must be supported by factual allegations. See id.

## DISCUSSION

Defendants make three principal arguments in support of their motion to dismiss: (1) Lead Plaintiffs lack standing to assert claims under Section 12(a)(2) because they did not adequately allege that they purchased securities directly from the Offerings; (2) Lead Plaintiffs' claims with respect to the Series 2, 3, and 4 Offerings are time-barred; and (3) Lead Plaintiffs fail to allege viable claims under Sections 11, 12(a)(2), and 15.

**I. Sections 11 and 12(a)(2)**

"Sections 11 and 12(a)(2) are Securities Act siblings with roughly parallel elements." Fait v. Regions Fin. Corp., 712 F. Supp. 2d 117, 120 (S.D.N.Y. 2010). In order to state a claim under Section 11 or 12(a)(2), a complaint must adequately allege, among other things, that offering materials contained a false statement of material fact or omitted a material fact necessary to make a statement not misleading.[15]  15 U.S.C. §§ 77k(a), 77l(a)(2); Zirkin v. Quanta Capital Holdings, Ltd., No. 08 Civ. 851, 2009 WL 185940, *9 (S.D.N.Y. Jan. 23, 2009). "The test for determining whether the prospectus contained a material misstatement or omission is whether the defendants' representations in the prospectus, taken together and in context, would have misled a reasonable investor." Id. "A statement is actionable only if materially false or misleading at the

---

[15] Section 11 applies to registration statements, Section 12 applies to prospectuses and oral communications, and Section 15 applies to "individuals or entities that controlled any person liable for a primary violation." Freidus v. ING Groep .N.V., --- F. Supp. 2d ---, 2010 WL 3554097, *5 (S.D.N.Y. Sept. 14, 2010).

time it is made. Moreover, material omissions are actionable only if the speaker had a duty to disclose." Freidus v. ING Groep .N.V., --- F. Supp. 2d ---, 2010 WL 3554097, *5 (S.D.N.Y. Sept. 14, 2010).

A plaintiff may not plead Section 11 or 12(a)(2) claims with the benefit of 20/20 hindsight. See Yu v. State St. Corp., 686 F. Supp. 2d 369, 377 (S.D.N.Y. 2010), vacated on other grounds, No. 08 Civ. 8235, 2010 WL 2816259 (S.D.N.Y. July 14, 2010). "[T]he accuracy of offering documents must be assessed in light of information available at the time they were published. A backward-looking assessment of the infirmities of mortgage-related securities, therefore, cannot help plaintiffs' case." Yu, 686 F. Supp. 2d at 377.

## II.  Lead Plaintiffs Lack Standing to Bring Their Section 12(a)(2) Claims

In order to establish standing, a "plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984).  In a class action, a plaintiff who represents a class must allege such an injury. Lewis v. Casey, 518 U.S. 343, 357 (1996).  To bring a Section 12 claim, a plaintiff must adequately allege that he or she purchased the relevant shares directly from the defendant.  See N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc., No. 08 Civ 5653, 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010).  A complaint that alleges only that plaintiffs bought shares "pursuant and traceable to" the Offering Materials is insufficient.  See id. (citing Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 658 F. Supp. 2d 299, 305 (D.Mass. 2009) ("If plaintiffs did in fact purchase the Certificates directly from the defendants, they should have said so.  An evasive circumlocution does not serve as a substitute.")).

Here, Lead Plaintiffs allege only that they bought securities "issued pursuant or traceable to" the allegedly false and misleading Offering Materials. (See Am. Compl. ¶¶ 18-21.) As a result, Lead Plaintiffs lack standing to bring a claim under Section 12 and these claims must be dismissed.[16]

**III. Lead Plaintiffs Claims Regarding the Series 2, 3, and 4 Offerings Are Untimely**

Section 11 and 12(a)(2) claims are subject to a one year statute of limitations which commences upon "the discovery of the untrue statement or the omission [i.e., actual notice], or after such discovery should have been made by the exercise of reasonable diligence." Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475, 479 (S.D.N.Y. 2010) (quoting Securities Act § 13, 15 U.S.C. § 77m).[17] "The limitations period begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." Freidus, 2010 WL 3554097, at *6 (citation and quotation marks omitted). "Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." Id. (quoting Staehr v. The Hartford Fin. Serv. Group, Inc., 547 F.3d 406, 427 (2d Cir.2008)). "The duty to inquire can be triggered by information contained in the financial press, mainstream media, and publicly filed documents." Id. at *6. "It is well established . . . that the facts placing one on inquiry notice need not detail every aspect of the alleged fraudulent scheme, but only enough in the totality of the

