UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ——————————————— x |  |  |
| In re BARCLAYS BANK PLC SECURITIES LITIGATION | : : : | Master File No. 1:09-cv-01989-PAC <u>CLASS ACTION</u> |
| ——————————————— | : : | |
| This Document Relates To: | : : | |
|    ALL ACTIONS. | : : | |
| ——————————————— x | | <u>DEMAND FOR JURY TRIAL</u> |

SECOND CONSOLIDATED AMENDED COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

596508_1

**NATURE OF THE ACTION**

1.      This is a securities class action on behalf of all persons who acquired preferred securities pursuant or traceable to the materially false and misleading Registration Statements and Prospectuses filed with the United States Securities and Exchange Commission ("SEC") by Barclays Bank Plc ("Barclays" or the "Company") (the "Class").[1]  The two Shelf Registration Statements were filed on September 14, 2005 ("2005 Registration Statement") and August 31, 2007 ("2007 Registration Statement") (collectively, the "Registration Statements");[2] the four Supplemental Prospectuses were filed on April 21, 2006, September 10, 2007, November 30, 2007 and April 8, 2008 (collectively, the "Offering Materials").  All told, from April of 2006 through April of 2008, Barclays consummated four offerings of the Securities pursuant to the false and misleading Registration Statements and Prospectuses (the "Offerings"), selling 218 million shares of the Securities at $25 per share for proceeds of $5.45 billion.  This action asserts claims under the Securities Act of 1933 ("1933 Act") against Barclays, Barclays Plc, its senior insiders, and the investment banks that underwrote the Offerings of the Securities (collectively, "defendants").

**INTRODUCTION**

2.      Between 2005 and 2008, Barclays significantly increased its exposure to risky credit market instruments, including:

---

[1]      In compliance with the Second Circuit's order in this matter, plaintiffs are hereby filing the Second Consolidated Amended Complaint they originally sought leave to file.  Plaintiffs acknowledge that the Second Circuit affirmed the Court's order dismissing plaintiffs' claims for the Series 2, 3 and 4 Offerings, and plaintiffs are no longer pursing claims regarding those three offerings.

[2]      The securities at issue (collectively, the "Securities") are Non-cumulative Callable Dollar Preference Shares, Series 2, 3, 4 and 5, sold in the form of American Depository Shares ("ADRs ") of Barclays.

- 1 -

- Residential Mortgage-Backed Securities ("RMBS");

- Collateralized Debt Obligations ("CDOs");

- Structural Investment Vehicles ("SIVs" and "SIV-lites");

- Commercial Mortgages and Commercial Mortgage-Backed Securities ("CMBS");

- Monoline insurers; and

- Leveraged finance instruments.

During this period, Barclays and the Individual Defendants caused the Company to acquire tens of billions of dollars in these highly risky securities and assets, or guarantee such investments by others. In fact, *the Company's total exposure to these high-risk assets during the relevant period actually exceeded the Company's total equity*.

3.     Subprime and Alt-A (non-prime) RMBS are securities backed by residential mortgages extended to borrowers who do not qualify for standard loans.  Such loans are inherently more risky than RMBS backed by conforming loans.  The value of Barclays' subprime and Alt-A RMBS/CDO portfolios was directly tied to the strength (or weakness) of the U.S. housing market. When housing prices began to stall and interest rates began to rise in early 2006, homeowners who overextended themselves and those with poor credit and unstable income began to default on their loans.  Default rates began to rise dramatically throughout 2006 and accelerated into 2007, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.

4.     Similar to RMBS, a CDO is a structured finance vehicle holding pools of underlying cash generating assets and issuing certificates paying a fixed amount of principal and interest.  The securities that were issued in each CDO were divided in "super senior," "high grade" and "mezzanine" tranches. "Super senior" tranches are paid first from the cash flow generated by the

- 2 -

CDO's underlying assets, with more junior tranches paid only after the more senior obligations had been satisfied. The assets supporting Barclays' CDOs of asset-backed securities consisted primarily of RMBS backed by pools of subprime and Alt-A mortgages, which Barclays referred to as "ABS CDOs." The quality and performance of the underlying mortgages in the RMBS was the key factor in determining the CDO's performance and value.

5.     Barclays retained "super senior" interests in both "mezzanine" and "high grade" CDOs. A mezzanine CDO is created by pooling together junior tranches (such as BBB and sub-BBB rated) of subprime RMBS and other collateral. This asset concentration means that a relatively small rise in underlying pool losses would simultaneously destroy most of the value of the mezzanine CDOs and impact the super senior tranches as well.

6.     These and other highly risky investments were material to Barclays' financial condition. In fact, Barclays' credit market exposure equaled more than £36 billion by the middle of 2007, exceeding the Company's total equity of £32.5 billion.[3] As the credit markets peaked and then began their rapid decline, Barclays' credit market assets also began declining in value, and the risks of further decline increased exponentially. Yet there was no disclosure to investors.

7.     In an effort to shore up its capital base as the mortgage and credit markets declined, Barclays issued the preferred securities at issue here. As the mortgage and credit markets deteriorated further, Barclays continued to issue more and more securities in order to shore up its depleting capital. But the financial disclosures accompanying these Offerings were both misleading and incomplete. Indeed, the prospectuses themselves contained virtually no information concerning

---

[3]     For purposes of comparing pounds ("£") to dollars ("$") plaintiffs suggest an exchange rate of 1.99 dollars to the pound, the average from January 1, 2007 to April 8, 2008.

the financial status of the Company or the risks it faced.  Defendants simply "incorporated by reference" earlier financial disclosures – even though those disclosures were both outdated and deficient.

8.      For example, in support of the $1.2 billion Series 3 Offering in September 2007, defendants included no current financial information for the Company in the Prospectus.  Instead, the Prospectus included such items as a description of the securities, how and when dividends would be paid, and what would trigger a default in the dividend payment.  Then the September 2007 Prospectus simply incorporated by reference the latest financial statements, the most recent of which was current as of June 30, 2007.  And even those financial statements were deficient, as they included almost no information concerning Barclays' credit market exposure, and the Company disclosed no impairments or losses to Barclays' credit market assets.

9.      As the mortgage and credit market decline intensified, defendants continued to sell preferred shares to investors who remained uninformed of Barclays' credit market exposure and growing losses.  In November 30, 2007, defendants completed another offering raising an additional $1.0 billion in capital.  The Series 4 Offering included a Prospectus virtually identical to the September 2007 Prospectus, and incorporated by reference the very same false and misleading documents as the Series 3 Offering.

10.     For its final $2.5 billion offering in April 2008 (Series 5), Barclays followed the same modus operandi as its earlier offerings, issuing a Prospectus that provided little information about the Company and simply incorporating by reference Barclays' fiscal year 2007 financial report on Form 20-F.  Of course, even this financial data was current only as of year-end 2007.  It did not include writedowns and impairments that would have to be taken due to the freezing of the credit markets and the collapse of Bear Stearns – all of which occurred in first quarter 2008 and *before* the Series 5

- 4 -

Offering.  And, like the prior offerings, even as of their effective date the incorporated financial results failed to properly disclose and account for impairments and writedowns attributed to the Company's vast credit market exposure.

11.     Yet at the same time defendants were failing to disclose the substantial risks and writedowns due to Barclays' exposure to the credit markets, they were boasting about the Company's considerable "risk management" practices and procedures.  Indeed, in the 2006 SEC Form 20-F, ***defendants dedicated more than 50 pages to describing Barclays' "Risk Management" practices***.  Thus, not only did defendants fail to warn and inform plaintiffs of the true credit market risks, they simultaneously assured investors that the extensive risk management practices of the Company helped it avoid such risks altogether.

12.     In fact, by the time of the Series 5 Offering, defendants were aware that their statements incorporated into the Offering Materials concerning the value of Barclays' assets, and the substantial risks that those assets posed in light of their extensive "risk management" assurances, were false and misleading.  The evidence demonstrating that defendants over-valued Barclays' assets was objectively verifiable, known to defendants, and directly tied to Barclays' assets, including:

- The ABX and TABX, market indices which Barclays stated it used internally to value its own assets and which were required to be considered by applicable accounting rules, had plummeted;

- The substantial distress in the credit markets that brought about the collapse of Bear Stearns, the country's seventh-largest bank, in March 2008;

- The fact that Barclays was actively engaged in mortgage origination and servicing in the United States (and had been since early 2007), and that most similar mortgage originators across the country had failed in spectacular fashion due to the collapsing mortgage, credit and real estate markets;

- The dramatic and public downgrades by ratings agencies of most of the monoline insurers who "insured" more than £20 billion of Barclays' highest-risk assets.  Barclays had relied on these monoline insurers as a hedge against loss for those assets.  As a result, by the time of the Series 5 Offering most

market observers expected those monoline insurers to fail, and Barclays' closest competitors had already written off tens of billions of the same or similar assets. Meanwhile, Barclays had not even disclosed the risk to its balance sheet caused by these monoline "hedges";

- In an effort to avoid the collapse of one of the monoline insurers Barclays initially agreed to provide "backstop" funding to it, but in December 2007 it was downgraded to junk status. Shortly thereafter, Barclays joined other large banks working with the New York Insurance Commissioner to protect their own balance sheets by funding these insurers;

- Barclays' closest competitors had all taken massive writedowns of the same and similar assets held by Barclays – some exceeding $10 billion – while Barclays' writedowns had been unreasonably small;

- By the end of 2007, Barclays' own research analysts were estimating that even the top classes of CDOs were worth only 20-30 cents on the dollar, based on current market prices and specifically citing the ABX. Those prices continued to decline prior to the Series 5 Offering, yet Barclays had valued its own CDOs (which were of varying quality) at more than 75 cents on the dollar.

- By defendants' own acknowledgment in February 2008, these false and misleading asset values were "run through a challenge process up to and including Bob [Diamond] and the senior management at Barclays Capital and there are a series of adjustments that are made reflected in here following that process."

13.     The writedowns of Barclays' credit market assets that the Company should have been taking and disclosing were clearly material. Not long after the April 2008 Series 5 Offering, Barclays began taking large writedowns and impairments for its toxic assets – just as other banks had done months and years earlier. In addition, defendants were required to seek huge capital infusions from third parties, while simultaneously enhancing the Company's disclosures concerning the extent of its credit market exposure.

14.     For instance, in June 2008 – less than three months after the Series 5 Offering and in spite of the fact that defendants had raised more than $5 billion from investors in those Offerings – Barclays announced it would need to raise an additional £4.5 billion by issuing shares to foreign investors in order to "boost its capital held against risky assets." Then on August 7, 2008, Barclays

- 6 -

announced its half-yearly results (as of June 30, 2008), and that it had taken a £2.8 billion writedown on its credit market assets.  But this was not nearly enough, so on October 13, 2008 the Company announced **another** private offering, this time raising an additional £7.5 billion and cutting the dividend to save an additional £2 billion.

15.     As a result of defendants' omissions and false statements in the Offering Materials, plaintiffs here who bought shares in the four offerings have suffered significant damages.  Each of the securities offerings were sold to investors for $25 per share.  On March 4, 2009 – the date of the first-filed complaint – the Series 2 securities traded at $5.61 per share, the Series 3 traded at $5.90 per share, the Series 4 traded at $6.60 per share, and the Series 5 traded at $6.84 per share.  This lawsuit follows.

**JURISDICTION AND VENUE**

16.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  In connection with the acts complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the Underwriter Defendants (defined below) conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

596508_1

## PARTIES

19.     Lead Plaintiff Marshall Freidus ("Freidus") acquired the Series 2 Securities in the Offering and issued pursuant to the false and misleading 2005 Registration Statement and Prospectuses as set forth in the Certification filed with the Court on May 4, 2009.  Freidus was appointed Lead Plaintiff by Order on December 9, 2009.

20.     Lead Plaintiff Dora L. Mahboubi ("Mahboubi") acquired the Series 3 Securities in the Offering and issued pursuant to the false and misleading 2007 Registration Statement and Prospectuses as set forth in the Certification filed with the Court on May 4, 2009.  Mahboubi was appointed Lead Plaintiff by Order on December 9, 2009.

21.     Lead Plaintiff Stewart Thompson and Sharon Thompson, Trustees for the S.O. Thompson Rev. Trust and the S.G. Thompson Rev. Trust (collectively, "Thompson") acquired the Series 4 Securities issued in the Offering and pursuant to the false and misleading 2007 Registration Statement and Prospectuses as set forth in the Certification filed with the Court on May 4, 2009. Thompson was appointed Lead Plaintiff by Order on December 9, 2009.

22.     Plaintiff Dennis Askelson ("Askelson") acquired the Series 5 Securities on April 9, 2008 in the April 2008 Offering and pursuant to the false and misleading 2007 Registration Statement and Prospectuses as set forth in the Certification attached hereto.

23.     Plaintiff Alfred Fait ("Fait") acquired the Series 5 Securities on April 8, 2008 in the April 2008 Offering and pursuant to the false and misleading 2007 Registration Statement and Prospectuses as set forth in the Certification filed with the Court on April 20, 2009.

24.     The plaintiffs referenced above in ¶¶19-23 are referred to herein as "plaintiffs."

25.     Defendant Barclays is a major global financial services provider operating in Europe, North America, the Middle East, Latin America, Australia, Asia and Africa.  Barclays' U.S.

- 8 -

operations are headquartered in New York, New York. Barclays Capital ("BarCap") is the investment banking division of Barclays. BarCap's financial results are reported as part of Barclays' result.

26.    Defendant Barclays Plc is a holding company that is listed in London, New York and Tokyo and operates through its subsidiary Barclays and acts as the ultimate holding company. Barclays Plc is located in London, England.

27.    Defendant John Silvester Varley ("Varley") is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of Barclays and Barclays Plc. Varley signed both the 2005 and 2007 false and misleading Registration Statements.

28.    Defendant Robert Edward Diamond, Jr. ("Diamond") is, and at all relevant times was, a director and President of Barclays and Barclays Plc. Diamond signed both the 2005 and 2007 false and misleading Registration Statements.

29.    Defendant Sir Richard Broadbent ("Broadbent") is, and at all relevant times was, a director of Barclays and Barclays Plc. Defendant Broadbent signed both the 2005 and 2007 false and misleading Registration Statements.

30.    Defendant Richard Leigh Clifford ("Clifford") is, and at all relevant times was, a director of Barclays and Barclays Plc. Defendant Clifford signed both the 2005 and 2007 false and misleading Registration Statements.

31.    Defendant Dame Sandra J.N. Dawson ("Dawson") is, and at all relevant times was, a director of Barclays and Barclays Plc. Defendant Dawson signed both the 2005 and 2007 false and misleading Registration Statements.

32.    Defendant Sir Andrew Likierman ("Likierman") is, and at all relevant times was, a director of Barclays and Barclays Plc. Defendant Likierman signed both the 2005 and 2007 false and misleading Registration Statements.

33.    Defendant Sir Nigel Rudd ("Rudd") is, and at all relevant times was, a director of Barclays and Barclays Plc. Defendant Rudd signed both the 2005 and 2007 false and misleading Registration Statements.

34.    Defendant Stephen George Russell ("Russell") is, and at all relevant times was, a director and Secretary of Barclays and Barclays Plc. Defendant Russell signed both the 2005 and 2007 false and misleading Registration Statements.

35.    Defendant John Michael Sunderland ("Sunderland") is, and at all relevant times was, a director of Barclays and Barclays Plc. Defendant Sunderland signed both the 2005 and 2007 false and misleading Registration Statements.

36.    Defendant Matthew William Barrett ("Barrett") was Chairman of the Board of Barclays and Barclays Plc until he resigned from the Company on January 1, 2007. Barrett signed the false and misleading 2005 Registration Statement.

37.    Defendant Naguib Kheraj ("Kheraj") was Principal Financial Officer and a director of Barclays and Barclays Plc until he resigned from the Company on March 31, 2007. Defendant Kheraj signed the false and misleading 2005 Registration Statement.

38.    Defendant Marcus Agius ("Agius") is Group Chairman of Barclays and Barclays Plc. Agius signed the false and misleading 2007 Registration Statement.

39.    Defendant Christopher Lucas ("Lucas") is a director of Barclays and Barclays Plc. Lucas signed the false and misleading 2007 Registration Statement.

- 10 -

40.     Defendant Gary A. Hoffman ("Hoffman") is a director of Barclays and Barclays Plc. Hoffman signed the false and misleading 2007 Registration Statement.

41.     Defendant Frederik Seegers ("Seegers") is a director of Barclays and Barclays Plc. Seegers signed the false and misleading 2007 Registration Statement.

42.     Defendant David G. Booth ("Booth") is a director of Barclays and Barclays Plc. Booth signed the false and misleading 2007 Registration Statement.

43.     Defendant Fulvio Conti ("Conti") is a director of Barclays and Barclays Plc.  Conti signed the false and misleading 2007 Registration Statement.

44.     Defendant Daniel Cronje ("Cronje") is a director of Barclays and Barclays Plc. Cronje signed the false and misleading 2007 Registration Statement.

45.     The defendants referenced above in ¶¶27-44 are referred to herein as the "Individual Defendants."

46.     Defendant Barclays Capital Securities Limited ("Barclays Securities") is the investment banking division of BarCap.  Barclays Securities was an underwriter of the Offerings.

47.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  Citigroup was an underwriter of the Offerings.

48.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are subsidiaries of banking giant Wachovia).  Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting and equity investing.  It also offers real estate financing, risk management services, and

- 11 -

structured products such as asset-backed and mortgage-backed securities. Wachovia Capital was an underwriter of the Offerings.

49.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals. Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions. Morgan Stanley was an underwriter of the Offerings.

50.    Defendant UBS Securities LLC ("UBS") is the U.S. investment banking and securities arm of UBS Investment Bank. UBS Investment Bank provides a range of financial products and services worldwide. UBS was an underwriter of the Offerings.

51.    Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America. Banc of America offers trading and brokerage services, debt and securities underwriting, debt and equity research, and advice on public offerings, leveraged buyouts, and mergers and acquisitions. Banc of America was an underwriter of the Offerings.

52.    Defendant RBC Dain Rauscher Inc. ("RBC") was the corporate and investment banking division of Royal Bank of Canada (the "Bank"). In March 2008, RBC Dain Rauscher Inc. changed its name to RBC Wealth Management ("RBC Wealth"). RBC Wealth is a division of RBC Capital Markets Corporation, which is a wholly owned subsidiary of the Bank. RBC was an underwriter of the Offerings.

53.    Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") is a full-service investment brokerage subsidiary of Wachovia Securities, which was acquired by Wells Fargo & Company. A.G. Edwards was an underwriter of the April 2006 and September 2007 Offerings.

- 12 -

54.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking, and related products and services on a global basis.  Merrill Lynch was an underwriter of the April 2006, November 2007 and April 2008 Offerings.

55.     Defendant BNP Paribas Securities Corp. ("BNP") is the largest bank in Europe and is active in the finance, investment and asset management markets.  BNP was an underwriter of the April 2006 Offering.

56.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a leading global investment banking, securities, and investment management firm that provides a wide range of services worldwide to a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals.  Goldman Sachs was an underwriter of the April 2006 Offering.

57.     Defendant KeyBanc Capital Markets ("KeyBanc") is a boutique investment bank that provides financial advisory services.   KeyBanc offers mergers and acquisitions advisory, divestitures, initial public offering, capital restructuring, equity and debt financing, and corporate loan syndication consulting services, and provides securities underwriting, interest rate risk management, equity research and treasury management solutions.   Additionally, KeyBanc offers brokerage, equity trading and investment advisory services.  KeyBanc was an underwriter of the April 2006 Offering.

