# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*

*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

November 9, 2015

Via ECF and U.S. Mail

The Honorable Paul A. Crotty,
    United States District Court,
        Southern District of New York,
            500 Pearl Street, Chambers 1350,
                New York, New York  10007..

Re:    *In re Barclays Bank Plc Sec. Litig.*, No. 1:09-cv-01989-PAC

Dear Judge Crotty:

I write on behalf of Barclays in response to plaintiffs' November 4, 2015 letter ("Letter") seeking leave to file a motion for judicial assistance under the Hague Convention for plaintiffs to obtain testimony in the United Kingdom from PwC employee Drew Haigh. Plaintiffs' request should be denied.

This request comes far too late.  Fact discovery in this case closes in only eight days—on November 17—a deadline that already reflects a two-month extension granted at plaintiffs' request. (ECF Nos. 125-26.)  Plaintiffs seek to excuse their delay until now in asking to commence lengthy and expensive Hague Convention procedures by asserting that "the need for Haigh's testimony only became clear during discovery, including depositions as recent as last week." (Letter at 3.)  That is not correct.  Plaintiffs have known for *over one year* that PwC issued "comfort letters" in connection with the Series 5 ADS offering at issue here, and that Mr. Haigh was a member of the PwC team that worked on the offering.  Indeed, Exhibit 6 to

plaintiffs' Letter—the "Working Party List" for the offering, which identifies Mr. Haigh and

others on the PwC team on page 16—was *the first document* Barclays produced in this case in

October of 2014 (*see* Ex. 6, stamped BARC-ADS-00000**001**).   That October 2014 document

production also included the PwC "comfort letters" that the Letter attaches as Exhibits 2-5.   As

for the e-mails involving Mr. Haigh, PwC and Linklaters that the Letter discusses at pages 2-3

(and attaches as Exhibits 7-8 and 11), plaintiffs received those documents more than six months

ago, on April 30, 2015.   And—presumably based on reviewing those materials—plaintiffs served

a document subpoena on PwC in the U.S. more than three months ago, on August 3, 2015,

seeking documents concerning (among other things) the same PwC "comfort letter" and "circle

up" work that are the focus of plaintiffs' current request.   (*See* Ex. A hereto, Aug. 3, 2015

Subpoena at 3 (Definitions 10-11), 15-18 (Requests 2-3).)   Plaintiffs have also questioned three

witnesses at depositions—one in the U.S. and two in the U.K.—on these very subjects.[1]

    In short, the Letter's suggestion (at 3) that plaintiffs did not appreciate these facts

until "depositions as recent as last week" is disingenuous (to say the least).   The Letter also

misleadingly suggests (at 3) that plaintiffs only recently "retained and began working with U.K.

counsel to prepare a highly detailed request for English courts," but counsel informed us back in

August that they had retained U.K. counsel to explore discovery from PwC in the U.K.   Yet

---

[1]  The Letter attempts to make a showing of "need" for Mr. Haigh's testimony by pointing
to e-mails with at least two layers of hearsay in which a Linklaters lawyer refers to
comments "in effect" made by another PwC employee (not Mr. Haigh) working on
another securities offering (not the Series 5 offering at issue here).   (Letter at 3 and
Ex. 11.)   Leaving aside that these e-mails are not relevant to our case, plaintiffs have had
them for over six months and issued a subpoena to PwC concerning these subjects over
three months ago.

Hon. Paul A. Crotty                                                                          -3-

plaintiffs waited until now to ask to embark on the Hague Convention process with only eight days left in fact discovery.

Plaintiffs' eleventh-hour request is all the more inappropriate because it will require the use of a process that the Supreme Court has called "unduly time consuming and expensive." *Société Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 542 (1987). Citing precisely these considerations, Judge Furman recently denied an application to commence the Hague Convention process made "two months before the close of fact discovery," because of the "close to certain" "delay that would result if the Court granted [the] request." *Skyline Steel LLC* v. *Pilepro*, LLC, No. 13-cv-8171, slip op. at 3-4 (S.D.N.Y. Jan. 28, 2015) (Ex. B hereto). Other courts have done the same. *See Gucci Am., Inc.* v. *Weixing Li*, 2012 WL 5992142, at *8 n.4 (S.D.N.Y. Nov. 15, 2012) (denying "letter of request" under the Hague Convention where request would call for discovery after the close of fact discovery), *rev'd on other grounds*, 768 F.3d 122 (2d Cir. 2014); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 4954634, at *5 (N.D. Cal. Oct. 1, 2014) (rejecting motion for "letters of request" made "a little more than three months prior to the discovery cutoff").

The November 17 cutoff is the deadline for the *completion* of fact discovery; it is not the deadline for *initiating* new discovery requests. As this Court recognized in denying plaintiffs' recent request to expand document discovery, plaintiffs have received a "massive" amount of discovery "in this 6 year old case." (ECF No. 134.) They have received roughly 1.75 million pages of documents, have now taken over 20 depositions and are deposing the former CEO of Barclays this week. Plaintiffs' belated application to commence lengthy and expensive procedures to take overseas discovery after the November 17 deadline should be denied.

