G5HSBARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARSHALL FREIDUS, et al.,

4                 Plaintiffs,

5            v.                          09 Civ. 1989 (PAC)

6   BARCLAYS BANK PLC, et al.,

7                 Defendants.

8   ------------------------------x
                                        New York, N.Y.
9                                       May 17, 2016
                                        10:15 a.m.
10
    Before:
11
                      HON. PAUL A. CROTTY,
12
                                        District Judge
13
                          APPEARANCES
14
    KESSLER TOPAZ MELTER & CHECK, LLP
15       Attorneys for Plaintiffs
    BY:  SHARAN NIRMUL
16       ANDREW ZIVITZ

17  ROBBINS GELLER RUDMAN & DOWD, LLP
         Attorneys for Plaintiffs
18  BY:  ANDREW J. BROWN

19  SULLIVAN & CROMWELL, LLP
         Attorneys for Defendants
20  BY:  MICHAEL T. TOMAINO, JR.
         THOMAS C. WHITE
21       MATTHEW A. PELLER

22  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
         Attorneys for Defendants
23  BY:  SCOTT D. MUSOFF
         PATRICK G. RIDEOUT

24

25

G5HSBARC

```
 1                (Case called)
 2                MR. NIRMUL:  Good morning, your Honor.  Sharan Nirmul,
 3      Kessler, Topaz, Meltzer & Check for the plaintiff,
 4      Mr. Askelson, who happens to be here today.
 5                THE COURT:  Good morning.
 6                MR. ZIVITZ:  Good morning.  Andrew Zivitz, Kessler
 7      Topax, also for the proposed class.
 8                THE COURT:  Good morning.
 9                MR. BROWN:  Good morning, your Honor.  Andrew Brown
10      from Robbins Geller on behalf of the plaintiffs.
11                THE COURT:  Who is going to argue for the plaintiff?
12                MR. NIRMUL:  I will, your Honor.
13                THE COURT:  All right.
14                MR. TOMAINO:  Good morning.  Michael Tomaino with
15      Sullivan & Cromwell.  I represent the Barclays Bank PLC,
16      Barclays PLC, and the individual defendants.  With me are my
17      colleagues from Sullivan & Cromwell, Thomas White and Matthew
18      Peller.
19                MR. MUSOFF:  Good morning, your Honor.  Scott Musoff
20      and Patrick Rideout, Skadden Arps, on behalf of the underwriter
21      defendants.
22                THE COURT:  Who is going to be arguing for the
23      defendants, you, Mr. Musoff, or Mr. Tomaino?
24                MR. TOMAINO:  I'll be arguing, your Honor.  Thank you.
25                THE COURT:  All right.  I have read your papers.  As
```

G5HSBARC

1  I understand it, on plaintiffs' motion for class certification,

2  there are three issues.  One is whether there is standing, two

3  is whether Mr. Askelson is an adequate representative, and

4  three deals with the term for the class period.

5          All parties agree to that?

6          MR. NIRMUL:  Yes, your Honor.

7          MR. TOMAINO:  Yes, sir.

8          THE COURT:  What I would like to do is take up the

9  standing issue then, ten minutes on each side; five minutes on

10  the adequacy question for each side; and five minutes for

11  consideration of the term on for each side.

12          Is that satisfactory?

13          MR. NIRMUL:  Yes, your Honor.

14          MR. TOMAINO:  Yes, your Honor.  Thank you.

15          THE COURT:  All right.  Why don't you go ahead then.

16          MR. NIRMUL:  Yes, your Honor.

17          THE COURT:  Good morning.

18          NEW SPEAKER:  On the standing issue that defendants

19  raised, they argue that Mr. Askelson's injury must be measured

20  from the date that he was proposed as a lead plaintiff in

21  February of 2011.

22          THE COURT:  At which time the price was over 45.

23          MR. NIRMUL:  At which time the price was slightly over

24  par.

25          THE COURT:  Correct.

G5HSBARC

1          MR. NIRMUL:  This is not the date Mr. Askelson

2     suffered an injury.  The date on which Mr. Askelson suffered an

3     injury was the date when the risks associated with his

4     investment and the Series 5 offering manifested.  That was in

5     the spring of 2009.  Mr. Askelson purchased his Series 5 shares

6     at $25 per share on April 8, 2008.  That's the date of the

7     offering.  Within ten months, the price of those shares had

8     fallen.  In March of 2009, they were $6.  By April, they were

9     at $12.

10          That injury, that out-of-pocket injury is harm and is

11     what congress intended to remedy by Section 11.  That concept

12     of an injury flowing from diminution in value of one's

13     securities is a traditional remedy, an injury that is

14     recognized under our securities laws.  When you purchase a

15     security and where there are risks associated with that

16     security that are not revealed but then later manifest, the

17     diminution in value of your security is your injury, and

18     congress intended to remedy that through Section 11 by

19     prescribing a statutory formula for compensating that injury.

20          Now, the statutory formula is an exclusive remedy that

21     congress has provided.  It is the sole remedy.  There are other

22     ways one could arguably measure an injury that arises from

23     purchasing a security from an inflated price if the risks

24     aren't truly revealed.  It could be, for example, you weren't

25     paid, you weren't compensated enough for the risk you took.

