UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                            :

In re BARCLAYS BANK PLC         :
SECURITIES LITIGATION         :
                            :
                            :
---------------------------------------------------------X

09 Civ. 1989 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff and class representative Dennis Askelson ("Plaintiff") brings this class action on behalf of purchasers of the April 8, 2008 public offering of Series 5 American Depositary Shares ("ADS") by Barclays Bank PLC (the "Series 5 Offering"), against Barclays Bank PLC, Barclays PLC, and certain individual officers or directors (together, "Barclays"); and various firms that served as underwriters ("Underwriters") (collectively, "Defendants").[1]

The Series 5 Offering materials consisted of: (i) an August 31, 2007 shelf registration statement and prospectus; (ii) an April 8, 2008 prospectus supplement (the "ProSupp") which incorporated by reference (iii) Barclays' Form 20-F, filed March 26, 2008, containing its consolidated financial statements for the fiscal year ended December 31, 2007 (the "2007 20-F") (collectively, with any documents incorporated by reference therein, the "Offering Materials"). Pursuant to the Offering Materials, on April 8, 2008, Barclays offered 100 million 8.125% non-cumulative callable preference Series 5 ADS at $25 per share. The offering raised $2.5 billion.

---

[1] The Barclays defendants are: Barclays Bank PLC, Barclays PLC, Marcus Agius, David G. Booth, Sir Richard Broadbent, Richard Leigh Clifford, Fulvio Conti, Daniel Cronje, Dame Sandra J.N. Dawson, Robert Edward Diamond, Jr., Gary A. Hoffman, Sir Andrew Likierman, Dr. Christopher Lucas, Sir Nigel Rudd, Stephen George Russell, Frederik Seegers, John Michael Sunderland and John Silvester Varley. The Underwriter defendants are: Banc of America Securities LLC, Barclays Capital Securities Limited, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co., Incorporated, RBC Dain Rauscher Inc., UBS Securities LLC and Wachovia Capital Markets, LLC (n/k/a Wells Fargo Securities, LLC).

1

In late 2008, the Series 5 ADS price started to fall, ultimately bottoming out at $4.95 on March 9, 2009. The price then increased and closed at $12.82 on April 8, 2009, the filing date of the initial complaint in this action. As of September 11, 2017, the price is $26.75. *Barclays PLC Quote & Summary Data BCS.PRD*, NASDAQ (September 11, 2017), http://www.nasdaq.com/symbol/bcs.prd. All interest and principal of the Series 5 preference shares were paid when due.

The Second Consolidated Amended Complaint ("SCAC"), filed September 16, 2013, alleges that the Offering Materials made material misstatements and omissions, in violation of Sections 11 and 15 of the Securities Act of 1933 (the "Act"), 15 U.S.C. §§ 77k and 77o. Plaintiff claims the Offering Materials, *inter alia*, failed to timely and adequately disclose, value, and/or write-down Barclays' exposure to risky credit market assets as their value declined; misleadingly assured that Barclays' risk management practices would prevent enormous losses; concealed and misstated Barclays' rapidly deteriorating capital risks and positions; and failed to comply with SEC regulations and accounting standards. Specifically, Plaintiff argues that the Offering Materials omitted the notional amount of Barclays' monoline insurance contracts, *i.e.*, the par value of the underlying insured assets; interim write-downs recognized during the first quarter of 2008 ("1Q08"); and information regarding Barclays' capital ratios that also arose in 1Q08.

Both Barclays and Underwriters move for summary judgement, arguing that Plaintiff has failed to raise genuine issues of material fact on any of the alleged misrepresentations. The motions for summary judgment are GRANTED.

The alleged misrepresentations are not actionable under Section 11; and so there can be no violation of Section 15. Some alleged misstatements are derivative of Plaintiff's omissions theories, which the Court finds untenable; and some of the claimed misstatements are not

misstatements at all. Other alleged omissions did not require disclosure as a matter of law; Barclays' disclosures satisfied its duty regarding other claimed omissions. All of the alleged omissions were immaterial to a reasonable investor. Moreover, the Series 5 ADS stock price movements on the days on which the alleged misrepresentations or omissions were corrected, indicate that the misrepresentations did not cause the Series 5 ADS price declines; and Barclays' negative loss causation expert confirms this.

## **BACKGROUND**

### I. **Procedural History**

This eight-year old case has generated a number of opinions and orders: Order granting motion to dismiss, dated January 5, 2011 (ECF 53); Order denying motion for reconsideration, dated May 31, 2011 (ECF 61); Second Circuit opinion affirming dismissal of certain claims as untimely, reversing dismissal of one claim regarding the Series 5 offering, reversing the order denying motion for reconsideration and remanding for further action on the proposed amended complaint, dated August 19, 2013 (ECF 64); Order denying motion to dismiss, dated June 2, 2014 (ECF 84); and Order granting Class Certification, dated June 9, 2016 (ECF 165). A brief synopsis of these proceedings will be helpful in the review and analysis of the pending summary judgment motions.

This litigation originally involved four Barclays offerings of Series 2, 3, 4, and 5 ADS. *See* ECF 36. Regarding all four offerings, "the core complaint [was] that Barclays failed to disclose and to properly account for the risky real estate business in which it was engaged." ECF 53 at 1.

On January 5, 2011, the Court granted Defendants' motion to dismiss all claims, finding that: (1) the lead plaintiffs lacked standing to bring their Section 12(a)(2) claims because they

alleged that they bought securities "issued pursuant or traceable to" the allegedly false and misleading offering materials, instead of directly from the defendant, as required by Section 12; (2) the claims regarding the Series 2, 3, and 4 ADS offerings were untimely, as they were brought after the one-year statute of limitations which starts upon discovery of the untrue statement or omission, or after such discovery should have been made with reasonable diligence; (3) the complaint failed to adequately state Section 11 and 12(a)(2) claims because (a) Barclays' asset valuations and write-downs were subjective decisions, and thus not actionable absent an allegation that Barclays did not truly believe such valuations; (b) lead plaintiffs failed to demonstrate that Barclays had a duty to itemize its mortgage-related assets into separate categories or that any statements were misleading absent such an itemization; (c) the allegations regarding accounting and SEC requirements were intertwined with arguments regarding Barclays' asset valuations and failed to cognizably allege how Barclays' accounting practices were improper; (d) Barclays' statements regarding its risk management practices were generalized and not misleading; and (e) the sole Series 5 lead plaintiff purchased his shares after the date on which the complaint alleged that Barclays began to make adequate disclosures, precluding recovery under Section 11 or 12(a)(2) and requiring dismissal of all Series 5 claims; and finally, (4) lead plaintiffs' failure to allege primary violations of Sections 11 and 12(a)(2) doomed their the Section 15 claim. *See* ECF 53.

Lead plaintiffs moved for reconsideration and for leave to amend; and submitted the proposed SCAC that added, among other things, allegations that Barclays "knowingly failed" to properly write down its exposure and adequately disclose risk, despite its awareness of its vulnerability to credit markets. *See* ECF 58 Ex. 1 ¶¶ 135, 151. On May 31, 2011, the Court

4

denied the motion as futile, reasoning that claims of subjective disbelief constituted fraud allegations and could not be brought pursuant to Section 11. *See* ECF 61.

On appeal to the Second Circuit, the Circuit affirmed dismissal of the Series 2, 3, and 4 ADS offerings as time-barred; but reversed the Court's denial of leave to amend as to the Series 5 Offering. *See Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013). In pertinent part, the Second Circuit held that based on a supervening decision, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011), allegations of disbelief of subjective opinions need not be brought as fraud claims; and thus the proposed SCAC stated a claim regarding the Series 5 Offering.[2] *Id.* at 141. It remanded "to give the Lead Plaintiffs the opportunity, with respect to the Series 5 Offering, to proceed with the claims in the Proposed Complaint and with a new Lead Plaintiff." *Id.* at 142.

After the SCAC was filed, Defendants again moved to dismiss. ECF 66; ECF 72. The District Court denied Defendants' motion on June 2, 2014. ECF 84. It interpreted the Second Circuit's decision as holding "that all of Plaintiffs' Series 5 allegations . . . state a claim for relief." *Id.* at 2. On June 9, 2016, the Court granted the lone remaining lead plaintiff Dennis Askelson's motion for class certification, and appointed him as class representative. ECF 165.

Presently before the Court are Barclays' and Underwriters' motions for summary judgment, and Plaintiff's motion to exclude the expert opinions of Allan W. Kleidon, Ph. D. ECF 181; ECF 183; ECF 175.

---

[2] The Second Circuit also held that the proposed SCAC remedied the prior inadequacy of the lead plaintiff for the Series 5 Offering by identifying a new set of plaintiffs; and remedied the Section 12(a)(2) standing defect by alleging that lead plaintiffs purchased the securities directly from Defendants. *See Freidus*, 734 F.3d at 141. Lead Plaintiff subsequently voluntarily dismissed the Section 12(a)(2) claims. *See* ECF 142 at 1 at n.2.

II.     **Relevant Facts**[3]

The parties have made voluminous submissions in connection with the pending motions. The following background and analysis presents the critical facts needed to determine the pending motions.

   a.     **The Housing Crisis**

As has been well documented, the years prior to 2006 experienced a rise in home prices and building, driven by increased demand, low interest rates, and easy credit access. Lenders provided mortgage loans to many high-risk borrowers with questionable ability to repay, fueled in large part by the opportunity to package and sell those mortgages into the growing market for mortgage-backed securities ("MBSs"), collateralized debt obligations ("CDOs"), and similar securities. Purchasers of these securities – including Barclays – typically required them to be insured by monoline insurers to hedge their investments. Late 2006 and 2007 saw a dramatic rise in mortgage loan defaults, causing the value of the related securities, whose income depended on borrower payments, to deteriorate. Banks and other investors began to experience substantial losses; and many monoline insurers could not accommodate such loss, given its quick pace and dramatic size.

---

[3] Citations to "BD 56.1 ¶ __" are to Barclays' Local Rule 56.1 Statement of Material Facts, ECF 182 (unsealed at ECF 239). Citations to "UW 56.1 ¶ __" are to Underwriters' Local Rule 56.1 Statement of Material Facts, ECF 190. Citations to "Pl. BD 56.1 ¶ __" are to Plaintiff's Response to Barclays Defendants' Local Rule 56.1 Statement and Counterstatement of Additional Material Facts, ECF 210 (unsealed at ECF 243). Citations to "BD Br." are to Barclays' Memorandum of Law in Support of the Barclays Defendants' Motion for Summary Judgment, ECF 194 (unsealed at ECF 241). Citations to "Pl. BD Opp." are to Plaintiff's Memorandum of Law in Opposition to the Barclays Defendants' Motion for Summary Judgment, ECF 205 (unsealed at ECF 242). Citations to "BD Reply Br." are to Barclays' Reply Memorandum of Law in Further Support of the Barclays Defendants' Motion for Summary Judgment, ECF 228 (unsealed at ECF 248). Citations to "[NAME] Ex. __" are to exhibits to the declarations of "[NAME]."

### b.   2007

Barclays is an enormous financial institution, with its headquarters in London.  BD 56.1 ¶

1.  During the relevant time period, one of Barclays' primary business groups was Barclays

Capital, its New York-based investment firm ("BarCap"), which held the credit market assets at

issue in this action.  *Id.* ¶¶ 2–3.  Barclays' securities valuation process included both (1) traders'

marks of positions they oversaw, based on market source information; and (2) "price testing"

performed by a separate Product Control Group ("PCG"), using external sources, to verify

traders' prices.  *Id.* ¶¶ 40–52; White Ex. 50 at 23–24; White Ex. 39 at 16–18; White Exs. 42–44,

49.  As a British bank, one of Barclays' regulators was the U.K. Financial Services Authority

("FSA").[4]

In January 2007, Barclays announced that it had agreed to purchase EquiFirst Financial

Corporation ("EquiFirst"), a subprime mortgage originator, for $225m; it completed the purchase

four months later in April 2007 for just $76m, a price cut that news attributed to the U.S.

subprime mortgage collapse.  Pl. BD 56.1 ¶¶ 137–40.  As the market for securitized loans dried

up in mid-2007, Barclays was left holding many unsold EquiFirst-originated subprime whole

loans on its balance sheet.  Nirmul Exs. 6, 9, 10; *see* Pl. BD 56.1 ¶¶ 141–43.