---

[16] This seems to be a curable defect, as Plaintiff's counsel contended at oral argument that Plaintiffs did, in fact, purchase directly from Barclays. (See Oral Argument Tr., 16-17, Dec. 15, 2010.) Granting leave to replead, however, would be futile in light of III and IV, infra.

[17] Section 15 claims "are derivative of the other claims and thus subject to the same time limitation." Merrill Lynch, 714 F. Supp. 2d at 479 n.3.

circumstances to establish a probability of the alleged claim." Id. at *7 (citation and internal quotations omitted).

Lead Plaintiffs argue that the Supreme Court "recently rejected" this inquiry notice standard in Merck & Co. v. Reynolds, 130 S. Ct. 1784 (2010), where the Court held that "the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period." Merck, 130 S. Ct. at 1798.  Specifically, the Supreme Court held that "the limitations period . . . begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation' — whichever comes first." Id.  Merck, however, dealt with claims under Section 10(b) of the Securities Exchange Act of 1934 — "the Second Circuit has not yet had occasion to determine whether Merck requires a change in how the Circuit interprets Section 13 of the 1933 Act." Merrill Lynch, 714 F. Supp. 2d at 480.  Accordingly, the inquiry notice standard discussed in Freidus applies to this case.

A. Series 2 and 3 Offerings

Defendants claim that the November 15, 2007 trading update put Lead Plaintiffs on inquiry notice as to their claims regarding the Series 2 and 3 Offerings, arguing that the information "allegedly omitted from the Series 2 and 3 Offering Documents was disclosed in the trading update and Barclays Form 6-K filed the next day."  (Barclays Mem. 23; see Perrin Decl., Ex. J (Nov. 15, 2007 Trading Update).)   Specifically, Defendants point to particular allegations in the Complaint, which correspond directly with disclosures made in the November 15, 2007 Trading Update.  For example, Lead Plaintiffs claim that Barclays failed to disclose "approximately £7 billion in ABS CDOs backed by risky U.S. subprime and Alt-A mortgages

and RMBS[,]" (Am. Compl. ¶ 83(a)), and the November 15, 2007 Trading Update disclosed a £7.4 billion exposure to ABS CDOs.[18] (Perrin Decl., Ex. J at 2.)

It is clear that Lead Plaintiffs had inquiry notice of their claims relating to the Series 2 and 3 Offerings beginning November 15, 2007, and that, therefore, the statute of limitations with respect to these claims expired on November 15, 2008. As Lead Plaintiffs did not file their Series 2 and Series 3 claims until March 4, 2009 and April 20, 2009, respectively, those claims are time-barred. Even under the more exacting standard outlined in Merck, Lead Plaintiffs Series 2 and 3 claims would be time barred because the information disclosed in the November 15, 2007 Trading Update was precisely the information that Lead Plaintiffs claim Barclays should have disclosed earlier. Stated differently, a reasonably diligent investor would have noticed the alleged discrepancy in Barclays' disclosures as of November 15, 2007. Accordingly, the statute of limitations began to run on that date.

Lead Plaintiffs claim that the information that allegedly placed them on inquiry notice was accompanied by "reliable words of comfort from management" that a reasonable investor would have relied upon. See In re Ambac Fin. Group, Inc., 693 F. Supp. 2d 241, 276 (S.D.N.Y. 2010). As a matter of logic, however, a reasonable investor would have noticed the disclosures that Barclays made in the November 15, 2007 Trading Update and would have investigated the issue rather than look for an excuse based on allegedly comforting words. Ambac, relied on by Lead Plaintiffs, involved certain abstract "storm warnings" — including questions from Ambac's investors expressing concern about the company's mortgage-related exposures at conferences and an article alleging that Ambac was overpriced — which constituted the information that allegedly triggered inquiry notice. Id. Here, however, the information that triggered Lead

---

[18] Defendants list several other examples of these disclosures in their submission. (Barclays Mem. 23-24.)