58.     Defendant SunTrust Capital Markets, Inc. ("SunTrust") is a full-service investment bank that specializes in emerging growth companies in selected industries.  SunTrust was an underwriter of the April 2006 Offering.

59.     Defendant Wells Fargo Securities LLC ("Wells Fargo") provides investment banking services in the United States.  Wells Fargo offers capital markets access through public offerings, private placements and debt offerings, which include new issue underwriting of high yield bonds and private placements, as well as market making, research and equity trading.  Wells Fargo also provides advisory services for mergers and acquisitions.  Wells Fargo was an underwriter of the April 2006 Offering.

60.     Pursuant to the 1933 Act, the defendants referenced in ¶¶46-59 above are referred to herein as the "Underwriter Defendants."

61.     The Underwriter Defendants are liable for the false and misleading statements in the Registration Statements and Prospectuses.  In connection with the Offerings, the Underwriter Defendants drafted and disseminated the Registration Statements and Prospectuses and were paid substantial fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

**The Public Offering Materials Misstated and Omitted
Material Facts Regarding Barclays' Credit Market Exposure**

62.     In the years leading up to 2006, the U.S. housing market boomed as a massive volume of mortgage loans were given to higher credit risk consumers.  Mortgage brokers and lenders began to relax their lending standards and issued mortgages on increasingly risky terms to the lender in order to compete for business and capitalize on the expanding market.  Demand for homes amid lower interest rates and easy credit terms fueled a rise in home prices.  Rising home prices fueled a building boom in new homes.  Inevitably, as lenders attempted to expand to ever more potential homebuyers, aggressive and oftentimes predatory lending practices by U.S. lenders spurred ever increasing loans to U.S. borrowers whose ability to repay their loans became questionable and

- 14 -

particularly sensitive to interest rate changes.  The end result was that millions of home buyers were able to borrow much more money than they could realistically afford to repay.

63.    Lenders were willing to extend loans to riskier borrowers because there were mortgage purchasers in the secondary market willing to relieve the lender of the risk associated with these loans.  Investment banks bundled mortgages into various security and debt obligations, or mortgage-backed securities ("MBS"), which were sold in turn to investors.  RMBS were a common type of MBS which were created by originating and purchasing thousands of residential mortgages, pooling them together, and then issuing securities that entitled the purchaser to a specified payout of the cash generated when borrowers made payments on the underlying mortgages.

64.    In order for the cash flows of the underlying mortgages to flow through to the RMBS security holder, each RMBS identified at least one mortgage processing agent (usually an institution) that was responsible for servicing each of the mortgages in the RMBS pool.  When the RMBS was then marketed and sold, the purchaser was able to view all the information relevant and necessary to justify the price charged for that asset.  In the instance of RMBS, that included the detailed underwriting analysis of each mortgage in the pool and its subsequent payment history.  To the extent any information was lacking, the RMBS holder could obtain that information from the identified servicing agent.  In this way, Barclays had access to any and all information necessary to evaluate the risk of each of the RMBS it held.

**Barclays' Residential Mortgage Exposure**

65.    The term "Alt-A" is shorthand for "Alternative to Agency," which historically meant loans not meeting the published standards of Freddie Mac or Fannie Mae.  An Alt-A loan falls just above subprime status, but below that of a "prime" loan because of deficiencies in the borrower's credit profile.  For example, an Alt-A borrower typically cannot provide complete asset or income

- 15 -

documentation.  Other characteristics of Alt-A loans include: (i) LTV in excess of 80%, but that lacks primary mortgage insurance; (ii) a borrower who is a temporary resident alien; (iii) the loan is secured by non-owner occupied property; or (iv) a debt-to-income ratio above traditional limits. During the offering period, Barclays held more than £5 billion (par) worth of Alt-A mortgages and RMBS.

66.    "Subprime RMBS," are residential mortgage-backed securities in which the underlying collateral consists of subprime mortgages.  Subprime mortgages carry a significantly higher default risk than prime mortgages or even Alt-A mortgages due to the creditworthiness of the borrowers who take out these loans.  Essentially, an investment in subprime RMBS is an investment in a pool of subprime home mortgage loans.  During the offering period, Barclays held more than £6 billion (par) worth of subprime mortgages and RMBS.

67.    In fact, shortly after the first offering and in an effort to expand its subprime origination, servicing and securitization business in the United States, Barclays acquired two large U.S.-based mortgage companies.  First, the Company acquired mortgage servicer HomEq Servicing Corporation ("HomEq") in June 2006 from Wachovia Corporation ("Wachovia") for $469 million. The transaction was completed in November 2006.

68.    Then Barclays announced in January 2007 that it was acquiring EquiFirst Corporation ("EquiFirst"), the non-prime mortgage origination business of Regions Financial Corporation ("Regions"), for $225 million.  At the time of the announcement, EquiFirst was the 12th largest "non-prime" wholesale mortgage originator in the United States.  EquiFirst was originating its loans through over 9,000 brokers in 47 states, and was to be combined with BarCap's active U.S. wholesale loan mortgage business, mortgage servicing, and capital markets capabilities to create a vertically integrated mortgage franchise for the purchase and securitization of non-prime mortgages.

- 16 -

According to the Company, all the loans originated by EquiFirst were expected to be securitized or sold after an average hold period of approximately two to three months.

69.     By April 2007, however, indications that the subprime mortgage market was collapsing had decimated valuations of subprime-related companies and their assets.  On April 3, 2007, Barclays reported that due to massive "operating losses" at EquiFirst, Barclays would complete its purchase of EquiFirst from Regions for only $76 million, ***67% less than the $225 million originally announced by the Company on January 19, 2007***.  A Barclays spokesman said the lower price reflected ***declining housing prices and higher mortgage delinquencies in the subprime sector***.  Notably, Barclays closed the EquiFirst deal on the same day that New Century Financial, one of the largest subprime mortgage lenders in the United States, announced it was filing bankruptcy.

70.     In 2007 and 2008, Barclays also had £5 billion of gross exposure to CDOs backed primarily by subprime/non-prime mortgages.  Of this amount, 24% or £1.2 billion consisted of mezzanine CDOs.  Mezzanine CDOs were particularly risky and susceptible to the decline of the subprime mortgage market because they were backed by nothing more than the ***lowest-rated*** and ***highest-risk*** tranches of RMBS.  In fact, Barclays' mezzanine CDOs were susceptible to catastrophic loss, even at relatively benign stages of what would become the subprime financial crisis.  The collateral underlying Barclays' £1.2 billion of mezzanine CDOs consisted of 50% subprime mortgages.  Not only did Barclays fail to quantify its total exposure to CDOs, but the Company also did not disclose that ***100% of its mezzanine CDOs could be wiped out even if the default rate of the underlying subprime mortgages was significantly less than 100%***.

71.     Barclays also materially misrepresented its exposure to monoline insurers.  By the end of 2007, the Company had a notional exposure of £21.5 billion to monoline insurers, which it

weighed against assets the Company valued at £20.2 billion, for a "net" exposure of £1.3 billion. These assets, however, were primarily made up of collateralized loan obligations ("CLOs") valued at more than £14 billion, U.S. RMBS (more than £2 billion), and commercial mortgage-backed securities (more than £2 billion). Even though these investments were purportedly "hedges," they represented significant exposure to U.S. subprime mortgage losses and ultimately resulted in significant losses to the Company.

72.     Because Barclays' massive exposures to CDOs (and other market-traded securities) were hedged by insuring those investments with monoline insurers, *the monoline insurers' ability to absorb losses on the billions of dollars of subprime/non-prime assets they insured was critical to Barclays*. In the event the monoline insurers failed – and many did – exposure on hedged CDOs was no different than exposure to unhedged and mezzanine CDOs. Downgrades in the credit ratings of those issuers also called into question their ability to cover any losses on those assets they had guaranteed. Therefore, the nature, extent and concentrations of risk associated with these monoline exposures were required to be disclosed under the applicable International Financial Reporting Standards ("IFRS") rules described at ¶¶136-151. *The purpose behind the IFRS disclosure requirements was to warn investors about concentrations in financial instruments that may result in losses under changed conditions* – not to wait until those losses were substantial and realized and then disclose the concentration of risk *after* the losses were recorded. But that is exactly what Barclays did here.

73.     By mid-2007, it became clear that monoline insurers, whose traditional business had been insuring relatively safe bonds issued by government authorities, had overextended themselves by insuring hundreds of billions of dollars worth of subprime-backed CDOs and other mortgage-backed assets. While their traditional business model had allowed them to operate with relatively

- 18 -

small capital bases in comparison to the notional amount of those assets they guaranteed, their expansion into insuring much riskier financial instruments resulted in a much greater concentration of risk. Accordingly, the notion that such assets were "hedges" was illusory, as monoline insurers could quickly be wiped out, leaving the holders of such assets to absorb the entire loss themselves. On March 14, 2007, *The Wall Street Journal* reported that "[t]raders also were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a wave of defaults." Similarly, in a May 2007 presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and Ambac Financial Group, Inc. ("Ambac") were "effectively insolvent" on account of predicted losses arising from their insurance of subprime-backed CDOs and other subprime-related assets.

74.    Yet the Company did not disclose any of its exposure to monoline insurers to investors in the Series 2, 3 or 4 Offering Materials. In fact, Barclays did not disclose *any* of its exposure to monoline insurers until it pre-announced Barclays' 2007 year-end results on February 18, 2008. But even this disclosure, which was included in the 2007 Form 20-F (and incorporated into the Series 5 Offering Materials), was false and misleading, however, because Barclays only provided its "net exposure" of £1.3 billion, and no other information regarding its true concentration of risk associated with the monolines. In fact, Barclays had insured more than £21.5 billion in assets with monolines, against a reported £20 billion in "fair value" underlying assets. At the time of the 2007 Form 20-F, however, Barclays had only written down the "fair value" of these insured assets by *£59 million*, a fraction of the impairment that should have been taken.

75.    The underlying assets were (but never disclosed in the Offering Materials) composed of £5 billion of A/BBB-rated CLOs and MBS, another £5 billion of "non-investment grade" CLOs

and MBS, and £5 billion of supposedly AAA-rated CLOs and MBS.  Despite the fact that by February 2008, the entire monoline industry faced utter collapse, along with those guarantees they had issued, the Company had only written down its insured assets by .002%.

76.     By June 2008, immediately following the Series 5 Offering, the Company began taking significant writedowns on those underlying assets.  As demonstrated in the chart below, Barclays' writedowns jumped from £59 million to £433 million between December 2007 and June 2008, and its "net" exposure leapt from £1.3 billion to £2.5 billion.

| As at June 30, 2008 | | | | |
|---|---|---|---|---|
| Exposure by Credit Rating of Monoline Insurer | Notional £m | Fair Value of Underlying Asset £m | Gross Exposure £m | Total Writedowns £m | Net Exposure £m |
| AAA/AA | 10,738 | 9,587 | 1,151 | (98) | 1,053 |
| A/BBB | 5,592 | 4,193 | 1,399 | (242) | 1,157 |
| Non-investment grade | 5,151 | 4,684 | 467 | (93) | 374 |
| Total | 21,481 | 18,464 | 3,017 | (433) | 2,584 |

77.     None of this information was disclosed in the Series 5 Offering Materials, which only incorporated by reference the 2007 Form 20-F, and did not provide the Company's *notional* exposure, fair value of the underlying assets, or any detail concerning the composition of the underlying assets.

78.     During the offering period, Barclays also mislead investors concerning its exposure to structured investment vehicles, or "SIVs."  In fact, the Company failed to disclose that Barclays had at least £1.6 billion in exposure to SIVs at the time of the Series 2 Offering, and £900 million of exposure at the time of the Series 3 Offering.  SIVs were generally constructed to make money by selling short-term debt and buying longer-dated and higher-yielding assets including bank bonds, mortgage-backed securities and collateralized debt obligations.  More specifically, Barclays created

- 20 -

and financially backed several "SIV-lites" which were essentially collateralized debt obligations, which pooled together bonds backed by mortgages and other asset-backed debt. The primary difference between SIV-lites and other CDOs is that CDOs sell long-term senior debt to fund their assets while SIV-lites raise senior debt in the short-term markets.

79.    Barclays created four SIV-lite funds, called Cairn Capital, Mainsail II, Sachsen Funding I and Golden Key. Beginning in 2007, however, these SIV-lites began to suffer huge losses as the value of the long-term debt they bought plummeted, forcing them to sell the debt at a loss, and while struggling to raise more funds in the commercial paper market, which simultaneously had dried up. Even though Barclays did not "own" these investments, the SIV-lites contained a "liquidity backstop" that allowed them to require Barclays to fund up to 25% of the value of the commercial paper it issued if and when the market turned sour, causing investors became increasingly worried about Barclays' exposure to SIVs.

## THE FALSE AND DEFECTIVE REGISTRATION STATEMENTS AND PROSPECTUSES

**The April 2006 Offering (Series 2)**

80.    On or about September 14, 2005, Barclays filed with the SEC the 2005 Registration Statement using a "shelf" registration statement or offering process. Pursuant to that process, the 2005 Registration Statement permitted Barclays to sell securities in future offerings upon the filing of a prospectus supplement to the 2005 Registration Statement. The 2005 Registration Statement incorporated certain SEC filings:

### INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" the information we file with them, which means we can disclose important information to you by referring you to those documents. The most recent information that we file with the Securities and Exchange Commission automatically updates and supersedes earlier information.

We filed our annual report on Form 20-F for the fiscal year ended December 31, 2004 (the "2004 Form 20-F") with the SEC on March 24, 2005 and an amendment thereto on May 6, 2005. We have also filed extracts from a results announcement by Barclays PLC for the six months ended June 30, 2005 under cover of Form 6-K with the SEC on August 12, 2005. We are incorporating the 2004 Form 20-F, as amended, and the Form 6-K dated August 12, 2005 by reference into this prospectus.

In addition, we will incorporate by reference into this prospectus all documents that we file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and, to the extent, if any, we designate therein, reports on Form 6-K we furnish to the SEC after the date of this prospectus and prior to the termination of any offering contemplated in this prospectus.

81.     By early 2006, investors were increasingly concerned about financial institutions' exposure to mortgage-backed securities. In a February 13, 2006 article entitled "Coming Home to Roost," *Barron's* reported that the market was experiencing increased "anxiety" over "mortgage-backed securities" given the "easy lending practices" that prevailed in recent years. Specifically, the article reported that "[v]arious doomsday scenarios are being posited" and warned that a "looming 'reset problem'" would lead to a "deadly feedback loop . . . in which forced home sales will diminish collateral values, which, in turn, will foster yet more delinquencies and forced sales. Before the crisis runs its course, the deflationary contagion will infect all manner of homes, from high-end to starters." The article also noted that because of the packaging of mortgages "all or most of the credit risk on the loans is shifted to the investors in securitizations . . . [but] [s]hould this funding dry up, the sector's financing structure could seize up. And that would spell big trouble not only for sub-prime borrowers, but for the entire U.S. housing market . . . and economy."

82.     On or about April 21, 2006, Barclays filed on Form 424B2 a prospectus supplement to the 2005 Registration Statement for the April 2006 Offering (the "April 2006 Prospectus"), pursuant to which defendants sold 30 million shares of the Series 2 Securities at $25 per share, for proceeds of over $750 million.

- 22 -

83.     The April 2006 Prospectus provided virtually no information about Barclays.  Instead, it described the securities being offered and simply incorporated by reference Barclays' previously filed 2005 Form 20-F.

84.     The Annual Report on Form 20-F for the year 2005 ("2005 20-F), filed on April 3, 2006 with the SEC and incorporated by reference into the April 2006 Prospectus, stated in pertinent part:

> The Group's profit before tax in 2005 increased 15% (£700m) to £5,280m (2004: £4,580m).  Total income net of insurance claims increased 23% (£3,225m) to £17,333m (2004: £14,108m) whilst operating expenses excluding amortisation of intangible assets rose 23% (£1,934m) to £10,448m (2004: £8,514m).  Amortisation of intangible assets was £79m (2004: £22m).  Impairment charges and other credit provisions rose 44% to £1,571m (2004: £1,093m).
>
> Earnings per share rose 7% to 54.4p (2004: 51.0p), diluted earnings per share rose 6% to 52.6p (2004: 49.8p).  Dividends per share rose 11% to 26.6p (2004: 24.0p).  Return on average shareholders' funds was 21% (2004: 22%).  Economic profit was up 12%, in line with our expectations and a reflection of tight capital management as well as a good business performance.
>
> Non-performing loans increased £1,095m (27%) to £5,210m.  Potential problem loans increased £131m to £929m.  Coverage of non-performing loans was broadly steady at 66.2% (2004: 66.9%) while the coverage of potential credit risk loans also remained stable at 56.2% (2004: 56.0%)
>
> ***Our capital position remained healthy.  Shareholders' equity excluding minority interests increased £1,556m (10%) to £17.4bn, primarily due to profit retention***.  Total assets increased £386bn (80%) to £924bn.  Weighted risk assets increased £50bn (23%) to £269bn.  The tier 1 capital ratio decreased to 7% (2004: 7.6%) and the risk asset ratio decreased to 11.3% (2004 11.5%).
>
> *        *        *
>
> **Barclays Capital** continued its very strong growth of recent years, with profit before tax in 2005 rising 25% to £1,272m (2004: £1,020m).  Income growth of 27% was broadly-based across products and geographies.  The year also saw continued investment in building Barclays Capital's scale and diversity in terms of geography, products and people.  As a result of investment and the profit performance, operating expenses grew 28%.  ***Market risk was well controlled with DVaR falling 6% to £32m as a result of increased diversification***.  The rate of growth of earnings once again exceeded the rate of growth of capital consumption.

- 23 -

\*       \*       \*

Barclays Capital delivered record profit before tax and net income.  Profit before tax increased 25% (£252m) to £1,272m (2004: £1,020m) as a result of the very strong income performance driven by higher business volumes and client activity levels.  Net income increased 27% (£894m) to £4,167m (2004: £3,273m).

Total income increased 27% (£895m) to £4,270m (2004: £3,375m) as a result of strong growth across Rates and Credit Businesses.  *Income by asset category was broadly based with particularly strong growth delivered by credit products, commodities, currency products and equity products.  Income by geography was well spread with significant growth in the US.  Areas of investment in 2004, such as commodities, commercial mortgage backed securities and equity derivatives, performed well, delivering significant income growth.  Market risk was well controlled with average DVaR falling 6% to £32m (2004: £34m) as a result of increased diversification across asset classes*.

85.     In an effort to reassure investors, the 2005 20-F also included a substantial discussion concerning the Company's "Risk Management."  In fact, the Company dedicated more than 30 pages to a discussion of its practices in evaluating and controlling various risks to the Company, including whole sections dedicated to "credit risk management," "Loan impairment: potential credit risk loans," and "Capital and liquidity risk management."

86.     The statements above in ¶¶84-85 from the April 2006 Offering Materials and the documents incorporated by reference therein were materially false and misleading.  Defendants reasonably should have known, but did not disclose, that Barclays had total credit market exposure of £30 billion.  More specifically, defendants failed to disclose that Barclays credit market exposure included:

(a)     approximately £7 billion in ABS CDOs backed by risky U.S. subprime and Alt-A mortgages and RMBS;

(b)     approximately £6 billion in U.S. subprime loans;

(c)     approximately £3 billion in U.S. Alt-A loans;

(d)     approximately £8 billion in commercial real estate;

- 24 -

(e)     the substantial and material risk that Barclays' exposure to Alt-A and subprime loans, CDOs, and RMBS had on the Company's stated capital ratio, shareholders' equity and its liquidity, and the risk that same exposure posed to the Company's future;

(f)     that the Company's failure to disclose items (a)-(e) above was in contravention of Barclays' stated risk management policies and public representations;

(g)     that defendants, in failing to disclose items (a)-(e) above, violated International Accounting Standards ("IAS") 30 and 32 as set forth more fully below in ¶¶142-145; and

(h)     that defendants, in failing to disclose items (a)-(e) above, violated Item 503 of Regulation S-K (17 C.F.R. §229.503) as set forth more fully below in ¶¶146 and 152-155.