Hon. Paul A. Crotty                                                    -4-

Respectfully submitted,

Michael T. Tomaino, Jr.

cc:    All Counsel (via ECF)

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re BARCLAYS BANK PLC SECURITIES LITIGATION | : Master File No. 1:09-cv-01989-PAC |
| | : CLASS ACTION |
| This Document Relates to: | : |
| ALL ACTIONS. | : |

## NOTICE OF ISSUANCE OF NON-PARTY SUBPOENA *DUCES TECUM*

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 45 of the Federal Rules of Civil

Procedure, Lead Plaintiffs in the above captioned action, by their undersigned counsel, are in the

process of issuing or will issue a subpoena *duces tecum* to the following non-party, requiring the

production of documents that are in its possession, custody or control, as described in the

Subpoena attached hereto, on or before the date, time, and at the location, specified below:

| Exhibit | NON-PARTY | Date/Time | Location |
|---|---|---|---|
| A | Pricewaterhouse Coopers LLP | August 17, 2015 at 5:00 p.m. | Robbins Geller Rudman & Dowd, LLP 30 Vesey Street, Suite 200 New York, NY 10007 |

Dated: August 3, 2015

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

*/s/ Sharan Nirmul*
Sharan Nirmul

Andrew L. Zivitz
Sharan Nirmul
Michelle M. Newcomer
Joshua E. D'Ancona
Jonathan F. Neumann
280 King of Prussia Road

Radnor, PA 19087-5110
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
snirmul@ktmc.com
mnewcomer@ktmc.com
jdancona@ktmc.com
jneumann@ktmc.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
ANDREW J. BROWN
LUCAS F. OLTS
ERIC I. NIEHAUS
CHRISTOPHER D. STEWART
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
darrenr@rgrdlaw.com
andrewb@rgrdlaw.com
lolts@rgrdlaw.com
ericn@rgrdlaw.com
cstewart@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 3, 2015, a copy of the foregoing document was served on all counsel listed below by electronic mail.

**SULLIVAN & CROMWELL, LLP**
MICHAEL T. TOMAINO, JR.
MATTHEW A. PELLER
THOMAS C. WHITE
YAVAR BATHAEE
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
tomainom@sullcrom.com
pellerm@sullcrom.com
whitet@sullcrom.com
bathaeey@sullcrom.com

*Attorneys for the Barclays Defendants and the Individual Defendants*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
JAY B. KASNER
SCOTT D. MUSOFF
GARY J. HACKER
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
gary.hacker@skadden.com

*Attorneys for the Underwriter Defendants*

/s/ Sharan Nirmul
Sharan Nirmul

# EXHIBIT A

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | |
|---|---|
| In re Barclays Bank PLC Sec. Litig. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   1:09-cv-01989-PAC |
| | ) |
| | ) (If the action is pending in another district, state where: |
| *Defendant* | ) _____ ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  PricewaterhouseCoopers LLP
     c/o CT Corporation System, 111 Eighth Avenue, New York, NY 10011

 ☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Schedule A

| Place:  Robbins Geller Rudman & Dowd, LLP<br>30 Vesey Street, Suite 200<br>New York, NY 10007 | Date and Time:<br>        08/17/2015 5:00 pm |
|---|---|

 ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___08/03/2015___

                    *CLERK OF COURT*
                                        OR

_____          _____
  *Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  ____Plaintiffs____
_____ , who issues or requests this subpoena, are:

Sharan Nirmul, Esquire, Kessler Topaz Meltzer Check, LLP, 280 King of Prussia Road, Radnor, PA 19087,
610-667-7706

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:09-cv-01989-PAC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*

was received by me on *(date)*               .

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____          on *(date)*               ; or

☐  I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$               .

My fees are $               for travel and $               for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:                

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A
## (PRICEWATERHOUSECOOPERS LLP)

I.     **DEFINITIONS**[1]

As used herein the following terms have the meanings indicated below:

1.     "2007 20-F" means Barclays' (as defined below) Annual Report on Form 20-F for the fiscal year ending December 31, 2007, filed with the United States Securities and Exchange Commission ("SEC") on or about March 26, 2008.

2.     "2007 Audit Reports" means the March 7, 2008 and March 10, 2008 reports issued by PricewaterhouseCoopers LLP ("PwC," as defined below) with respect to the "financial statements" of Barclays PLC and Barclays Bank PLC, respectively, as of and for the years ending December 31, 2007 and December 31, 2006, as well as Barclays' internal control over financial reporting for these periods, and incorporated into Barclays' 2007 20-F.

3.     "2006 20-F" means Barclays' (as defined below) Annual Report on Form 20-F for the fiscal year ending December 31, 2006, filed with the United States Securities & Exchange Commission ("SEC") on or about March 26, 2007.

4.     "2006 Audit Reports" means the March 8, 2007 and March 26, 2007 reports issued by PricewaterhouseCoopers LLP ("PwC"), as defined below, with respect to the financial statements of Barclays PLC and Barclays Bank PLC, respectively, as of and for the years ending December 31, 2006 and December 31, 2005, as well as Barclays' internal control over financial reporting for these periods, and incorporated into Barclays' 2006 20-F.

5.     "And" shall include the term "or," and the term "or" shall include the term "and," such that each document request calls for the production of the greatest number of documents.

_____

[1]     All terms used herein shall have the same meaning, whether capitalized or not.