G5HSBARC

```
 1   You should have get a greater dividend, for example.  You
 2   weren't compensated for the decline in your security when your
 3   investment account was eviscerated and you lost the use of
 4   those funds.  Those are other conceivable injuries.  But the
 5   only one that congress seeks to remedy under the statute is the
 6   diminution in value of one's securities.
 7            Now, the case law --
 8            THE COURT:  Even if you haven't suffered a diminution
 9   in value?
10            MR. NIRMUL:  Well, Mr. Askelson certainly did when the
11   risks that were associated with his investment materialized in
12   the spring of 2009.  That is the injury.
13            The fact that the securities may have recovered after
14   that says nothing about whether or not the true value of that
15   security that congress recognizes in 11(e) as reflecting the
16   value after the risks.  The fact that it recovers afterwards
17   speaks nothing to whether the true value should be measured at
18   the time the risks are revealed.
19            Courts have recognized this.  Judge Cote recently, in
20   the Nomura case --
21            THE COURT:  Judge who?
22            MR. NIRMUL:  Judge Cote in the Nomura case, a case we
23   cited in our brief, rejected an in limine motion, any evidence
24   of a subsequent increase in value of a security in a Section 11
25   claim.  That is because she recognized that Section 11(e) of
```

G5HSBARC

1    the Securities Act, the value that Section 11(e), recognizing

2    the true value, is the value of the security once the risks are

3    revealed.

4              We have an analogy in the sister act to Section 11,

5    which is Section 10(b).  There is an analogous way to recognize

6    harm and damages when there is a corrective disclosure.

7    Someone purchases a security based on a false statement and

8    there is a corrective disclosure or a previously concealed risk

9    is revealed.  The diminution in value of that security is a

10   measure of one's injury and harm.  They are coextensive.  And

11   the only difference between 10(b) and Section 11 is that under

12   Section 11, congress has said we are going to assume that when

13   the plaintiff files their lawsuit after these risks are

14   revealed, the price at which the security is trading is the

15   true value of that security reflecting the previously concealed

16   risks.  We are going to impose on defendants -- and this is a

17   policy determination -- we are going to impose on defendants

18   the obligation to prove that that price at the time the

19   complaint was filed actually was due to something else.

20             That is the innovation in Section 11 that doesn't

21   exist under 10(b) because congress has determined that they are

22   going to shift the burden of proof to defendants for disproving

23   that that injury reflected in the diminution of value of the

24   securities was not caused by their misconduct.

25             Defendants cite not a single case that stands for the

G5HSBARC

1    proposition that one should measure whether its damages under

2    Section 11 or injury at some later point when the lead

3    plaintiff is appointed.  In fact, we have surveyed the case

4    law.  The cases that have actually reached this issue, your

5    Honor, have uniformly held that the measuring point for one's

6    damages under the statute is the date the first complaint is

7    filed.

8            Now, defendants point out in their sur-reply that

9    these cases talk about damages and not injury, but the reason

10   is, is that those two things are coextensive under Section 11.

11   They both seek to measure the loss in value of one's

12   securities.  And congress wants to, under the statute, redress

13   that loss in value because it recognizes that that injury has

14   been caused by false statements and admissions published by the

15   defendants.

16           So the case is exactly on point, all squares with the

17   issues in this case.  The case from the District of

18   Massachusetts, that's the Brooks Automation case -- I don't

19   think it appears in defendant's table of authorities, it is in

20   a footnote in their opposition brief -- but in that case, you

21   had two complaints filed by individuals in 2006.  Then there

22   was through the PSLRA lead plaintiff process an institutional

23   investor was appointed in February of 2007 to lead the case.

24           As the court is aware, the PSLRA requires, once an

25   initial complaint is filed, there is a notice period of 60 days

G5HSBARC

1      and then briefing on who is the most adequate lead plaintiff,

2      which is deemed to be the institution or individual with the

3      largest financial interest in the class action.   The court is

4      required to consolidate the actions, the related actions, and

5      then appoint a lead plaintiff.   And this process in the Brooks

6      case resulted in February of 2007, the lead plaintiff, I

7      believe it was Mississippi PERS, being appointed to manage the

8      case.   Defendants moved to dismiss and it turns out that

9      Mississippi PERS didn't actually purchase its securities out of

10     the offering.   So there was a standing issue that was raised

11     and they started to cure it by adding in another institutional

12     plaintiff in March of 2007.

13          Defendants argued that because the stock price had

14     increased and returned to par or above the offering price by

15     March of 2007, that new plaintiff didn't have standing to

16     assert the claim.   And the court, Judge Zobel, in the District

17     of Massachusetts, held that, no, under established law, the

18     price at which you measure damages under Section 11 is the date

19     on which the first filed complaint that raised these issues was

20     filed, and that was in 2006.

21          Now, that's exactly the situation we have here.

22          THE COURT:   I think I have your point.   Let me hear

23     from Mr. Tomaino.   Thank you very much.

24          MR. NIRMUL:   Thank you.

25          MR. TOMAINO:   Thank you, your Honor.   May it please

G5HSBARC

1    the Court.  Let me just quickly respond, if I might, to a

2    couple of points Mr. Nirmul started out with.