In autumn of 2007, certain Barclays executives sought to "portfolio" new EquiFirst whole

loans by having EquiFirst sell them to BarCap Portfolio Management, instead of transferring to

Barclays' trading book.[5]  Nirmul Exs. 11–16; *see generally* Pl. BD 56.1 ¶¶ 137–82.  In mid-

November the FSA requested, and Barclays provided, information regarding its notional amount

---

[4] Until its abolishment in 2013, the FSA was an independent, non-governmental body with statutory authority to
regulate financial services in the United Kingdom.  *See What we do: who we regulate*, Financial Services Authority,
http://www.fsa.gov/uk/about/what/who.

[5] On Barclays' trading book, the loans "would be subject to mark-to-market accounting with write-downs flowing to
Barclays' income statement."  Pl. BD 56.1 ¶ 146.

of monoline exposure and the quality of the underlying insured assets. Nirmul Ex. 73; *see* Pl. BD 56.1 ¶¶ 246–49.

As the credit market continued to deteriorate, many of Barclays' competitors announced significant and substantial losses and write-downs in 3Q07 and 4Q07.[6] Pl. BD 56.1 ¶¶ 203–14. By contrast, in an unscheduled and unannounced "Trading Update" issued November 15, 2007, pertaining only to BarCap and delivered ahead of the larger Group Trading Statement due later that month, Barclays reported £1.3bn in write-downs on its CDO, subprime and SIV assets through October 31, 2007. Nirmul Ex. 62; *see* BD 56.1 ¶¶ 23–27; Pl. BD 56.1 ¶¶ 215–29. The Trading Update specified that of the £1.3bn, £500m was taken in 3Q07, and £800m was taken in October 2007 alone. Nirmul Ex. 62 at 4.

Barclays decided to issue the November Trading Update "to reassure" investors amidst market turmoil; yet simultaneously "acknowledged that issuing a statement in this way was unusual and that it was a finely balanced judgement given that there was a danger that some in the media could describe it as a profits warning." Nirmul Ex. 19 at BARC-ADS-01537965. Barclays also knew that its auditor, PricewaterhouseCoopers LLC ("PwC") would not have sufficient time to review the statement; and that "BarCap and PwC were still discussing the valuation of the whole loans portfolio." *Id.*

The Trading Update and related conference call held on November 15, 2007 contained both reassuring and cautionary statements by Barclays' senior executives. They praised the "strength and resilience of our performance during the year and in particular during the turbulent month of October;" and Barclays' "strong risk management" resulting in "year to date performance in

---

[6] For example, for 3Q07, Merrill Lynch wrote down $8.4bn in credit market exposures, including $7.9bn on its CDO and subprime positions, and reported a $2.24bn net loss; UBS announced $4.4bn in losses and write-downs on fixed-income securities; and Citigroup announced write-downs and losses of $6.8bn in connection with investments tied to the U.S. subprime market. *See* Pl. BD 56.1 ¶¶ 204–13.

8

2007 ahead of last year's record October year to date profits." Nirmul Ex. 62 at 1. Nevertheless, Barclays noted the "difficult market conditions;" and warned that certain sectors "will be very, very difficult in '08. Our sub-prime is the poster child for that;" and that "Sub-prime will be in workout for a couple of years . . . [it] is troubled and difficult and will get worked out." BD 56.1 ¶¶ 26–27.

Barclays had both internal target capital ratios and mandatory regulatory capital ratios.[7] *See* BD 56.1 ¶¶ 5–8, 33; Pl. BD 56.1 ¶ 323. The FSA's "absolute minimum" Tier 1 Capital Ratio and Equity Tier 1 Ratio in 2007 and 2008 were 4% and 2%, respectively.[8] BD 56.1 ¶ 7; Pl. BD 56.1 ¶ 7. Throughout the second half of 2007, Barclays executives, recognizing Barclays' "tight" capital position "relative to proposed Risk Appetite," discussed the need to raise capital and to reduce RWAs to increase capital ratios, particularly before year-end. Nirmul Ex. 138 at BARC-ADS-01593646; *see* Nirmul Exs. 134–38; Pl. BD 56.1 ¶¶ 326–32. Barclays' December 2007 "Short Term Capital Plan" stated 2008 year-end internal target Tier 1 Capital and Equity Tier 1 Ratios of 7.25% and 5.25%, respectively. Nirmul Exs. 129, 139.

c. **1Q08: 2007 Year-End Results; Capital Ratios and Capital Position Deterioration; FSA Conversations; and Interim Write-Downs**

Throughout 1Q08, Barclays executives continued to discuss internally capital adequacy, target ratios, capital position risks; and explored ways to raise equity capital. Nirmul Exs. 142–45; *see* Pl. BD 56.1 ¶¶ 341–46.

---

[7] These include the Tier 1 Capital Ratio, "total Tier 1 capital over total risk weighted assets [RWAs];" and the Equity Tier 1 Ratio, "total equity Tier 1 capital over total risk weighted assets." BD 56.1 ¶ 6. RWAs "are a bank's total assets multiplied by a regulatory risk weighting ascribed to those assets." BD Br. at 20 n.13. Since RWAs are used as the denominator, reduced RWAs lead to higher ratios. *See* Pl. BD. Opp. at 21 n. 15.

[8] FSA guidance added that "almost all major international banks already have ratios well above these levels, and that regulators already have discretion to require higher levels." Pl. BD 56.1 ¶ 7.

Barclays announced its 2007 year-end results on February 19, 2008 in an investor conference call, reporting £1.6bn in net losses from subprime and related exposure. *See* White Ex. 6[9] at 2; *see* BD 56.1 ¶¶ 28–33. Barclays reported that at year end, under Basel I, its Tier 1 Capital Ratio was 7.8% and its Equity Tier 1 Ratio was 5.0%; and that under Basel II, which was introduced at the start of 2008, the ratios were 7.6% and 5.1%, respectively. White Ex. 6 at 4. While Barclays warned of "difficult market conditions in the first six months" of 2008, other comments were more positive. *Id.* at 27. Barclays' CEO, John Varley, stated that the Tier 1 Capital Ratio was "well ahead of our target . . . a good and a comfortable position to be in," and that Barclays' 5.1% Equity Tier 1 Ratio was "just below our target of 5.25%." *Id.* at 13. In response to a request for confirmation that Barclays did not think there was "a need for any further significant write-downs on [risk assets]" despite increased "turmoil in the first six or seven weeks" of 2008, Barclays reiterated that its positions were taken as at December 31, 2007 and "continually mark[ed] . . . on a daily, weekly, monthly basis;" and that if Barclays "had something that we felt significantly changed the comments that we've made about the outlook and something that had a significant effect on the market position of our equity, we'd make a statement and we do not feel we have to make one." *Id.* at 22.

In March 2008, Barclays' Chairman Marcus Aigus met with FSA Chairman Callum McCarthy.[10] Nirmul Exs. 146–48; *see* Pl. BD 56.1 ¶¶ 347–50. Agius' summary of the meeting, circulated to Barclays' Board, stated that McCarthy had a "sharp" tone; "expressed particular concern that [Barclays'] Tier 1 equity ratio is only 4.6 per cent (as compared with our own figure

---

[9] The parties' Stipulation and Order unsealing certain documents, so-ordered by the Court on May 12, 2017, did not include this exhibit. ECF 238. The exhibit consists of a transcript of this earnings conference call, held nearly ten years ago. The Court sees no reason why this exhibit should remain under seal; and unseals it *nunc pro tunc.*
[10] The FSA also emailed Barclays on January 11, 2008, requesting a meeting with Barclays within the following three weeks to discuss Barclays' capital positions, resources, and plans "[i]n view of the current market environment, and the potential for further deterioration." Nirmul Ex. 141.

of 5 percent.) and, he believes, is only forecast to be at or above our target of 5.25 per cent . . .
(Interestingly, he made no reference at any time to our Tier 1 ratio of 7.8 per cent, which is
surprising given that the Tier 1 ratio, not the equity ratio, is the standard to which the regulators
normally pay most attention);" "referred to our equity ratio profile as being 'alarming' and said
that he needed to know 'as a matter of urgency' what our contingency plans were in order to
decide 'whether we would need to take any action.'" Nirmul Ex. 148 at BARC-ADS-01551751.
Aigus "reassured McCarthy that we were paying very careful attention to our liquidity and our
capital position and that we would not have raised our dividend, completed our recent share
repurchase, or made the two recent in-fill acquisitions if we had any serious concerns in this
regard." *Id.* He added that Barclays had been meeting with the FSA "on a very regular basis," to
brief the FSA on Barclays' exposures and discuss stress test and liquidity analysis results; and
that such meetings would continue. *Id.*

Days later, Barclays revised its Short Term Capital Plan for 2008 (the "2008 Capital Plan
Update"). Nirmul Ex. 149; *see* Pl. BD 56.1 ¶¶ 351–60. This updated Barclays' projected June
2008 Equity Tier 1 and Tier 1 Capital Ratios from 4.89% to 4.53%, and from 7.39% to 6.82%,
respectively; reiterated the need for RWA reduction and/or increased equity; and noted that
"continued [market] volatility and investor appetite makes further proposed issuance difficult."
Nirmul Ex. 149 at 2, 5. Barclays provided the 2008 Capital Plan Update, along with stress test
updates, to the FSA on March 14, 2008, in advance of a meeting. Nirmul Ex. 150. At the
Board's March 20, 2008 meeting, it was explained that "discussions [with the FSA] were
continuing as to the appropriate target ratios . . . indications were that the FSA would wish
[Barclays] to achieve its own target equity ratio [of 5.25%] before the end of 2008." Nirmul Ex.
121 at BARC-ADS-01544651; *see* Pl. BD 56.1 ¶¶ 361–72.

11

In early 2008, Barclays analyzed whether it should close its EquiFirst unit, in light of the "virtual disappear[ance]" of the securitization market and increased mortgage default rates. Nirmul Ex. 34 at 2; *see* Pl. BD 56.1 ¶¶ 177–82. BarCap's head of RMBS trading testified that "[t]he outcome [] was we should just close Equifirst." Nirmul Ex. 35 at 365:21–366:25. Barclays stopped all EquiFirst subprime mortgage origination as of April 22, 2008. Nirmul Ex. 36.

As borrower payment delinquencies continued to rise, BarCap recognized approximately £2.1bn in gross credit market position losses in 1Q08, including £446m in subprime (whole loan) positions and £675m in Alt-A position write-downs, approximately four and six times, respectively, the amount of write-downs taken on those two asset classes in the entirety of 2007. Nirmul Ex. 120 at BARC-ADS-01347144; Nirmul Ex. 126 at BARC-ADS-01550740; Nirmul Ex. 26 at 2; Nirmul Ex. 223 at Losses Summary Tab; *see* Pl. BD 56.1 ¶¶ 167–68, 304, 316–18. Ultimately, BarCap recognized net losses of £1bn "relating to credit market turbulence" in 1Q08, as reported in Barclays' May 15, 2008 Form 6-K; but Barclays as a whole reported a pre-tax profit of £1.194bn for 1Q08, as reported in its May 7, 2009 Form 6-K. *See* BD 56.1 ¶¶ 92, 94.

### d. Barclays' 2007 20-F

Barclays filed its Form 20-F with the SEC on March 26, 2008, providing its consolidated financial statements for 2007 year-end (the "2007 20-F"). Barclays 2007 Form 20-F; *see* BD 56.1 ¶¶ 34–39. It included PwC's March 7, 2008 audit opinion on the 12/31/2007 financial statements, concluding that the statements "present fairly, in all material respects, the financial position of Barclays PLC . . . in conformity with International Financial Reporting Standards [IFRSs]," and that as of 12/31/2007, Barclays "maintained, in all material respects, effective

internal control over financial reporting." 2007 20-F at 147. The year-end 2007 financials have never been restated.