13

Plaintiffs' notice was the very information that Lead Plaintiffs claim was not disclosed at the proper time. Comforting words cannot counteract this kind of explicit information.

B. Series 4 Offering

Defendants claim that Lead Plaintiffs were on inquiry notice of their claims relating to the Series 4 Offering beginning on February 19, 2008, the date that Barclays released its 2007 annual results. (See Perrin Decl., Ex. U (Feb. 19, 2008 Results Announcement for 2007).) Similar to the disclosures with respect to Series 2 and 3, discussed supra, the information disclosed in this results announcement was clearly the same information that Lead Plaintiffs allege that Barclays failed to disclose at the proper time. For example, Lead Plaintiffs allege that Barclays failed to disclose in November 2007 "£5 billion in exposure to risky U.S. Alt-A loans." (Am. Compl. ¶ 119(b)), but the February 19, 2008 announcement disclosed Alt-A exposure of £4.9 billion.[19] (Barclays Mem. 24; Perrin Decl., Ex. U at 60.)

It is clear that Lead Plaintiffs were on inquiry notice of their Series 4 claims on February 19, 2008. Accordingly, the statute of limitations expired on February 19, 2009. As Lead Plaintiffs filed their initial complaint on March 12, 2009, their claims with respect to Series 4 are time-barred. For the reasons stated in the discussion of the Series 2 and 3 Offerings, supra, Lead Plaintiffs Series 4 claims would be time-barred under the Merck standard as well.

**IV. The Complaint Fails to Adequately State Section 11 and 12(a)(2) Claims**

A. Barclays Adequately Disclosed and Wrote Down Its Mortgage-Related Assets

Lead Plaintiffs claim that the Offering Materials failed to disclose credit market exposures totaling £30-36 billion during the Offering Period and that Barclays failed to

---

[19] Defendants list other examples in their submission. (Barclays Mem. 24-25.)

14

adequately write down such assets in a timely manner. (See Pl. Mem. 17-19; Am. Compl. ¶¶ 6, 83, 111, 119.)

"[F]inancial valuation models depend so heavily on the discretionary choices of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions." In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005). Subjective opinions "are only actionable under the Securities Act if a complaint alleges that the speaker did not truly have the opinion at the time it was made public." DLJ Mortgage, 2010 WL 1473288, at *7; see Fait, 712 F. Supp. 2d 117, 121 (S.D.N.Y. 2010) ("An opinion is actionable under Section 11 or 12 only if the complaint alleges that the speaker did not truly hold the opinion at the time it was issued.").

The assets here "were not traded on the New York Stock Exchange or some other efficient market where the fair market value typically is the price at which a share or other asset is trading at any given moment. . . . Rather, the value of such assets is a matter of judgment and opinion." Fait, 712 F. Supp. 2d at 122-23. Since Barclays' valuations and write downs were subjective,[20] the Amended Complaint must adequately allege that Barclays did not truly believe its own valuation.[21] The complaint contains no such allegations.[22]

Lead Plaintiffs argue that Defendants' disclosures led them to believe that Barclays' securities were less risky than its competitors'. Barclays, however, offered substantial risk

---

[20] Indeed, Barclays made clear in its filings that, "[t]o the extent that valuation is based on models or inputs that are not observable in the market, the determination of fair value can be more subjective." (Perrin Decl., Ex. I (2007 Form 20-F) at 48; see also Ex. G (2005 Form 20-F) at 89; Ex. H (2006 Form 20-F) at 104.)

[21] Courts have even even found testimony by rating agency employees suggesting that their valuation models were inaccurate — testimony not found here —to be insufficient to support an inference that the entity involved did not truly believe its valuation of an asset. In re Lehman Bros. Securities and ERISA Litig., No. 09 MD 2017, 2010 WL 545992, *6 (S.D.N.Y. Feb. 17, 2010).