87.     The residential mortgage and credit market problems grew worse in late 2006, as borrowers began defaulting in record numbers.  As a result, the market for Alt-A and subprime mortgages, RMBS and related CDO/CLOs began to show substantial distress.  This distress resulted from three primary indicators used by industry experts to assess the current state of, and future prospects for, the U.S. mortgage market, which had turned negative: (1) rising interest rates; (2) the declining U.S. Housing Price Index, which measures changes in U.S. home prices; and (3) delinquency rates, which monitor the percentage of mortgagees who default on their mortgage obligations.

88.     As illustrated in the chart below, by late-2006, and accelerating into 2007, the domestic housing market collapsed.  For a financial institution like Barclays, with substantial exposure to exotic mortgage products, this collapse immediately resulted in rising delinquency rates in its mortgages, RMBS and CDOs.



89.     The combination of higher interest rates and the dramatic slowing of U.S. property appreciation (and decline in some areas) was devastating to Alt-A and subprime borrowers who overextended themselves by purchasing homes that they could not afford.  Faced with new, higher mortgage payments, little refinancing options and declining home values that wiped out what little equity they had in their homes, millions of U.S. mortgagees, particularly Alt-A and subprime mortgagees, defaulted on their mortgages:







90.     By late 2006, periodicals that focused on banking and real estate had begun documenting the collapse.  For example, on November 13, 2006, *American Banker* reported:

UBS Securities issued a report last week that found that *subprime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year*.

About 2.4% of subprime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said.

91.     By early 2007, this collapse of the housing and mortgage market was affecting all financial institutions that had invested or participated in these markets.  Some of the top mortgage lenders with Alt-A and subprime U.S. mortgage exposure started to reveal enormous losses and warned of future losses.  For example, on February 7, 2007, citing trouble with the U.S. subprime lending market, HSBC Holdings announced that provisions for bad loans would be 20% higher than analysts expected.  On that the same day, New Century Financial, the second-largest subprime mortgage originator in the United States, reported significant problems with loan defaults (and would later file for Chapter 11 bankruptcy).

92.     The collapse of the housing market had spread beyond subprime mortgages as defaults rose dramatically in Alt-A and even in "prime" loans.  For instance, in a February 18, 2007 article entitled "Will Other Mortgage Dominoes Fall?," *The New York Times* reported:

> It is becoming clear . . . that subprime mortgages are not the only part of this market experiencing strain.  Even paper that is in the midrange of credit quality – one step up from the bottom of the barrel – is encountering problems.  That sector of the market is known as Alt-A, for alternative A-rated paper, and it is where a huge amount of growth and innovation in the mortgage world has occurred.

> The Alt-A segment of the market used to consist of mortgages issued to professionals – like doctors – with unpredictable incomes.  Now Alt-A is dominated by so-called affordability mortgages – adjustable-rate interest-only loans, 40-year loans and silent-second loans.  You, dear risk-taking homeowner, know all about these loans that allowed people to buy a house that might have been beyond their means but looked attractive because they didn't need to make payments on the principal in the early years.

93.     And on April 24, 2007, *Housingwire.com* reported:

- 28 -

Moody's Begins Downgrading AAA-Rated Alt-A RMBS to Junk

Moody's Investors Service issued more Alt-A downgrades on Thursday morning, this time taking a heavy hand to 32 different Aaa-rated tranches from 10 different Alt-A deals.  Many of the downgrades even pushed former Aaa's into non-investment grade categories – a stunning descent for top-rated Alt-A mortgage bonds that underscores two key points.

**First, defaults are obviously accelerating**.  Second, many Alt-A deals were issued with less in the way of overcollateralization – which, in plain English, means that these deals **will start to see downgrades sooner, compared to the relative stress that a typical subprime RMBS** deal can withstand before the hits start coming at the Aaa level.

94.     Just as the mortgage and credit market collapse was gaining momentum, Barclays bought a subprime loan originator in the United States.  In January, 2007, Barclays announced it was buying Regions Bank's subprime originator ("EquiFirst") for $225 million.  Upon completion of its due diligence, however, Barclays closed the deal in April for a mere $76 million, due to "operating losses" at EquiFirst.  Thus, as of April 2007 Barclays became the 12th largest "non-prime" mortgage originator in the United States, and would be intimately familiar with the challenges occurring in that market.

95.     The collapsing mortgage market and rising defaults resulted in an accelerating decline in the value of mortgage-backed securities, as reflected in specialized indices, the ABX.HE ("ABX") and the TABX.HE ("TABX").  The ABX index, developed in 2006, was designed to track the value of RMBS tranches at each rating level (AAA, AA, A, BBB and BBB-).  Similarly, the TABX index, launched in 2007 by a consortium of banks attempts to replicate the market value of a basket of RMBS and CDOs.  The TABX index accounts for high levels of subordination and therefore provides a benchmark for the value of senior MBS.

96.     Market experts, analysts, **and even Barclays itself** relied upon the ABX and TABX indices to monitor the value of RMBS and CDO tranches.  Beginning in October 2006, the ABX

- 29 -

BBB and BBB- indices began suffering substantial declines, after MBS risks began to materialize via monthly tracking reports showing that 2006 vintage mortgages were experiencing record levels of nonpayment.

97.     By February and March 2007, the ABX index for BBB and BBB- RMBS tranches had suffered serious declines – some BBB dropped as much as 60% of par.  During that time, market participants anticipated that the values of junior tranche RMBS such as these *were going to zero*.

98.     RMBS continued to hemorrhage value throughout the summer of 2007.  By September 30, 2007, the ABX triple-B indices had fallen to 30% of par, while the TABX indices for all junior mezzanine tranches showed such tranches to be effectively worthless.  The TABX index for mezzanine super seniors had fallen to 33% of par.  In addition, ABX indexes for higher RMBS tranches also showed substantial declines: single-A ABX indices were at 50% of par, while double-A ABX indices were at 80%.

99.     Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans."  Similarly, the SEC considered the ABX a "relevant market ind[ex]" for CDO valuation.  Therefore, defendants reasonably should have known that the ABX should have been used in valuing RMBS and CDOs and that disregarding this market index in the Company's mark-to-market valuations was a violation of IFRS, as described in ¶¶139 and 151.

100.    During the fourth quarter of 2006 and most of 2007, the value of the ABX indices plummeted, evidencing the market's expectation of a measurable decrease in the estimated future cash flows on Alt-A and subprime RMBS and CDO/CLOs.  The ABX index showed that all subprime RMBS tranches were being adversely affected by the subprime mortgage crisis beginning

in late 2006 and into 2007. As shown in the chart below, during the fourth quarter of 2006 and the first half of 2007, the value of the ABX Index plummeted.



101.    The "TABX index," launched in February 2007, tracked the value of the BBB and BBB- tranches of the ABX indices, but *also* takes into account varying levels of subordination. Like CDOs, which include senior and junior tranches, the TABX index accounts for high levels of subordination and therefore provides a benchmark for the valuation of senior CDO positions such as those owned by Barclays. The most senior index is the TABX.HE 07-1 06-2 40-100 (the "40-100 TABX"), because that index is tied to underlying RMBS collateral with a subordination level of 40%.

102.    Like the ABX indices, the TABX indices also plunged throughout 2007. From its inception in February 2007, when it was already indicating CDO values were more than 15% under par, the 40-100 TABX simply collapsed, falling to less than 35% of par by September 28, 2007.

- 31 -

| Date | Value (100 = 100% of par) |
|------|---------------------------|
| 3/30/2007 | 83.8 |
| 6/29/2007 | 69.08 |
| 9/28/2007 | 34.25 |

103.    The collapse of the ABX and TABX indices made it clear that the value of Barclays' subprime/non-prime-backed RMBS/CDOs and other subprime/non-prime-related assets had declined significantly prior to the September 2007 Offering.  The IFRS required Barclays to: (1) disclose the risks associated with these assets; and (2) timely write down the value of its RMBS/CDO holdings to fair value.  Nonetheless, Barclays failed to disclose or record any writedown of its RMBS/CDO holdings until November 2007, and it did not sufficiently record the necessary writedowns until the end of 2008.

104.    Defendants themselves were aware of and knew that the ABX and TABX were important market indices for valuing Barclays' assets.  According to the November 2007 "trading update":

> ABS and CDO positions held on the trading book were acquired for market-making, ABS and CDO structuring purposes.  These positions, which include ABS bonds, CDOs and subprime residuals, ***are valued by reference to observable transactions including the level of the ABX indices*** and on a pool-by-pool basis, implied cumulative loss projections.

105.    At the very same time, Barclays began suffering – and denying it was suffering – large losses from its commitments to support four separate SIV-lites.  On August 28, 2007, Reuters reported in part:

### Barclays denies exposure to failed debt vehicles

> British bank Barclays Plc denied a report on Tuesday that it has several hundred million dollars of exposure to failed debt vehicles structured by its investment banking arm.
>
> ***Barclays Capital has been one of the most innovative players in the debt market, embracing highly leveraged investment vehicles known as SIV-lites, which***

- 32 -

*combine traditional structured investment vehicle (SIV) and collateralised debt obligation (CDO) technologies*.

SIV-lites, however, have become a focus of investor jitters in recent weeks after credit market turmoil hit the value of assets underpinning the deals and led to short-term funding for them drying up.

"*To say we have hundreds of millions of dollars of exposure to SIV-lites generally is inaccurate,*" *a spokesman for the bank said, dismissing a report in the Financial Times*.

      \*      \*      \*

Rating agency Standard & Poor's has only rated five SIV-lites. Of these, two have been downgraded steeply, two are on rating watch negative and one has been affirmed.

*All four on which negative action has been taken were arranged by Barclays Capital*.

106.    On or about August 31, 2007, Barclays filed another SEC Form F-3 Registration Statement. By using a "shelf" registration statement or continuous offering process, the 2007 Registration Statement permitted Barclays to sell securities in several offerings going forward after a prospectus supplement to the 2007 Registration Statement was filed for each offering. Like the 2005 Registration Statement, the 2007 Registration Statement incorporated by reference certain SEC filings, stating:

The SEC allows us to "incorporate by reference" the information we file with them, which means we can disclose important information to you by referring you to those documents. The most recent information that we file with the SEC automatically updates and supersedes earlier information.

      \*      \*      \*

We filed our annual report on Form 20-F for the fiscal year ended December 31, 2006 (the "2006 Form 20-F") with the SEC on March 26, 2007. We are incorporating the 2006 Form 20-F by reference into this prospectus. We are further incorporating by reference our Current Reports on Form 6-K furnished to the SEC on April 23, 2007, April 27, 2007, May 8, 2007, May 31, 2007, June 19, 2007, July 23, 2007, July 30, 2007, August 2, 2007 and August 13, 2007, in each case to the same extent as such report was designated on the cover thereof for incorporation

- 33 -

by reference into our Registration Statements on Form F-3 (Nos. 333-126811, 333-85646 and 333-12384).

107.    The 2007 Registration Statement also stated:

The financial statements and management's assessment of the effectiveness of internal control over financial reporting (which is included in Management's Report on Internal Control over Financial Reporting) incorporated in this Prospectus by reference to the Annual Report of Barclays PLC and Barclays Bank PLC on Form 20-F for the year ended December 31, 2006 have been so incorporated in reliance on the reports of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

108.    Pursuant to the 2007 Registration Statement, defendants completed three Securities

Offerings by filing Supplemental Prospectuses during the period September 2007 through April

2008, as follows:

| Offering of Non-Cumulative Callable Dollar Preference Shares | Date Prospectus Filed | Total Proceeds (Including Over-Allotment) | SEC Filings Incorporated by Reference | Shelf Registration Statement |
|---|---|---|---|---|
| Series 3 | September 10, 2007 | $1.2 billion | 2006 Form 20-F; Forms 6-K filed 4/23/07, 4/27/07, 5/8/07, 5/31/07, 6/19/07, 7/23/07, 7/30/07, 8/2/07, 8/13/07 | August 31, 2007 |
| Series 4 | November 30, 2007 | $1 billion | 2006 Form 20-F; Forms 6-K filed 4/23/07, 4/27/07, 5/8/07, 5/31/07, 6/19/07, 7/23/07, 7/30/07, 8/2/07, 8/13/07 | August 31, 2007 |
| Series 5 | April 8, 2008 | $2.5 billion | 2007 Form 20-F | August 31, 2007 |

**September 10, 2007 (Series 3) Offering**

109.    On or about September 10, 2007, Barclays filed on Form 424B5 the prospectus

supplement to the 2007 Registration Statement for the September 2007 Series 3 Offering (the

- 34 -

"September 2007 Prospectus"), pursuant to which defendants sold 48 million shares of the Series 3 Securities at $25 per share for proceeds of $1.2 billion.

110.    The September 2007 Prospectus provided virtually no information about Barclays. Instead, it described the securities being offered and simply incorporated by reference Barclays' previously filed Forms 20-F and 6-K, including the Annual Report on Form 20-F for the year ending December 31, 2006 and filed on March 26, 2007 ("2006 20-F").

111.    The 2006 20-F stated that Barclays' reported financial results complied with IFRS reporting requirements and also stated in pertinent part:

**Group financial performance**

The Group's profit before tax in 2006 increased 35% (£1,856m) to £7,136m (2005: £5,280m). Income increased 25% (£4,262m) to £21,595m (2005: £17,333m) whilst operating expenses rose 20% (£2,147m) to £12,674m (2005: £10,527m). Impairment charges rose 37% (£583m) to £2,154 (2005: £1,571m).

Earnings per share rose 32% to 71.9p (2005: 54.4p), diluted earnings per share rose 33% to 69.8p (2005: 52.6p). Dividends per share rose 17% to 31p (2005: 26.6p). Return on average shareholders' funds was 25% (2005: 21%).

**Business performance**

\*        \*        \*

**Barclays Capital** produced an outstanding performance with profit before tax rising 55% to £2,216m. Income growth of 39% was driven by doing more business with new and existing clients and was broadly based across asset classes and geographies. *Growth was particularly strong in areas where we have invested in recent years, including commodities, equity products and credit derivatives. Profit growth was accompanied by improvements in productivity: income and profits grew significantly faster than Daily Value at Risk, risk weighted assets, economic capital, regulatory capital and costs*. The ratio of compensation costs to net income improved two percentage points to 49% and the cost:net income ratio improved three percentage points to 64%. *We continued to invest for future growth, increasing headcount 3,300 including 1,300 from the acquisition of HomEq, a US mortgage servicing business*.

\*        \*        \*

- 35 -

**Barclays Capital**

**2006/05**

Barclays Capital delivered record profit before tax and net income.  Profit before tax increased 55% (£785m) to £2,216m (2005: £1,431m).  This was the result of a very strong income performance, driven by higher business volumes, continued growth in client activity and favourable market conditions.  Net income increased 42% (£1,831m) to £6,225m (2005:£4,394m).  Profit before tax for Absa Capital was £71m (2005: £39m).

\*        \*        \*

**Impairment charges on loans and advances and other credit provisions**.

Impairment charges on loans and advances and other credit provisions increased 32% (£501m) to £2,068m (2005: £1,567m).  Excluding Absa impairment of £126m (2005: £20m), the increase was 26% (£395m) and largely reflected the continued challenging credit environment in UK unsecured retail lending through 2006.  The wholesale and corporate sectors remained stable with a low level of defaults.

\*        \*        \*

**Impairment on available for sale assets**

The total impairment charges in Barclays Capital included losses of £83m (2005: £nil) on an available for sale portfolio where an intention to sell caused the losses to be viewed as other than temporary in nature.  These losses in 2006 were primarily due to interest rate movements, rather than credit deterioration, with a corresponding gain arising on offsetting derivatives recognised in net trading income.

112.    The 2006 20-F provided little accurate information concerning the effects of the credit collapse on the Company, yet it provided excruciating details concerning the "risk management" practices designed to avoid the effects of the ongoing market collapse.  Over the course of 50 pages, Barclays misleadingly assured investors that, unlike its competitors, it was immune from the worst effects of the credit markets because of its stringent risk management practices, making statements such as:

- "Barclays ensures that it has the functional capability to manage the risk in new and existing businesses, and that business plans are consistent with risk appetite";

- 36 -

- "Each business area also employs risk specialists to provide an independent control function and to support the development of a strong risk management environment"; and

- "Barclays continues to use and develop advanced analysis, with comprehensive reporting of risk positions against their key risk factors and against risk appetite."

113.    Barclays' Series 3 Offering also incorporated the Company's August 2, 2007 SEC Form 6-K (the "August 2, 2007 6-K") containing Barclays' financial results for the six months ending June 30, 2007.  It reported net income of £11.9 billion, *shareholder equity of £28.9 billion, and assets of £1.16 trillion*.

114.    The August 2, 2007 6-K stated in pertinent part:

Barclays Capital delivered record results in the first half of 2007 with its two best quarters ever.  Profit before tax increased 33% (£414m) to £1,660m (2006: £1,246m).  This was the result of a very strong income performance, driven by good growth across asset classes and geographical regions underpinned by the strength of the client franchise.   Net income increased 23% (£776m) to £4,143m (2006: £3,367m).  Absa Capital delivered a very strong growth in profit before tax of 49% to £67m (2006: £45m) in the first half of 2007, despite a 20% depreciation in the Rand against Sterling.

Income increased 21% (£716m) to £4,153m (2006: £3,437m) as a result of very strong growth in commodity, credit, equity, emerging market, mortgage and currency asset classes. Income grew in all geographical regions.  Average DVaR increased 9% to £39.3m (2006: £36.2m).

*        *        *

Impairment charges of £10m (2006: £70m) reflected the stable wholesale credit environment and recoveries in the period.  The prior year included non credit-related impairment charges on available for sale assets of £83m.

*        *        *

Total impairment charges decreased 9% (£98m) to £959m (2006: £1,057m).

**Impairment charges on loans and advances and other credit provisions**

Impairment charges on loans and advances and other credit provisions decreased 2% (£15m) to £959m (2006: £974m).  In retail sectors this reflected a decrease in flows into delinquency and arrears balances across UK cards and unsecured loans; and some increase in impairment following book growth in

- 37 -

international portfolios.  UK mortgage impairment remained negligible.  In addition, the wholesale credit environment remained stable with continued low levels of default.

* * *

In UK Home Finance, mortgage delinquencies as a percentage of outstandings remained stable and amounts charged off were low, with the result that there was a small release to impairment.  The impairment charge in Barclaycard UK secured lending increased sharply in the second half of 2006 reflecting very strong book growth and stricter criteria for management of early cycle delinquency.  The impairment charge in the first half of 2007 was consistent with the second half of 2006 and Risk Tendency was broadly stable.

* * *

In the wholesale and corporate businesses, impairment charges on loans and advances and other credit provisions increased 12% (£17m) to £159m (2006: £142m).  Wholesale and corporate impairment charges as a percentage of period end total loans and advances of £219,981m (2006: £186,297m) was broadly stable at 0.14% (2006: 0.15%).