- 1 -

6.     "Asset-Backed Securities" refers to any debt security collateralized by specific assets, including, but not limited to, securities backed by home mortgages, credit card receivables, car loans, home-equity loans, mobile home loans and student loans.  This definition includes, without limitation, mortgage-backed securities, residential mortgage-backed securities, commercial mortgage-backed securities, collateralized debt obligations, collateralized loan obligations, collateralized bond obligations, structured investment vehicles ("SIV") and SIV-Lites, credit default swaps, and any tranche of any asset-backed security.

7.     "Audit documentation" refers to and adopts the definition and requirements of the term audit documentation as established or otherwise described by the Public Company Accounting Oversight Board's Auditing Standard No. 3 ("AS 3, Audit Documentation"), and the American Institute of Certified Public Accountants Statement on Auditing Standards Nos. 96 and 103 ("SAS 96, Audit Documentation", and "SAS 103, Audit Documentation").  As elaborated in these standards, audit documentation includes and consists of all records, "workpapers" or other documents (including workpapers prepared using audit software) prepared or received relevant to the engagement, including records of the planning and performance of the work, the procedures applied, test performed, evidence obtained and conclusions reached.  Specific examples of audit documentation include audit programs, analyses, memoranda, letters of confirmation, representation letters, abstracts or photocopies of documents, client-prepared documents, schedules or commentaries, engagement administrative, review and completion documents, workpaper and documentation organizational schedules, indices or elements, permanent files, and correspondence.

8.     "Barclays" or the "Company" refers to Barclays PLC, Barclays Bank PLC, Barclays Capital and its subsidiaries, divisions, and affiliates (foreign and domestic), and any

present and former officers, directors, employees, agents or members of the Board of Directors of Barclays, and Barclays' attorneys, accountants, advisors, and all other persons acting or purporting to act on its behalf.

9.    "Communication," "Concerning,"  and "to Identify" (with respect to persons and with respect to documents), have the same meanings as set forth in Rule 26.3 of the Local Rules of the United States District Court for the Southern and Eastern District of New York.

10.    "Circle Up Work" means the procedures and other work that PwC performed in connection with any Comfort Letter (defined below) that PwC issued or contemplated issuing in connection with the Series 5 Offering.

11.    "Comfort Letters" means the April 8, 2008 U.S. comfort letter, the April 8, 2008 non-U.S. comfort letter, and the April 11, 2008 U.S. and non-U.S. bringdown comfort letters that PwC provided to Barclays and/or the Underwriter Defendants in connection with the Series 5 Offering, and any other comfort letters that PwC issued or contemplated issuing in connection with the Series 5 Offering or any debt, securities or notes offering made under Barclays' Debt Issuance Program (as defined below).

12.    "Consent to Incorporation" means the March 26, 2008 signed consent given by PwC, to the incorporation by reference into the Automatic Shelf Registration Statement filed by Barclays with the SEC on Form F-3 on August 31, 2007 (File No. 333-145845), of PwC's audit reports dated March 7, 2008 and March 10, 2008, respectively, for:  (1) Barclays PLC, relating to the financial statements and the effectiveness of internal control over financial reporting; and (2) Barclays Bank PLC, relating to the financial statements, which appear in the 2007 20-F, and to the reference to PwC under the heading "Experts" in such Registration Statement.

13.     "Debt Issuance Program" means Barclays' £30,000,000 Debt Issuance Program commenced or renewed on or about June 7, 2007, pursuant to a base prospectus dated June 7, 2007, and as subsequently amended, including but not limited to Barclays' issuance of $2,000,000,000 7.70% Undated Subordinated Notes under the Debt Issuance Program, which was made pursuant to the base prospectus dated June 7, 2007, and base prospectus supplements dated September 4, 2007, November 8, 2007, November 16, 2007, February 22, 2008, and March 27, 2008.

14.     "DIP Comfort Letters" means the April 24, 2008 U.S. comfort letter and the April 24, 2008 non-U.S. comfort letter issued by PwC with respect to Barclays' issuance of $2,000,000,000 7.70% Undated Subordinated Notes under the Debt Issuance Program.

15.     "Document" is synonymous in meaning and equal in scope to the usage of the term in Rule 26.3 of the Local Rules of the United States District Court for the Southern District of New York and Rule 34(a) of the Federal Rules of Civil Procedure.  The term includes writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained.  The term should be interpreted broadly, and includes electronic or computerized data compilations.  A draft or non-identical copy is a separate document within the meaning of "Document."

16.     "Electronically stored information" or "ESI" includes, without limitation, the following:

(a)     all items covered by Fed. R. Civ. P. 34(a)(1)(A);

(b)     information or data that is generated, received, processed, and recorded by computers and other electronic devices, including Metadata;

(c)     internal or external websites;

- 4 -

          (d)      output resulting from the use of any software program, including, but not limited to, any word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, AOL Instant MessengerTM (or similar program), Bloomberg Instant Messenger or e-mail or bulletin board programs, operating systems, source code, PDF files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; and

          (e)      any and all items stored on Electronic Media (defined herein).

      17.    "Electronic Media" means any magnetic or other storage media device used to record ESI. Electronic media devices may include computer memories, hard disks, floppy disks, hard drives, memory sticks, CD, CD-ROM, DVD, personal digital assistant devices (*e.g.*, Palm Pilot, Blackberry, iPhone or "smart phone" devices), magnetic tapes of all types microfiche, or any other vehicle for digital data storage and/or transmittal, including, but not limited to, any containers or labels appended to, or relating to, any physical storage device associated with each original or copy of such device.