3           Respectfully, your Honor, Mr. Nirmul referred to

4    Section 11 as reflecting a congressional intent to compensate

5    plaintiffs with the traditional out-of-pocket measure of

6    damages.  That is not correct.  The legislative history shows

7    and the cases show, in particular <u>Beecher v. Able</u> by Judge

8    Motley, which is cited in the briefs, that congress, in fact,

9    rejected the traditional out-of-pocket measure of damages when

10   enacting Section 11.  The traditional out-of-pocket tort

11   measure of damages, as Mr. Nirmul pointed out, is, for example,

12   in a 10b-5 case, the disparity between the price paid and the

13   true value at the time the price was paid.  And Mr. Nirmul is

14   correct, that in Section 10(b) cases, often the decline in

15   value after a corrected disclosure is used as a surrogate to

16   measure the true value at the time of purchase or the level of

17   inflation.  That is not the measure of damages under

18   Section 11.  The measure of damages under Section 11(e) --

19           THE COURT:  Why are we talking about the measure of

20   damages?

21           MR. TOMAINO:  We shouldn't be at all.

22           THE COURT:  Thank you.

23           MR. TOMAINO:  Thank you for guiding me there.

24           Damages are distinct from Article III injury,

25   Article III standing -- and the Supreme Court yesterday

G5HSBARC

1   clarified all of these points quite nicely in the Spokeo

2   decision, which we sent in to the court yesterday.

3             THE COURT:  I read it.

4             MR. TOMAINO:  That is, if you will, one-stop shopping

5   for all of this Article III standing jurisprudence over the

6   past several decades, which the court yesterday reaffirmed.

7             Article III standing measures whether or not this

8   plaintiff has a concrete and particularized injury in fact, and

9   the time of measure --

10            THE COURT:  If he weren't seeking to be the

11  representative, just a member of the class, he can participate

12  as a member of the class, couldn't he?

13            MR. TOMAINO:  I'm sorry, your Honor, I didn't hear the

14  question.

15            THE COURT:  What if you are not seeking to be the

16  class representative, you're just seeking to be a participate

17  in the class.  He could participate in the class, couldn't he?

18            MR. TOMAINO:  If there is a certified class.

19            THE COURT:  But if there is a certified class, he

20  could participate in it?

21            MR. TOMAINO:  He can participate.

22            THE COURT:  Why can't he participate as a class

23  representative?

24            MR. TOMAINO:  By stepping forward as a named

25  plaintiff, your Honor, you need to satisfy all the obligations

G5HSBARC

1    of a named plaintiff asserting the claim, one of which and the

2    most important of which, under the Constitution, is actual

3    injury in fact under Article III.

4           Now, the plaintiffs point out in their reply brief,

5    your Honor, that there is something anomalous about the fact

6    that if Mr. Askelson had not stepped forward, he might be able

7    to participate as an absent class member.  There is nothing

8    anomalous about that at all, your Honor.  It happens all the

9    time that absent class members may share in a settlement

10   recovery or a judgment recovery, because the fact of the matter

11   is, that in a class action, the ability for the absent class

12   members to themselves state claims is never really tested.  The

13   only plaintiff that is subject to that test is the plaintiff

14   seeking class certification because he is a named or lead

15   plaintiff.

16          I'll give you one very quick example.  Mr. Spindel

17   steps forward, as your Honor will recall, to try to participate

18   as a named plaintiff.  He was late under the statute of repose.

19   He was not permitted to participate.

20          THE COURT:  I understand.

21          MR. TOMAINO:  He may well state a claim.

22          THE COURT:  That's the opinion I wrote.  That is not

23   this case.  That's not Mr. Askelson' case, is it?

24          MR. TOMAINO:  No, sir, but it is responsive to the

25   point that an absent class member may well end up sharing in a

G5HSBARC

recovery even though he was not able to assert a claim as a

named plaintiff, which is what Mr. Askelson is trying to do

here.

         The other thing that Mr. Askelson is trying to do here

which is improper under the Constitutional jurisprudence, the

first is he is using a damages remedy to define injury, which

Spokeo addresses as improper.

         The second thing he is doing, which was also addressed

by your Honor in the Spindel ruling, is that he seeks to borrow

facts and circumstances from a prior, now absent plaintiff to

establish damages.  Not injury, but damages.  He seeks to use

Ms. Pellegrini's complaint, and the date of suit of her

complaint to establish the lower price to plug into the damages

formula of 11(e).

         In a sense, your Honor, there are two major problems

under Article III jurisprudence with the plaintiffs' theory.

One, they are using a damages measure under 11(e) to define

Article III injury, and two, they are borrowing a prior

complaint of a plaintiff who is no longer here to plug into

that formula to create damages.