The 2007 20-F reported Tier 1 Capital and Equity Tier 1 Ratios at December 31, 2007 of 7.8% and 5.0%, respectively, under Basel I. 2007 20-F at 5, 43. It explained that Barclays "started managing capital ratios under Basel II from 1st January 2008," under which the ratios were 7.6% and 5.1%, respectively. *Id.* at 5.

The 2007 20-F disclosed £37.8bn in BarCap's credit market positions, including £1.635bn in net write-downs taken "due to dislocations in the credit markets," £1.135bn of which was taken in 4Q07, and £500m in 3Q07. *Id.* at 53. The 2007 20-F included a table, reproduced below, showing line-item exposures for the impacted asset classes at 12/31/07, compared with exposure at 6/30/07. *Id.*

## Financial review
## Barclays Capital credit market positions

Barclays Capital credit market positions

Barclays Capital credit market exposures resulted in net losses of £1.635m in 2007, due to dislocations in the credit markets. The net losses primarily related to ABS CDO super senior exposures, with additional losses from other credit market exposures partially offset by gains from the general widening of credit spreads on issued notes held at fair value.

Credit market exposures in this note are stated relative to comparatives as at 30th June 2007, being the reporting date immediately prior to the credit market dislocations.

| | As at | |
| --- | --- | --- |
| | 31st December 2007 £m | 30th June 2007 £m |
| **ABS CDO Super Senior** | | |
| High Grade | 4,869 | 6,151 |
| Mezzanine | 1,149 | 1,629 |
| Exposure before hedging | 6,018 | 7,780 |
| Hedges | (1,347) | (348) |
| Net ABS CDO Super Senior | 4,671 | 7,432 |
| | | |
| **Other US sub-prime** | | |
| Whole loans | 3,205 | 2,900 |
| Other direct and indirect exposures | 1,832 | 3,146 |
| Other US sub-prime | 5,037 | 6,046 |
| Alt-A | 4,916 | 3,760 |
| Monoline insurers | 1,335 | 140 |
| Commercial mortgages | 12,399 | 8,282 |
| SIV-lite liquidity facilities | 152 | 692 |
| Structured investment vehicles | 590 | 925 |

Below this table, the 2007 20-F stated: "none of the above hedges of ABS CDO Super Senior exposure as at 31st December 2007 were held with monoline insurer counterparties." *Id.* On this same page, the 2007 20-F explained that BarCap "held assets with insurance protection or other credit enhancement from monoline insurers," and that the "value of exposure to monoline insurers under these contracts" was £1.335bn. *Id.* The 2007 20-F also stated that "[o]ur ABS CDO Super Senior positions were reduced during the year and our remaining exposures reflected netting against writedowns, hedges, and subordination." *Id.* at 65.

The 2007 20-F warned of future potential negative impact on credit market assets. For example, it stated: "results of the severe disruption in the US sub-prime mortgage market were felt across [] credit markets in the second half of 2007 . . . [and] [a]t the end of the year, market conditions remained difficult;" "[g]oing into 2008, the credit environment reflects concern about weakening economic conditions in our major markets;" and "[w]e expect some deterioration in credit metrics." *Id.* The 2007 20-F also emphasized that valuation judgments "change with time as new information becomes available or as work-out strategies evolve . . . [c]hanges in these estimates would result in a change in the [impairment] allowances and have a direct impact on the impairment charge." *Id.* at 50.

The 2007 20-F did not report any post-12/31/07 write-downs in its "[e]vents after the balance sheet date" section. *Id.* at 212. PwC wrote separately to PwC U.K. that it had performed a "subsequent events review" for BarCap and had "not identified any subsequent events material to [Barclays]" requiring disclosure under IFRS. White Ex. 56 at PWC007241; *see* BD 56.1 ¶ 76. At this time, PwC's "Subsequent Events Procedures" required PwC to make "enquiries with senior management," with PwC UK performing "review of interim financial information." Nirmul Ex. 108 at 4445–46; *see* Pl. BD 56.1 ¶ 297.

14

### e. The April 8, 2008 Series 5 Offering

The Offering Materials consisted of a shelf registration statement and prospectus, dated August 31, 2007; plus a ProSupp dated April 8, 2008, incorporating by reference the 2007 20-F. BD 56.1 ¶ 13. Pursuant to the Offering Materials, on April 8, 2008, Barclays offered 100 million 8.125% non-cumulative callable preference Series 5 ADS at $25 per share. *Id.* ¶ 14.

The Series 5 ADS price fell to below $20 for the first time on September 15, 2008. White Ex. 31 at Closing Price and Volume Chart. Prices continued to fluctuate and reached a low of $4.95 on March 9, 2009. *Id.* The price then increased and closed at $12.82 on April 8, 2009, the filing date of the initial complaint in this action. *Id.*

### f. Underwriters

Citi was the lead underwriter for the Series 5 Offering, heading Underwriters' due diligence efforts and performing certain due diligence on their behalf. *See, e.g.*, UW 56.1 ¶¶ 19, 57, 74. Underwriters were represented by Linklaters LLP ("Linklaters"); Barclays was represented by Sullivan & Cromwell LLP (United States counsel) and Clifford Chance LLP (English counsel). *Id.* ¶¶ 21–22. All Underwriters had participated in, and had conducted certain due diligence for, prior Barclays securities issuances. *Id.* ¶¶ 58, 71, 80, 91, 103, 116, 127, 137. Linklaters had served as underwriters' counsel in two prior Barclays offerings. *Id.* ¶ 48.

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in the light most favorable to the nonmoving party." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123

(2d Cir. 2013). Where the movant provides "facts showing that the non-movant's claims cannot be sustained, the opposing party must 'set forth specific facts showing that there is a genuine issue for trial,' and cannot rest on the 'mere allegations or denials' of his pleadings." *Goldkrantz v. Griffin*, No. 97-CV-9075 (DLC), 1999 WL 191540, at *2 (S.D.N.Y. Apr. 6, 1999) (quoting Fed. R. Civ. P. 56(e)). Summary judgement may be granted "when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (internal citations and quotations omitted).

## II.    Section 11 of the Securities Act of 1933

Section 11 provides purchasers of a security a private right of action if any part of a registration statement, when it became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

A plaintiff bringing a Section 11 claim must establish one of three bases of liability: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) (citations and quotations omitted). If a plaintiff does so, the issuer is "subject to 'virtually absolute' liability;" other defendants "may be held liable for mere negligence." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (citation omitted).

Valuations and write-downs are subjective statements of opinion, *see Freidus*, 734 F.3d at 141, and actionable only if they are (1) subjectively disbelieved, *i.e.*, not "honestly held;" or (2) "omit[] material facts about the issuer's inquiry into or knowledge concerning a statement of

16

opinion, . . . if those facts conflict with what a reasonable investor would take from the statement itself.'" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015).

### a. Relevant Regulatory Required Disclosures

#### i. Item 303

Item 303 of SEC Regulation S-K[11] requires that registrants "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "Disclosure is required where the trend is both (1) known to management and (2) 'reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (*"Vivint"*) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011)).

#### ii. Item 503

Item 503 of SEC Regulation S-K[12] requires offering documents to include a "discussion of the most significant factors that make the offering speculative or risky" and "how the risk affects the issuer or the securities being offered." 17 C.F.R. § 229.503(a), (c). The same facts underlying an Item 303 violation may also support an Item 503 violation, *In re Deutsche Bank AG Sec. Litig.*, No. 09-CV-1714 (DAB), 2016 WL 4083429, at *27 (S.D.N.Y. July 25, 2016); and a court's rationale for determining the former may also support the same determination of the latter. *Hutchison*, 647 F.3d at 484 n.4.

---

[11] The SEC interprets Item 5 of Form 20-F, which imposes disclosure requirements on foreign issuers such as Barclays, as "calling for the same disclosure as Item 303 of Regulation S-K." *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-38960; FR-72, *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728.

[12] Item 3 of Form F-3 regulates foreign issuers' registration statements, and incorporates by reference Item 503 of Regulation S-K.

### iii. Material Subsequent Events

International Accounting Standard 10 ("IAS 10")[13] requires disclosure of material events occurring between the end of an annual reporting period and the date on which the financial statements are authorized for issue, including the nature and estimated financial effect of the event. IAS 10. Similarly, Auditing Standard Section 560 ("AU 560")[14] requires disclosure of those events occurring subsequent to the balance sheet date and before the issuance of the next financial statement that "have a material effect on the financial statements." AU § 560.01.

### b. Materiality

"Once plaintiffs have established that defendants had a duty to disclose the alleged information, they must also prove materiality." *Vaccaro v. New Source Energy Partners L.P.*, No. 15-CV-8954 (KMW), 2016 WL 7373799, at *5 (S.D.N.Y. Dec. 19, 2016).

"Whether a misrepresentation is material is judged according to an objective standard that turns on the significance of an omitted or misrepresented fact to a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quotations and citation omitted). "A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *IBEW Local Union No. 58 Pension Tr. Fund and Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("*RBS*") (quotations and citations omitted). "In other words, . . . for the misstatement to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

---

[13] The European Commission requires public companies' financial statements to comply with International Financial Reporting Standards ("IFRS"). The United States has not adopted IFRS, and instead uses Generally Accepted Accounting Principles (GAAP). *See, e.g.*, *IFRS in the US*, PWC, https://www.pwc.com/us/en/cfodirect/issues/ifrs-adoption-convergence.html.

[14] The Public Company Accounting Oversight Board ("PCAOB") requires public companies to comply with AU 560. *See, e.g.*, *Auditing Standards*, PCAOB, https://pcaobus.org/Standards/Auditing/pages/au560.aspx.

information made available." *Id.* at 389–90 (quotations and citation omitted).

Though materiality is generally a mixed question of fact and law, courts may find alleged misrepresentations immaterial as a matter of law if they are "so obviously [un]important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted); *see also DeMaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003).

### III.    Section 15 of the Securities Act of 1933

Section 15 "creates liability for individuals or entities that 'control any person liable' under section 11 or 12;" thus, a Section 15 claim requires a plaintiff to establish a defendant's "primary liability" under Section 11. *In re Morgan Stanley*, 592 F.3d at 358 (quoting 15 U.S.C. § 77o).

### IV.    Negative Causation Affirmative Defense

"Defendants may assert the absence of loss causation as an affirmative defense to claims under Section[] 11 . . . by proving that the allegedly misleading representations did not cause the depreciation in the stock's value." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009); *see* 15 U.S.C. § 77k(e). In so doing, defendants "bear the burden of demonstrating that something other than the alleged omissions or misstatements at issue caused plaintiffs' loss." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 523 (S.D.N.Y. 2013). Where a defendant meets this "heavy burden," a plaintiff must then "come forward with specific facts showing that there is a genuine issue for trial," *i.e.*, evidence

19

"suggesting that [the] price decline actually resulted from the alleged misstatement." *Akerman v. Oryx Commc'ns Inc.*, 810 F.2d 336, 341, 343 (2d Cir. 1987) (affirming summary judgment for defendants that met burden "by establishing that the misstatement was barely material and that the public failed to react adversely to its disclosure") (quotations and citation omitted). "[S]tock price immediately before the disclosure that a prior statement was inaccurate is generally the point from which to begin an analysis;" and "expert analysis of price declines is useful to determine the effect of disclosure on stock value." *Goldkrantz*, 1999 WL 191540, at *3.

## DISCUSSION

### I. Barclays

Barclays seeks summary judgement because, it contends, the 2007 20-F's purported misrepresentations are not actionable. Specifically, Barclays argues that there is no evidence that the 2007 20-F valuations were either (1) objectively false or misleading or (2) subjectively disbelieved, and that Barclays had no duty to disclose the alleged omissions; and that regardless, the misrepresentations were not material to a reasonable Series 5 ADS investor. Barclays also asserts negative loss causation as an affirmative defense, contending that any misrepresentations did not cause the Series 5 price declines.