[22] Lead Plaintiffs argue that Defendants should have valued and written down its mortgage-backed assets in light of the subprime mortgage crisis, as reflected by the ABX and TABX indices, downgrades by rating agencies, substantial writedowns by its competitor banks, and Barclays' own extensive trading experience. (Am. Compl. ¶ 147.) Even accepting that the publicly available information compelled certain actions, "[p]laintiffs cannot state a claim that defendants misled them as to information readily available in the public domain because the law imputes knowledge of such market trends to the reasonable investor." Yu, 686 F. Supp. 2d at 377.

disclosures regarding its valuations, such as: "[i]f any of these risks occurs, our business, financial condition, and results of operations could suffer, and the trading price and liquidity of the . . . ADSs could decline, in which case you could lose some or all of your investment," (Perrin Decl., Ex. F (Series 2 Pro. Supp.) at S-10) and:

> The profitability of Barclays businesses could be adversely affected by a worsening of general economic conditions in the United Kingdom, globally or in certain individual markets such as the US or South Africa. . . . An economic downturn or significantly higher interest rates could adversely affect the credit quality of Barclays on-balance sheet and off-balance sheet assets by increasing the risk that a greater number of Barclays customers would be unable to meet their obligations.

(Perrin Decl., Ex. H (2006 Form 20-F) at 60; see also Ex. G (2005 Form 20-F) at 31, 87.)

Accordingly, in the absence of ample allegations that Barclays did not truly believe its subjective valuations, Lead Plaintiffs' claims must be dismissed.[23]

B. Defendants Had No Duty to Provide an Itemized Breakdown of Mortgage-Related Assets

Defendants assert that Barclays made considerable disclosures concerning its substantial mortgage securitization business, its aggregate holdings of mortgage-backed securities, and the risks involved. (See Barclays Mem. 13-15.) Lead Plaintiffs, however, contend that Barclays was required to itemize its mortgage-related assets into separate subcategories, such as "ABS CDO," "subprime," "SIVs," and "Alt-A." (See Am. Compl. ¶¶ 83, 111, 119.) Lead Plaintiffs, however, fail to demonstrate (1) that Barclays had an independent duty to provide such an itemization or (2) that any statements were misleading in the absence of such an itemization.

---

[23] The Court rejects Barclays' arguments that the PSLRA's "safe harbor" provision and/or the "bespeaks caution" doctrine, alone, protect them from liability. The statements at issue were made in connection with an initial public offering and so the safe harbor is not available. 15 U.S.C. §77z-2(b)(2)(D). With regard to "bespeaks caution," the statements made by Barclays were general and did not directly and expressly address its mortgage-related securities. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009). Accordingly, the "bespeaks caution" doctrine does not, in and of itself, protect Barclays' valuations.

The Second Circuit has explicitly held that such an itemization is not necessary. Hunt v. Alliance North American Government Income Trust, Inc., 159 F.3d 723, 730-31 (2d Cir. 1998) ("The contention fails because the prospectuses contained disclosures broad enough to cover these instruments."); see Yu, 686 F. Supp. 2d at 377.  The cases cited by Lead Plaintiffs to refute this point are distinguishable because they involve allegations that the defendants' itemized disclosures contained misleading statements.  See In re Citigroup. Inc. Bond Litig., 723 F. Supp. 2d 568, 589-90 (S.D.N.Y. 2010); In re MBIA, Inc. Sec. Litig., 700 F. Supp. 2d 566, 579-80 (S.D.N.Y. 2010).  There are no such allegations here.  The relevant rule is simply that "once an entity opts to include information in its registration statement . . . it has a duty to disclose any additional material fact 'necessary to make the statements [already contained] therein not misleading.'" Citigroup, 723 F. Supp. 2d  at *590 (citation omitted).

"Securities Act Sections 11 and 12 do not require an offering participant to disclose information 'merely because a reasonable investor would very much like to know' it." Freidus, 2010 WL 3554097, at *8 (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010)).  Accordingly, Barclays had no duty to further itemize its mortgage-related assets.