**Impairment on available for sale assets**

In 2006, there was an impairment charge related to losses on assets in the available for sale portfolio.  There has been no corresponding charge in the first half of 2007.

* * *

**Risk Tendency**

Risk Tendency increased £50m (2%) to £2,310m (31st December 2006: £2,260m) reflecting the broadly stable risk profile of the loan book.  Factors influencing Risk Tendency included the very strong growth (16%) of the Group loans and advances balances, particularly in Barclays Capital where the Risk Tendency component is very low, methodology enhancements in UK Retail Banking, and the maturation in the credit risk profile in the international card portfolios.  These were partially offset by a portfolio sale, methodology refinements in Barclaycard and improvements in the credit risk profile in the wholesale and corporate portfolios.

115.    The statements above in ¶¶111-114 from the September 2007 Offering were

materially false and misleading.  Defendants reasonably should have known, and did not disclose,

- 38 -

that Barclays had total credit market exposure of approximately £35 billion.  More specifically, defendants failed to disclose:

       (a)     that Barclays had £5.0 billion in risky ABS CDO exposure;

       (b)     that Barclays had an additional £5.4 billion in U.S. subprime mortgage exposure, including £2.4 billion of subprime mortgages originated by EquiFirst and £3.5 billion in subprime loans that were in the process of being securitized into CDOs and ABSs;

       (c)     that Barclays had £7.3 billion in leveraged finance exposure;

       (d)     that Barclays had more than £900 million of exposure to SIVs created by Barclays, which also had invested in risky credit and mortgage related products and for which Barclays would be required to support;

       (e)     that Barclays had £5 billion in Alt-A loan exposure;

       (f)     that Barclays had £1.3 billion in net monoline insurance exposure, and held more than £21.5 billion notional exposure against £20 billion in risky mortgage-backed assets, including £5 billion in non-investment grade CLOs and RMBS;

       (g)     that Barclays had £12.4 billion in commercial mortgage exposure, £1.3 billion of which was comprised of CMBS;

       (h)     that Barclays had failed to adequately write down its ABS CDO/subprime/Alt-A and other mortgage-related assets as had been done by other major financial institutions, and as indicated by the ABX and TABX indices;

       (i)     that Barclays' disclosures concerning market risks and credit risks were false and misleading because they failed to disclose the Company's true exposure to more than £30 billion in ABS CDO/subprime/Alt-A/leveraged finance and other mortgage-related assets;

(j)     that Barclays' assertions concerning compliance with IFRS were false and misleading because the reported financial results did not comply with IFRS;

(k)     that the Company's failure to disclose and comply with items (a)-(j) above was in contravention of Barclays' stated risk management policies and public representations;

(l)     that defendants, in failing to disclose items (a)-(i) above, violated IAS 30 and 32, as set forth more fully below in ¶¶142-145; and

(m)     that defendants, in failing to disclose items (a)-(i) above, violated Item 503 of Regulation S-K (17 C.F.R. §229.503), as set forth more fully below in ¶¶146 and 152-155.

116.     Immediately after Barclays' Series 3 Offering, banks similar to Barclays continued to reveal massive losses as a consequence of the mortgage crisis.  In October 2007, Merrill Lynch announced that it would write down its ABS CDOs by $12.4 billion.  In that same month, Swiss banking giant UBS wrote down $4.4 billion in subprime-related RMBS and CDOs.

117.     Then in November 2007, Morgan Stanley announced a $3.7 billion hit, Bank of America took a $3 billion writeoff and Citigroup was forced to sell a $7.5 billion stake to Abu Dhabi in a desperate effort to raise capital.  The Federal Reserve also injected $41 billion into the money supply for the banks to borrow, the largest single expansion since September 11, 2001.

118.     On November 15, 2007, Barclays suddenly announced an unscheduled "trading update" regarding BarCap's performance in the first ten months of 2007.  The purpose of the trading update was to quell fears in the market that Barclays would be required to take huge writedowns for fiscal year 2007, just as its competitors had done.

119.     In the trading update, defendants partially and misleadingly disclosed Barclays' exposure to the U.S. subprime mortgage and credit markets, disclosing for the first time that Barclays had £5.0 billion in ABS CDOs, £5.4 billion of "Other US Subprime" exposure (which

- 40 -

included £4.3 billion in subprime loans from EquiFirst), £7.3 billion in leveraged finance exposure and  £0.7 billion in SIV exposure.  The November 2007 trading update also disclosed for the first time that Barclays had taken only a meager £1.5 billion writedown through the end of October 2007 on its CDO and subprime exposure.  None of the information in the November 2007 trading update was incorporated by reference into the Series 4 Offering Materials.

120.    The trading update had its intended effect, as the market was apparently relieved to learn Barclays' writedowns would be small and that the Company's "liquidity position remains very strong."  Unfortunately, the information disclosed in the trading update understated the risk to shareholders, as the Company failed to properly write down these assets and failed to disclose other substantial exposures.

121.    By way of comparison, Barclays' meager November 2007 writedown of its ABS CDO assets (which equated to about 12% of its exposure, net of tax) was dramatically lower than those of other major investment banks which had previously announced writedowns to their own ABS CDO exposure.  For example, Merrill Lynch wrote down its ABS CDOs exposure by more than 25% in September, Morgan Stanley about 30% in October and UBS by more than 35% September.  And importantly, Barclays' meager writedowns were in stark contrast to the market indices Barclays claimed it was using for valuation purposes – the ABX and TABX.

**November 30, 2007 (Series 4) Offering**

122.    Two weeks later on or about November 30, 2007, Barclays filed, on Form 424B2, the prospectus supplement to the 2007 Registration Statement for the November 2007 Series 4 Offering (the "November 2007 Prospectus"), pursuant to which defendants sold 40 million shares of the Series 4 Securities at $25 per share for proceeds of $1 billion.  Like the Series 3 Offering in September the November 2007 Prospectus incorporated by reference Barclays' previously filed

Forms 20-F and 6-K as set forth in ¶¶111-114 above. ***It did not incorporate, and therefore specifically excluded, the November 15, 2007 trading update***.

123.   Just as in the Series 3 Offering, the statements above in ¶¶111-114 incorporated into the November 2007 Series 4 Offering were materially false and misleading.  Defendants reasonably should have known, and did not disclose that Barclays had total credit market exposure of approximately £35 billion.  More specifically, defendants failed to disclose that:

(a)   Barclays had failed to adequately write down its CDO, subprime and Alt-A exposure as had been done by other major financial institutions;

(b)   Barclays had £5 billion in exposure to risky U.S. Alt-A loans;

(c)   Barclays had £1.3 billion in net monoline insurance exposure, and held more than £20 billion notional exposure against £20 billion in risky mortgage backed assets, including £5 billion in non-investment grade CLOs and RMBS;

(d)   Barclays had £12.4 billion in commercial mortgage exposure, £1.3 billion of which was comprised of CMBS;

(e)   Barclays' disclosures concerning market risks and credit risks were false and misleading because they failed to disclose the Company's true exposure to more than £6.3 billion in Alt-A and monoline insurance assets;

(f)   Barclays' assertions concerning compliance with IFRS were false and misleading because the Offering Materials did not comply with IFRS;

(g)   the substantial and material risk that Barclays' exposure to Alt-A and subprime RMBS had on the Company's stated capital ratio, shareholders equity and its liquidity, and the risk that same exposure posed to the Company's future;

- 42 -

(h)     the Company's failure to disclose items (a)-(g) above was in contravention of Barclays' stated risk management policies and public representations;

(i)     defendants, in failing to disclose items (a)-(e) above, violated IAS 30 and 32 as set forth more fully below in ¶¶142-145; and

(j)     defendants, in failing to disclose items (a)-(e) above, violated Item 503 of Regulation S-K (17 C.F.R. §229.503) as set forth more fully below in ¶¶146 and 152-155.

124.    While Barclays continued to sell preferred securities to investors uninformed of the scope and extent of Barclays' credit market exposure, defendants were able to shore up Barclays' capital and take minimal writedowns against its massive asset base.  In contrast, Barclays' competitors continued to take huge writedowns on those very same assets.  For instance, in December 2007, UBS reported an additional $10 billion writedown in subprime-related RMBS and CDOs and Bank of America liquidated a $12 billion cash fund to access capital.  During the same time frame, Merrill Lynch received a $6.2 billion cash infusion from outside investors.

125.    By the end of 2007, more rating agencies were downgrading non-prime RMBS at a rapid pace, even those that had previously been rated AAA by ratings agencies.  For example, between December 31, 2007 and February 25, 2008, the credit ratings associated with ***more than $16 billion*** of Freddie Mac's AAA RMBS securities were downgraded below AAA by at least one nationally recognized rating agency.

126.    And the rating agencies themselves were being politically and publically attacked for failing to timely downgrade subprime and Alt-A RMBS much sooner and much faster.  On September 26, 2007, National Public Radio reported:

> Lawmakers will grill executives from credit-rating agencies for their role in the subprime mortgage crisis at today's Senate committee hearing. ***Critics say firms like Moody's and Standard & Poor's failed to see the risk.  They say rating***

- 43 -

*agencies should have downgraded the bonds backed by risky home loans much earlier*.

The firms made their first downgrade last July, at least two months after defaults on subprime loans started rising.  Still, there's probably not much Congress can do to overhaul the rating system – beyond finger pointing, that is.  There's even less it can do to restore confidence in the debt products that have exploded on Wall Street in recent years.

127.    The year 2008 saw the housing and credit crisis continue unabated.  On January 30, 2008, UBS announced that it had written down an additional $4 billion on its mortgage-related assets as of December 31, 2007.  Then in February 2008, UBS announced that its writedowns for fiscal year 2007 totaled $18.7 billion, primarily due to its exposure to U.S. mortgages.  This total included a $2 billion writedown for the fourth quarter of 2007 on the bank's $26.6 billion Alt-A portfolio.

128.    In mid-February, Barclays announced its year-end results for fiscal year 2007.  Again Barclays announced parsimonious writedowns on its troubled assets – in stark contrast to its competitors, the ratings agency downgrades, its own analysts' statements, and the ABX and TABX indices.

129.    On February 19, 2008, Reuters reported in part:

*Barclays writedown at $3.1 bln, relief lifts shares . . .*

LONDON, Feb 19 (Reuters) - British bank Barclays raised its writedown on the value of risky assets to 1.6 billion pounds ($3.12 billion) but relief that the loss wasn't worse and annual profit that met forecasts sent its shares soaring.

Barclays is the first major UK player to report earnings after a turbulent year and analysts said Tuesday's numbers – including a modest 300 million pound ($584 million) increase in writedowns and a 10 percent dividend rise – were good news for the sector.

Britain's third-biggest bank reported a 2007 pretax profit of 7.08 billion pounds, down from 7.14 billion in 2006 but just above an average forecast of 7.05 billion from Reuters Estimates. Underlying profits, which exclude sales of businesses, rose 3 percent.

Profit at  Barclays Capital rose 5 percent to a record 2.34 billion pounds, above expectations, making it one of few major investment banking units to report a

- 44 -

rise in 2007 earnings as capital markets were squeezed following the U.S. sub-prime mortgage crisis.

*     *     *

*Reassuring investors, Barclays said it remains confident it knows where its risks are and is comfortable with the current levels of writedowns.  Any surprises in the first weeks of 2008 would have had to have been disclosed, executives said.*

*     *     *

*He said the threat of further write-downs would largely depend on economic and market conditions, but he was comfortable with the risks facing the bank, including potential losses from trouble in the U.S. bond insurance sector.*

BarCap's losses arising from credit-market turbulence were 1.64 billion pounds last year, net of gains of 658 million pounds from widening credit spreads, which reduced the carrying value of notes held on its balance sheet.

Barclays had previously announced a 1.3 billion pound net writedown on assets linked to U.S. subprime mortgages, which included 400 million in gains on valuation of notes.

*The bank said its exposure to collateralised debt obligations stood at 6 billion pounds before hedging, while its exposure to Alt-A mortgages – which are of higher quality than subprime loans but also considered risky – rose to 4.9 billion.  Its exposure to U.S. monoline insurers totals 1.3 billion.*

"I can't predict where the markets are going this year but I'm confident that we know where our risks are," Diamond told Reuters in an interview.

130.    In March 2008, the collapsing real estate and credit markets led to the destruction of one of this country's oldest investment banks.  On March 16, 2008, Bear Stearns announced it would be acquired for $2 a share by J.P. Morgan (later increased to $10 per share) in a fire sale to avoid bankruptcy.  The deal had to be brokered by the Federal Reserve, which provided up to $30 billion to cover potential Bear Stearns losses – mostly resulting from mortgage-backed securities.

131.    During the three months ended March 31, 2008, American International Group, Inc. ("AIG") recorded an impairment charge of $5.6 billion that was "primarily related to the significant disruption in the residential mortgage and credit markets."  In April 2008, the International Monetary

- 45 -

Fund, which oversees the global economy, warned that potential losses from the credit crisis could reach $1 trillion.  Shortly after this announcement, UBS doubled its subprime writedowns, writing down another $19 billion.

**April 8, 2008 (Series 5) Offering**

132.    On or about April 8, 2008, Barclays filed, on Form 424B5, the prospectus supplement to the 2007 Registration Statement for the April 2008 Offering (the "April 2008 Prospectus"), pursuant to which defendants sold 100 million shares of the Series 5 Securities at $25 per share *for proceeds of $2.5 billion*.  The April 2008 Prospectus incorporated by reference Barclays' 2007 Form 20-F, which had been filed by Barclays with the SEC on March 26, 2008.  The April 2008 Prospectus did not include any financial information for the first quarter of 2008.

133.    The Annual Report on Form 20-F for the year ending December 31, 2007 and filed on March 26, 2008 ("2007 20-F") reported the Company's financial results for fiscal year 2007, which had previously been announced in February 2008.  Like the 2006 20-F, the 2007 20-F contained less detail concerning the Company's exposure to risky assets than it did in elaborating on the Company's risk management practices.  The 2007 20-F stated, in pertinent part:

> **Group Performance**
>
> Barclays delivered profit before tax of £7,076m.  Earnings per share were 68.9p and we increased the full year dividend payout to 34p, a rise of 10%.
>
> Income grew 7% to £23,000m.  Growth was well spread by business, with strong contributions from International Retail and Commercial Banking, Barclays Global Investors and Barclays Wealth.  Net income, after impairment charges, grew 4% and included net losses of £1,635m relating to credit market turbulence, net of £658m of gains arising from the fair valuation of notes issued by Barclays Capital and settlements on overdraft fees in relation to prior years of £116m in UK Retail Banking.
>
> ***Impairment charges and other credit provisions rose 30% to £2,795m. Impairment charges relating to US sub-prime mortgages and other credit market exposures were £782m.  Excluding these sub-prime related charges, impairment charges improved 7% to £2,013m.***  In UK Retail Banking and Barclaycard,

- 46 -

impairment charges improved significantly, as a consequence of reductions in flows into delinquency and arrears balances in UK cards and unsecured loans.  UK mortgage impairment charges remained negligible, with low levels of defaults, and the wholesale and corporate sector remained stable.  The significant increase in impairment charges in International Retail and Commercial Banking was driven by very strong book growth.

*     *     *

### Business Performance – Investment Banking and Investment Management

**Barclays Capital** delivered a 5% increase in profit before tax to £2,335m. Net income was ahead of last year, reflecting very strong performances in most asset classes including interest rates, currencies, equity products and commodities. *Results also included net losses arising from credit market turbulence of £1,635m net of gains from the fair valuation of issued notes of £658m*.  All geographies outside the US enjoyed significant growth in income and profits.  Strong cost control led to operating expenses declining slightly year on year.

*     *     *

### Capital management

At 31st December 2007, our Basel I Tier 1 Capital ratio was 7.8% (2006: 7.7%).  We started managing capital ratios under Basel II from 1st January 2008. Our Basel II Tier 1 Capital ratio was 7.6%.  *Our Equity Tier 1 ratio was 5.0% under Basel I (2006: 5.3%) and 5.1% under Basel II*.

*     *     *

The US sub-prime driven market dislocation affected performance in the second half of 2007.  Exposures relating to US sub-prime were actively managed and declined over the period. Barclays Capital's 2007 results reflected net losses related to the credit market turbulence of £1,635m, of which £795m was included in income, net of £658m gains arising from the fair valuation of notes issued by Barclays Capital.  Impairment charges included £840m against ABS CDO Super Senior exposures, other credit market exposures and drawn leveraged finance underwriting positions.

*     *     *

Impairment charges and other credit provisions of £846m included £722m against ABS CDO Super Senior exposures, £60m from other credit market exposures and £58m relating to drawn leveraged finance underwriting positions.  Other impairment charges on loans and advances amounted to a release of £7m (2006: £44m release) before impairment charges on available for sale assets of £13m (2006: £86m).

- 47 -

*      *      *

**Collateralised Debt Obligations**

The Group has structured and underwritten CDOs. At inception, the Group's exposure principally takes the form of a liquidity facility provided to support future funding difficulties or cash shortfalls in the vehicles. If required by the vehicle, the facility is drawn with the amount advanced included within loans and advances in the balance sheet. Upon an event of default or other triggering event, the Group may acquire control of a CDO and, therefore, be required to fully consolidate the vehicle for accounting purposes. The potential for transactions to hit default triggers before the end of 2008 has been assessed and included in the determination of impairment charges and other credit provisions (£782m in relation to ABS CDO Super Senior and other credit market exposures for the year ended 31st December 2007).

The Group's exposure to ABS CDO Super Senior positions before hedging was £6,018m as at 31st December 2007. This includes £1,149m of undrawn facilities provided to mezzanine transactions (exposure stated net of writedowns and charges). Undrawn facilities provided to unconsolidated CDOs are included as part of commitments in Note 34 to the accounts.

The remaining £4,869m is the Group's exposure to High Grade CDOs, stated net of writedowns and charges. £3,782m of drawn balances are included within loans and advances on the balance sheet, with the remaining £1,087m representing consolidated High Grade CDOs accounted for on a fair value basis.

*      *      *

**Barclays Capital credit market positions**

Barclays Capital credit market exposures resulted in net losses of £1,635m in 2007, due to dislocations in the credit markets. The net losses primarily related to ABS CDO super senior exposures, with additional losses from other credit market exposures partially offset by gains from the general widening of credit spreads on issued notes held at fair value.

Credit market exposures in this note are stated relative to comparatives as at 30th June 2007, being the reporting date immediately prior to the credit market dislocations.

*      *      *

**ABS CDO Super Senior exposure**

ABS CDO Super Senior net exposure was £4,671m (30th June 2007: £7,432m). Exposures are stated net of writedowns and charges of £1,412m (30th June 2007: £56m) and hedges of £1,347m (30th June 2007: £348m).

- 48 -

The collateral for the ABS CDO Super Senior exposures primarily comprised Residential Mortgage Backed Securities. 79% of the RMBS sub-prime collateral comprised 2005 or earlier vintage mortgages. On ABS CDO super senior exposures, the combination of subordination, hedging and writedowns provide protection against loss levels to 72% on US sub-prime collateral as at 31st December 2007. None of the above hedges of ABS CDO Super Senior exposures as at 31st December 2007 were held with monoline insurer counterparties.

**Other credit market exposures**

Barclays Capital held other exposures impacted by the turbulence in credit markets, including: whole loans and other direct and indirect exposures to US sub-prime and Alt-A borrowers; exposures to monoline insurers; and commercial mortgage backed securities. The net losses in 2007 from these exposures were £823m.