      18.    "Engagement Letters" means the U.S. Engagement Letter dated April 8, 2008 between PwC and Barclays PLC and Barclays Bank PLC, and the non-U.S. Engagement Letter dated April 8, 2008 between PwC and Barclays PLC, Barclays Bank PLC, Barclays Capital Securities Limited, and the Underwriter Defendants, concerning PwC's issuance of Comfort Letters with respect to the Series 5 Offering.

      19.    "EquiFirst Transaction" refers to Barclays' acquisition of EquiFirst Corporation from Regions Financial Corporation, announced on January 19, 2007, and which closed in April 2007.

20.    "Financial statements" includes, without limitation, the following, whether audited or unaudited; whether draft, final, interim or pro forma; whether complete or partial; and whether consolidated, consolidating or unconsolidated: balance sheets; statements of financial position; income statements; statements of earnings, revenues, expenses, profits and losses; statements of equity, additional paid-in capital and retained earnings; cash flow statements and source of application of funds; notes to each of such statements; and any and all other statements and notes that relate to the past or present financial condition of Barclays PLC and Barclays Bank PLC, respectively.

21.    "Including" means including, but not limited to.

22.    "Lead Plaintiffs" means Alfred Fait and Dennis Askelson, the Court-appointed Lead Plaintiffs in *In re Barclays PLC Securities Litigation*, No. 09-1989 (PAC) (S.D.N.Y.).

23.    "Meeting" means any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged or scheduled in advance, and whether or not occurring face-to-face, telephonically, via videoconference, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

24.    "Metadata" means ESI describing the history, tracking or management of an electronic file, including, but not limited to, all information concerning the date(s) the documents were created, modified, or distributed, the format of the documents, the owner or the custodian of the documents, and the author(s) and recipient(s) of the documents.

25.    "Person" means any individual, corporation, partnership, limited partnership, joint venture, sole proprietorship, corporation, trust, governmental agency or other organization recognizable at law, and all other entities and their respective agents and employees.

26.     "Professional services" means any work or services performed by You for Barclays PLC and Barclays Bank PLC.

27.     "Project RIMU" or "RIMU" means the Series 5 Offering (as defined below).

28.     "PwC" means PricewaterhouseCoopers LLP and its predecessors, successors, parents, subsidiaries, divisions, partnerships, or affiliates, and anyone acting or purporting to act on its behalf, including any of its respective partners, directors, officers, managing agents, agents, employees or other representatives or committees thereof, including but not limited to the PwC firms located at Hay's Galleria, 1 Hay's Lane, London, SE1 2RD, United Kingdom, 300 Madison Ave., New York, New York, 10017, and 1301 K Street NW, Washington, DC 20005.

29.     "Refer" or "relate" or "referring" or "relating" means all documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, without limitation, all documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

30.     "Risk Management Controls" means Barclays' internal controls over financial reporting.

31.     "SEC" refers to the United States Securities and Exchange Commission, its national, regional and branch officers, and its commissioners, directors, administrators, branch chiefs, attorneys, accountants, investigators, paralegals and staff.

32.     "Series 5 Offering" refers to Barclays' public offering of American Depositary Shares, Series 5, representing Non-Cumulative Callable Dollar Preference Shares, Series 5, bearing an 8.125% coupon (CUSIP 06739H362), commenced on or about April 8, 2008.

33.    "Underwriters' Counsel" means the Linklaters law firm or any other law firm who served as counsel to the Underwriter Defendants (as defined below) in connection with the Series 5 Offering.

34.    "Underwriter Defendants" means the following entities as well as their officers, directors, employees, partners, corporate parent, subsidiaries or affiliates:

        (a)    Banc of America Securities LLC;

        (b)    Barclays Capital Securities, Limited;

        (c)    Citigroup Global Markets Inc.;

        (d)    Merrill Lynch, Pierce, Fenner & Smith Incorporated;

        (e)    Morgan Stanley & Co., Incorporated;

        (f)    RBC Dain Rauscher Inc.;

        (g)    UBS Securities LLC; and

        (h)    Wachovia Capital Markets, LLC (n/k/a Wells Fargo Securities, LLC).

35.    "You" and "your" refers to PricewaterhouseCoopers LLP, including its predecessors, successors, parents, subsidiaries, affiliates, present or former officers, directors, employees, agents, representatives or other persons acting on its behalf.

36.    "White Papers" means the white paper issued by the Center for Audit Quality dated October 3, 2007 and titled "Measurements of Fair Value In Illiquid (or Less Liquid) Markets," and the white paper issued by the Global Public Policy Committee dated December 13, 2007 and titled "Determining Fair Value of Financial Instruments under IFRS in Current Market Conditions."

37.    "Workpapers" or "working papers" means all documents concerning the procedures applied, work performed, evidence obtained and conclusions reached in the

- 8 -

engagement by any auditor, practitioner, consultant or any other person working on your behalf. Workpapers for any audit or attestation include, but are not limited to:

(a)     Working papers are records kept by the auditor (or practitioner) of the procedures applied, the tests performed, the information obtained, and the pertinent conclusions reached in the engagement.   Examples of working papers are audit programs, analyses, memoranda, letters of confirmation and representation, abstracts of company documents, and schedules or commentaries prepared or obtained by the auditor.  Working papers also may be in the form of data stored on tapes, films, or other media.  AU §339A.03.