         Now, that borrowing of a prior putative class action

complaint is improper under the IndyMac case.  It is the reason

your Honor denied Mr. Spindel entry into the case, because the

only way he could establish his claims were timely under the

statute of repose was to borrow either through relation back

G5HSBARC

```
1    under Rule 15 or through the class action mechanism of Rule 23,

2    a prior complaint.  That violates the rules enabling act.

3    Borrowing a prior putative class action complaint to create

4    Article III standing is not allowed because it also violates

5    Rule 82 of the Federal Rules of Civil Procedure, which says

6    that the rules of civil procedure cannot be used to expand the

7    court's jurisdiction.

8         THE COURT:  Mr. Tomaino, let me ask you about the

9    Second Circuit's decision in this case in 2013, when they

10   affirmed by dismissal on Series 2, 3 and 4 and reversed me on

11   Series 5.  They found that the complaint, the second

12   consolidated amended complaint, alleges violations of

13   Section 11 and said that Mr. Askelson's inability to serve as a

14   class representative would be remedied through the lead

15   plaintiff's proposed repleading, which puts forth a set of new

16   lead plaintiffs, meaning Mr. Askelson, to bring the Series 5

17   offering claims.

18        Isn't that the ratification of the second consolidated

19   amended complaint?

20        MR. TOMAINO:  No, sir, it is not for purposes of class

21   certification or Article III standing.  That is their

22   ratification of these plaintiffs' ability to file a complaint

23   as a pleading matter.  And the defect of Mr. Ettin that was

24   being remedied by Mr. Askelson's complaint was the fact that

25   Mr. Ettin had purchased after the corrected disclosures were
```

G5HSBARC

1    issued and therefore had no claim under Section 11.

2              THE COURT:  That's what I held.

3              MR. TOMAINO:  That's what you held.  So when

4    Mr. Ettin --

5              THE COURT:  We have a new pleading where Mr. Askelson

6    purchased, I guess, from the original offering.

7              MR. TOMAINO:  Mr. Askelson alleges he purchases from

8    the original offering and therefore he is not subject, at least

9    on the pleadings, to an argument that he bought after the

10   corrected disclosure.

11             THE COURT:  Right.

12             MR. TOMAINO:  What the Second Circuit did not address,

13   and was not raised at that time and didn't need to be raised at

14   that time, was whether or not Mr. Askelson had Article III

15   standing and actual injury in fact.

16             THE COURT:  Did you read the Second Circuit's holding

17   only that an amending pleading could be filed, but it was

18   subject to all the motions that you could bring to attack its

19   validity?

20             MR. TOMAINO:  Yes, sir, that's correct.

21             In fact, when Mr. Askelson sought to be named lead

22   plaintiff, we filed a piece of paper that said consistent with

23   the Second Circuit's ruling, he can be appointed lead

24   plaintiff, but we preserve all of our rights and defenses to

25   direct it at him and to the putative class as a whole.

G5HSBARC

1          I just want to bring this back to one fundamental

2    point, your Honor, which is that despite what Mr. Nirmul just

3    argued about different theories of damages, none of those were

4    alleged in the complaint, none of them were alleged or argued

5    in the motion for class certification.  But this idea that

6    purchasing at an inflated price constitutes Section 11 damages,

7    despite being nowhere pled or argued, is simply incorrect.  The

8    measure of damages --

9          THE COURT:  By inflated price you mean what,

10   Mr. Tomaino?

11         MR. TOMAINO:  I'm sorry, sir?

12         THE COURT:  By inflated price, you mean $25?

13         MR. TOMAINO:  The plaintiffs are apparently now

14   alleging in this argument that the $25 or the dividend

15   percentage was somehow inflated as a result of

16   misrepresentations.  That has never been pled before.

17         I am responding to the argument that is being made

18   today that that simply is not a redressable injury under

19   Section 11.  So, in fact, not only does Mr. Askelson, who

20   testified that his injury was hypothetical at his deposition,

21   not only does he lack an actual concrete injury in fact, but to

22   the extent he's trying to identify an injury as purchasing at

23   an inflated price, which has never been pled, that runs afoul

24   of the second requirement of Article III standing,

25   redressability.

G5HSBARC

1          Because even if that were a cognizable injury in fact

2     under Section 11, which it is not, it is not redressable

3     because none of the three Section 11(e) formulas speak to

4     remedying inflation of the date of purchase.  The three

5     measures under Section 11(e) are if one is a holder of the

6     shares that he bought through judgment, it is the difference

7     between what he paid, here 25, and the value at the time of the

8     suit, his suit, here above 25.  And it is his suit, because the

9     prior suits don't count, because as your Honor held and IndyMac

10     held, before there is a certified class, those prior cases are

11     just individual actions that Mr. Askelson was not a party to.

12          The other two formulas under Section 11(e) are for

13     someone who sold at a loss prior to filing suit, which Mr.

14     Askelson didn't do, or someone who sold at a loss after filing

15     suit, at which point the calculation is price paid minus

16     proceeds of the sale, unless the sale price was lower than the

17     price of the date of suit.  So the price on the date of suit

18     actually locks in the floor, and that is what Judge Cote was

19     talking about, your Honor, in the Nomura case.

20          THE COURT:  All right.

21          MR. TOMAINO:  Respectfully, that has nothing to do

22     with the issue we are talking about here.