The Court determines that there are no genuine issues of material fact. Accordingly, Defendants' motions are granted and Plaintiff's case is dismissed.

#### a. Alleged Misstatements

The 2007 20-F's asset valuations and write-downs are statements of subjective opinion and judgement. *See Freidus*, 734 F.3d at 140–41. Accordingly, they are actionable only if they are (1) objectively materially false or misleading; and (2) "not 'honestly held' or omit[] facts about [Barclays'] basis for holding that view, and those facts conflict with what a reasonable investor

20

would understand from the statement itself." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (citing *Omnicare*, 135 S. Ct. at 1327).

Barclays argues that the 2007 20-F's statements are not objectively false or misleading because they were "the result of rigorous processes, reviewed and approved" by PwC; PwC's audit opinion concluded that the valuations were reasonable and fairly presented Barclays' financial position; the valuations have never been restated; and Plaintiff's experts do not opine that the valuations were erroneous or that the underlying methodologies were unreasonable or inappropriate. *See* BD Br. at 1–2, 12–13. Barclays also maintains that no evidence suggests that the valuations "did not reflect honestly held judgments reached after employing reasonable methodologies." *Id.* at 13.

Plaintiff's opposition brief points out five specific allegedly false or misleading affirmative representations in the 2007 20-F, but none are actionable. *See* Pl. BD Opp. at 9. Two of these claims are derivative of Plaintiff's omissions theories, none of which, as the Court explains below, give rise to Section 11 claims. *See infra* Part I.b. Plaintiff's assertion that Barclays "fail[ed] to disclose that two of its CDO positions suffered events of default prior to the [Series 5] Offering, thereby necessitating mark-to-market writedowns," is a mere repetition of its theory that Barclays was obligated to disclose interim capital position deterioration and write-downs. Pl. BD Opp. at 9, 14–20; *see infra* Part I.b.ii *and* Part I.b.iii. Similarly, Plaintiff's claim that the 2007 20-F's representation that BarCap's credit market positions totaled £37.8bn was misrepresentative because it omitted the underlying value of monoline-insured assets is a rephrased repetition of Plaintiff's theory that Barclays was obligated to disclose the notional amount of its monoline exposure, and that the omission of such value rendered the 2007 20-F

misleading. *See* Pl. BD Opp. at 9, 12–14; *infra* Part I.b.i.

The three remaining alleged misrepresentations are simply incorrect. First, Plaintiff claims that the 2007 20-F's statement that "[o]ur ABS CDO Super Senior positions were reduced during the year and our remaining exposure reflected netting against writedowns, hedges, and subordination," 2007 20-F at 65, was false and misleading because "in fact, Barclays did not reduce" these positions in 2007. Pl. BD Opp. at 9. This is directly contradicted by the 2007 20-F itself, which shows that Barclays did reduce its net exposure of these positions from £7.432bn at 6/30/07 to £4.671bn at 12/31/07. 2007 20-F at 53; *see* BD Reply Br. at 6 n.6. Second, Plaintiff asserts that the 2007 20-F's disclosure of £1.635bn in credit market exposure write-downs misled investors because the amount was reported as a net, rather than a gross, figure. Pl. BD Opp. at 9. But the 2007 20-F expressly stated that the £1.635bn represented "net losses" "partially offset by gains" of £658m; and reporting of write-downs net of gains is not misleading under *Omnicare*. 2007 20-F at 53; *see In re Deutsche Bank AG Sec. Litig.*, No. 09-CV-1714 (DAB), 2016 WL 4083429, at *28, *31 (S.D.N.Y. July 25, 2016) (where plaintiff claimed defendant said it had "no losses at all" related to certain exposures, but Form 6-K actually stated "we had no net write-downs" related to those exposures, court refused to "infer that no losses is the accounting equivalent of no net write downs;" and where Form 6-K explained that value of write-downs were net of any hedging gains, statements were not materially false or misleading under *Omnicare*). Plaintiff's final allegation relies on an incomplete, out-of-context excerpt: he contends that Barclays falsely and misleadingly represented "that none of the hedges on its disclosed ABS CDO positions 'were held with monoline insurance counterparties,' when in fact, [Barclays] held over £6 billion in undisclosed ABS CDO positions that were hedged with monoline insurers." Pl. BD Opp. at 9. This is another example of Plaintiff's repeated efforts to

breathe life into fragments of disclosure statements. When read in full, the 2007 20-F excerpt clearly indicates that only a portion of the ABS CDO positions were uninsured, and refers specifically to a line item in the table directly above, not to the separate line item and section addressing monoline insurers: "none of the *above* hedges of ABS CDO *Super Senior* exposure as at 31st December 2007 were held with monoline insurer counterparties." 2007 20-F at 53 (emphasis added).

### b. Alleged Omissions

#### i. Monoline Exposure Disclosures and Credit Market Positions

Barclays' 2007 20-F disclosed, *inter alia*, (1) approximately £37.8bn in BarCap's credit market positions; (2) that BarCap "held assets with insurance protection or other credit enhancement from monoline insurers" and that the "value of exposure to monoline insurers under these contracts" was £1.335bn[15] at 12/31/07; (3) £4.671bn in ABS CDO Super Senior positions, net of £1.347bn in hedges; and (4) that "none of the above hedges of ABS CDO Super Senior exposures as at 31st December 2007 were held with monoline insurer counterparties." 2007 20-F at 53. It also disclosed a £2.472 trillion notional amount of credit derivatives, which included monoline CDS. *Id.* at 89, 172.

Plaintiff argues that the 2007 20-F's omission of Barclays' £21bn notional amount of credit market assets insured by monoline insurers (*i.e.*, the par value of the underlying insured assets) rendered other disclosures[16] materially false and misleading; and required disclosure as a significant risk under Item 503. *See* Pl. BD Opp. at 11–12. Additionally, Plaintiff contends that the 2007 20-F's representation that the "value of exposure to monoline insurers" was £1.335bn

---

[15] This amount represented the fair value of Barclays' monoline insurance.

[16] Namely, Plaintiff urges that disclosure of the £21bn would have shown that (1) Barclays' credit market positions approached £60bn, not £37.8bn; and (2) Barclays' CDO position was over £13bn, not £6bn. Pl. BD Opp. at 11–12.

was materially misleading: it understated Barclays' potential capital risks and "did not convey the maximum potential loss on the £21 billion in wrapped assets, the true size of the exposure, or any other meaningful assessment of Barclays' burgeoning risk from monoline insurers." *Id.* at 12. Plaintiff also claims that the £1.335bn amount was "stale" by the Series 5 Offering, and Item 303 required disclosing that this value had grown to £2.7bn by March 31, 2008. *Id.* at 14. As evidence that the par value of the underlying assets was important, Plaintiff also cites requests by the FSA and a potential strategic investor for information about Barclays' notional amount,[17] and Barclays' competitors' disclosures of their notional monoline exposure in 2007 year-end financials. *See* Pl. BD 56.1 ¶¶ 246–49, 257–61, 289–94.

But, as Barclays persuasively argues, there is no duty as a matter of law to disclose the notional amount of monoline exposure. *RBS*, 783 F.3d at 390–92; *see* BD Br. at 14; BD Reply Br. at 1. In *RBS*, plaintiffs claimed that RBS failed to disclose $6.8 billion in subprime exposures and $14.1 billion in exposure to monoline insurers. *RBS*, 783 F.3d at 390. Plaintiffs' argument was based on an allegation that RBS' disclosures "omitted [RBS'] CDO and Subprime U.S. RMBS holdings that were covered by monoline insurers;" that such omissions were false and misleading; and that investors would have considered this purportedly material, undisclosed exposure risky: *i.e.*, the same omitted notional amount that Plaintiff contends Barclays was required to disclose, for the same reasons. *RBS*, Joint App'x at 1356–57; *see RBS*, Plaintiffs-Appellants' Br. at 131–32; *RBS*, Plaintiffs-Appellants' Reply Br. at *14–15. The Second Circuit affirmed the district court's dismissal for failure to state a claim and denial of leave to amend the complaint. *RBS*, 783 F.3d at 390–92. The Second Circuit concluded that the allegedly

---

[17] Barclays drafted a presentation for the investor including this information, but before a due diligence call, wrote: "we are unable to disclose any information relating to individual counterparties, but will discuss in more detail our exposure to monolines in general." Nirmul Ex. 80; *see* Pl. BD 56.1 ¶ 261. Barclays did provide notional value information to the FSA. *See* Nirmul Ex. 73; Pl. BD 56.1 ¶ 248.

undisclosed $6.8 billion was immaterial and did not require disclosure,[18] and added: "[s]imilarly, plaintiffs fail to explain how the $14.1 billion monoline insurers constitute subprime exposures or that RBS had an obligation to disclose them as U.S. subprime exposures 'net of hedges.'" *Id.* at 391–92. In other words, the Second Circuit concluded that the notional amount of monoline-insured assets was not RBS' "exposure," and RBS had no duty to disclose it. *Id.* The Court understands *RBS* to instruct that Barclays had no duty, as a matter of law, to disclose the same notional amount of its monoline-insured assets.

Plaintiff does not address *RBS* on this issue at all. Instead, Plaintiff tries to shift its focus to the purportedly materially misleading nature of the disclosed £1.335bn and omitted £21bn notional values. But the £1.335bn amount was not materially misleading to a reasonable investor; nor did the omission of the notional amount render any other disclosures in the 2007 20-F misleading. "[A]n investor reads each statement within [a registration statement], whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information. And the investor takes into account the customs and practices of the relevant industry." *Omnicare*, 135 S. Ct. at 1330. The statement that BarCap "held assets with insurance protection or other credit enhancement from monoline insurers" and that the "value of exposure to monoline insurers under these contracts" at 12/31/07 was £1.335bn must be read in context of the entire 2007 20-F. 2007 20-F at 53. This includes the several statements throughout the 2007 20-F that made it clear to a reasonable investor that Barclays viewed the £1.335bn as reflecting the value of the insurance itself, not the notional amount of underlying assets; and that Barclays did not consider the notional amount to be its exposure. For

---

[18] In doing so, the Second Circuit looked to SEC's Staff Accounting Bulletin No. 99, which "provides that a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality" and also considered "qualitative factors, which can turn a quantitatively immaterial statement into a material misstatement." *RBS*, 783 F.3d at 390–91.

example, one statement F reads: "notional amounts . . . do not indicate the Group's exposure to credit or price risks." *Id.* at 172. Another explicitly advises: "[n]otional amounts of the contracts [i.e., derivative instruments] are not recorded on the balance sheet." *Id.* at 89.

Granted, the notional amount "would have provided [investors with] a more complete assessment of Barclays' exposure to monoline insurers," Pl. BD Opp. at 13, Nirmul Ex. 66 ¶ 123; but Barclays was "not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (quotations and citation omitted). This alleged omission is not actionable under Plaintiff's Section 11 claim.

### ii. Interim Write-downs of Subprime and Alt-A Positions

In 1Q08, BarCap recorded approximately £2.1bn in gross losses, including £446m in subprime (whole loan) and £675m in Alt-A position write-downs. Nirmul Ex. 120 at BARC-ADS-01347144. BarCap's 1Q08 net loss relating to credit market turbulence, however, was £1bn; and Barclays as a whole reported a 1Q08 pre-tax profit of £1.194bn. BD 56.1 ¶¶ 92, 94.