C.  Lead Plaintiffs' Claim that Defendants Violated Accounting and SEC Requirements Fails

The Complaint alleges that Barclays did not comply with applicable accounting standards and SEC requirements.  (See Am. Compl. ¶¶ 132-151.)  Lead Plaintiffs quote accounting standards, such as the IFRS, at length and then make such claims as "[t]he disclosure in the Registration Statements and Prospectuses failed to adequately alert investors to the actual risks associated with Barclays' investments in Alt-A and subprime mortgages, RMBS and financial institution debt securities" and  "Barclays did not comply with Item 503 of Regulation S-K, and

Regulation S-X, because it did not begin to make adequate disclosures of its capital market exposures until after all of the Offerings described herein were completed." (Am. Compl. ¶¶ 143, 151.)

As Defendants argue, however, Lead Plaintiffs fail to allege "in any cognizable respect whatever how [Barclays'] . . . accounting practices were improper." In re Duke Energy Corp. Securities Litigation, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003). Lead Plaintiffs' allegations with respect to these accounting and reporting violations are inextricably intertwined with their previously rejected arguments regarding Barclays' valuations of its assets. (See Discussion IV.A-B, supra.) Accordingly, Lead Plaintiffs have not adequately alleged that Defendants violated applicable accounting standards and SEC regulations.

D.  Barclays Did Not Misleadingly Emphasize Its Risk Management Practices

Lead Plaintiffs claim that Barclays' descriptions of its risk management practices were misleading. "[G]eneralizations regarding integrity, fiscal discipline, and risk management," however, are not actionable misstatements. In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005). Further, expressions of "corporate optimism" are not securities violations because "[u]p to a point, companies must be permitted to operate with a hopeful outlook." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

Barclays' statements, such as "[w]hen weaknesses in exposures are detected — either in individual exposures or in groups of exposures — action is taken to mitigate the risks," (id. ¶ 155), are precisely the sort of non-actionable statement that is too general for a reasonable investor to rely upon. See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009). Moreover, the Offering Materials cautioned that Barclays' risk management "system is designed to manage rather than eliminate

18

the risk of failure to achieve business objectives, and can only provide reasonable and not absolute assurance against material misstatement or loss." (Perrin Decl., Ex. G (2005 Form 20-F) at 29; Ex. I (2007 Form 20-F) at 143.)

In addition, a plaintiff challenging a defendant's disclosures regarding its risk management processes must allege facts "showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, [or] facts showing that the processes were not followed." In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004). As is obvious from previous sections, Lead Plaintiffs have not adequately made such allegations.

As a result, Lead Plaintiffs' claims regarding Barclays' statements discussing its risk management procedures must be dismissed.

E. Lead Plaintiff Martin Ettin's Claims Regarding the Series 5 Offering Must Be Dismissed

A plaintiff "may not recover under §§ 11 or 12(a)(2) if [the plaintiff] knew of the alleged untruth or omission at the time of purchase." In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001) (citation omitted). Lead Plaintiff Martin Ettin purchased his Series 5 shares in September 2008, subsequent to August 7, 2008, when the Complaint alleges that Barclays began to make "adequate disclosures of its capital credit market exposures." (Am. Compl. ¶ 184; Perrin Decl. Ex. R (8/7/08 Form 6-K).) Although Lead Plaintiffs allege that "certain vital disclosures were not made until the annual report as of December 31, 2008," the Complaint fails to identify these specific vital disclosures. Accordingly, Ettin's claims must be dismissed. As Ettin is the only named Plaintiff alleged to have purchased securities from the Series 5 Offering, all claims regarding the Series 5 Offering must be dismissed.

## V. Lead Plaintiffs Fail to State Section 15 Claims

To establish a Section 15 claim, a plaintiff must adequately allege "(1) a primary violation of . . . Section 11 or 12(a) by a controlled person or entity, and (2) direct or indirect control by the defendant of the alleged primary violator." Fait, 712 F. Supp. 2d at 125. Lead Plaintiffs' failure to allege primary violations of Sections 11 and 12(a)(2), is fatal to their Section 15 claims as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. The Clerk of Court is directed to enter judgment and to close this case.

Dated: New York, New York
January 5, 2011

SO ORDERED

PAUL A. CROTTY
United States District Judge