Other US sub-prime whole loan and net trading book exposure was £5,037m (30th June 2007: £6,046m). Whole loans included £2,843m (30th June 2007: £1,886m) acquired since the acquisition of EquiFirst in March 2007, all of which were subject to Barclays underwriting criteria. As at 31st December 2007 the average loan to value of these EquiFirst loans was 80% with less than 3% at above 95% loan to value. 99% of the EquiFirst inventory was first lien.

Net exposure to the Alt-A market was £4,916m (30th June 2007: £3,760m), through a combination of securities held on the balance sheet including those held in consolidated conduits and residuals. Alt-A exposure is generally to borrowers of a higher credit quality than sub-prime borrowers. As at 31st December 2007, 99% of the Alt-A whole loan exposure was performing, and the average loan to value ratio was 81%. 96% of the Alt-A securities held were rated AAA or AA.

Barclays Capital held assets with insurance protection or other credit enhancement from monoline insurers. The value of exposure to monoline insurers under these contracts was £1,335m (30th June 2007: £140m). There were no claims due under these contracts as none of the underlying assets were in default.

Exposures in our commercial mortgage backed securities business comprised commercial real estate loans of £11,103m (30th June 2007: £7,653m) and commercial mortgage backed securities of £1,296m (30th June 2007: £629m). The loan exposures were 54% US and 43% European. The US exposures had an average loan to value of 65% and the European exposures had an average loan to value of 71%. 87% of the commercial mortgage backed securities held as at 31st December 2007 were AAA or AA rated.

Loans and advances to customers included £152m (30th June 2007: £692m) of drawn liquidity facilities in respect of SIV-lites. Total exposure to other structured investment vehicles, including derivatives, undrawn commercial paper backstop

facilities and bonds held in trading portfolio assets was £590m (30th June 2007: £925m).

134.    Like the 2005 and 2006 20-Fs, the 2007 20-F also contained an expansive discussion of the Company's risk management practices in an effort to reassure investors of Barclays' ability to identify and control credit market risks.  In fact, the Company dedicated more than 30 pages to a discussion of its practices in evaluating and controlling various risks to the Company, including whole sections dedicated to "Credit risk management," "Market risk management" and "Liquidity risk management."

135.    The statements in ¶¶133-134 from the April 2008 Prospectus and 2007 20-F were false and misleading for the following reasons:

(a)    As set forth in ¶¶67-70, 136-155 and 182-209, Barclays knowingly failed to properly write down its exposure to U.S. subprime and Alt-A mortgages, CDOs, monoline insurers and RMBS in accordance with applicable accounting standards, and failed to adequately disclose the risks posed by these assets;

(b)    As demonstrated in ¶¶71-77, Barclays knowingly failed to adequately disclose the risk to the Company associated with its exposure to monoline insurers, including the fact that the Company had more than £21.5 billion of notional exposure to highly risky mortgage-backed assets, such as £10 billion in A/BBB and non-investment grade CLOs and MBSs, which had only been written down by less than 0.3% at the time of the Series 5 Offering;

(c)    Barclays failed to disclose the substantial and material risk that the Company's U.S. subprime and Alt-A exposure had on its stated capital ratio, shareholder's equity and the risk that the same posed to the Company's future capital ratio and liquidity; and

(d)    The Company's failure to disclose and comply with items (a)-(d) above was in contravention of Barclays' stated risk management policies and public recommendations.

- 50 -

**During the Offering Period, Barclays Failed to Comply
with Applicable Accounting Standards and SEC Requirements**

136.    As a publicly traded company, Barclays was required by the EU Commission, Regulation (EC) No. 1606, and Article 4 to issue financial results in accordance with IFRS. Barclays adopted IFRS for the first time for the purpose of preparing financial statements for the year ended December 31, 2005.  During 2005 through 2007, Barclays prepared their consolidated financial statements subject to IFRS.  IFRS are those principles adopted by the International Accounting Standards Board ("IASB") and recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted international accounting practices at a particular time.  IFRS are promulgated by the IASB (formerly the Board of the International Accounting Standards Committee ("IASC")).  Narrowly, IFRS refers to the numbered series of pronouncements currently being issued by the IASB, as distinct from the IAS's numbered series of pronouncements issued by its predecessor.

137.    Barclays' compliance with IFRS and all statements describing the fair presentation of its financial results were covered by IAS 1, which states:

> An entity whose financial statements comply with IFRSs shall make an explicit and unreserved statement of such compliance in the notes.  An entity shall not describe financial statements as complying with IFRSs unless they comply with all the requirements of IFRSs.

138.    IAS 1 further states:

> The application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.

139.    IFRS No. 7 Financial Instruments: Disclosures ("IFRS 7"), which became effective beginning January 1, 2007, requires disclosures that enable users of the financial statements to evaluate the significance of financial instruments, such as subprime-backed CDOs and other

- 51 -

subprime-related assets, to an entity's financial position and performance.  IFRS 7 also requires the disclosure of the nature and extent of risks arising from those financial instruments.

140.    Specifically IFRS 7 states:

An entity shall disclose information that **_enables users of its financial statements to evaluate the nature and extent of risks arising from financial instruments to which the entity is exposed_** at the end of the reporting period.

. . . These risks typically include, but are not limited to, **_credit risk, liquidity risk and market risk_**.

\*        \*        \*

For each type of risk arising from financial instruments, an entity shall disclose:

(a)    the exposures to risk and how they arise;

(b)    its objectives, policies and processes for managing the risk and the methods used to measure the risk; and

(c)    any changes in (a) or (b) from the previous period.

141.    IFRS 7 further states:

[E]ntities [are required] to provide disclosures in their financial statements that enable users to evaluate:

(a)    **_the significance or financial instruments for the entity's financial position and performance_**; and

(b)    the nature and extent of risks arising from financial instruments to which the entity is exposed during the period and at the end of the reporting period, and how the entity manages those risks.

142.    Prior to the effective date of IFRS 7, IAS No. 32, Financial Instruments: Disclosure and Presentation ("IAS 32"), and IAS No. 30, Disclosures in Financial Statements of Banks and Similar Financial Institutions ("IAS 30"), required similar disclosures. Barclays failed to accurately and adequately disclose Barclays' exposure of its financial assets to credit risk:

143.    Specifically, IAS 32 states:

- 52 -

Transactions in financial instruments may result in an enterprise's assuming or transferring to another party one or more of the financial risks described below. ***The required disclosures provide information that assists users of financial statements in assessing the extent of risk related to*** both recognized and unrecognized ***financial instruments***:

(a)    Price risk – There are three types of price risk: currency risk, interest rate risk and market risk.

\*        \*        \*

(iii) ***Market risk is the risk that the value of a financial instrument will fluctuate as a result of changes in market prices*** whether those changes are caused by factors specific to the individual security or its issuer or factors affecting all securities traded in the market.

\*        \*        \*

(b)    ***Credit risk*** – Credit risk is the risk that one party to a financial instrument will fail to discharge an obligation and cause the other party to incur a financial loss.

(c)    ***Liquidity risk*** – Liquidity risk, also referred to as funding risk, is the risk that an enterprise will encounter difficulty in raising funds to meet commitments associated with financial instruments. ***Liquidity risk may result from an inability to sell a financial asset quickly at close to its fair value***.

\*        \*        \*

For each class of financial asset, financial liability and equity instrument, both recognized and unrecognized, an enterprise should disclose:

(a) information about the extent and nature of financial instruments, ***including significant terms and conditions that may affect the amount, timing and certainty of future cash flows*** . . . .

144.    IAS 32 states:

Concentrations of credit risk are disclosed when they are not apparent from other disclosures about the nature and financial position of the business and they result in a significant exposure to loss in the event of default by other parties. Identification of significant concentrations is a matter for the exercise of judgement by management taking into account the circumstances of the enterprise and its debtors . . . .

***Concentrations of credit risk may arise from exposures to a single debtor or to groups of debtors having a similar characteristic such that their ability to meet***

- 53 -

*their obligations is expected to be affected by changes in economic or other conditions.  Characteristics that may give rise to a concentration of risk include the nature of the activities undertaken by debtors*, such as the industry in which they operate, the geographic area in which activities are undertaken *and the level of creditworthiness of groups of borrowers* . . . .

*Disclosure of concentrations of credit risk includes a description of the shared characteristic that identifies each concentration and the amount of the maximum credit risk exposure* associated with all recognised and unrecognised financial assets sharing that characteristic.

145.    IAS 30 states:

*A bank shall disclose any significant concentrations of its assets, liabilities and off balance sheet items*.  Such disclosures shall be made in terms of geographical areas, customer or industry groups *or other concentrations of risk*. . . .

*A bank discloses significant concentrations* in the distribution of its assets and in the source of its liabilities *because it is a useful indication of the potential risks inherent in the realisation of the assets and the funds available to the bank*.  Such disclosures are made in terms of geographical areas, customer or industry groups or *other concentrations of risk which are appropriate in the circumstances of the bank*.

146.    In addition to the foregoing, Barclays' Offering Materials failed to comply with SEC Regulation S-K.  In the Registration Statement and Prospectuses defendants had the duty to disclose information pursuant to Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), including, *inter alia*, a "*discussion of the most significant factors that make the offering speculative or risky*."

147.    The disclosure in the Registration Statements and Prospectuses failed to adequately alert investors to the actual risks associated with Barclays' investments in Alt-A and subprime mortgages, RMBS and financial institution debt securities.  As noted herein, Barclays' Alt-A and subprime RMBS debt securities were backed by mortgages extended to borrowers who did not qualify for standard loans, and therefore were inherently much more risky.

148.    Under IAS 39, Barclays was also required to accurately value its subprime-backed CDOs and other subprime-related assets at their fair value at each reporting period and to record losses in its income statement, in the form of writedowns, arising from any decreases in fair value

- 54 -

since the prior reporting period.  Under IAS 39, Barclays was required to incorporate all relevant

factors, as opposed to relying on its own unrealistic valuation assumptions to calculate the fair value

of its subprime-backed assets and to determine if writedowns were necessary.  IAS 39 states, in

relevant part:

> The objective of using a valuation technique is to ***establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations***.  Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same . . . . ***The chosen valuation technique makes maximum use of market inputs*** and relies as little as possible on entity-specific inputs.  ***It incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments***.  Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (i.e., without modification or repackaging) or based on any available observable market data.

149.    As the subprime/non-prime crisis worsened, Barclays was required at the end of each

period to value its subprime/non-prime-backed CDOs and other assets at their true fair value based

on the then-current market conditions – not a hypothetical value based on Barclays' own internal

assumptions.  Sir David Tweedie ("Tweedie"), Chairman of the IASB, commenting on the fair value

calculations of instruments affected by the subprime crisis, stated, "accounts [including those

affected by the subprime crisis] are supposed to reflect the current situation, not a probable future

one."  Tweedie also commented that "***[a]ccounting has to reflect facts, not assume stability when it doesn't exist***."

150.    Barclays improperly valued these subprime and other mortgage-backed assets using

internally generated valuation models that relied on variables and highly subjective forward-looking

estimates supplied by Barclays' own management.  Contrary to Barclays' public statements,

Barclays' internal values did not reflect market prices, such as those found on the ABX and TABX.

- 55 -

Barclays' valuations were clearly inconsistent with actual current market conditions and blatantly missed the objective of fair value. The results were valuations that allowed Barclays to avoid reporting significant losses on its subprime/non-prime exposure prior to its Offerings, despite the fact that all indications of fair value explicitly showed these assets were significantly below the value that Barclays' models purported to show.

151. Under IFRS, Barclays was required to incorporate the risks arising from these assets in valuing and writing down its RMBS/CDOs and other mortgage-backed assets. Specifically, defendants were aware of prior to the Series 5 Offering, all of the following:

(a) Barclays' subprime/non-prime exposure was massive, concentrated and highly vulnerable to the adverse events which had occurred in the U.S. subprime real estate and credit markets;

(b) warning signs demonstrating the U.S. subprime crisis directly affected the collateral underlying Barclays' subprime-backed assets, including the collapse of Bear Stearns as a result of its heavy investments in asset-backed securities similar to Barclays;

(c) the ABX index, a leading indicator of the value of mortgage-backed assets, was rapidly declining;

(d) substantial writedowns by similar banks holding the same and similar financial instruments;

(e) substantial ratings downgrades by rating agencies charged with analyzing and evaluating the risk of default associated with these assets;

(f) Barclays' extensive trading experience would have revealed the increasing illiquidity and market vulnerability of its CDOs and mortgage-backed assets;

- 56 -

(g)      Barclays' active involvement in the subprime and Alt-A mortgage market, through its origination and servicing businesses;

(h)      Barclays' own research analysts publicly reporting that even the highest classes of CDOs were worth only 20-30 cents on the dollar; and

(i)      Barclays' own internal risk management processes, as described more fully herein.

**The Offering Materials Failed to Comply with SEC Regulations**

152.   In the Registration Statement and Prospectuses defendants also had the duty to disclose information pursuant to Item 503 of Regulation S-K, 17 C.F.R. §229.503, including, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Item 503 also required that the defendants "[e]xplain how the risk affects the issuer or the securities being offered."

153.   Moreover, disclosures of such loss contingencies in the annual Forms 20-F were particularly important to an informed investment decision in view of SEC Article 10-01 of Regulation S-X, 17 C.F.R. §210.10-01, which provides, in pertinent part, that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

154.   The disclosure in the Registration Statements and Prospectuses failed to adequately alert investors to the actual risks associated with Barclays' investments in credit market instruments such as ABS CDOs, Alt-A, subprime RMBS, and financial institution debt securities. Barclays' ABS CDOs, Alt-A, and subprime RMBS debt securities were backed by mortgages extended to

- 57 -

borrowers who did not qualify for standard loans, and therefore are inherently more risky. Subprime mortgages carry a significantly higher default risk than prime mortgages or even Alt-A mortgages due to the significantly weaker creditworthiness of the borrowers who take out these loans. Default rates began to rise dramatically in 2006, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages. These problems grew worse in 2007, as borrowers continued to default in record numbers, and as a result, the market for Alt-A and sub-prime RMBS and related CDO/CLOs showed substantial distress as set forth more fully above.

155. Barclays did not comply with Item 503 of Regulation S-K, and Regulation S-X, because it did not begin to make adequate disclosures of its capital market exposures until after all of the Offerings described herein were completed. Barclays only began to make certain disclosures of its capital credit market exposures until its interim 2008 results, as of June 30, 2008, and certain vital disclosures were not made until the annual report as of December 31, 2008 was filed in March 2009, which included specific credit market exposures, fair value losses, and total gross losses pertaining to BarCap's credit risks.

**Series 2 Offering**

156. On or about September 14, 2005, Barclays filed with the SEC a Form F-3/A Registration Statement for the Preferred Stock. The Registration Statement incorporated certain SEC filings and also included assurances that the registrant would undertake

> [t]o reflect in the document any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement . . . .

On or about April 21, 2006, Barclays filed its Form 424B2 for the Offering, which forms part of the Registration Statement and which became effective on April 20, 2006, selling 30 million shares at

$25 per share (which included a 15-day option to underwriters to purchase up to an additional 4 million shares of Preferred Stock to cover over-allotments), for a total price to the public of $776.25 million, including over-allotments. The Prospectus incorporated by reference Barclays' previously filed Forms 20-F and 6-K.

157.    The Registration Statement/Prospectus omitted important information about Barclays' exposure to the credit and real estate markets and how the changes in the markets were affecting Barclays by the time of the Offering, including omitting information about how this exposure could affect the Company's capital base.

158.    In addition, the Registration Statement/Prospectus contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading, and the incorporated documents were not prepared in accordance with applicable IFRS guidelines and SEC regulations. In truth, the statements above were false and/or misleading because the dislocation in the financial markets was then having an increasingly severe impact on Barclays' business which significantly increased the risk level of the Preferred Stock.

159.    More specifically, Barclays' Form 20-F for 2005 indicated that Barclays' derivative financial instruments, which included RMBS, CDOs and other derivatives, were recorded at £136.823 billion as of December 31, 2005, representing 14.8% of the Company's total reported assets of £924.357 billion. Barclays reassured investors that "Barclays actively manages its credit exposures." Barclays also stated that "[w]hen weaknesses in exposures are detected – either in individual exposures or in groups of exposures – action is taken to mitigate the risks." Barclays also claimed that it "manages the diversification of its portfolio to avoid unwanted credit risk concentrations." Indeed, Barclays claimed that "the identification and management of risk remains a high priority and underpins all our business activity."

160.     Furthermore, the 2005 Form 20-F indicated that when valuing financial instruments in which the fair values were measured using valuation techniques that are determined in full or in part on assumptions that are not supported by observable market prices, using "reasonably possible alternative assumptions," the valuation range would be about £87 million lower to £121 million higher than the fair values recognized in the 2005 financial statements.  Comparing this low end estimate of £87 million to Barclays' total reported value of derivative instruments of £136.823 billion, Barclays, in effect, suggested that *the total reported value of its derivative instruments was at most overstated by a mere 0.06%*.

161.     Barclays' assurances in the 2005 Form F-20, however, were disingenuous and without foundation, as the Company failed to disclose the nature and magnitude of its credit risk exposures, and gave no meaningful indications of the Company's real vulnerability and leverage with respect to the subprime, Alt-A and other high-risk credit markets.  For example, the 2005 Form F-20 only discloses the notional contract (face value) amounts of the derivatives held for trading. *Yet Barclays provided no information whatsoever* concerning the nature, concentrations, leverage and actual risk exposures, and misled investors with false assurances that Barclays took action that would materially "mitigate the risks," all in violation of IFRS guidelines and Item 503 of SEC Regulation S-K.

162.     Barclays also stated that the Company's Tier 1 capital ratio was 7% for the year ended December 2005, "reflecting strong cash flow generation and the efficient use of capital markets."  Tier 1 capital is the core measure of a bank's financial strength and is closely followed by regulators as well as the market.  Tier 1 capital is essentially equal to core capital, consisting of common stock and disclosed reserves (or retained earnings) divided by the Company's total assets.

- 60 -

However, Barclays did not disclose the potential adverse impact of the deteriorating housing conditions that threatened to weaken Barclays' Tier 1 capital ratio.

**Series 3 Offering**

163.    The Series 3 Registration Statement/Prospectus also omitted important and material information about Barclays' exposure to the credit and real estate markets and how the changes in the markets were affecting Barclays by the time of the Offering, including omitting information about how this exposure could affect the Company's capital base.

164.    The Registration Statement/Prospectus contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading, and the incorporated documents were not prepared in accordance with applicable IFRS guidelines and SEC regulations.   The statements above in ¶¶111-114 were false and/or misleading because the dislocation in the financial markets was then having an increasingly severe impact on Barclays' business which significantly increased the risk level of the Preferred Stock.

165.    Barclays' Form 20-F for 2006 indicated that Barclays' derivative financial instruments, which included RMBS, CDOs and other derivatives, were recorded at £138.353 billion as of December 31, 2006, representing 13.9% of the Company's total reported assets of £996.787. As with the Form 20-F for 2005, in 2006 Barclays again reassured investors that "Barclays actively manages its credit exposures."   Barclays again stated that "[w]hen weaknesses in exposures are detected – either in individual exposures or in groups of exposures – action is taken to mitigate the risks."   Barclays also claimed that it "manages the diversification of its portfolio to avoid unwanted credit risk concentrations."