**II.     INSTRUCTIONS**

1.     In responding to these requests, you shall produce all responsive documents which are in your possession, custody or control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, executives, officers, partners, managing agents, agents, employees, attorneys, accountants or any other representative.  A document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document.

2.     Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by plaintiffs original documents as they are kept in the usual course of business and you shall organize and label them to correspond with the categories in these requests.

3.     In responding to these requests, you shall produce all responsive documents available at the time of production and you shall supplement your responses as required by Rule 26(e) of the Federal Rules of Civil Procedure.

4.     If any responsive document was, but no longer is, in your possession or subject to your control, state whether the document is: (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each instance identify the name and address of its current or last known custodian, and the circumstances surrounding such disposition.

5.     If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise, as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information:

(a)     the privilege being asserted;

(b)     the person on whose behalf the privilege is asserted;

(c)     a precise statement of the facts upon which the claim of privilege is based;

and

(d)     identify the purported privileged document including:

(i)       its nature, *e.g.*, letter, memorandum, tape, etc.;

(ii)      the date it was prepared;

(iii)     the date the document bears;

(iv)     the date the document was sent;

(v)      the date it was received;

(vi)     the name of the person who prepared the document;

(vii)    the name(s) of the person(s) who received the document;

(viii)   the name of  each person to whom it was sent or was intended to

be sent, including all addressees and all recipients of copies; and

- 10 -

(ix)      a statement of whom each identified person represented or purported to represent at all relevant times.

6.      If a portion of any document responsive to these requests is withheld under claim of privilege pursuant to Instruction 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.      You are to produce each document requested herein in its entirety, without deletion, redaction or excision (except as qualified by Instructions 4 and 5 above), regardless of whether you consider the entire document to be relevant or responsive to the requests.

8.      Provide a source list that clearly identifies who maintained the document and identifies the person or location it was collected from.

9.      The singular shall include the plural, and the disjunctive shall include the conjunctive, and vice versa.

## III.    FORM OF PRODUCTION – HARD COPY

Hardcopy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (i.e., .dat). The database load file should contain the following fields: "BEGNO," "ENDNO," "BEGATTACH," "ENDATTACH," "PAGES" and "CUSTODIAN." The documents should be logically unitized (i.e., distinct documents should not be merged into a single record, and a single document should not be split into multiple records) and should be produced in the order in which they are kept in the usual course of business. If an original document contains color necessary to understand the meaning or content of the document, the document should be produced as single-page, 300 DPI, color JPG images. Multi-page Optical Character Recognition ("OCR") text for each document should also be provided. The OCR software should maximize text quality over process speed.

- 11 -

Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

## IV.   FORM OF PRODUCTION – ELECTRONICALLY STORED INFORMATION

Electronically stored information ("ESI") should be produced as single-page, Group IV, 300 DPI TIFF images with the exception of source code, audio, video, and spreadsheet-type files, including, but not limited to, Microsoft Excel, CSV – which should be produced in native format.   All ESI should be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.   An .opt image cross-reference file should also be provided for all TIFF images.

TIFF images should show any and all text and images which would be visible to the reader using the native software that created the document.   For example, TIFF images of e-mail messages should include the BCC line.   PowerPoint documents should be processed with hidden slides and all speaker notes unhidden, and should be processed to show both the slide and the speaker's notes on the TIFF image.   If an original document contains color, the document should be produced as single-page, 300 DPI, color JPG images.

If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing the confidential designation and text stating the document has been produced in native format should also be provided.   If documents requested in native format require redactions, the parties should meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained. Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field.   To the extent that either

PricewaterhouseCoopers LLC or Lead Plaintiffs believe that native files should be produced for a specific document or class of documents not required to be produced in native format pursuant to this paragraph or to the extent records do not easily conform to native or TIFF format (i.e., structured data), the parties should meet and confer in good faith.

All documents prepared or created using audit software shall be produced in the format that you maintained in the ordinary course of business.

Removal of duplicate documents should only be done on exact duplicate documents (based on MD5 or SHA-1 hash values, at the family level). Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates. An e-mail that includes content in the BCC or other blind copy field should not be treated as a duplicate of an e-mail that does not include content in those fields, even if all remaining content in the e-mail is identical. Removal of near-duplicate documents is not acceptable. De-duplication should be done across the entire collection (i.e., global level) and the CUSTODIAN field should list each Custodian, separated by a semicolon, who was a source of that document. To accommodate for rolling productions, for ESI that is removed as duplicate from earlier productions, the producing party should provide an overlay file no later than three days after the date of each rolling production that includes the duplicate custodian names.

## V.    RELEVANT TIME PERIOD

Unless otherwise specifically indicated, all requests herein refer to the period from January 1, 2007 to March 24, 2009. If a document prepared before or after this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the

date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## VI.   DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents and communications referring to, identifying, reflecting or concerning any audit, review or other professional services that You performed for Barclays in connection with Barclays' issuance of the 2007 20-F and 2006 20-F, and/or the issuance of the 2007 Audit Report and 2006 Audit Report, and any interim management statement, half yearly report, and SEC Form 6K covering fiscal years ended December 31, 2007 and 2006, including but not limited to:

(a)      All contracts or engagement letters between or among You and Barclays;

(b)      All engagement workpapers and audit documentation in connection with any professional services You performed concerning all audit reports, interim management statements, half yearly reports and SEC Form 6Ks covering or pertaining to fiscal years 2006 and 2007;

(c)      Documents reflecting or concerning any meetings between You and Barclays, including all communications regarding such meetings, all agendas and minutes prepared, and all materials distributed, in connection with such meetings, and all notes taken during such meetings;

(d)      All documents You provided to or received from Barclays;

(e)      All documents that You used, considered and/or relied upon;

(f)      All communications between You and Barclays;

(g)      All communications among PwC personnel; and

(h)      All other notes, memos and internal documents You prepared.