23          THE COURT:  I think I have your point.  Thank you.

24          Mr. Nirmul, do you want to talk about adequacy of

25     Mr. Askelson?

G5HSBARC

1          MR. NIRMUL:  Yes, sir.

2          Your Honor, I think defendants' argument with respect

3     to Mr. Askelson's adequacy really are drawn from snippets of

4     deposition testimony that they put together that truly doesn't

5     reflect Mr. Askelson's case, his monitoring of counsel, his

6     commitment to the litigation, his understanding of the claims

7     at issue.

8          Mr. Askelson, who joined this action in 2011, has

9     testified that he has met with counsel and discussed this case

10    with counsel over 50 times over the course of the four years.

11    He has reviewed all the pleadings, he has prepared for and sat

12    for a six-and-a-half-hour deposition, produced documents in

13    this case.  He understands his role as a lead plaintiff.  He

14    has articulated that, and he has discharged those obligations

15    over the last four years.

16         The test for adequacy, your Honor, is a very low bar.

17    This court has recognized this in the past.  The Second Circuit

18    has recognized that as a flag in <u>Telecom</u>.  Mr. Askelson far

19    surpasses that threshold by his commitment and work on this

20    case.

21         Defendants have identified more specifically that they

22    claim that Mr. Askelson doesn't understand what the claims are

23    in this case and that he doesn't even believe that he suffered

24    any harm.  That sets in and creates a conflict between him and

25    other class members.

G5HSBARC

1          That is not true.  Mr. Askelson clearly testified in

2     his deposition that when he purchased the Series 5 shares, he

3     believed it was a safe investment.  It was double A rated at

4     the time in April of 2008.

5          THE COURT:  It has proven to be a safe investment for

6     him, hasn't it?  He has always gotten his interest payments or

7     dividends, and now the market has returned so that, in fact, he

8     didn't have any depreciation in the asset value.

9          MR. NIRMUL:  That is what defendants want to contend,

10    but the question is, when he purchased that security, and ten

11    months later it basically collapsed in value, purportedly a

12    safe investment, he held on to that security and assumed, you

13    know, some additional risk that had never been disclosed to him

14    before.

15          The fact that the security recovered, it could have

16    been a completely different outcome.  Barclays Securities could

17    have been the Middle East investors, whom they raised money

18    from in November of 2008, could have taken a preferred interest

19    over Mr. Askelson.  That was indeed a possibility that the

20    market priced into the risk reflected in the price in March of

21    2009, in April of 2009.

22          Mr. Askelson has testified in his deposition that he

23    had to basically put those securities away in a drawer and his

24    investment account was diminished.  He spent $60,000 to

25    purchase this security.  At the time this complaint was filed,

G5HSBARC

that investment was worth 80 percent less.  That is an injury
and that's a harm that he recognizes that he suffered.

        The fact that he continued to hold the investment, he
assumed a risk, and in thinking about -- just to go back to
Mr. Tomaino's earlier point, he is not being compensated for
that risk in the form of an increased dividend and so forth.
The only compensation that he is permitted that congress has
authorized for that injury under the Securities Act is, as
Mr. Tomaino correctly identified, the difference in price
between what he paid and what the value was at the time the
lawsuit was commenced.  That difference is to compensate him
from this actual concrete and particularized injury and harm
that he suffered in the spring of 2009.

        That wasn't just the stock didn't rebound immediately.
I mean, his investment account was diminished for a period of
time where he had no access to those funds.  Congress, in its
wisdom, has decided that those types of harms, when someone
sells a security, offers a security based on risks that are not
truly fully revealed and that security loses value, that's a
harm that congress wants to remedy via Section 11.  That
provides an exclusive specific remedy to the exclusion of any
others that could be articulated.

        THE COURT:  Thank you.

        MR. NIRMUL:  That's the harm that he suffered.

        THE COURT:  Thank you, Mr. Nirmul.

G5HSBARC

1          Mr. Tomaino.  How many cases have you found,

2    Mr. Tomaino, where the adequacy of the representative has led

3    to a denial of the certification?

4          MR. TOMAINO:  Well, first --

5          THE COURT:  Not many?

6          MR. TOMAINO:  Not many, your Honor, but a few.  In

7    fairness, I think my team found them for me.

8          THE COURT:  I have always read the briefs from the

9    bottom up.

10          MR. TOMAINO:  So, your Honor, first, there are many

11    cases where a class representative was denied representative

12    status on adequacy grounds, but the class ended up being

13    certified because there were others there.  I just want to

14    respond quickly on that point to an argument that I saw in the

15    reply brief from the plaintiff.

16          The fact that Mr. Askelson is the only lead plaintiff

17    and proposed class representative doesn't somehow create an

18    exception to the adequacy requirement.

19          THE COURT:  No, I understand that.  He has got to meet

20    the standards.

21          MR. TOMAINO:  Here are some cases on the inadequacy

22    question.

23          Gordon v. Sonar, Judge Rakoff, 92 F.Supp.3d 193, class

24    certification denied on inadequacy grounds.

25          George v. China Automotive, Judge Forrest.  That's a

G5HSBARC

1    West Law cite, 2013 3357170, class certification denied,

2    inadequacy, subject to unique defenses.

3              Judge Kaplan, In re Lehman Brothers, I think actually

4    that was one where a representative was found inadequate.