Plaintiff argues that the 1Q08 "significant deterioration" of subprime and Alt-A credit market positions, "known only to Barclays prior to the Series 5 Offering," required disclosure under (i) Item 303, as an "an undisclosed adverse trend;" (ii) Item 503, as a significant risk factor; and (iii) IAS 10 and AU 560, as material subsequent events. ECF 254 (July 5, 2017 Letter to the Court) at 2; *see* Pl. BD Opp. at 3, 14–20. Plaintiff urges Barclays knew it "was poised to suffer huge losses" on these positions, as evidenced by the EquiFirst discussions and ultimate decision to suspend all EquiFirst subprime mortgage origination; and efforts made by some senior executives to "portfolio" EquiFirst loans. Pl. BD Opp. at 16; *see* Pl. BD 56.1 ¶¶

137–82. Plaintiff also contends that this trend and omitted information rendered the 2007 20-F "obsolete and incomplete at the time of the Offering, vastly understating the risks facing investors." Pl. BD Opp. at 14. The Court also assumes Plaintiff is alleging that the omitted write-downs required disclosure to make other disclosures not misleading. But under any of these theories, the undisputed facts establish that the allegedly omitted interim trends and write-downs are not actionable under Section 11.

Even if Plaintiff's argument that Barclays had a duty to disclose the trend(s) of deteriorating credit market positions and/or of general market dislocation is accepted (which it is not), Barclays satisfied such duty.[19] A brief examination of two recent Item 303 violations found by the Second Circuit supports this conclusion. In *Litwin*, the Second Circuit found that a reasonable investor could consider material offering documents' alleged failure to disclose the extent to, and manner in, which the trend of the global real estate market decline would affect the company's revenue and stock price; and permitted the case to proceed past the motion to dismiss stage. *Litwin*, 634 F.3d at 721–23. But there, "[n]ot only did [defendant] make no mention of a downturn in its real estate holdings, but it rather noted that 'the real estate industry is . . . experiencing historically high levels of growth and liquidity driven by the strength of the U.S. economy.'" *Vaccaro*, 2016 WL 7373799, at *7 (quoting *Litwin* complaint, 08-CV-3601 ¶ 125)). In *Panther Partners*, a supplemental registration statement failed to mention a known "substantial" product design defect, which might cause returns and supplemental refunds; and

---

[19] As to Plaintiff's EquiFirst-related assertion, Plaintiff has proffered only limited evidence showing that certain executives developed a prospective plan to "portfolio" EquiFirst whole loans; but there is no conclusive evidence that such plan was executed. In fact, some evidence that Plaintiff posits infers the contrary. Though one senior executive asserted that such a movement would increase profitability and characterized the loans as "high quality," Nirmul Ex. 13, a characterization that a PCG director later called "laughable" and "unbelievable," Nirmul Ex. 18, the supervisor of the trader whose portfolio book these loans would go to testified that he was unaware of any such conversations, and had he known about such a decision made without his permission, he would have fired that trader. Nirmul Ex. 16.

instead generally cautioned that the products "frequently contain defect and bugs." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 117 (2d Cir. 2012). The Second Circuit concluded: "[Plaintiff] has adequately alleged that the disclosures concerning a problem of this magnitude were inadequate and failed to comply with Item 303." *Id.* at 122.

Here, however, Barclays' disclosures satisfied Item 303. "Issuers satisfy disclosure requirements under the Securities Act when they identify the current trend or trend and its effect on the market, as well as provide a cautionary statement describing whether the company expects the event or trend to continue to affect revenues in the future." *Vaccaro*, 2016 WL 7373799, at *7. Moreover, on similar facts, the Second Circuit found that to satisfy Item 303, a bank "needed to disclose only that it faced deteriorating real estate, credit, and subprime mortgage markets, that it had significant exposures to those markets, and that if the trends came to fruition, [it] faced trading losses that could materially affect its financial condition." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105–06 (2d Cir. 2015) (affirming dismissal for failure to state a Section 10(b) claim where plaintiff failed to adequately plead scienter). Certainly, Barclays did as much: the 2007 20-F specified that "dislocations in the credit markets" caused its 2007 £1.635bn net credit market exposure losses; and directly below this statement, provided a table specifically identifying different types and amounts of assets as of 06/30/07 and 12/31/07. 2007 20-F at 53. Given these disclosures, a reasonable investor would infer how continued credit market dislocation "might reasonably be expected to have a material impact on future revenues;" the investor would conclude that these assets would be vulnerable to additional write-downs. *See Vaccaro*, 2016 WL 7373799, at *8 (statement that company's "financial condition was, and would remain, tied to the health of the global oil market" and related disclosures of how oil prices would affect future revenue satisfied Item 303).

Even if Barclays breached Item 303's disclosure duty, the omissions are still not actionable under Section 11 because they are immaterial. *See Vaccaro*, 2016 WL 7373799, at *5; *Litwin*, 634 F.3d at 716 (where Item 303 disclosure duty exists, "the sole remaining issue is whether the effect of the 'known' information was 'reasonably likely' to be material"). The Second Circuit recently confirmed that the operative test to determine whether omitted interim financial data requires disclosure for Section 11 purposes is the "traditional materiality test" set forth in *DeMaria*.[20] *Vivint*, 861 F.3d at 36–38.[21] *Vivint* rejected the "extreme departure" test to determine materiality of the alleged omissions. *Id.* The Second Circuit explained that this test "leaves too many open questions" and permits litigants to argue that there is a duty to disclose even immaterial information by focusing on "metrics, standing alone" that "are not fair indicators of [a company's] performance." *Id.* at 37–38. By contrast, the traditional materiality test "examines omissions in the context of the total mix of available investor information." *Id.* at 38. And here, there was an abundance of investor information about real estate. *Id.* at 33–35, 38–40.

The Second Circuit held that Vivint was not required to disclose its third quarter interim shareholder income and earnings-per share: a reasonable investor would not have viewed the omissions as "significantly altering the 'total mix' of information made available," which included information about real estate and Vivint's residential solar energy systems. *Id.* at 38–39

---

[20] As explained above, this test asks "whether there is a substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Vivint*, 861 F.3d at 37 (alterations, quotations, and citations omitted).

[21] Barclays originally contended that the proper test for determining whether interim financials less than 135 days old as of the effective date of a registration statement (*i.e.*, within the SEC Regulation S-X's "135-day window," *see* 17 C.F.R. § 210) required disclosure was the "extreme departure" test. *See* BD Br. at 16–20. Plaintiff argued that the correct inquiry was one of materiality; but that regardless, under either test, disclosure was required. *See* Pl. BD Br. at 15. On June 27, 2017, Barclays filed a letter notifying the Court of the Second Circuit's *Vivint* decision, arguing that summary judgment is still warranted under the traditional materiality test. ECF 253. Plaintiff's July 5, 2017 response letter disputes that. ECF 254.

(citation omitted). The plaintiff's theory that Vivant had to disclose these two isolated metrics was "too myopic:" rather, "[a] more accurate indicator of the company's performance [] is Vivant's *total* revenue and *total* income." *Id.* at 38 (emphasis in original) The Second Circuit thus looked to additional disclosures, including other metrics and explanations of Vivint's unique business model and accounting method which inherently led to fluctuations across quarters. *Id.* at 38–39. It added that "Vivint's registration statement contained ample warnings and disclosures that explained [its business model and accounting method, and the resultant fluctuations]," bolstering the conclusion that a reasonable investor would not consider the omission of third-quarter results material in light of the "total mix." *Id.* at 39.

Here, a reasonable investor considering the total mix of available information would not have viewed the omitted interim write-downs of Barclays' subprime and Alt-A positions, or the "trend" of their deterioration, as "significantly altering the 'total mix' of information made available." *Id.* at 38 (quotations omitted). Plaintiff's narrow view fails to consider Barclays' performance as a whole, and does not analyze the "total mix of information in the public domain." *Id.* Like the plaintiff in *Vivint*, Plaintiff micro-focuses on isolated metrics – the 1Q08 write-downs taken on two asset classes, subprime and Alt-A – to claim that Barclays was required to disclose such information. *See* Pl. BD Opp. at 15–17 (emphasizing that the £446m subprime and £675m Alt-A write-downs taken in 1Q08 were approximately four and six times, respectively, the amount of write-downs taken on those assets in the entirety of 2007). But in 1Q08, Barclays reported a pre-tax *profit* of £1.194bn. BD 56.1 ¶ 94. This statistic, "[a] more accurate indicator" of Barclays' overall performance, supports the conclusion that the omissions were immaterial. *Vivint*, 861 F.3d at 38.

Further, investors knew that BarCap had taken net write-downs of £1.135bn in 4Q07 and £500m in 3Q07, as disclosed in the November Trading Update and in the 2007 20-F. 2007 20-F at 53; *see* Nirmul Ex. 62 at 4 (disclosing £500m write-downs taken in 3Q07 and £800m write-downs taken in October 2007). The £1bn net loss BarCap recognized in 1Q08 was in line with this disclosed pattern of increased write-downs, confirming the conclusion that a reasonable investor would not have considered the 1Q08 write-downs material under the test set forth in *DeMaria*. *See DeMaria*, 318 F.3d at 180.

Similar to the investor warnings disclosed in *Vivint*, the 2007 20-F warned of potential risk and fluctuation, including current "concern about weakening economic conditions" that "has led to a more cautious approach . . . which we believe will continue through the year;" and also expressly stated that asset valuations were as at 12/31/07. 2007 20-F at 65, 54–55; *see also In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 104, 109 (2d Cir. 2013) (affirming dismissal of Section 11 claims and explaining that determination of whether omissions render prospectus representations misleading requires courts to "review documents holistically and in their entirety;" and concluding that where prospectus cautioned of potential effects of additional market volatility, coupled with other warnings, "it [was] implausible that a reasonable investor would read these offering documents without understanding the potential for rapid, substantial loss") (quotations and citation omitted). Also part of the "total mix" were comments made by Barclays executives in the February 19, 2008 call announcing 2007 year-end results, clarifying that valuations were fluid and cautioning investors of future risk. *See* White Ex. 6 at 22 ("[W]e continually mark the positions as we do across the whole business, on a daily, weekly, monthly basis."); *Id.* at 9 ("[Barclays] expect[s] the first half [of 2008], no mistake, to be extremely challenging.").

In light of this "total mix," a reasonable investor would not have considered the omitted interim financial information and write-downs material; and the omissions are not actionable under Section 11, regardless of whether they are labeled as alleged Item 303, Item 503, AU 560 or IAS 10 disclosure failures.[22] *See Vivint*, 861 F.3d at 38–39; *Litwin*, 634 F.3d at 716; *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (in light of "scant caselaw on Item 503," courts "typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard").

### iii. Capital Position Deterioration and Need for Additional Capital

Barclays' Tier 1 Capital Ratio and Equity Tier 1 Ratios at 12/31/07, as disclosed in the 2007 20-F, were 7.8% and 5.0%, respectively (Basel I). 2007 20-F at 5, 43. As market tumult continued in early 2008, the FSA and Barclays continuously discussed Barclays' exposure, stress test results, liquidity analyses, and contingency plans. *See* Nirmul Ex. 148. By March, the FSA had communicated its concern about Barclays' Equity Tier 1 Ratio, including its "wish" for Barclays to raise it to meet its internal target of 5.25% by year-end 2008. Nirmul Exs. 148, 121. At least as early as mid-March 2008, Barclays started "developing plans" to achieve its 5.25% target by year-end, including exploration of additional capital raises beyond the Series 5 Offering and trying to reduce RWAs. Nirmul Exs. 151, 121. By the end of March, Barclays' Tier 1

---

[22] Plaintiff devotes only two brief paragraphs to the purported IAS 10 and AU 560 violations, concluding that "[f]or the reasons discussed above" – *i.e.*, regarding the purported Item 303 and 503 violations – the omissions were also material subsequent events requiring disclosure. Pl. BD Opp. at 19–20. Plaintiff cites no cases wherein IAS 10 and/or AU 560 violations gave rise, on their own, to a Section 11 claim. *Cf. Stratte-McClure v. Morgan Stanley*, No. 09-CV-2017 (DAB), 2013 WL 297954, at *7 (S.D.N.Y. Jan. 18, 2013), *aff'd*, 776 F.3d 94 (2d Cir. 2015) (even if defendants had an AU 560 duty to disclose a certain financial position, "Plaintiffs cite to no case law wherein such a failure to disclose gives rise to a Section 10(b) claim"). Plaintiff cites just one case in support of this theory, a case wherein GAAP violations gave rise to a Section 11 claim, but it is distinguishable. *See* Pl. BD Opp. at 20 (citing *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547 (S.D.N.Y. 2012)). Unlike the alleged omissions at issue here, *Ho* involved SEC filings that were false at the time of disclosure. *See Ho*, 887 F. Supp. 2d at 567–71. Regardless, as discussed in detail above, the immateriality of the omissions render the IAS and AU 560 claims moot.