166.    In Barclays' 2006 20-F, Barclays indicated that many people in the Company were involved in the risk management process, stating the following, for example:

- 61 -

Across Barclays, every business manager is accountable for managing risk in his or her business area; they must understand and control the key risks inherent in the business undertaken. Each business area also employs risk specialists to provide an independent control function and to support the development of a strong risk management environment. This functional approach to risk management is built on formal control processes that rely on individual responsibility and independent oversight, as well as challenge through peer reviews. Barclays continues to use and develop advanced analysis, with comprehensive reporting of risk positions against their key risk factors and against risk appetite. To support expanded risk taking, Barclays has continued to strengthen the independent and specialised risk teams in each of its businesses, supported by matching teams at Group level, acting in both a consultancy and oversight capacity. It has made the recruitment, development and retention of risk professionals a priority because it is believed that it is a prerequisite to business growth plans. Barclays also continues to make significant investment in the infrastructure to identify, measure and report risk positions.

*     *     *

The Board approves Risk Appetite and the Board Risk Committee monitors the Group's risk profile against this appetite.

- Business Heads are responsible for the identification and management in their businesses.

- The Risk Director, under delegated authority from the Group Chief Executive and Group Finance Director, has responsibility for ensuring effective risk management and control.

*     *     *

- Business risk teams, each under the management of a Business Risk Director, are responsible for assisting Business Heads in the identification and management of their business risk profiles and for implementing appropriate controls.

- Internal Audit is responsible for the independent review of risk management and the control environment.

167.    Barclays stated that the Company ensured that there was strong oversight over the risk management process throughout the entire organization. But these statements were false and misleading. Barclays had, in fact, taken on increasingly greater risks as the housing problems grew worse in 2006. Borrowers continued to default in record numbers. As a result, the market for Alt-A and subprime RMBS and related CDO/CLOs began to show substantial distress. This distress

- 62 -

resulted from three primary indicators used by industry experts to assess the current state of, and future prospects for, the U.S. mortgage market, all of which had turned negative: (1) rising interest rates; (2) the declining U.S. Housing Price Index, which measures changes in U.S. home prices; and (3) delinquency rates, which monitor the percentage of mortgagees who default on their mortgage obligations.  The Company failed to disclose the nature, concentration and magnitude of its credit risk exposures, and gave no meaningful indications of the Company's real vulnerability and leverage with respect to the subprime, Alt-A and other high-risk credit markets, in violation of IAS 30, IAS 32, IAS 39 and Item 503 of SEC Regulation S-K.  These critical omissions, coupled with Barclays' repeated assurances regarding the Company's extensive risk control oversight, were tantamount to sending the false message that management took reasonable steps to mitigate the adverse housing trends and associated risks.

168.    Barclays stated in the 2006 Form 20-F that when valuing financial instruments in which the fair values were measured using valuation techniques that are determined in full or in part on assumptions that are not supported by observable market prices, using "reasonably possible alternative assumptions," the valuation range would be about £123 million lower to £139 million higher than the fair values recognized in the 2007 financial statements.  Comparing this low end estimate of £123 million to Barclays' total reported value of derivative instruments of £138.353 billion, Barclays, in effect, suggested that the total reported value of its derivative instruments was at most overstated by 0.09%.  ***This "reasonably possible" overstatement of 0.09% in 2006 was a mere three basis points greater than the "reasonably possible" overstatement of 0.06% level in 2005. Such an insignificant increase from 2005 to 2006 in the "reasonably possible" overstatement of Barclays' total reported derivative instruments was false and misleading***, given the tremendous adverse shifts in the housing market that took place during the period from late 2005 through the end

- 63 -

of 2006, and the inherent leveraging involved in derivative instruments, *unless* Barclays had managed to hedge or transfer those risks to others.

169.    Delinquencies related to subprime mortgage loans began to spike in August 2006 and reached historical highs by the end of November 2006. As of December 2006, late mortgage payments rapidly increased in third quarter 2006 as higher interest rates squeezed budgets and made it difficult for homeowners, particularly those with weaker credit records, to maintain their monthly obligations. The Mortgage Bankers Association, in its quarterly assessment of the mortgage market, reported that the percentage of monthly payments that were 30 or more days past due for all loans tracked jumped to 4.67% in third quarter 2006 – the worst performance since first quarter 2005. The delinquency rate for subprime borrowers in third quarter 2006 was even higher at 12.6% – the highest in more than three years. And for those holding adjustable rate mortgages, the delinquency rate was 13.2% in third quarter 2006, which was also the worst reading in more than three years. As of November 2006, there were clear signs that CDO performance was suffering due to the delinquency rates of the underlying RMBS, as many CDOs during this period were backed by subprime RMBS. Declining property values coupled with rising interest rates caused delinquency rates to rise sharply during the class period for U.S. residential subprime and Alt-A mortgages. By October 2006, borrowers were 60+ days behind in payments on 3.9% of the subprime loans packaged into mortgage securities during 2006, nearly twice the delinquency rate on subprime loans recorded a year earlier. Given these adverse conditions, and Barclays' relatively modest estimate of "reasonably possible" overstatement of the Company's total reported derivative instruments, Barclays falsely conveyed to the market that it implemented sufficient controls to contain the risk of substantial losses associated with those derivative instruments.

170.     Barclays also stated that the Company's Tier 1 capital ratio was 7.7% for the year ended December 2006.  Barclays did not disclose, however, any of the above formidable adverse trends in the deteriorating housing conditions that threatened to critically weaken Barclays' Tier 1 capital ratio.

**Series 4 Offering**

171.     On November 30, 2007, Barclays filed its 7.75% non-cumulative callable dollar preference shares, Series 4, with a total price to the public of $1.15 billion, including over-allotments.  Barclays incorporated by reference its Form 20-F for 2006 and Forms 6-K filed on April 23, 2007, April 27, 2007, May 8, 2007, May 31, 2007, June 19, 2007, July 23, 2007, July 30, 2007, August 2, 2007 and August 13, 2007.

172.     The Series 4 Prospectus omitted important information about Barclays' exposure to the credit and real estate markets and how the changes in the markets were affecting Barclays at the time of the Offering, including omitting information about how this exposure could affect the Company's capital base.  In addition to the adverse market conditions occurring in connection with the Series 3 Offering, in connection with the Series 4 Offering, other banks continued to reveal losses as a consequence of the mortgage crisis through October 2007.  Merrill Lynch announced that it would write down its ABS CDOs by $12.4 billion.  Also in October 2007, Swiss banking giant UBS wrote down $4.4 billion in subprime related RMBS and CDOs.  In November 2007, Morgan Stanley announced a $3.7 billion hit, Bank of America took a $3 billion write-off and Citigroup was forced to sell a $7.5 billion stake to Abu Dhabi in a desperate effort to raise capital.  Barclays did record impairment charges and other credit provisions totaling £2.154 billion, compared with impairment charges of £1.561 billion in 2005, but Barclays' relatively better performance compared

- 65 -

with its peers was not accomplished as a result of superior risk management skills, but rather, through erroneous accounting.

173.    One example was a financial device that Barclays developed called the SIV-lite, a form of an SIV.  The standard SIV was a type of fund in the shadow banking system invented by Citibank in 1988.  An SIV is a sort of "virtual bank."  However, unlike a commercial bank, it borrows money, rather than obtaining funds through deposits from the public.  The borrowing rate was usually close to the London Inter-Bank Offer Rate ("LIBOR").  The SIV then typically uses the funds to invest in bonds earning a higher interest rate, with the spread representing the gross profit to pay to the capital note holders and the investment manager.  SIV-lites, on the other hand, are essentially CDOs which pool together bonds backed by mortgages and other asset-backed debt.  The main difference is that other CDOs sell long-term senior debt to fund their assets while SIV-lites raise senior debt in the short-term asset-backed commercial paper or asset-backed commercial paper markets.

174.    Barclays later described its SIV-lite activities in its 2007 Form 20-F:

> The Group structured and helped to underwrite three SIV-Lite transactions. The Group is not involved in their ongoing management.
>
> The Group provided £0.55bn in liquidity facilities as partial support to the £2.6bn of CP programmes on these transactions.  These facilities have now been fully drawn or are terminated, such that no further drawings are possible.  One of the three vehicles has been restructured into a cash CDO.  As part of this restructuring, the Group acquired the £800m senior note in the CDO which is held at fair value within trading portfolio assets.  The credit risk on this note has been transferred to a third party investment bank.  For the remaining facilities, the amount drawn totaled £152m and is included on the balance sheet within loans and advances to customers and included in the credit market positions discussed on page 53 [of the 2007 Form 20-F].

175.    Barclays' statements regarding the SIV-lites were false and misleading and omitted material facts.  The SIV-lite was a scheme developed by a group of investment bankers within

- 66 -

BarCap, part of Barclays.  Between 2005 and 2007, Edward Cahill ("Cahill"), who was then employed by BarCap as European Head of Collateralised Debt Obligations, along with his team structured at least four SIV-lites:

- Mainsail II, a $4.5 billion fund structured by Barclays and managed by Solent Capital ("Solent");

- Golden Key, a $5 billion fund structured by Barclays and managed by Avendis;

- Cairn High Grade Funding I, a $1.6 billion SIV-lite created by Barclays in January 2006; and

- Sachsen Funding I, a $7 billion SIV-lite set up by Barclays in May 2007.

176.    The SIV-lites that Barclays structured were similar to conduits – packages of commercial and retail loans used by banks and fund managers as collateral to raise short-term debt – **but often leveraged by between 40 to 70 times**, compared with standard SIVs which were typically leveraged 12 to 16 times.  As part of the process, Barclays purchased the initial portfolio of securities for each SIV-lites, which is called "warehousing."  When the portfolio was complete, Barclays arranged to sell the entire portfolio to the SIV-lite.  Normally, Barclays, as arranger of the SIV-lite would bear the risk of holding the warehoused assets.

177.    However, during the first half of 2007, Solent, the manager of Mainsail II, and Avendis, the manager of Golden Key, transferred impaired securities backed by U.S. subprime mortgages to Mainsail II and Golden Key.  Barclays began "warehousing" those assets in late 2006 or early 2007 in order to sell them to Mainsail II and Golden Key at a profit.  But as the U.S. subprime market declined in the first half of 2007, the value of those assets plunged and Barclays needed to transfer the toxic securities to some of the SIV-lites to avoid recording a loss.

178.    Barclays had warehoused about $528 million in mortgage-backed securities by March 2007.  But as investors became increasingly unwilling to make investments in securities backed by

- 67 -

U.S. residential mortgages, particularly subprime mortgages, the prices for those securities fell dramatically.  Barclays could be caught holding the bag and lose hundreds of millions of dollars.

179.    Barclays arranged to transfer the impaired securities to Mainsail II and Golden Key at cost, rather than the actual fallen market value.  To accomplish this, Barclays worked with Solent and Avendis to raise additional funding for Mainsail II and Golden Key, respectively, so that those SIV-lites could purchase the impaired securities at inflated prices.  While Standard & Poor's ("S&P") granted the SIV-lites top credit ratings throughout this process, ***shortly after S&P confirmed its rating of Mainsail II and Golden Key in July 2007, S&P cut the SIV-lites by as much as 17 levels from a rating of AAA to CCC***.

180.    Another critical, but undisclosed, feature of Barclays' SIV-lites was that they were required to have a "liquidity backstop" to ensure that the SIV-lites could have initially high credit ratings.  This meant that Barclays was essentially on the hook to fund up to 25% of the commercial paper that the SIV-lites issued.

181.    On or about August 20, 2007, Cahill resigned from Barclays.  While Cahill's departure was widely publicized in the financial press, the 2007 Form 20-F was silent on this matter, just as it failed to disclose all other important matters described herein regarding the SIV-lites.

**Series 5 Offering**

182.    On April 8, 2008, Barclays filed its 8.125% non-cumulative callable dollar preference shares, Series 5, with a total price to the public of $2.875 billion, including over-allotments. Barclays incorporated by reference its Form 20-F for 2007.

183.    The Series 5 Prospectus omitted important information about Barclays' exposure to the credit and real estate markets and how the changes in the markets were affecting Barclays at the

- 68 -

time of the Offering, including omitting information about how this exposure could affect the Company's capital base.

184.    Barclays' writedowns of its risky credit assets contained in the 2007 20-F were knowingly or recklessly inadequate.  As was later publicly admitted, the senior management of BarCap, including defendant Diamond, personally reviewed and signed off on the marks the Company took on its subprime assets.  According to Barclays' Group Finance Director Chris Lucas, on a February 19, 2008 conference call:

> In terms of the process, [each asset class] go[es] through an independent product control process, independent of the desks, they run through a challenge process up to and including Bob [Diamond] and the senior management at Barclays Capital and there are a series of adjustments that are made reflected in here following that process.  Finally, they're subject to year end audits and these have been through that and are the products of that.

These writedowns had no basis in reality, and were false and misleading.  At the time of the 2007 20-F, Barclays only marked down its subprime portfolio by a total of 14%, including only 23% on its CDOs.  In contrast, Barclays' competitors, including Merrill Lynch, Morgan Stanley and Citigroup, had marked down these same types of assets by 50%-60%.  Fellow British bank Royal Bank of Scotland had wrote off its subprime assets by £5.9 billion, including 75% from its CDOs, while UBS wrote down its CDO portfolio by 67%.  In addition, the ABX (which tracks subprime bonds) fell by 21% in November and December 2007, after falling 50% in July through October 2007.  This market data demonstrates that Barclays' subprime assets should have been written down by at least an additional 50%.

185.    The collapse of the ABX and TABX indices, the massive writedowns taken by Barclays' competitors, and Barclays' own experience provided Barclays with clear evidence by the time of the Series 5 Offering that the market for its CDOs and RMBS was frozen, and that the fair values of its assets were seriously impaired.  The record default rates of sub-prime borrowers

- 69 -

provided Barclays with additional evidence that the cash flows from the RMBS and other ABS that formed the collateral of Barclays' CDOs were also seriously impaired.

186.    As early as January 2008, analysts and banks were in agreement that the market for CDOs had dried up.  On January 2, 2008, *Bloomberg* reported, in part:

> Citigroup Inc., the biggest U.S. bank, may have to reduce the value of holdings by $12 billion in the fourth quarter because of financial-market swings, according to Sanford C. Bernstein & Co. analysts.
>
> *        *        *
>
> U.S. subprime-mortgage defaults have already forced the world's biggest financial institutions to write down about $100 billion in fixed-income securities and prompted concern about a global economic slowdown.  Goldman Sachs Group Inc. said last month that Citigroup may discount the value of its investments by $18.7 billion in the fourth quarter.
>
> *        *        *
>
> The market for CDOs, loans packaged into new securities, dried up after surging subprime mortgage defaults led to rating downgrades and convinced many investors to buy only the safest debt.  Goldman analyst William Tanona said last month that JPMorgan may write off $3.4 billion.

187.    On February 5, 2008, *Bloomberg* reported, in part:

> Buying and selling of collateralized debt obligations based on mortgage bonds, high-yield loans or preferred shares has ground to a near-halt, traders said at the securitization industry's largest conference.
>
> "We're definitely in a period of very low liquidity at the moment, which has actually been dropping precipitously in the last few weeks," Ross Heller, an executive director at JPMorgan Securities Inc., said yesterday during a panel discussion at the American Securitization Forum's annual conference in Las Vegas. "It's a challenging time."
>
> The slowdown of the more than $2 trillion CDO market follows record downgrades in mortgage-linked securities last year.  Some AAA rated debt lost all its value.  CDOs, which have fueled unprecedented bank writedowns since mid-2007, repackage assets into new securities with varying risks.
>
> *        *        *

Fitch Ratings today said it may downgrade the $220 billion of CDOs it assesses that are based on corporate securities. The New York-based company said it may lower the notes by as much as five levels after failing to accurately assess the risk of debt that packages other assets.

*       *       *

Investors with experience with residential-mortgage assets have been buyers, paying in the "mid-teens to low 30" cents on the dollar for the senior-most, or super-senior, classes of CDOs comprised of low-rated asset-backed bonds, he said.

188.    Barclays' refusal to timely write down its assets in light of these drastic market changes went squarely against their own valuation policies. As Barclays had assured investors in its 2007 Form 20-F, the criteria Barclays used in determining whether there was objective evidence of an impairment loss included the disappearance of an active market for those financial assets because of financial difficulties, or whether there was observable data indicating a measurable decrease in the estimated future cash flows of its assets, including adverse changes in the payment status of borrowers in the portfolio and national economic conditions that correlated with defaults on its assets. The collapse of the subprime and non-prime mortgage markets, the freezing up of the market for securities backed by such mortgages including RMBS and CDOs, and the fact that super-senior CDO classes were being sold for pennies on the dollar provided Barclays with objective evidence its assets were impaired. Barclays' failure to act according to its own guidelines, in light of this clear evidence of asset impairment, demonstrated that its disclosures regarding its risk management practices were either false and misleading when made or were simply not followed.

189.    In addition to ignoring the market prices for its credit assets, including the ABX index and write-offs by competitors, Barclays' senior managers consciously disregarded Barclays' own internal CDO valuation analysis. In an analyst report from December 2007, Barclays' own analysts estimated that even the top classes of CDOs were worth only 20-30 cents on the dollar, based on

- 71 -

current market prices, and specifically cited and relied on the ABX index.  Those prices continued to

plummet after December 2007.

190.    On December 6, 2007, *Bloomberg* reported; in part:

**Top CDO Classes May Lose 80 Percent, Barclays Says (Update2)**

. . . U.S. mortgage assets in collateralized debt obligations have lost so much value that the top classes of the securities may be worth as little as 20 cents on the dollar in a liquidation, Barclays Plc analysts said in a report.

About 20 percent to 30 percent of principal would be covered for the "super senior" portions of mezzanine asset-backed bond CDOs, which mainly contain mortgage bonds and other CDOs initially assigned low investment-grade ratings, Barclays said in the report yesterday.  The senior-most classes of CDOs containing highly rated asset-backed bonds would recoup 30 percent to 65 percent, it said.

*        *        *

Recent writedowns at the world's biggest financial companies including Citigroup Inc., Merrill Lynch & Co., Morgan Stanley and Wachovia Corp. amid a global credit-market seizure were partly related to declines on super-senior CDOs.  Losses of that debt, sparked by rising U.S. foreclosures, may reach $77 billion, JPMorgan Chase & Co. CDO analysts estimate.

Standard & Poor's today lowered ratings on $4.5 billion of asset-backed CDOs, bringing its total downgrades to $30.1 billion.  An additional $24 billion remain under review.  About $1 trillion of CDOs of asset-backed bonds or related derivatives are outstanding, according to Moody's Investors Service.

191.    The Registration Statement/Prospectus contained untrue statements of material fact or

omitted to state other facts necessary to make the statements made therein not misleading and was

not prepared in accordance with applicable IFRS guidelines and SEC regulations.  The statements

identified above in ¶¶133-134 were false and/or misleading because the dislocation in the financial

markets was then having a severe impact on Barclays' business which significantly increased the

risk level of the Preferred Stock.

192.    Barclays' Form 20-F for 2007 indicated that Barclays' derivative financial

instruments, which included RMBS, CDOs and other derivatives, were recorded at £248.088 billion

- 72 -

as of December 31, 2007, representing 20.2% of the Company's total reported assets of £1.227 trillion. As with the Forms 20-F for 2005 and 2006, in 2007 Barclays again reassured investors that "Barclays actively manages its credit exposures." Barclays again stated that "[w]hen weaknesses in exposures are detected – either in individual exposures or in groups of exposures – action is taken to mitigate the risks." Barclays also claimed that it "manages the diversification of its portfolio to avoid unwanted credit risk concentrations."