- 14 -

REQUEST NO. 2:

All documents and communications referring to, identifying, reflecting or concerning any audit, review or other professional services that You performed for Barclays and/or any Underwriter Defendant in connection the Series 5 Offering and/or that provide the basis for Your Consent to Incorporation and/or any Comfort Letters You issued or contemplated issuing in connection with the Series 5 Offering, including, but not limited to:

(a)     All contracts or Engagement Letters between or among You and Barclays and/or any Underwriter Defendant;

(b)     All engagement workpapers and audit documentation in connection with any professional services You performed concerning all audit reports, interim management statements, half yearly reports and SEC Form 6Ks covering or pertaining to fiscal years 2006 and 2007;

(c)     Documents reflecting or concerning any meetings between You and Barclays and/or the Underwriter Defendants, including all communications regarding such meetings, all agendas and minutes prepared, and all materials distributed, in connection with such meetings, and all notes taken during such meetings;

(d)     All documents You provided to or received from Barclays and/or any Underwriter Defendant;

(e)     All documents that You created, used, considered and/or relied upon on in connection with the work You performed, including but not limited to any Circle-Up Work that You performed, and all documents reflecting or concerning any decision regarding whether or not to circle-up any items in connection with the work You performed, regardless of whether or not items were ultimately circled;

- 15 -

(f)     All Comfort Letters You issued or contemplated issuing in connection with the Series 5 Offering, and all drafts thereof;

(g)     All communications between You and Barclays and/or any Underwriter Defendant, including but not limited to communications concerning any Circle-Up Work You performed and any aspect of Barclays financial results for which You expressed the view that You could not give a statement of comfort with respect to such results;

(h)     All communications among PwC personnel, including but not limited to communications concerning any Circle-Up Work You performed and any aspect of Barclays' financial results for which You expressed the view that You could not give a statement of comfort with respect to such results;

(i)     All other notes, memos and internal documents prepared;

REQUEST NO. 3:

All documents and communications referring to, identifying, reflecting or concerning any audit, review or other professional services that You performed for Barclays and/or any Underwriter Defendant in connection with any other securities offerings or debt issuances, including but not limited to any work You performed in connection with Barclays' issuance of $2,000,000,000 7.70% Undated Subordinated Notes under its Debt Issuance Program and/or Your issuance of the DIP Comfort Letters, that caused You to question the accuracy, truthfulness and/or propriety of Your Consent to Incorporation, Circle Up Work, and/or any Comfort Letters You issued or contemplated issuing in connection with the Series 5 Offering, pursuant to which You could not circle up items in connection with the work You performed for such other securities offerings or debt issuances including but not limited to:

(a)     All engagement workpapers and audit documentation in connection with any professional services You performed concerning all audit reports, interim management statements, half yearly reports and SEC Form 6Ks covering or pertaining to fiscal years 2006 and 2007;

(b)     All documents reflecting or concerning any meetings between You and Barclays and/or the any Underwriter Defendants, including but not limited to all communications regarding such meetings, all agendas and minutes prepared, and all materials distributed, in connection with such meetings, and all notes taken during such meetings;

(c)     All documents You provided to or received from Barclays and/or any Underwriter Defendant;

(d)     All documents that You created, used, considered and/or relied upon on in connection with the work You performed and/or Your issuance of the DIP Comfort Letters, including but not limited to documents reflecting or concerning any circle-up work You performed and Your decision whether to circle-up any items in connection with Your work;

(e)     All DIP Comfort Letters You issued or contemplated issuing in connection with the Debt Issuance Program and all drafts thereof;

(f)     All communications between You and Barclays and/or any Underwriter Defendant, including but not limited to communications concerning any circle-up work You performed and any aspect of Barclays financial results for which You expressed the view that You could not give a statement of comfort with respect to such results;

(g)     All communications among PwC personnel, including but not limited to communications concerning any Circle-Up Work You performed and any aspect of Barclays'

- 17 -

financial results for which You expressed the view that You could not give a statement of comfort with respect to such results;

> (h)    All other notes, memos and internal documents prepared.

REQUEST NO. 4:

All documents referring to, identifying, reflecting or concerning any audit, review or other professional services that You performed with respect to the valuation of Barclays' Asset-Backed Securities, including but not limited to:

> (a)    All engagement workpapers and audit documentation in connection with any professional services You performed concerning all audit reports, interim management statements, half yearly reports and SEC Form 6Ks covering or pertaining to fiscal years 2006 and 2007;

> (b)    All documents and communications reflecting or concerning any meetings among PwC personnel or between You and Barclays, including but not limited to all agendas and minutes concerning such meetings, all materials distributed in connection with such meetings, and all notes taken during or regarding such meetings;

> (c)    All documents You provided to or received from Barclays;

> (d)    All documents that You created, used, considered and/or relied upon;

> (e)    All communications between You and Barclays;

> (f)    All communications among PwC personnel;

> (g)    All other notes, memos and other documents You prepared.