5              Then we have some Section 11 cases with class cert

6    denied.

7              THE COURT:  The first three cases you cited were 10(b)

8    cases?

9              MR. TOMAINO:  They were 10b-5 cases, yes.

10             THE COURT:  All right.

11             MR. TOMAINO:  I think, your Honor, let me correct

12   myself.  I think the Lehman case from Judge Kaplan, the class

13   was certified, but at least one of the representatives was not

14   certified as a class representative.

15             So you're quite right, your Honor, they are not all

16   that common.  And there is a case that says it is a relatively

17   low bar, but it is still a bar.  It is a requirement.  And I

18   think that --

19             THE COURT:  Why don't you tell me why Mr. Askelson is

20   not adequate here.

21             MR. TOMAINO:  I will, your Honor, thank you.

22             First, we aren't really arguing principally that it is

23   his lack of knowledge about the allegations in the case that

24   rendered him inadequate.  That argument could be made.  I think

25   that is sort of the weakest point and probably appears last in

G5HSBARC

```
 1   our brief.  Mr. Nirmul focused on that.
 2           But I'll say this, your Honor.  Mr. Askelson doesn't
 3   understand his role as lead plaintiff or proposed lead
 4   plaintiff and class representative, as he testified.  In fact,
 5   he testified -- and these cites are all in our brief -- he
 6   doesn't even consider himself to be suing to redress his own
 7   claims.  He said that he is here only as a class representative
 8   because, as he testified, others have been injured.  He said he
 9   had no injury --
10           THE COURT:  How does that make him ineffective or
11   defective?
12           MR. TOMAINO:  Because he --
13           THE COURT:  He doesn't have a complete understanding?
14           MR. TOMAINO:  He doesn't have a complete
15   understanding.  He also doesn't share a common interest in the
16   class if he doesn't think he is redressing any injury to
17   himself.
18           Second, your Honor, along the lines that Mr. Nirmul
19   was just arguing about how he should be compensated for his
20   risks because things could have happened to Barclays or their
21   ability to pay the dividends, none of those things happened,
22   your Honor.
23           And Mr. Askelson testified that since April 2008, when
24   he bought these Series 5 ADS, this was the best investment he
25   has made.  He testified he is happy with the investment.  Not
```

G5HSBARC

only that, after the so-called truth came out, Mr. Nirmul says

that was in March of '09, Mr. Askelson bought more of these.

So he spent $60,000 to buy Series 5 shares in the offering in

April of 2008.  He spent another $80,000, your Honor, to buy

more shares in 2012, after all of the alleged

misrepresentations had been corrected.  And Mr. Askelson still

bought more.

Why did he buy more?  He said he bought them for the

dividend, which was eight and an eighth percent, which is a

hefty, hefty return.  In fact, to this date, he's received

$60,000 in dividends.  He also testified, your Honor, that he

does not want the remedy under Section 12 of rescission because

he doesn't want to give up his shares.  That's why he did not

move to certify the Section 12 class.

Very quickly, your Honor, then I'll wrap this up, if I

might.  Mr. Askelson testified also that it was of "no interest

to me at the time I bought these shares whether or not Barclays

would take initial write-downs."  Now the plaintiffs in the

reply brief said that was not a question about Barclays, that

was a general question.  Not true.

The general question was:

"Did you understand when you bought in April of '08

that if the market declined further, banks could take

additional write-downs?

Answer:  Yes."

G5HSBARC

1                And then he testified that it was of no interest to me

2      whether Barclays would take additional write-downs, because he

3      was buying for the coupon.  There are some cases directly on

4      point here, your Honor, that are in our brief -- and I won't

5      spend any more time now on them -- that explain that when a

6      plaintiff does not share the theory of the case with the rest

7      of the class, he is not adequate.  That is the <u>Safeguard</u>

8      <u>Scientifics</u> case and the <u>Lipton</u> case.  They are very

9      interesting.  They are very, very similar here where the

10     plaintiff, essentially, in two different cases that required a

11     showing of material misrepresentation, testified that they

12     would have purchased anyway despite the allegedly

13     misrepresented information because they didn't care about it,

14     and that is very consistent with what Mr. Askelson testified.

15               The plaintiffs have argued, the plaintiff has argued

16     in his reply brief that the fact that there might be undue

17     attention devoted to him, at a trial, by defendants, on

18     cross-examination, based on his deposition testimony to

19     undermine the materiality of the allege the misrepresentations

20     shouldn't matter here because although the class may be

21     prejudiced by having that cross-examination come in, they

22     couldn't be more prejudiced than having no class certified.

23               That brings me back to where I started, your Honor.

24     There is no exception under Rule 23 just because there is only

25     one class representative.  Rule 23 and the certified class

G5HSBARC

carries with it huge leverage for plaintiffs.  There is

recognized in the advisory committee notes to the 1998

amendments that brought 23(f) interlocutory appeal in.

     So in order to gain access to the very powerful

vehicle of a certified class, the plaintiff has to meet the

requirements of Rule 23.  And if his theory of the case or his

understanding of materiality is inconsistent with the

plaintiffs' theory, he is not adequate and a class should not

be certified, your Honor.