Capital Ratio and Equity Tier 1 Ratios had declined to 6.65% and 4.34%, respectively (Basel II). Nirmul Ex. 132.

Plaintiff argues that Barclays' failure to disclose its "material decline" in capital ratios and alleged "need to raise additional capital in order to achieve the 5.25% Equity Tier 1 Ratio requirement imposed by the FSA," and the related FSA communications, rendered the Offering Materials materially misleading: the 2007 20-F thus overstated Barclays' capital position and need for capital, and failed to disclose the full extent of risk of the Series 5 ADS. Pl. BD Opp. at 20–21. Additionally, Plaintiff argues that the reduced ratios and need for capital constituted adverse trends and events reasonably likely to impact Barclays' financial condition, requiring Item 303 disclosure; that the "fragile," deteriorating capital positions and FSA communications were significant factors making the Series 5 Offering risky, requiring Item 503 disclosure; and ostensibly, that some (or all) of these facts also required IAS 10 disclosure.[23] *Id.* at 3–4, 20–23.

First, the Court rejects Plaintiff's contentions that (i) the FSA imposed a "directive" and "established a new *de facto* regulatory minimum . . . which Barclays did *not* meet at the time of the Offering;" and (ii) that a question of fact exists regarding whether the ratios and deteriorated capital position, "which fell below the FSA's mandate, should have been disclosed."[24] Pl. BD Opp. at 21. These contentions are purportedly based on (1) Chairman Aigus' contemporaneous notes from his March 8, 2008 meeting with FSA Chairman McCarthy, *see* Nirmul Ex. 148; and (2) explanation at the March 20, 2008 Board meeting that, after Barclays shared its 2008 Capital Plan Update with the FSA, which included its revised internal target ratios, "[t]he indications

---

[23] Plaintiff references IAS 10 only once in this context, and fails to cite any case law supporting his single-sentence assertion that such information constituted a material subsequent event requiring disclosure under IAS 10. *See* Pl. BD Opp. at 22 ("Whether Defendants were obligated to disclose these trends, events and risks pursuant to Items 303 and 503, and IAS 10 is a question for the jury.").

[24] Plaintiff bases his theory on the alleged new "mandate" of 5.25% Tier 1 Equity Ratio by year-end 2008, and is silent about any alleged new Capital Tier 1 Ratio mandate; but phrases his argument as pertaining to both ratios. *See* Pl. BD Opp. at 20–23.

were that the FSA would wish [Barclays] to achieve its own target equity ratio before the end of 2008." Nirmul Ex. 121. Chairman Aigus' notes explain that Barclays and the FSA had been meeting regularly to discuss exposure, stress test results, liquidity analyses, and contingency plans; and would continue to do so. *See* Nirmul Ex. 148. McCarthy's "alarm" about Barclays' 4.6% Equity Tier 1 Ratio does not mean there was an FSA mandate. *Id.* Nor does the FSA's "wish" that Barclays "achieve its own target equity ratio [of 5.25%]" by year-end 2008 constitute a formal regulatory directive. Nirmul Ex. 121. Plaintiff cites no case law supporting the contention that heightened regulatory monitoring and/or concern constitutes a *de facto* regulatory minimum. *See* Pl. BD Opp. at 21–22. Certainly, if the FSA wished to officially require Barclays to maintain its ratio above the official 2% "absolute minimum," which at 4.6% Barclays was far exceeding; or raise it to 5.25%, the internal target Barclays had already set for to reach by year-end 2008, it could have issued that direction. Pl. BD 56.1 ¶ 7; Nirmul Exs. 129, 139. Barclays' capital ratios, dimishing as they were, remained above the regulatory minimum and did not require disclosure on the basis of Plaintiff's theory. *See Solow v. Citigroup, Inc.*, 507 Fed. Appx. 81, 82 (2d Cir. 2013) (summary order) (affirming dismissal of Section 10(b) claim because defendant's statements that it was "well-capitalized" were not misleading as defendant "met the regulatory definition of the term when those statements were made").

Moreover, the Second Circuit has held that there was no duty to disclose an *actual* FSA mandate "specifically requir[ing]" RBS to raise capital, even where RBS publicly "represented that [it] was 'not asked to raise capital by anyone,' including the FSA." *RBS*, 783 F.3d at 393. The Second Circuit concluded that the statements were not actionable, because the "total mix of information available to the reasonable investor," including (i) "RBS was not deemed by the FSA to have violated FSA's minimum capital guidelines;" (ii) RBS had started preparing for the

34

raise before speaking with the FSA; (iii) the market knew RBS needed capital and was taking write-downs; and (iv) "there was generally a steep deterioration in market conditions and credit market outlooks" at the time (April 2008). *Id.* This FSA guidance, which the Second Circuit found did not require disclosure, was far more directed and forceful, than the FSA dialogue with Barclays here.

Further, Barclays had no disclosure obligation as to the ongoing FSA dialogue. The FSA and Barclays were engaged in continuous discussions regarding capital and contingency plans. *See* Nirmul Ex. 148. "[C]ourts have held repeatedly that a company is not compelled to disclose every communication it has with a regulator – even when . . . . a regulator has informed a company of deficiencies in its operations." *Christine Asia Co., Ltd. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 471 (S.D.N.Y. June 24, 2016). This is especially true where there has been no official regulatory action. *See id.* at 472–74; *see also Richman v. Goldman Sachs Grp. Inc.*, 868 F. Supp. 2d 261, 274–75 (S.D.N.Y. 2012) (10(b) disclosure mandated only "[w]hen the regulatory investigation matures to the point where litigation is apparent and substantially certain to occur")).

Finally, even if Plaintiff had raised a factual dispute regarding Barclays' duty to disclose the reduced capital ratios, or FSA communications, under Item 303, Item 503, or IAS 10,[25] the omissions are still not actionable under Section 11 because they are immaterial.

Series 5 ADS investors, like the investors in *RBS*, which involved a capital raise in the same month as the Series 5 Offering, were aware of steep market deterioration. *See RBS*, 783 F.3d at 393; *see also Freidus*, 734 F.3d at 139 ("By April 2008, the financial environment into

---

[25] Plaintiff proffers only a single, four-sentence paragraph, referring to two cases that support the proposition that the adequacy of Item 303 and 503 disclosures are questions for the jury. *See* Pl. BD Opp. at 21–22. This is not convincing.

which the Series 5 Offering was sold had deteriorated markedly and was continuing to do so."). Indeed, Barclays expressly warned investors of "difficult market conditions," and specifically, of potential deterioration of its sub-prime assets. BD 56.1 ¶¶ 26–27. Further, Barclays informed investors in its February 19, 2008 call announcing 2007 year-end results that its 5.1% Equity Tier 1 Ratio was below Barclays' internal target of 5.25%, BD 56.1 ¶ 33; and the Offering Materials disclosed that Barclays "may, at any time . . . create or issue further preference shares" to raise additional capital. Prospectus Supplement at S-9.

An objective investor reading a registration statement "takes into account the customs and practices of the relevant industry." *Omnicare*, 135 S. Ct. at 1330. From this perspective, and viewing the totality of the available information, a reasonable investor would not have viewed disclosure of the omitted capital ratios or FSA communications "as having significantly altered the 'total mix' of information made available." *RBS*, 783 F.3d at 389–90. Nor would Barclays' "representations, taken together and in context . . . have misled a reasonable investor." *In re Morgan Stanley*, 592 F.3d at 360 (quotations omitted); *see also In re Britannia*, 665 F. Supp. 2d at 413 (courts may find alleged misrepresentations immaterial as a matter of law where they are "sufficiently balanced by cautionary language within the same [offering document] such that no reasonable investor would be misled about the nature and risk of the offered security") (quoting *P. Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004)). The reduced capital ratios and/or the FSA communications did not require disclosure to assure that the 2007 20-F was not "so incomplete as to mislead." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (citation omitted). Plaintiff's Section 11 claim cannot proceed on this basis.

### c.  Negative Loss Causation

Even if some or all of the alleged misrepresentations were actionable under Section 11, the action would still be dismissed based on Barclays' affirmative defense of negative loss causation.

As this Court previously explained, "Section 11 damages are calculated according to a statutory formula. Where, as here, the plaintiff still holds his shares, damages are measured as 'the difference between the amount paid for the security . . . and [] the value thereof as of the time such suit was brought.' 15 U.S.C. 77(k)(e)(1)." ECF 165 at 9 (granting class certification).

> This statutory scheme envisions material misrepresentations in the [registration statement] inflating the market price of the security at the time of the statement. When the nature of the misrepresentation is revealed, whether by the issuer or by other circumstances, the market corrects the price of the security to the value it would have had absent the misrepresentation. Thus the statute awards as damages the difference between the two prices – the purchase price reflecting the inflation associated with the material misstatement and the latter reflecting the market correction after disclosure . . . to approximate the value of the loss caused by the material misstatement.

*In re State St. Bank and Trust Co. Fixed Income Funds Invest. Litig.*, 774 F. Supp. 2d 584, 593 (S.D.N.Y. 2011). In other words, the defense "recognizes that other market forces can also contribute to the depreciation in the value of a security;" thus, for a Section 11 claim to succeed, "it is crucial that there be a revelation of the concealed risk and that the revelation cause a depreciation in the value of the security." *Id.* The defense prevails where a defendant shows "that an otherwise recoverable loss was not caused by the alleged misstatement or omission." *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010). Recovery is only permitted for declines "that actually *result from* the materialization of a risk contained within a material misstatement, not to those that are somehow connected with the misstatement." *In re State St.*, 774 F. Supp. 2d at 595 (emphasis in original).

Barclays argues that the alleged misrepresentations did not cause the Series 5 ADS price declines based on (1) the lack of price reaction to revelation of the alleged misrepresentations, as

evidenced by the Series 5 ADS stock price history – specifically, on three "corrective disclosure dates;" and (2) the event study and analysis performed by its loss causation expert, Dr. Allan Kleidon. *See* BD Br. at 26–33.[26] Plaintiff contends that the three dates were not "fully corrective" and points to several potentially corrective disclosure dates that Mr. Coffman states might be "related to" the alleged misrepresentations; and that Dr. Kleidon's conclusions and analysis are unreliable and flawed. *See* Pl. BD Opp. at 27–34. Plaintiff also moves to exclude Dr. Kleidon's expert testimony based on largely the same grounds as those asserted in his opposition papers (the "*Daubert* Motion"). *See* ECF 177. Plaintiff's rebuttal expert, Mr. Chad Coffman, did not conduct an event study; and did not analyze either (i) the cause of any Series 5 ADS price changes; nor (ii) the effect of any of the three corrective disclosure dates cited by Barclays, *see* White Dec. 16, 2016 Ex. 6 (Coffman Dep.) at 28–29, 69–70, 72, 97, 160–61. The Court agrees with Barclays; the alleged misrepresentations did not cause the Series 5 ADS price declines.

### i. The Three "Corrective Disclosure" Dates and Series 5 ADS Price History

Barclays categorizes the alleged misrepresentations into three theories; contends all were corrected on one of three disclosure dates; and cites either a statistically insignificant price decrease or a price *increase* when each correction was disclosed. *See* BD Br. at 27. Barclays' chart detailing this information is reproduced below:

---

[26] For the complete Series 5 ADS price chart from issuance through November 30, 2015, *see* White Ex. 31 at Closing Price and Volume Chart.

| Misrepresentation Theory | "Correction" Date | Previous Day Closing Price | Closing Price | Change |
|---|---|---|---|---|
| 12/31/07 Write-downs 1Q08 Write-downs | May 15, 2008 | $25.17 | $25.23 | up $0.06 |
| Need to Raise Capital | June 25, 2008 | $24.80 | $24.96 | up $0.16 |
| Notional Amount of Monoline Insurance | August 7, 2008 | $24.69 | $24.46 | down $0.23 |

BD Br. at 27; *see* White Ex. 31; BD 56.1 ¶¶ 90–100.