193.    Barclays stated that the Company ensured that there was strong oversight over the risk management process throughout the entire organization. But these assurances were false and misleading. Barclays had, in fact, taken on increasingly greater risks as the housing problems grew worse in 2006 and deepened further in 2007. In fact, by early 2007, Barclays was now actively involved in subprime mortgage originations and servicing. Nonetheless, the Company still failed to disclose the nature, concentration and magnitude of its credit risk exposures, and gave no meaningful indications of the Company's real vulnerability and leverage with respect to the subprime, Alt-A and other high-risk credit markets, in violation of IFRS 7, ¶31, and Item 503 of SEC Regulation S-K. Barclays also failed to adequately disclose the exposures to risk and how they arose; the objective, policies and procedures for managing the risk; and any changes from the prior period. IFRS 7, ¶33. These critical omissions, coupled with Barclays' repeated assurances regarding the Company's extensive risk control oversight, were tantamount to sending the false message that management took reasonable steps to mitigate the adverse housing trends and associated risks.

194.    Barclays stated in its 2007 Form 20-F that when valuing financial instruments in which the fair values were measured using valuation techniques that are determined in full or in part on assumptions that are not supported by observable market prices, using "reasonably possible alternative assumption," the valuation range would be approximately £1.2 billion lower to £1.5

- 73 -

billion higher than the fair values recognized in the 2007 financial statements.  Comparing this low end estimate of £1.2 billion to Barclays' total reported value of derivative instruments of £248.088 billion, Barclays, in effect, suggested that the total reported value of its derivative instruments was at most overstated by 0.49%.  This "reasonably possible" overstatement of 0.49% in 2007 was a mere 40 basis points greater than the "reasonably possible" overstatement of 0.09% level in 2006.  This increase from 2006 to 2007 in the "reasonably possible" overstatement of Barclays' total reported derivative instruments did not fully reflect the tremendous adverse shifts in the housing market that took place during the period from 2006 through the end of 2007, and the inherent leveraging involved in derivative instruments.  Barclays had still not come clean about how much toxic assets continued to remain on its books.

195.    Barclays would not begin to make certain disclosures of its capital credit market exposures until its 2008 Interim results, as of June 30, 2008, and certain important disclosures were not made until the annual report as of December 31, 2008 was filed in March 2009.  For example, although Barclays disclosed in its 2007 Form 20-F that the impairment charges for Barclays Capital were £782 million, Barclays failed to disclose the total fair value losses and total gross losses pertaining to BarCap's credit risk, which included U.S. residential mortgages (*i.e.*, ABS CDO super senior, other U.S. subprime, Alt-A and U.S. RMBS wrapped by monoline insurers); commercial real estate; commercial mortgages (*i.e.*, commercial MBS and CMBS wrapped by monoline insurers); and other credit market assets (*i.e.*, SIVs and SIV-lites, credit derivative products companies and CLOs and other assets wrapped by monoline insurers).  As Barclays eventually disclosed in its 2008 Form 20-F, the total fair value losses for these credit market risks ***in 2007*** were £2.217 billion.  These losses of £2.217 combined with the £782 million impairment charges for 2007 resulted in an undisclosed total gross loss of nearly £3 billion in 2007.  Barclays' failure to make this vital

- 74 -

disclosure prevented investors from evaluating the nature and extent of Barclays' risks arising from its financial instruments for 2007, as required by IFRS 7, ¶31 and Item 503 of SEC Regulation S-K. Barclays also failed to disclose: (a) the exposures to risk and how they arose; (b) its objectives, policies and processes for managing the risk and the methods used to measure the risk; and (c) any changes in (a) or (b) from the previous period.  IFRS 7, ¶33.

196.    Barclays' Series 5 Prospectus was also materially misleading in that it omitted important details regarding assets Barclays had insured with monoline insurers.   While this information was not disclosed until after the Series 5 Offering, by the end of 2007 Barclays held £21.5 billion in assets that monoline insurers had guaranteed would be repaid in case the bond's issuer defaulted.  In its 2007 20-F, however, Barclays only disclosed its net exposure of £1.3 billion, omitting such key information as the notional or "face" value of those insured assets and the credit ratings of those parties with whom those assets had been insured.

197.    As Barclays was well aware, insured bonds carried the rating of the monoline insurers who had wrapped them.  Thus, the fair value of Barclays' insured assets was largely dependent on the credit ratings that agencies had bestowed upon the insurers.  Were the agencies to downgrade the insurers' ratings, the credit rating of the wrapped assets would correspondingly drop, along with their market value.  This was precisely what happened prior to the Series 5 Offering.

198.    By 2007, ratings agencies were eyeing monoline insurers for potential ratings downgrades.  On December 20, 2007, CNNMoney.com reported that bond insurer ACA Financial Guaranty Corporation ("ACA") was downgraded 12 levels by Standard & Poor's, from A to CCC (junk status).  Those assets which ACA had wrapped and which lacked higher public underlying ratings were correspondingly downgraded to junk status.  This downgrade prompted at least one large bank, Canadian Imperial Bank of Commerce ("CIBC"), to immediately write down 48% of the

- 75 -

collateralized debt obligations that ACA had guaranteed.  CIBC announced news of their $1.7 billion

writedown just minutes after ACA's downgrade was made public.  ACA's downgrade also prompted

Merrill Lynch to writedown $1.9 billion in ACA-wrapped securities.

199.     Importantly, ACA was about to fail and would have resulted in potentially disastrous

consequences, including the collapse of other monoline insurers which would in turn cause the

immediate writedown of all assets "issued" by those monolines, totaling more than $1 trillion.  In

order to avoid this domino effect causing a collapse in value of Barclays' own assets, on December

20, 2007, CNNMoney.com reported, in part:

> Wall Street banks may inject cash into ACA Financial Guaranty Corporation, which
> was dramatically downgraded to junk while nearly the entire bond insurance industry
> was put on negative credit watch by S&P yesterday.
>
> *       *       *
>
> When ACA's debt went from A to CCC, the move also hit Canadian bank CIBC
> (which Fortune predicted in November).  CIBC said it may immediately write down
> $1.7 billion of the $3.5 billion in mortgage holdings guaranteed by ACA, which were
> part of CIBC's roughly $10 billion in hedged collateralized debt obligations.
>
> These CDOs were not included in previous write downs because, though
> sullied by bad mortgage debt, they were supposedly insured or hedged by entities
> like ACA.  Now that ACA can't backstop the losses, the credit ratings on those
> bonds will fall, and result in losses.
>
> *       *       *
>
> As more bond insurer ratings are cut, banks will have to write down losses on the
> securities they guaranteed.  Bloomberg estimates that an industrywide downgrade
> would lead to $200 billion in losses.  The two biggest guarantors alone, MBIA and
> Ambac Financial Group, stand behind about $652 billion and $546 billion in debt
> respectively that could fall in value if those companies are downgraded.
>
> *       *       *
>
> The monolines are not required to put up collateral when doing business with
> Wall Street because of their high credit ratings.  But that all changed as they started
> insuring riskier products.  ACA and other firms were often required to find
> counterparties with strong balance sheets to back them up when they insured the
> exotic bonds that Wall Street became addicted to in recent years.

> *CIBC, Barclay's and perhaps other banks were willing to be the backstops for a small fee (some believe as little as 5 or 6 basis points).  Barclays says its exposure is minimal and has faith that the monolines will meet their obligations.*

200.    Then, on January 18, 2008 *Bloomberg* announced that Fitch Ratings had downgraded Ambac, the second-largest bond insurer, two levels from AAA to AA.  News of this downgrade triggered immediate downgrades of at least 420 U.S. asset-backed securities.  At the time of its downgrade, Ambac had insured $556 billion in municipal and structured finance debt, and held approximately a 22.5% market share of the entire industry (as of September 30, 2007).

201.    The January 18, 2008 *Bloomberg* article stated, in part:

Ambac Assurance Corp. was lowered two levels to AA and may be reduced further, New York-based Fitch said today in a statement.  The downgrade "reflects the significant uncertainty with respect to the company's franchise, business model and strategic direction," Fitch said.

\*        \*        \*

"This makes Ambac insurance toxic," said Matt Fabian, senior analyst and managing director at Municipal Market Advisors in Westport, Connecticut.  "The market has no tolerance for a ratings-deprived insurer."

\*        \*        \*

Moody's Investors Service and Standard & Poor's, the two largest ratings companies, are reviewing Ambac's ratings for a possible reduction.  Moody's said this week it may also cut the ratings of MBIA Inc., the largest bond insurer.

\*        \*        \*

"The likelihood is quite high the others will follow," said John Tierney, credit market strategist at Deutsche Bank AG in New York.  "Barring some significant development on new capital, it's just a matter of time before S&P and Moody's act on MBIA and Ambac."

The seven AAA rated bond insurers place their stamp on $2.4 trillion of debt.  Losing those rankings may cost borrowers and investors as much as $200 billion, according to data compiled by Bloomberg.  The industry guaranteed $100 billion of collateralized debt obligations linked to subprime mortgages, $22 billion of non-prime auto loans and $1.2 trillion of municipal debt.

New York-based Merrill Lynch & Co., the world's largest brokerage, yesterday took $3.1 billion of writedowns on the value of default protection from bond insurers

\* \* \*

Fitch, following its downgrade of Ambac Assurance, adjusted ratings accordingly for 137,990 municipal bonds and 114 non-municipal issues insured by the company. Bonds with underlying ratings higher than Ambac's will remain above the bond insurer's level, Fitch said today in a statement.

\* \* \*

Ambac agreed to guarantee almost $200 million of bonds sold so far this year, or 6 percent of the market for new insured issues, according to data compiled by Bloomberg. Ambac's market share was 22.5 percent as of Sept. 30, 2007, according to a Dec. 13 report from Bear Stearns Cos.

202. Barclays itself was well aware of the dire impact these ratings downgrades had on the value of its insured assets. On January 25, 2008, *Bloomberg* reported that analysts at BarCap projected banks could require up to $143 billion in capital should credit rating firms downgrade bond insurers.

203. The January 25, 2008 *Bloomberg* article stated, in part:

Banks will need at least $22 billion if bonds covered by insurers led by MBIA Inc. and Ambac Assurance Corp. are cut one level from AAA, and six times more for downgrades by four steps to A, Paul Fenner-Leitao wrote in a report published today. Barclays' estimates are based on banks holding as much as 75 percent of the $820 billion of structured securities guaranteed by bond insurers.

\* \* \*

The risk of a deeper capital shortfall may help explain why New York's Insurance Superintendent Eric Dinallo is trying to arrange a bank-led bailout of the bond insurers. Downgrades would cast doubt on the credit quality of $2.4 trillion of bonds the industry guarantees.

\* \* \*

Fitch Ratings cut New York-based Ambac by two levels to AA last week, triggering downgrades for 420 U.S. asset-backed securities as well as debt sold by companies from London soccer club Arsenal Holdings Plc to Sydney Airports Finance Co.

- 78 -

Fitch is likely to cut the rankings of other bond insurers in the "very near term," with Financial Guaranty Insurance Co. at greatest risk, Fenner-Leitao wrote in the report.  New York-based FGIC insures $315 billion of bonds.

Standard & Poor's cut New York-based ACA Capital Holdings Inc.'s rating by 12 levels to CCC last month, causing Merrill Lynch & Co. to write down $1.9 billion of securities and Canadian Imperial Bank of Commerce to sell more than C$2.75 billion ($2.7 billion) in stock to cover writedowns.

* * *

MBIA Inc., the largest bond insurer, based in Armonk, New York, and Ambac in New York, the No. 2 so-called monoline, are on review for a possible downgrade by Moody's Investors Service and Standard & Poor's.

204.    Thus, by Barclays' own account, their assets wrapped by these monoline insurers would plummet in value upon news of ratings downgrades, which was already occurring and which Barclays expected to accelerate.  Barclays even acknowledges in its 2007 20-F that one major criterion used in determining whether there was objective evidence of an impairment loss was whether the issuer or obligor (here, the monoline insurer) was experiencing significant financial difficulty.  The wave of downgrades on the insurers' ratings, other banks' huge writedowns of monoline-wrapped assets, and the rating agencies' negative outlook on the entire industry, provided clear evidence that Barclays' wrapped assets were severely impaired according to their own valuation criteria.

205.    These downgrades of bond insurers continued into February 2008.  On February 1, 2008, *TheStreet.com* reported, in part:

**Moody's View Darkens on Bond Insurers**

Moody's Investors Service said that it may complete its review of monoline bond insurers by mid- to late February – a move that may result in downgrades, given the ratings agency's increasingly negative view on the mortgage market.

In a conference call Friday morning, Moody's explained that its view of the entire sector is becoming more negative. It said it would be employing more stringent assumptions in assessing the outlook and capital adequacy of firms such as troubled guarantor heavyweights Ambac Financial and MBIA.  Downgrades to monolines

- 79 -

would be devastating, as their pristine credit is critical to their core business of insuring some $2.4 billion to $2.6 billion in debt.

The health and viability of the financial guarantors, which insure debt issued from municipalities as well as newfangled securities structured by investment banks known as collateralized debt obligations, has been deeply tested by the stresses in the mortgage market. The fear is that delinquencies in some of the securities these entities provide a backstop for – which have so far been relatively few – may begin to ratchet up significantly in the near term.

206.    In an effort to avoid having to recognize losses tied to its monoline counterparty exposures, Barclays joined a group of other Wall Street banks to bail out the insurers.  On February 1, 2008, *TheStreet.com* and other news agencies reported that a consortium of banks, including Barclays, were "working in conjunction with New York Insurance Superintendent Eric Dinallo to hammer out a bond insurer bailout plan."  Barclays knew it had to bail out the monolines in order to stave off writedowns on its own mortgage-related exposure, because if the insurers failed, Barclays could no longer claim its exposure was insured or hedged by the monolines.  As soon as the monolines could not backstop those losses the credit ratings on those bonds would fall, resulting in huge losses for Barclays.

207.    On February 14, 2008, *Reuters* reported that Moody's had cut its AAA rating of Financial Guaranty Insurance Corporation *by six levels*.  FGIC had insured $315 billion in outstanding bonds as of September 2007, including $31 billion of mortgage-backed securities and $28 billion of CDOs.

208.    The February 14, 2008 *Reuters* article stated, in part:

Moody's Investors Service on Thursday steeply cut its "AAA" ratings on FGIC Corp's bond insurance arm, making FGIC the first big bond insurer to lose its top rating from all three major ratings agencies.

The action on FGIC, the fourth largest bond insurer, raised fears among investors of even more write-downs at global banks and could further drag down prices in the $2.5 trillion municipal bond market.

- 80 -

Moody's slashed its rating on FGIC by six notches, and warned it may cut the rating again because of a $4 billion hole in the insurer's capital position.

S&P had cut FGIC's rating to "AA" on Jan. 31, while Fitch cut it to "AA" on Jan. 30.

"I think what this does most importantly is it further diminishes liquidity in the marketplace," said Andrew Harding, chief investment officer for fixed income at Allegiant Asset Management in Cleveland. "Therefore, all your credit spreads and risk premiums increase and you are definitely seeing that today."

\*       \*       \*

Moody's cut Financial Guaranty Insurance Co's "Aaa" insurer financial strength rating to "A3," the seventh-highest investment grade rating. It also cut parent company FGIC Corp's senior debt rating to "Ba1," the highest junk level, from "Aa2."

\*       \*       \*

Moody's also downgraded bonds guaranteed by FGIC to "A3," except those with higher underlying ratings.

209.   Barclays' knowing or reckless failure to write down its own wrapped assets in light of these ratings downgrades, or even acknowledge the extent of the risk to the Company, as other banks had done almost immediately, rendered Barclays' Series 5 Prospectus materially misleading.  As evidenced by its own analysts' reports, the value of Barclays' insured assets was entirely dependant on the rating of the monoline insurers.  The downgrades of Ambac, FGIC and ACA, which collectively held nearly 40% of the monoline insurance market share going into 2008, should have resulted in a dramatic write down of the value of those assets Barclays had insured with these bond insurers.  In fact, as Barclays first disclosed in its Form 6-K filed August 7, 2008, the notional amount of assets wrapped by monolines with AAA/AA ratings dropped to £10.7 billion as of June 30, 2008, from £21.5 billion as of December 31, 2007.  The Form 6-K indicated that about £5.6 billion in notional assets were now wrapped by A/BBB rated insurers, and £5.1 billion in assets were wrapped by monolines carrying junk status ratings.  While banks such as CIBC had written down up

- 81 -

to half of its exposure to these insurers, Barclays disclosed no such writedowns prior to the Series 5 Offering, in spite of what its own analysts were telling the market.   Further, despite these downgrades, Barclays' total writedowns of its wrapped assets as of June 30, 2008 was still only £433 million, about 2% of its notional exposure of £21.4 billion.

210.   Barclays also did not disclose its gross exposure to leveraged finance loans.   In leveraged buyouts, buyout firms typically borrow two-thirds of the money needed for acquisitions. Leveraged loans are typically rated below BBB – by S&P and less than Baa3 by Moody's Investor Services.   During the financial turmoil in 2007, these loans became significantly impaired. However, Barclays failed to disclose its gross exposure to such leveraged loans in 2007 in accordance with IFRS 7, ¶¶31, 33.   As of December 31, 2008, however, after Series 5 was completed, Barclays disclosed in its 2008 Form 20-F that its exposure to leveraged loans was £10.506 billion.

## POST-OFFERING EVENTS

211.   On May 15, 2008, just over a month after the Series 5 Offering, the Company issued a Q1 Interim Management Statement announcing that it had taken £1.7 billion in charges to BarCap's risk assets, but failed to disclose to investors how the marks taken were split across the Company's asset classes.   The Company also disclosed that it was below the target 5.25% Equity Tier 1 ratio, and that it expected its Tier 1 capital and equity under Basel II on June 30, 2008 to be lower than the 7.6% and 5.1% the Company reported as its goals on December 31, 2007.

212.   On May 16, 2008, *The Wall Street Journal* reported, in part:

**Barclays Doesn't Budge – Bank Posts Profit,
Declines for Now To Seek Infusion**

LONDON – Barclays PLC stopped short of a widely expected move to raise capital, leaving the British bank with one of the industry's thinnest cushions against losses at a time of great uncertainty in the economy.

- 82 -

The U.K.'s third-largest bank by market capitalization, Barclays said it turned a profit in the first quarter despite GBP 1.7 billion ($3.3 billion) in write-downs on mortgage and other investments.

While the bank left the door open for a capital injection, it decided for the time being not to join rivals, such as Royal Bank of Scotland Group PLC and HBOS PLC, that have turned to investors for funds to help them weather the financial crisis.

\* \* \*

***Barclays appears to be "in denial," said Tom Rayner, a banking analyst at Citigroup. Mr. Rayner also said Barclays's write-downs seemed meager compared with its peers, given the size of its portfolio of troubled assets. Barclays has said direct comparisons aren't valid because it holds a different mix of assets***.

In London, Barclays's shares fell 2% to 418.75 pence.

One reason for delaying a capital increase could be to allow Barclays to distance itself from the troubles of rivals RBS and HBOS. But people familiar with the bank believe Barclays could turn to capital raising by the third quarter.

In lieu of an immediate capital raising, Barclays could build up its cash cushion by retaining profits or by selling assets. Barclays is keeping all options open.

Chief Financial Officer Chris Lucas said he expects Barclays's core Tier 1 capital ratio to be less than 5.1% at the end of June.

That is below the bank's own target of 5.25% and the European average of 6.5%, and not far from the U.K. regulatory minimum of 4%. Tier 1 capital is important for banks because it provides a cushion against losses.