REQUEST NO. 5:

All documents referring to, identifying, reflecting or concerning any audit, review or other professional services that You performed in connection with the EquiFirst Transaction, including but not limited to:

(a)    All engagement workpapers and audit documentation in connection with any professional services You performed concerning all audit reports, interim management statements, half yearly reports and SEC Form 6Ks covering or pertaining to fiscal years 2006 and 2007;

(b)    All documents and communications reflecting or concerning any meetings among PwC personnel or between You and Barclays, including but not limited to all agendas and minutes concerning such meetings, all materials distributed in connection with such meetings, and all notes taken during or regarding such meetings;

(c)    All documents You provided to or received from Barclays;

(d)    All documents that You created, used, considered and/or relied upon;

(e)    All communications between You and Barclays;

(f)    All communications among PwC personnel;

(g)    All other notes, memos and other documents You prepared.

REQUEST NO. 6:

All documents and communications referring to, identifying, reflecting or concerning any audit, review or other professional services that You performed in connection Barclays' response to the White Papers, including but not limited to:

(a)    All engagement workpapers and audit documentation in connection with any professional services You performed concerning all audit reports, interim management

- 19 -

statements, half yearly reports and SEC Form 6Ks covering or pertaining to fiscal years 2006 and 2007;

        (b)     All documents and communications reflecting or concerning any meetings among PwC personnel or between You and Barclays, including but not limited all agendas and minutes concerning such meetings, all materials distributed in connection with such meetings, and all notes taken during or regarding such meetings;

        (c)     All documents You provided to or received from Barclays;

        (d)     All documents that You created, used, considered and/or relied upon;

        (e)     All communications between You and Barclays;

        (f)     All communications among PwC personnel;

        (g)     All other notes, memos and other documents You prepared.

REQUEST NO. 7:

All organizational charts and rosters of Your employees who performed any audit, review or other professional services for Barclays broken down by engagement name, code, personnel title, office location, and amount of time billed, including, but not limited to any audit, review or other work performed in connection with the 2007 20-F, the 2007 Audit Report, the Series 5 Offering (including any work leading to Your Consent to Incorporation and Your issuance of the Comfort Letters), the Debt Issuance Program (including any work leading to Your issuance of the DIP Comfort Letters), the valuation of Barclays' Asset-Backed Securities, the EquiFirst Transaction, or Barclays' response to the White Papers.

REQUEST NO. 8:

All documents concerning the preservation, search for, collection, maintenance, destruction or alteration of any and all documents (including e-mail and other electronic data)

concerning Barclays that were undertaken with respect to this action, including, without limitation, all such action taken after this action was filed but prior to this request.

REQUEST NO. 9:

All documents and communications with or regarding any government agency, regulatory body or law enforcement agency concerning Barclays, including, but not limited to, the SEC, the U.S. Department of Justice and any U.S. Attorney's Office. This request includes, without limitation, documents produced to any such agency, and transcripts of testimony given to any such agency.

REQUEST NO. 10:

All documents and communications with or concerning regulatory agencies regarding Barclays or PWC's services for Barclays, including, but not limited to, the Public Company Accounting Oversight Board, the Public Oversight Board, the American Institute of Certified Public Accountants, the New York Stock Exchange, and the National Association of Securities Dealers, Automated Quotations, and banking or insurance regulators.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

SKYLINE STEEL, L.L.C.,

                       Plaintiff,

         -v-

PILEPRO, L.L.C.,

                    Defendant.

--------------------------------------------------------------------X

```
┌────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:_____         │
│ DATE FILED: 01/28/2015          │
└────────────────────────────────┘
```

13-CV-8171 (JMF)

MEMORANDUM OPINION
AND ORDER

JESSE M. FURMAN, United States District Judge:

There are now pending in this contentious patent litigation between Plaintiff Skyline Steel,

LLC ("Skyline") and Defendant PilePro, LLC ("PilePro"), familiarity with which is assumed, a

total of seven motions. This Memorandum Opinion and Order addresses one: PilePro's application

to this Court, filed on January 6, 2015, requesting that the Court issue a Letter of Request for

International Judicial Assistance (a "Letter of Request") pursuant to Article 1 of the Hague

Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters,

23 U.S.T. 2555, 847 U.N.T.S. 231, *reprinted in* 28 U.S.C. § 1781 (the "Hague Evidence

Convention"). (Docket No. 186). For the reasons that follow, PilePro's request is DENIED.

Article 1 of the Hague Evidence Convention provides that a judicial authority in one

contracting state "may" forward a letter of request to the competent authority in another contracting

state for the purpose of obtaining evidence. 28 U.S.T. 2555; *see Societe Nationale Industrielle*

*Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa* ("*Aerospatiale*"), 482 U.S. 522, 535 (1987). As

the plain language of the Convention indicates, and as the Supreme Court has held, the

Convention's procedures should be viewed "as a supplementary measure," *Bodner v. Paribas*, 202

F.R.D. 370, 374 (E.D.N.Y. 2000), setting forth "optional," "not mandatory" methods for discovery

"available whenever they will facilitate the gathering of evidence by the means authorized in the Convention," *Aerospatiale*, 482 U.S. at 541. The party seeking discovery through the Convention "bears the burden of demonstrating that proceeding in that manner is necessary and appropriate." *Metso Minerals Inc. v. Powerscreen Int'l Distribution Ltd.*, No. 06-CV-1446 (ADS) (ETB), 2007 WL 1875560, at *2 (E.D.N.Y. June 25, 2007) (internal quotation marks omitted). "[I]n determining whether to employ Hague Convention means or allow other procedures, a court must look to such factors as considerations of comity, the relative interests of the parties including the interest in avoiding abusive discovery, and the ease and efficiency of alternative formats for discovery." *Madanes v. Madanes*, 199 F.R.D. 135, 141 (S.D.N.Y. 2001).