     THE COURT:  Thank you.

     Mr. Nirmul, when should the class period end?

     MR. NIRMUL:  Your Honor, if there is any doubt about

Mr. Askelson's adequacy of understanding of this case and why

he is here, he is here today to answer any questions the court

may have.  I would submit --

     THE COURT:  We are not having a hearing.  This is here

for oral argument.

     MR. NIRMUL:  I respect that the record that

Mr. Tomaino is relying upon, I sat through that deposition, it

is all too common that depositions of plaintiffs are a game of

gotcha.  And we have objected, and we objected during that

deposition to many of the questions that are being relied upon,

the testimony being relied upon today, because the questions

were vague.

     Defendants don't share a common view of what this case

G5HSBARC

```
 1    is about with the plaintiffs.  That, I would stipulate to.
 2    That's the basis of the third argument that they have raised,
 3    which is that this court should rely on a 2010 decision about
 4    what the scope of this case is, not withstanding the fact that
 5    the Second Circuit has spoken on this issue, recognized that
 6    the complaint indeed alleges actionable claims that go beyond
 7    what this court had identified --
 8               THE COURT:  I have heard you on this point.  Now I
 9    would like to hear you about the term.
10               MR. NIRMUL:  That is what I am getting at, your Honor.
11               Defendants argue that the class should be cut off in
12    August of 2008.  Anyone who purchased after August 2008 --
13               THE COURT:  Is out of the class.
14               MR. NIRMUL:  -- is out of the class.  They are relying
15    exclusively on the law of the case doctrine.
16               THE COURT:  What's wrong with that?
17               MR. NIRMUL:  Well, this case is broader than what your
18    Honor recognized in 2010 and considered, which is that Barclays
19    didn't --
20               THE COURT:  When I dismissed Mr. Ettin's claim, I
21    wasn't making up the August 8.  That was the date we had on
22    both sides.
23               MR. NIRMUL:  That's correct, your Honor.
24               THE COURT:  That was the date in the record in the
25    Court of Appeals.  And the Court of Appeals said get somebody
```

G5HSBARC

1    in here before the corrective notice of August 8.  So why isn't

2    that the law of the case?

3              MR. NIRMUL:  What the Court of Appeals actually held,

4    your Honor, is that to the extent that the court had identified

5    a deficiency with the lead plaintiff, it was improper for the

6    court not to allow the plaintiffs to cure that deficiency by

7    offering a plaintiff who purchased before the date that the

8    court believed was defective.

9              THE COURT:  August 8.

10             MR. NIRMUL:  That was the issue.  The only claim that

11   this Court recognized in its 2010 opinion was that plaintiffs

12   alleging that Barclays should have taken additional

13   write-downs, identified them before the offering, well, the

14   Second Circuit has recognized that the case is far broader than

15   that.  There were initial credit market exposures and positions

16   that plaintiffs have alleged in this case that were concealed

17   at the time of the offering that Second Circuit recognized gave

18   rise to a duty by defendants to disclose both adverse trends

19   regarding the capital position, adverse trends regarding the

20   increase in risk weighted assets that were drawing down

21   Barclays' capital position and giving rise to the need to raise

22   additional capital.  There were credit market positions.  This

23   also has been developed in the expert record since this case

24   was remanded back from the Second Circuit.  We have produced --

25             THE COURT:  The issue about August '08, isn't that

G5HSBARC

1    whether total disclosures were made, whether sufficient

2    disclosures were made, but Mr. Askelson or any member

3    purchasing Series 5 ADS on notice?

4          MR. NIRMUL:  I think this Court has recognized in its

5    opinion in the New Jersey Carpenters case the question of

6    knowledge, when was the class apprised of all the risks

7    associated with their investment.  That is a question of fact.

8          Now, in the New Jersey Carpenters case, the defendants

9    put on an evidentiary record before this court of class

10   certification.  The defendants haven't done that.  They want to

11   pretend as if this case and the evidence that's been produced

12   in this case doesn't exist.  They want to go back to 2010 and

13   rely on the pleading to argue that the court must -- and law of

14   the case is discretionary -- the court must rely on its

15   analysis of the pleadings and ignore all of the discovery that

16   has happened since then and find that the class as a whole was

17   on notice and knew of the risks associated with their

18   investment in August of 2008.

19         But if you look at the complaint, your Honor, and the

20   allegations, the experts have engaged in this, of additional

21   risks not revealed in August that continued to be revealed

22   through March of 2009.  Those risks are associated with the

23   misstatements and admissions that are the heart of this case.

24   So as your Honor recognized in the New Jersey Carpenters case,

25   those questions of knowledge are classwide issues because

G5HSBARC

1   defendants are really relying on public statements and public

2   revelations.

3           THE COURT:  What else would they rely on to make the

4   corrective --

5           MR. NIRMUL:  That's right, but they haven't put it

6   into the record before this court.

7           They are saying, look at your opinion from 2010 and

8   that's definitive.  Well, they have a burden, an affirmative

9   defense here, of knowledge to disprove that or to prove that

10  the class knew.  They haven't taken on that burden at all.