Plaintiff makes much of alleged facts which should have been disclosed after year-end 2007, but before the Series 5 ADS was offered in April 2008. *See* Pl. BD Opp. 29–32. However, as one reviews the alleged misstatements and omissions, the three subsequent disclosures cure each alleged deficiency. Plaintiff alleges the 2007 20-F's omission of interim write-downs, specifically of subprime and Alt-A positions, required disclosure; but on May 15, 2008, Barclays released its 1Q08 results and disclosed BarCap's £1bn net loss "relating to credit market turbulence." BD 56.1 ¶ 92. While Plaintiff refers to alleged omissions of Barclays' declining capital ratios and need to raise capital, on June 25, 2008, Barclays announced a share issue to raise approximately £4.5bn with involvement by foreign investors. *Id.* ¶ 95. Finally, Plaintiff maintains that the 2007 20-F's disclosure of a £1.335bn "value of exposure to monoline insurers" was insufficient; and instead demands that Barclays should have disclosed its "notional monoline exposure." Pl. BD Opp. at 10–11. While the discussion and debate over "notional monoline exposure" and "value of exposure to monoline insurers" cause a migraine, on August 7, 2008, Barclays disclosed its 2008 interim results, including the notional amount. BD 56.1 ¶ 98.

Plaintiff begins to grasp at straws here and quibbles that none of the three disclosure dates were *fully* corrective. Plaintiff claims that the subsequent disclosures did not constitute the "*full*

*truth* about Defendants' misrepresentations and omissions."[27] Pl. BD Opp. at 29 (emphasis in original). This argument is not to be taken seriously.

Plaintiff claims the May 15, 2008 disclosure of Barclays' 1Q08 write-downs "did not reveal the trend of increasing deterioration of whole loans and resultant gross writedowns." *Id.* at 29. The Court is convinced to the extent this trend was hidden before the Series 5 Offering in April, the 1Q08 results, disclosed less than six weeks later and reporting Barclays' financial conditions updated as of March 30, 2008, revealed any such trend and its effect on Barclays' positions. Plaintiff essentially urges the Court to accept that despite disclosure of the 1Q08 write-downs, the trend continued until approximately one month before the all-time low of the Series 5 ADS stock price. But Plaintiff cannot recover for declines resulting from materialization of risk "somehow connected with the misstatement." *In re State St.*, 774 F. Supp. 2d at 595 (emphasis in original). Plaintiff's theory that this omitted trend and related financial information continued to materialize through additional "potential capital raises," "ratings downgrades," "anticipated writedowns," and "the shuttering of EquiFirst on February 17, 2009" is too far-reaching for the Court to accept. Pl. BD Opp. at 30.

The June 25, 2008 announcement of a £4.5bn capital raise was also corrective. Plaintiff's capital position deterioration or "need for additional capital" theory is premised on the FSA's "directive" (which does not exist) that Barclays increase its Tier 1 Equity Ratio to or above 5.25% by year-end 2008; the June 2008 capital raise did so by the time it was completed in July 2008. *See* Peller Ex. A at 2; BD Reply Br. at 10. The additional subsequent corrective

---

[27] The Court rejects Plaintiff's related objection that this three-fold categorization fails to encapsulate the entirety of the alleged misrepresentations. *See* Pl. BD Opp. at 9, 28. The purportedly omitted misstatements Plaintiff contends are missing are those the Court rejects as either derivative of non-actionable omissions theories or demonstrably false. *See supra* Part I.b.

information and dates proffered by Plaintiff, *see* Pl BD Opp. at 30–31,[28] "resulted from circumstances arising long after the April 2008 Series 5 [O]ffering, and thus do not reflect information that was misstated or concealed before the [O]ffering." BD Reply Br. at 10; *see Coronel v. Quanta Capital Holdings Ltd.*, No. 07-CV-1405 (RPP), 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2006) (Section 11 alleged misrepresentations are "adjudged by the facts as they existed when the registration statement became effective") (citation omitted).

Finally, Plaintiff's theory that Barclays misrepresented its monoline exposure is based on the 2007 20-F's omission of the notional amount of monoline insurance; on August 7, 2008, Barclays disclosed this notional amount. Plaintiff resorts to his familiar attack that the information was insufficient and not fully corrective because it did not disclose that "(1) Barclays held over £1 billion in additional CDO positions wrapped by bank insurance; and (2) the £21 billion in total notional assets wrapped by monoline insurers was in addition to, and not included in, the credit market positions disclosed in the Offering Documents." Pl. BD Opp. at 32. But Plaintiff fails to articulate why Barclays had a duty to disclose the former; and regarding the latter, it is clear that Barclays' subsequent, separate disclosure of the notional amount was distinct from the previously-disclosed credit market positions.

The three disclosures were, in fact, corrective of the alleged misrepresentations; and on none of these three dates did the Series 5 ADS stock price react in any drastic manner. Indeed, the two price *increases*, and one immaterial drop of 0.23¢ – which Dr. Kleidon characterizes as statistically insignificant – are persuasive evidence that the misrepresentations did not cause

---

[28] Specifically, Plaintiff contends that the following disclosures were additionally corrective and/or represented a materialization of risk concealed by the alleged omissions: Barclays' July 18, 2008 disclosure that 19% of existing shareholders accepted new shares from a July 17, 2008 offering; Barclays' October 10, 2008 press release stating that it was debating seeking additional capital from investors; Barclays' October 31, 2008 announcement of a £7.3bn foreign investment capital raise; Barclays' December 22, 2008 announcement that it was raising capital through additional measure, including selling parts of its investment bank; and a "resurfac[ing]" of discussions on January 20, 2009 regarding the possibility that Barclays would participate in a U.K. bailout. Pl. BD Opp. at 30–31.

Plaintiff's loss. *See* BD Br. at 27 n.19; BD 56.1 ¶ 100; *Waters v. Gen. Elec. Co.*, No. 08-CV-8484 (RJS), 2010 WL 3910303, at \*8 (S.D.N.Y. Sept. 29, 2010) ("The Court cannot find . . . a single section 10b-5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud."), *aff'd*, 447 Fed. Appx. 229 (2d Cir. 2011); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, No. 08-MDL-1963 (RWS), 2016 WL 4098385, at \*11 (S.D.N.Y. July 25, 2016) (stock price decrease concluded statistically insignificant by event study infers that decrease may have been "caused by chance").

Moreover, the Series 5 ADS price after the last corrective disclosure was \$24.46. The post-August 2008 declines, with an all-time low of \$4.95 on March 9, 2009, "coincide[ed] with a marketwide phenomenon causing comparable losses to other investors;" *i.e.*, continued fall-out from the financial crisis unrelated to the alleged misrepresentations. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (citation omitted). The Lehman Brothers collapse; the U.S. government AIG bailout; and the U.K. government capital injection into British banks other than Barclays all occurred from September 2008 to March 2009. *See* BD 56.1 ¶¶ 102–06. Effects were felt throughout the markets; for example, the Dow Jones Industrial Average fell approximately 40% from 10,917.51 on September 15, 2008, the day of Lehman's collapse, to its twelve-year low of 6,547.05 on March 9, 2009. *Market Report*, CNN (March 9, 2009), http://money.cnn.com/2009/03/09/markets/markets_newyork/; *Market Report*, CNN (September 15, 2008), http://money.cnn.com/2008/09/15/markets/markets_newyork2/. In such circumstances, "the prospect that the plaintiff's loss was caused by the [alleged misrepresentations] decreases."[29] *Lentell*, 396 F.3d at 174 (citation omitted).

---

[29] The loss causation element of a Section 10(b) fraud claim is a "mirror image" of the Section 11 negative loss causation defense. *In re WorldCom, Inc. Sec. Litig.*, No. 02-CV-3288 (DLC), 2005 WL 375314, at \*6 (S.D.N.Y. Feb. 17, 2005).

After the three disclosures, what else had to be disclosed about the Series 5 ADS? Plaintiff fails to cite facts or risks that required disclosure in the Series 5 Offering and remained undisclosed after the three dates. Plaintiff's expert, Mr. Coffman, concluded that certain additional events *might* have released information "related to" the alleged misrepresentations; but did not opine that they actually did so. *See* White Ex. 40 (Coffman Dep.) at 117, 29; Nirmul Ex. 4. Moreover, as discussed above, the potentially corrective additional disclosures Mr. Coffman identifies do not reveal "some then-undisclosed fact" about the alleged misrepresentations in light of the May 15, June 25, and August 7, 2008 disclosures; and are not corrective. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2011); *see* Nirmul Ex. 4. Section 11 does not permit recovery for declines resulting from materialization of risk or disclosures merely "somehow connected with the misstatement." *In re State St.*, 774 F. Supp. 2d at 595 (emphasis in original). To be sure, the burden is on Barclays to prove this affirmative defense; but the Court determines that it has proffered sufficient evidence to do so, and Plaintiff has not raised any genuine issues of material fact to the contrary.

Courts may grant summary judgment on negative loss causation where, as here, the alleged misrepresentations had "minimal materiality" and the market "fail[ed] to react in any discernible[] way to the [corrective] revelations." *Ross v. Warner*, No. 77-CV-243 (CHT), 1980 WL 1474, at *9 (S.D.N.Y. Dec. 11, 1980); *see Akerman*, 810 F.2d at 343. The Court grants summary judgment; and turns now briefly to address Dr. Kleidon's event study.

### ii.    The Event Study and Plaintiff's *Daubert* Motion

Event studies are now "standard operating procedure in federal securities litigation." *Vivendi*, 838 F.3d at 253–54. The regression analysis examines the extent to which stock prices

react to the release of new, material information (an "event").[30] *In re Fed. Home Loan Mortg.*

*Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (*"In re Freddie Mac"*).

> The actual price of the security during the event is compared against the expected price, which is calculated based on the security's historical relationship to a market index. This historical relationship is measured over a "control period." The difference between the stock's actual price and the expected price is defined as an "abnormal [or residual] return." In an efficient market, stock prices should show statistically significant abnormal returns on days in which unexpected, material information is released into the market.

*Id.* This process allows an expert to "determine whether the price changes at issue in a case were

related or unrelated to the representations in dispute by eliminating other factors, such as the

effects on stock price of market and industry market information." *United States v. Martoma*,

993 F. Supp. 2d 452, 458 (S.D.N.Y. 2014) (quotations, citation, and alterations omitted), *aff'd*,

2017 WL 3611518 (2d Cir. Aug. 23, 2017). "[N]umerous courts have held that an event study is

a reliable method for determining market efficiency and the market's responsiveness to certain

events or information." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 170

(S.D.N.Y. 2007), *aff'd in part*, 574 F.3d 29 (2d Cir. 2009).

　　　Under Rule 702 of the Federal Rules of Evidence, an expert witness with "specialized

knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in

issue" may testify (including in opinion form) if that testimony is "based on sufficient facts or

data" and is the "product of reliable principles and methods" that the expert "has reliably applied

. . . to the facts of the case." Fed. R. Evid. 702. The party offering such testimony bears the

burden of establishing these requirements, and the Court acts as a gatekeeper to ensure that

proffered expert evidence "rests on a reliable foundation and is relevant to the task at hand."

---

[30] More specifically, an event study "allows an expert to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information." *Vivendi*, 838 F.3d at 253–54.

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).[31]  In making this determination, courts "[t]ak[e] into account . . . the law's aversion to rigid standards of expert opinion admissibility." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. 2014).  Accordingly, "only serious flaws in reasoning or methodology will warrant exclusion" of expert testimony. *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

## A. Dr. Kleidon's Study

Dr. Kleidon, a financial and economic consultant who holds a Ph.D. and M.B.A. from the University Chicago, conducted two types of analysis in his event study, which he conducted in the typical manner.[32]  *See In re Freddie Mac*, 281 F.R.D. at 178; *see* White Ex. 31 ¶ 1.