213.     Throughout June 2008, rumors circulated concerning Barclays need to take much larger writedowns, and analysts began speculating on how Barclays would be able to raise enough capital to stay afloat in the aftermath of these impending writedowns. On June 12, 2008, Barclays stock hit its lowest level of trading on the London Exchange since 1998.

214.     On June 26, 2008, *The Wall Street Journal* reported, in part:

### Barclays taps Asian cash – Entities from China, Japan and Singapore buy into share offer

Barclays PLC became the latest British bank to unveil a share issue to shore up its balance sheet, revealing participation by several Asian and Middle East investors.

- 83 -

*The bank said it will raise about GBP 4.5 billion ($8.86 billion), half of which will be used to boost its capital held against risky assets, while the remainder will be "put to work in the businesses*."

\*     \*     \*

"Through our capital raising . . . we strengthen our capital base and give ourselves additional resources to pursue our strategy of growth through earnings diversification," Chief Executive John Varley said in a statement.

\*     \*     \*

*While Mr. Diamond acknowledged that the criticism has come from peers as well as analysts, he said "our [markdowns] on credit investments shouldn't be an issue."  He said the markdowns have been subject to extensive revision and scrutiny from outsiders – including the investors who are now injecting cash into the bank – as well as from regulators and rating agencies*.

215.    On August 7, 2008, Barclays issued its 2008 Interim Results, disclosing that its first-half net income declined 34% to £1.72 billion ($3.4 billion).  The net income reduction was due in large part to a massive writedown of £2.8 billion of credit-related assets, more than analysts predicted.  Analysts commented on the size of the writedowns:

"Maybe this is grist to the mill for those who said that Barclays was underproviding for its writedowns," said Simon Maughan, a London-based analyst at MF Global Securities Ltd. who has "buy" rating on the stock.  "*They have written off significantly more than they flagged in June* . . . ."

216.    On August 7, 2008, Business Week Online reported, in part:

**Barclays' Profits Hit by Credit Crunch; The British bank's first-half pretax profits declined by one-third after it took $5.5 billion in credit-related writedowns**

The credit crunch continues to take its toll on British banks.  On Aug. 7, Barclays revealed its first-half pretax profits fell by one-third, to $5.4 billion, after the bank took credit-related writedowns of $5.5 billion.  *Describing the bank's performance as "acutely disappointing," CEO John Varley all but apologized for the decline in company's share price over the past year: "Our shareholders have had to endure a lot*."

*Barclays also revealed a sharp rise in bad debts*.  For the six months ended in June, total bad debts rose by 155% from the previous year, to $4.7 billion, as subprime mortgages and other credit-related investments plunged in value.  And the

- 84 -

investment bank Barclays Capital, which many analysts expected to fall victim to the credit crunch, posted net losses of $4 billion.

217.   By October, these and other impending writedowns and impairments required Barclays to seek *another* massive infusion of capital.  On October 13, 2008, Barclays issued a press release entitled "Update on capital, dividend and current trading," which stated in part:

> Following the announcement made by the UK Government on 8 October 2008 in relation to UK banking sector capital and funding, Barclays has been in detailed discussions with the UK Financial Services Authority ("FSA") and HM Treasury.

> **Capital and dividend**

> Barclays is well capitalised, profitable and has access to the liquidity required to support its business.  Taking into account the new higher capital targets which the FSA has set for all UK banks, ***the Board has determined that it will raise in excess of £6.5bn of Tier 1 Capital***.  This would result in a pro forma Tier 1 Capital ratio as at 30 June 2008 of over 11%.

> Given the strength of Barclays' well diversified business and the existing capital base, ***the Board expects that the additional capital will be raised from investors without calling on the Government funding which has been offered to UK Banks***.  Accordingly, a plan has been agreed with and approved by the FSA which envisages:

> - The issue of preference shares to raise £3bn by 31 December 2008 as Barclays' contribution to the commitment made by UK banks to increase Tier 1 capital by £25 billion in aggregate by year-end.

> - The issue of new ordinary shares to raise £0.6bn ($1bn) as announced on 17 September as part of our announcement concerning the acquisition of Lehman Brothers North American investment banking and capital markets businesses ("the Lehman Acquisition").

> - The issue of new ordinary shares to raise a further £3bn as soon as practicable after the announcement of our full year 2008 results and our intention is that this should be before 31 March 2009.  The offer of such shares will be structured so as to give existing shareholders full rights of participation.

> - Balance sheet management and operational efficiencies to release at least a further £1.5bn in equity resources.

- 85 -

As part of the above issuance of shares, Barclays has agreement in principle with an existing shareholder to contribute £1bn in new capital, to be allocated between the component parts listed above.

In the light of the new capital ratios agreed with the FSA and in recognition of the need to maximise capital resources in the current economic climate, the Board of Barclays has concluded that it would not be appropriate to recommend the payment of a final dividend for 2008. This dividend, amounting to £2bn, would otherwise have been payable in April 2009. Our intention is to resume dividend payments in the second half of 2009.

The effect of the above is that more than £6.5bn is raised through capital issuance and at least a further £3.5bn through dividend and other actions.

In the event that any of the proposed capital issuances do not proceed, Barclays, along with the other UK banks, would be eligible to have access to the capital facilities announced by the UK Government on 8 October 2008. The terms of such facilities would be negotiated at the time and may be on terms less favourable than those made available today. The UK Government has also confirmed that Barclays is eligible to use the extended facilities with the Bank of England and the UK Government guarantee of term unsecured issuance which have been made available to UK Banks.

218.    Before the end of the month, on October 31, 2008, the Company announced its decision to sell up to one third of the Company to investors from Abu Dhabi and Qatar. This announcement came just weeks after Barclays announced its decision to raise £6.5 billion from private investors. On that day, Reuters reported, in part:

### Barclays raises $12 bln from Middle East, others

Middle East investors will own up to one third of Barclays Plc after Abu Dhabi and Qatar provided most of 7.3 billion pounds ($12.1 billion) raised by the bank on Friday to repair damage from the global financial crisis and avoid taking UK government rescue funds.

Barclays said the fundraising through a range of complex capital instruments will allow it to rebuild capital to levels required by the UK regulator without taking taxpayer cash.

That will allow the bank "to be in charge of our own destiny" without the threat of government interference, said Barclays Chairman Marcus Agius.

But its shares fell on concern the fundraising is more costly than cash on offer from the government. An issue of reserve capital instruments (RCIs) will pay annual

interest of 14 percent until June 2019.  Warrants for shares worth another 3 billion pounds could also be issued.

219.     As evidenced by Barclays' piecemeal disclosure of its capital needs, the market was slow to realize the true condition of the Company's capital structure.  Investors were extremely unhappy, and it quickly became apparent however, that Barclays might not be able to persuade investors to approve a (now) £7 +billion plan to raise cash by the November 24 deadline.

220.     On November 18, 2008, the Associated Press reported, in part:

### Barclays lets shareholders in on Mideast stock

*     *     *

Barclays PLC moved to appease shareholders Tuesday, saying it will let existing stockholders in on a share issue originally earmarked for private Middle Eastern investors and that it won't pay its top executives any annual bonuses this year.

*     *     *

Barclays said its existing stockholders will be allowed to purchase up to 500 million pounds ($750 million) in preference shares, which pay a high annual interest rate of 14 percent, that had been previously earmarked for private investors in Qatar and Abu Dhabi.

"The board of Barclays has listened carefully to shareholders' views," the bank said in a statement.  It added that all members of the board would offer themselves for re-election at the bank's annual general meeting in April.

The preference shares will come out of planned investments by three Middle Eastern investors Qatar Investment Authority, the Challenger investment vehicle led by the Qatari royal family, and Sheik Mansour Bin Zayed Al Nahyan of the Abu Dhabi royal family reducing their combined proposed investment from 5.8 billion pound ($8.7 billion) to 5.3 billion pounds ($8 billion).

*     *     *

***Barclays management agreed to take investments from the Middle East last month rather than participate in the government's recapitalization plan, which was taken up by rivals Royal Bank of Scotland Group PLC, Lloyds TSB Group PLC and HBOS PLC***.

- 87 -

221.     Investors eventually approved the plan, but railed against the Individual Defendants'

stewardship of the Company.  On November 24, 2008, Reuters reported, in part:

**Bruised Barclays gets backing for capital plan**

\*     \*     \*

Barclays Plc won approval for its controversial 7 billion pound ($10.4 billion) fundraising, but the British bank was slammed by shareholders for ignoring their rights and favouring two big Middle East investors.

Barclays said on Monday about 87 percent of investors who voted had backed the plan, although approval dropped to 78 percent if abstentions were included. Barclays was expected to win approval from the 75 percent of voters it needed.

Many investors said they had been forced to back the plan and some voiced fury at a stormy meeting of about 310 investors.

"I feel like we've all been invited to a game of Russian roulette.  The only difference is all the chambers are loaded," said Trevor White, a private investor since 1962.

Chairman Marcus Agius said the bank was faced with a "devil's dilemma" and needed to secure funds quickly and with certainty.  Unprecedented turmoil in financial markets had created a risk that customers and investors would lose confidence and cause a "death spiral" that could endanger the bank, he said.

\*     \*     \*

Institutions joined the chorus of disapproval and some private shareholders called for Agius and other board members to step down.

Top 20 investor F&C said it would vote for the deal but did not like the way it was structured, echoing comments from Legal & General last week.

"We have really been left with no reasonable alternative.  The consequences of voting against would make a bad situation worse," said George Dallas, director of corporate governance at F&C.  The fund manager owns a 0.6 percent stake, Thomson Reuters data shows.

Agius said he regretted leaving investors unable to participate in the offer, but noted rights issues were too risky in the current environment.

"The greater danger was not getting on with it and securing the money," Agius said.

\*     \*     \*

- 88 -

**CONSTRAINED BY TIME**

Barclays opted to raise funds privately rather than take part in a 37 billion pounds UK government bailout partly because it feared the conditions attached might force it to neglect overseas growth and its freedom to make commercial decisions on dividends and lending, Agius said.

Barclays last week tried to head off the backlash by offering investors a slice of the capital earmarked for Middle East backers, scrapping executive bonuses and saying all its board will stand for re-election next year.

Banks around the world have had to be rescued or raise billions of pounds to rebuild capital after losses on risky assets and the prospect of big losses as economies deteriorate.

222.    In order to further counteract its credit market losses, in mid-January 2009, Barclays announced plans to cut up to 2,100 jobs in its retail and commercial banking units, the equivalent of 7% of its workforce.  Analysts were again surprised by this development:

"We think this is a significant development, as previously Barclays had been arguing that this downturn was a great time to invest in people," said analysts at Evolution Securities.

"Management have consistently been too upbeat with their outlook statements; we are going into the worst downturn in living memory and it is hard to see how Barclays, with a 1.4 trillion pound balance sheet, is not going to have to recognize larger write-downs," they added.

223.    On February 18, 2009, Barclays announced it was shutting down its U.S. mortgage origination business EquiFirst, less than two years after Barclays purchased the entity from Regions in April of 2007.  In its 2008 Form 20-F, Barclays stated it was discontinuing operations due to the market environment and strategic direction of the Company.  While Barclays had originally offered $225 million for the entity back in 2007, Barclays ended up paying only $76 million, in light of the severe impairment the U.S. housing crisis exacted on EquiFirst's underlying assets.  Barclays would later announce in March 2010 its decision to sell HomeEq Servicing, which it had acquired just four years earlier for $469 million from Wachovia.  Barclays' operation of U.S.-based EquiFirst (a non-prime mortgage origination business) and HomeEq (a mortgage servicer) provided Barclays with

- 89 -

intimate knowledge of the non-prime mortgage industry and the reality that by April 2007, the industry and the value of subprime-related assets were collapsing.  Barclays even acknowledged at the time it purchased EquiFirst that its bargain-priced acquisition was the result of declining housing prices and higher mortgage delinquencies in the subprime sector.

224.    On September 17, 2009 *The Wall Street Journal* and the *Guardian (London)* reported that Barclays was setting up a hedge fund to buy £7.5 billion of the Company's credit market assets, two-thirds of which were monoline insured.  Analysts had been predicting major further writedowns on these assets, include RMBS, CDOs and other credit related financial instruments.

225.    By setting up this transaction, Barclays was paying hundreds of millions of pounds to avoid the requirement of having to mark to market the toxic assets on its balance sheet.   The hedge fund was run by two ex-BarCap employees, who receive a $40 million annual "management fee" from Barclays.  While the hedge fund, called Protium, was located in the Cayman Islands, it was managed by C12 Capital Management, which is run out of 200 Park Street in New York City, the same address as BarCap.

226.    The September 17, 2009 *Wall Street Journal* article stated, in part:

> LONDON -- Barclays PLC said it has set up a fund to buy $12.3 billion of its risky credit assets, a move aimed at reducing prospects of a big write-down.
>
> The sale means Barclays will no longer have to record market moves in the value of a portfolio of securities backed by U.S. subprime mortgages and other poorly performing loans that already wiped more than a billion pounds off its profit in 2008.
>
> *     *     *
>
> In doing so, however, the bank won't be able to book gains if or when the markets recover for those risky assets.
>
> "They are replacing the upside of a potential recovery in asset values for something that is a more steady income flow and that avoids potential mark-to-market downgrades," said Morgan Stanley analyst Steven Hayne.

- 90 -

Protium's manager, C12 Capital Management, was founded by Stephen King, the former head of Barclays Capital's principal mortgage-trading group, and Michael Keeley, a member of the investment-banking unit's management committee covering European financial institutions.  Mr. Keeley worked under former Barclays banker Roger Jenkins, known for setting up complex structures to reduce the bank's tax bills.

*       *       *

Barclays also is giving up interest payments on the securities.  Mr. Lucas said Barclays has been collecting $100 million to $120 million each month in interest payments on the portfolio, while the interest rate on the loan will bring in annual returns of less than $400 million.

In a research note, analysts at Credit Suisse said the transaction "seems like a definite transfer of value away from Barclays," but acknowledged it could protect the bank from a big hit from its exposure to monoline insurers, which insure bonds against default.

***The bulk of the assets Barclays is selling, $8.2 billion, are monoline-insured***.

Investors have been concerned about the health of monoline insurers and the effect on banks if they fail. Barclays's remaining monoline exposure totals about $6.78 billion, almost all of it in securities backed by corporate loans.

"This gives Barclays a way to tidy up its monoline exposure, and anyone with significant monoline exposure could follow suit," said Simon Willis, an analyst at NCB Stockbrokers who called the transaction "sensible."

Tom Jenkins, a credit analyst at Royal Bank of Scotland, said ***it is a clever structure "but essentially smoke and mirrors" in the context of Barclays's GBP 1.5 trillion ($2.475 trillion) balance sheet***.

The interest rate is fixed at the London interbank offered rate plus 2.75 percentage points, which Barclays said should result in about $3.9 billion in total interest payments.

## CLASS ACTION ALLEGATIONS

227.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are defendants, the

officers and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

228.   The members of the Class are so numerous that joinder of all members is impracticable.  Each of the Securities were traded on the New York Stock Exchange.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are at least hundreds of members in the proposed Class for each security.  Record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

229.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

230.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

231.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)    whether the 1933 Act was violated by defendants' acts as alleged herein;

> (b)    whether statements made by defendants to the investing public in the Registration Statements and Prospectuses misrepresented material facts or omitted material facts necessary not to make the statements misleading about the business, operations and management of Barclays; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

232.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

233.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this complaint.

234.     First, none of the statements complained of herein was a forward-looking statement.  Rather they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

235.     To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted defendants' statements regarding the Company's business and financial condition and its purported compliance with IFRS.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

236.    Plaintiffs repeat and reallege each and every allegation contained above.

237.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

238.    The 2005 and 2007 Registration Statements were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

239.    Barclays was the registrant for the Offerings.  As issuer of the Securities, Barclays is strictly liable to plaintiffs and the Class for the misstatements and omissions.

240.    The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statements.  Each of the Individual Defendants signed or authorized the signing of the Registration Statements and/or the documents incorporated therein.

241.    The Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

242.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omission of any material facts, and were not misleading.

243.    The Registration Statements were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

244.    By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

245.    Plaintiffs acquired the Securities pursuant and/or traceable to the Registration Statements.

246.    Plaintiffs and the Class have sustained damages.  At the time of their purchases of the Securities, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs filed this action.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiffs filed this action.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants Barclays, Barclays Plc
### and the Underwriter Defendants

247.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

248.    By means of the defective April 2006 Prospectus, September 2007 Prospectus, November 2007 Prospectus and April 2008 Prospectus (the "Prospectuses"), the defendants named herein sold or assisted in the sale of the Securities to plaintiffs and other members of the Class.

249.    The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  The defendants named in this Count owed plaintiffs and the other members of the Class who purchased the Securities pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

Defendants, in the exercise of reasonable care, knew or should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

250.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time plaintiffs acquired the Securities.

251.    By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased the Securities pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the Securities.  Accordingly, plaintiffs and the other members of the Class who hold such Securities have the right to rescind and recover the consideration paid for their Securities, and hereby tender their Securities to the defendants sued herein.  Class members who have sold their Securities seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants

252.    Plaintiffs repeat and reallege each and every allegation contained above.

253.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

254.    Each of the Individual Defendants was a control person of Barclays and Barclays Plc by virtue of his or her position as a director, senior officer and/or major shareholders of Barclays and Barclays Plc which allowed each of these defendants to exercise control over Barclays and Barclays Plc and their operations.

255.    Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of

- 96 -

the Registration Statements and having otherwise participated in the process which allowed the Offerings to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiffs as Class representatives;

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED: September 13, 2013          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   DARREN J. ROBBINS
                                   MARK SOLOMON
                                   ANDREW J. BROWN
                                   LUCAS F. OLTS
                                   ERIC I. NIEHAUS
                                   CHRISTOPHER D. STEWART

                                   ANDREW J. BROWN

- 97 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
andrewb@rgrdlaw.com
loltz@rgrdlaw.com
ericn@rgrdlaw.com
cstewart@rgrdlaw.com

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com

KESSLER TOPAZ MELTZER
    & CHECK, LLP
MATTHEW L. MUSTOKOFF
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)

KESSLER TOPAZ MELTZER
    & CHECK, LLP
RAMZI ABADOU
ERIK D. PETERSON
580 California Street, Suite 1750
San Francisco, CA  94104
Telephone:  415/400-3000
415/400-3001 (fax)

Co-Lead Counsel for Plaintiffs

- 98 -

DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on September 16, 2013, declarant served the **SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List. The parties were also served via e-mail.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 16, 2013, at San Diego, California.

_____
CHRISTINE CLARK

596508_1

BARCLAYS PFD SERIES 2 (LEAD)
Service List - 9/13/2013    (09-0054)
Page 1 of  1

**Counsel for Defendant(s)**

Jay B. Kasner
Scott D. Musoff
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036
  212/735-3000
  212/735-2000 (Fax)

David H. Braff
Michael T. Tomaino Jr.
Christopher A. Perrin
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
  212/558-4000
  212/558-3588 (Fax)

**Counsel for Plaintiff(s)**

Matthew L. Mustokoff
Joshua E. D'Ancona
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA  19087
  610/667-7706
  610/667-7056 (Fax)

Ramzi Abadou
Erik D. Peterson
Kessler Topaz Meltzer & Check, LLP
One Sansome Street
Suite 1850
San Francisco, CA  94104
  415/400-3000
  415/400-3001 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario Alba Jr.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)

Darren J. Robbins
Mark Solomon
Lucas F. Olts
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)