Here, PilePro seeks a Letter of Request to enable it to inspect ArcelorMittal's manufacturing facility in Luxembourg — the facility that produces the products (the "HZM System") for which Skyline seeks summary judgment against PilePro based on non-infringement (Docket No. 102) — on the ground that PilePro's observation of the manufacturing process is relevant to its defense against Skyline's motion. (*See* Docket No. 186 ("PilePro's Application") 1-2). Specifically, it contends that because the '543 Patent owned by PilePro covers a specific manufacturing process involving shape-cutting of interlocks, and "Skyline admits that the HZM System" — or, at least, parts of the HZM system (*see* Docket No. 189 ("Skyline's Opp'n") 4-5) — "features shape-cut interlocks . . . PilePro has at least preliminary knowledge about a weakness in Skyline's non-infringement argument" warranting further inquiry into the HZM System's manufacturing process (Docket No. 194 ("PilePro's Reply") 2).

The Court has serious doubts about whether the discovery sought by PilePro could, in fact, ever lead to the discovery of non-cumulative evidence relevant to its defense against Skyline's non-infringement claim — doubts succinctly expressed by Skyline in its opposition to PilePro's request. (*See* Skyline's Opp'n 1-6). Nevertheless, it need not address that issue because there is an

2

independent and adequate ground for denying PilePro's application: the fact that PilePro waited more than eight months to file it. As early as April 2014, in opposing Skyline's first request for expedited summary judgment briefing on its claim of non-infringement, PilePro indicated that the issue would "necessarily require third party discovery from ArcelorMittal," including "[s]ite visits," and that it intended to pursue such discovery under the Hague Convention. (Docket No. 22 ("PilePro's Apr. 8, 2013 Ltr.") 4). Nevertheless, over five months later, in a hearing before the Court, counsel for Skyline observed — correctly — that PilePro had "not taken a single step" toward pursuing discovery under the Hague Convention. (Sept. 23, 2014 Hr'g Tr. (Docket No. 89) at 70:18-22). In response, the Court underscored the initial fact discovery deadline of March 27, 2015, and admonished PilePro for its delays in pursuing discovery. (*Id.* at 70:12-14; 73:5-74:5). The Court indicated in no uncertain terms that PilePro was "not entitled to sit on [its] hands" and that if, having effectively done so, PilePro did not "have enough time to take whatever discovery [it] need[ed], whether that [was] in Europe or otherwise," it was "not necessarily going to get any more time." (*Id.* at 73:21-74:4; *see also id.* at 77:4-5). Even then, however, PilePro waited another three and a half months to file the present motion.

PilePro has offered no reason for why it waited until now — through an application fully briefed only two months before the close of fact discovery — to seek discovery under a procedure that the Supreme Court has noted is often "unduly time consuming and expensive." *Aerospatiale*, 482 U.S. at 542. (The delay is certainly not a product of Skyline's reasonable decision to oppose the motion, as PilePro ridiculously suggests. (PilePro's Reply 5).) Although not raised by PilePro, the fact that the Court granted its request to substitute counsel in November 2014 (Docket No. 129) is no excuse, as the Court repeatedly cautioned that any substitution of counsel could not be used to justify delay. (Sept. 23, 2014 Hr'g Tr. at 78:23-79:13). And in light of the short time remaining in fact discovery, the delay that would result if the Court granted PilePro's request is far from

"speculative," as PilePro argues (PilePro's Reply 5) — instead, it is close to certain. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 53 (E.D.N.Y. 2010) ("[T]he outcome of a request pursuant to the Convention is by no means certain, and making the request will undeniably result in delays of unknown, and perhaps considerable, duration.").

Finally, PilePro has not made a showing that the information it seeks — regarding the HZM System's manufacturing process — could not be obtained through other, more efficient means, *see, e.g., Madanes,* 199 F.R.D. at 141; in fact, in opposing Skyline's motion for partial summary judgment, PilePro asserts that its principal Roberto Wendt has the professional experience and expertise to glean at least some of the relevant information regarding the HZM System's manufacturing process from a visual inspection alone. (Docket No. 141 ("PilePro's Summ. J. Opp'n") 5). Accordingly, and for the reasons stated above, PilePro's application is DENIED. *See Gucci Am., Inc. v. Weixing Li*, No. 10-CV-4974 (RJS), 2012 WL 5992142, at *8 n.4 (S.D.N.Y. Nov. 15, 2012), *rev'd on other grounds*, 768 F.3d 122 (2d Cir. 2014) (declining to issue a Letter of Request because the the window of time in which to seek it had "long since closed" and the "request smack[ed] of gamesmanship designed to further delay discovery").

SO ORDERED.

Date:   January 28, 2015
       New York, New York

                                           JESSE M. FURMAN
                                         United States District Judge