11          They will get an opportunity at summary judgment.  The

12  parties, if this court allows this case to proceed as a class

13  action, the next step is summary judgment and then trial.  They

14  will get an opportunity to actually put on the evidence to show

15  or try to demonstrate that the class knew everything in August

16  of '08 or March of 2009.

17          THE COURT:  Thank you, Mr. Nirmul.

18          MR. NIRMUL:  Yes.

19          THE COURT:  Mr. Tomaino.

20          MR. TOMAINO:  Thank you, your Honor.

21          Respectfully, the Second Circuit did not disturb your

22  Honor's ruling that Mr. Ettin had no claim because he bought

23  after the corrective disclosure.

24          In the Second Circuit decision, 730 F.3d 132, 141, the

25  Second Circuit described the timing of Mr. Ettin's purchase as

G5HSBARC

1   a defect that your Honor highlighted in the decision dismissing

2   Mr. Ettin.

3          The Second Circuit also said -- I am quoting, sir --

4   at 141 and 142, the proposed complaint -- that's Mr. Askelson's

5   proposed complaint -- also put forth a new set of lead

6   plaintiffs to bring the Series 5 offering claims in response to

7   the district court's ruling that Martin Ettin was not a viable

8   lead plaintiff as he purchased his shares after the alleged

9   omissions and misstatements were revealed.  That's what the

10  Second Circuit said.  There was not, to the extent that

11  Mr. Ettin's claims were invalid, that is not what the Second

12  Circuit said, and the Second Circuit did not disturb your

13  Honor's ruling.

14          It is not just law of the case, your Honor.  It was

15  correct.  We are not relying on evidence.  We don't need to

16  rely on evidence.  The plaintiffs pled the correction in

17  paragraph 195 of the complaint that Mr. Ettin was named in, and

18  then they had an opportunity to make amendments to that

19  complaint with the second consolidated amended complaint, which

20  they did.  They submitted those proposed amendments to your

21  Honor with their motion for reconsideration of the dismissal

22  and to the Second Circuit on appeal with a redline showing what

23  they were adding and deleting.  That redline is in the docket,

24  sir, as docket number 27 filed October 3, 2011.

25          Paragraph 195 of that redline complaint is the

G5HSBARC

paragraph that the plaintiffs initially pointed to as the

paragraph showing that there was some lingering important

information.  I think they called it vital disclosures that

were not made until after August 7, 2008.  They didn't really

change anything in that paragraph 195, as the redline shows.  I

think they crossed out the word "vital" and changed it to

"important," but they didn't allege any additional information

that came out after August 7.

Most of the amendments, the redline shows, appear in

196 through paragraph 209, and it is a bunch of stuff about

allegedly undisclosed monoline insurance exposure that Barclays

had.  But if we look at paragraph 209, what the plaintiffs pled

is that the monoline exposure, the so-called truth, was

disclosed by Barclays in its form 6K filed on August 7, 2008.

So, this is not a matter of the defendants failing to

come forward with evidence.  It was plaintiffs' only pleading

based on the public corrections that formed the basis for your

Honor's dismissal of Mr. Ettin because he had no claim.  It was

the same information plus the proposed amended complaint that

the Second Circuit had before when it didn't disturb your

Honor's ruling.  And I would like to point out, your Honor,

that Mr. Nirmul just argued that the law of the case doesn't

apply because you need to consider evidence and it is not just

the pleadings.  The plaintiff has not come forward with any

additional evidence from discovery on this point.  In fact,

G5HSBARC

1   your Honor, we sent you a short letter seeking permission to

2   file a three page sur-reply on this motion for class

3   certification.

4           THE COURT:  Yes.

5           MR. TOMAINO:  In response, the plaintiffs' counsel

6   sent your Honor a letter, it is ECF No. 155, which said, quote

7   -- let me back up, not quoting yet -- which said the defendants

8   shouldn't get a sur-reply because the plaintiff, "did not offer

9   any evidence to support his affirmative burden on any element

10  under Rule 23."

11          So to the extent that there is evidence in the

12  discovery record to support some notion that there were

13  lingering misrepresentations uncorrected after August 7, they

14  never put it in.  There isn't any, your Honor, but they never

15  put it in.  There is some cases that say that if a party wants

16  to get around prior rulings, in this case of the Second Circuit

17  and, your Honor, under law of the case, they need to come

18  forward with evidence to justify a departure from the prior

19  rulings.  Bermudez v. City of New York, 2005 WL 81500235.

20  Jones v. Ford Motor Credit, 2005 WL 743213.  So no new evidence

21  means that you don't disturb the prior ruling.  It is not just

22  law of the case, your Honor, it is because the prior ruling was

23  correct and a class period needs an end date.

24          We are not arguing that the end date should be

25  August 7, because after that date individual issues of

G5HSBARC

1    knowledge will predominate common questions and therefore class

2    certification is not appropriate.

3              What we are arguing is that your Honor properly held

4    that no one after August 7, like Mr. Ettin, has a claim.

5    That's why the class should end on that date, sir.

6              THE COURT:  Thank you.

7              MR. TOMAINO:  Thank you.

8              THE COURT:  I'll have a decision for you shortly.

9    Thank you very much.

10             ALL PRESENT:  Thank you, your Honor.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25