Dr. Kleidon identified all dates on which "corrective" information was disclosed to the market; he found 11 dates. White Ex. 31 ¶ 50.  To do so, he considering all events cited in the SCAC's "Post-Offering Events" section, as well as additional events and announcements that the SCAC referenced but did not characterize as "corrective." *Id.* ¶¶ 41 n. 43, 50–51; SCAC ¶¶ 211– 223; White Dec. 16, 2016 Ex. 5 (Kleidon Surrebuttal Expert Report) at 77–78, 180–81; *see also*

---

[31] In assessing reliability under Rule 702, courts may consider "(1) whether [the expert's] theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004) (internal quotations and omitted) (quoting *Daubert*, 509 U.S. at 593–94).

[32] Specifically, Dr. Kleidon used linear regression analysis and a control index that included peer firms over the period of April 8, 2008 to March 24, 2009 (the "Analysis Period") to isolate those portions of Series 5 price movements that could not be attributed to general market and industry effects, and instead, may be related to Barclays-specific information. White Ex. 31 ¶¶ 43, 46. After controlling for market effects, Dr. Kleidon tested the remaining price movements (*i.e.*, the residual returns) for statistical significance; these changes may indicate the existence of previously undisclosed, material, Barclays-specific information. *Id.* ¶ 43. He did so using a "standard 95% confidence interval" to measure the expected range of normal price volatility and account for random movements, thus "identif[ying] days on which the security price increased or decreased by significantly more than would have been predicted by market and industry factors." *Id.* ¶¶ 43–45. Price changes outside of the confidence interval are statistically significant. *Id.* ¶ 44. In other words, Dr. Kleidon was 95% sure that price changes outside of the confidence interval did not stem from normal price movements. *Id.*

ECF 207 at 7–8. His analysis of these 11 days found only one with a statistically significant residual return (October 13, 2008) – and on that day, when Barclays announced it would seek to raise Tier 1 capital, the price *increased* from $9.10 to $13.87. White Ex. 31 ¶ 50.

Dr. Kleidon also identified all dates with with statistically significant residual returns, of which there were 10; 7 of these were negative. *Id.* ¶ 50; *see also* ECF 207 at 8–9. He searched the Factiva database for Barclays-related news on those 10 days, as well as the immediately prior and subsequent trading days. *Id.* ¶ 62 n. 56. As explained above, only one of these 10 days coincided with disclosure of allegedly corrective information; and that day saw a price *increase*. *See id.* ¶ 50.

From this analysis, Dr. Kleidon opines:

> [T]here were no statistically significant price declines in the Series 5 ADS during the Analysis Period on any days when (i) any allegedly corrective information was disclosed to the market, or (ii) any allegedly undisclosed risk materialized. Moreover, all statistically significant price declines in the Series 5 ADS during the Analysis Period occurred on days when (i) there was no allegedly corrective information disclosed to the market, and (ii) no allegedly undisclosed risk materialized. Based on my analysis, the price declines during the Analysis Period are not attributable in whole or in part to any of the alleged misrepresentations.

*Id.* ¶ 107.

### B. Plaintiff's *Daubert* Motion

Plaintiff contends that Dr. Kleidon's event study and methodology are unreliable and flawed; and fail to comply with Fed R. Evid. 702.[33] *See* ECF 177.

Plaintiff's chief argument is that event studies are "not capable of" "prov[ing] the absence of causation," and "the lack of a statistically significant residual return provides no scientific

---

[33] The *Daubert* motion also claims that the part of Dr. Kleidon's report providing background on the global financial crisis is an impermissible "factual narrative," irrelevant to his opinions. *Id.* at 24. This argument is irrelevant to the Court's instant determination of negative loss causation and is not addressed herein.

basis to conclude that no causation exists." ECF 177 at 13–14. Accordingly, Plaintiff contends that Dr. Kleidon erroneously limited his analysis to the 10 statistically significant residual return days and the 11 days on which allegedly corrective information was disclosed to the market. *Id.* at 15.

This argument is unpersuasive. Event studies are "accepted methodology[ies]." *See In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 411 (D. Conn. 2010). Indeed, the Second Circuit now considers them "standard operating procedure." *Vivendi*, 838 F.3d at 253–54. Dr. Kleidon employed a standard methodology for conducting event studies. *Compare* White Ex. 31 ¶¶ 43–46 *with In re Freddie Mac*, 281 F.R.D. at 178 (setting forth materially similar definition of event study methodology as that used by Dr. Kleidon) *and Goldkrantz*, 1999 WL 191540, at *4–5 (granting defendants summary judgment on negative loss causation affirmative defense where expert examined statistically significant residual returns identified by "'standard' 95% confidence interval," used index of peer stock firms, and assumed market efficiency; and plaintiff's expert "conducted no independent statistical analysis" of defendant's stock).

Plaintiff's contention that Dr. Kleidon "ignores" news disclosed on a "majority of trading days" during the Analysis Period, thus overlooking potentially corrective disclosures – *i.e.*, the 107 statistically insignificant residual price decline days that Dr. Kleidon did not analyze – is misplaced. [34] ECF 177 at 15. A typical event study identifies statistically significant residual price movement dates. *See In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 n.10 (S.D.N.Y. 2009). Consistent with this standard method, Dr. Kleidon analyzed statistically

---

[34] These arguments are also set forth in Plaintiff's opposition, wherein he similarly concludes that Dr. Kleidon cannot prove that the declines on those 107 days "'represent[] other than the depreciation in value of' the Series 5 shares due to Plaintiff's claims." Pl. BD Opp. at 28 (quoting 15 U.S.C. §77k(e)); *see id.* at 31–32. Plaintiff points to Mr. Coffman's "examples of several dates [among those 107 days] on which potentially corrective information was disclosed." Pl. BD Opp. at 28 n.26. As discussed herein, these additional disclosures are not corrective as a matter of law. *See supra* Part. I.c.i.

significant residual return dates; he "had a sound basis for concluding the other dates were not relevant and therefore did not comprehensively review them. As to [Plaintiff's] contention that he missed . . . dates when news was disclosed" about the alleged misrepresentations, Dr. Kleidon and Mr. Coffman "simply disagree whether the disclosures made on other dates were materially less informative, in both quality and depth." *In re Xerox Corp.*, 746 F. Supp. 2d at 411.

Also unconvincing is Plaintiff's argument that Dr. Kleidon's failure to determine and disclose the "Type II" error rate "renders his methodology completely unreliable and unhelpful to the factfinder."[35] ECF 177 at 19. Dr. Kleidon used a 95% confidence rate, and disclosed a Type I error rate of 5%. White Ex. 31 ¶ 44; *see* White Dec. 16, 2016 Ex. 5 (Kleidon Dep.) at 157–58. Putting aside the fact that Type II error rates appear irrelevant here, *see* ECF 207 at 17, failure to disclose a Type II error rate does not warrant exclusion of an event study. *See Carpenters*, 310 F.R.D. at 95 (declining to exclude event study even where expert's findings "do not rule out either Type I or Type II errors").

Plaintiff's remaining arguments challenge Dr. Kleidon's assumption of market efficiency; selection of news sources; and control index. *See* ECF 177 at 16–24; *see generally* Nirmul Ex. 4. These all go to the weight, not the admissibility, of Dr. Kleidon's testimony; and the Court declines to exclude his testimony on such grounds. *See Olin Corp v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 133–34 (2d Cir. 2006).

Dr. Kleidon reasonably assumed market efficiency. The Series 5 ADS were traded on the New York Stock Exchange ("NYSE") throughout the entire class period, and analysts closely followed Barclays, an enormous financial institution. *See Lapin v. Goldman Sachs & Co.*, 254

---

[35] Type II errors are "when a study incorrectly fails to reject a null hypothesis." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015). "Type I errors are when a study incorrectly rejects a null hypothesis." *Id.*

F.R.D. 168, 183 (S.D.N.Y. 2008) (NYSE is an efficient market). Moreover, Dr. Kleidon's declaration opposing the *Daubert* motion states that his conclusions would remain the same even if the one-day event window used to measure statistical significant were increased to a 20-day window. Kleidon Decl. ¶ 6.

Plaintiff contends Dr. Kleidon's news search protocol was improper because his "search for 'corrective information,'" using the Factiva database, "ignored key news sources, including *Reuters* and the *Associated Press*." ECF 177 at 21. This argument is unavailing; the Court is convinced that news appearing in these publications would likely have appeared in Factiva, a "global news database of nearly 33,000 premium sources." *Products: Factiva*, Dow Jones, https://www.dowjones.com/products/factiva. Regardless, Dr. Kleidon "necessarily" had to use his "discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis . . . Put differently, 'identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations.'" *McIntire*, 38 F. Supp. 3d at 429 (citations and quotations omitted).

Finally, Dr. Kleidon's control index used to calculate residual returns, which included peer banks, is reliable and not improper on its face. Plaintiff's arguments to the contrary are speculative and insufficient to exclude Dr. Kleidon's testimony.[36] *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94-CV-5587 (PKL/RLE), 2000 WL 310352, at \*9–10 (S.D.N.Y. Mar. 24, 2000) (finding "industry index of comparable securities" appropriate).

---

[36] Plaintiff contends that Dr. Kleidon's control index was improper because "it is likely that the securities of these banks would have reacted negatively to information that *also* informed *Barclays* shareholders of the severity of losses suffered by these other firms." ECF 177 at 22.

Dr. Kleidon's opinions are admissible. The event study is based on "reliable principles and methods" and "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. It is clearly relevant: it "has a tendency to make [negative causation] more . . . probable than it would be without [it]." Fed. R. Evid. 401(a).

### iii.    Barclays is Entitled to the Negative Loss Causation Affirmative Defense

In addition to the Series 5 ADS prices, which alone convincingly illustrate no loss causation, the Court also finds the results of Dr. Kleidon's event study persuasive.

For all the reasons previously described, Barclays has adduced compelling evidence that the alleged misrepresentations did not cause the Series 5 ADS price declines; and Plaintiff has failed to present material issues of fact "suggesting that [the Series 5 ADS] price decline actually resulted from the alleged misstatement." *Akerman*, 810 F.2d at 343. Barclays has provided sufficient evidence to establish the negative loss causation affirmative defense under Section 11; and Plaintiff has adduced insufficient evidence to the contrary. The Court determines that there is no "causal connection between the [alleged] misrepresentation and the drop in the value of the security." *In re State St.*, 774 F. Supp. 2d at *595. The alleged misrepresentations in the Series 5 Offering did not cause the Series 5 ADS price declines.

### II.    Underwriters

Underwriters dispute that the Offering Materials contained a material misstatement or omission; and also seek summary judgment based on Section 11's affirmative "due diligence" defense. *See* ECF 189 at 1 n.1; ECF 223; 15 U.S.C. § 77k(b)(3). Since the Court finds that the Series 5 Offering Materials did not contain any actionable misrepresentations under Section 11, there can be no liability. *See* 15 U.S.C. § 77k(a). The Court thus declines to reach Underwriters' affirmative due diligence defense, and grants Underwriters' motion for summary judgment.

### III. Section 15 Claims

"To establish [section] 15 liability, a plaintiff must [first] show a 'primary violation' of [section] 11." *Hutchison*, 647 F.3d at 490. Since Plaintiff's Section 11 claims are not actionable, the Court concludes that Plaintiff's Section 15 "control person" claims fail for lack of a primary violation. *See id.*; 15 U.S.C. § 77o.

## CONCLUSION

The Court GRANTS Barclays' and Underwriters' motions for summary judgment (ECF 181 and ECF 183); and DENIES Plaintiff's motion to exclude expert the opinions of Allan W. Kleidon, Ph.D. (ECF 175). The Clerk of Court is directed to enter judgment in favor of Defendants, terminate all open motions, and close this action.

Dated: New York, New York
      September 13, 2017

SO ORDERED

PAUL A. CROTTY
United States District Judge